1              IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF SOUTH CAROLINA

2                   CHARLESTON DIVISION

3

   UNITED STATES OF AMERICA     :     VOLUME I

4                       :

          vs.              :

5                       :

   MARTIN LOUIS BALLARD        :     2:12 – CR – 232

6

7

8        Trial commences in the above-captioned matter on

9   Tuesday, May 5th, 2015, commencing at 10:17 a.m., before

10  the Hon. Sol Blatt, Jr., in the United States Courthouse,

11  Courtroom III, 81 Meeting St., Charleston, South Carolina,

12  29401.

13

14

   APPEARANCES:

15

                 JULIUS N. RICHARDSON, ESQUIRE,

16              PETER T. PHILLIPS, ESQUIRE, Office of the

                 U.S. Attorney, P.O. Box 978, Charleston, SC,

17              appeared for the Government.

18              JERRY N. THEOS, ESQUIRE and

                 PHILIP R. HAMMOND, ESQUIRE, P.O. Box 399,

19              Charleston, SC, appeared for defendant.

20

21

22

          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR

23      Official Court Reporter for the U.S. District Court

                     P.O. Box 835

24               Charleston, SC  29402

                   843/723-2208

25

1                              I N D E X

2

3      WITNESS:  JOHNNY EVANS

4      Direct Examination by Mr. Richardson......................  54
       Cross-Examination by Mr. Theos...........................  73
5      Redirect Examination by Mr. Richardson...................  89
       Recross-Examination by Mr. Theos.........................  95

6

7      WITNESS:  MARION MACK

8      Direct Examination by Mr. Phillips.......................  98
       Cross-Examination by Mr. Theos...........................  99
9      Direct Examination by Mr. Phillips.......................  99
       Cross-Examination by Mr. Theos........................... 121

10

11     WITNESS:  NORMAN ROBINSON

12     Direct Examination by Mr. Phillips....................... 154
       Cross-Examination by Mr. Theos........................... 177

13

14

15

16     EXHIBITS:                       Received in Evidence

17     Government Exhibits 2 - 25                65
       Government Exhibits 30-38                 65

18

19

20

21

22

23

24

25

1          (Jury not present.)

2               THE COURT:  All right, Mr. United States Attorney.

3               MR. RICHARDSON:  Thank you, Your Honor, just to

4     begin, if you will, this is the case of United States versus

5     Martin Ballard, Criminal No. 12-232.  And we're here for the

6     trial of Mr. Ballard.

7          I do want to begin by telling Your Honor that Mr. Kittrell

8     expresses his regret for not being here; he had a family

9     emergency and was called away to the hospital about an hour

10    ago.  And so he will not be with us this morning, but we hope

11    that he will join us again tomorrow.

12         (Discussion held off the record.)

13              THE COURT:  All right, sir.  Well, is the Government

14    ready to proceed?

15              MR. RICHARDSON:  We are, Your Honor.

16              THE COURT:  All right, sir.

17              MR. THEOS:  Morning, Judge.

18              THE COURT:  Is the defendant ready to proceed?

19              MR. THEOS:  We are, Judge.

20              THE COURT:  I'd like to ask Mr. Ballard one question.

21    We went over this business of a bench trial -- I don't need to

22    swear him, you can stand there.  We went over this business,

23    all of the information about a bench trial the other day; you

24    recall that?

25              THE DEFENDANT:  Yes, sir.

1          THE COURT:  And you were under oath and you answered

2    the questions that I asked you, and I've had it transcribed

3    and read it again myself.  And it seemed to me that, without

4    question, you did want to waive your right to a trial by jury

5    and have your trial by the Court.

6          There's been no change since then, has there?

7          THE DEFENDANT:  No, sir.

8          THE COURT:  All right, sir.  All right, you can be

9    seated.

10         All right, then, Mr. Richardson, you can proceed.

11         MR. THEOS:  Your Honor, there are a few pretrial

12   matters that I'd like to bring to the Court's attention, maybe

13   you can give us some guidance or some assistance.

14         First of all, Judge, there are a number of witnesses that

15   we would like to subpoena as in our case in chief.

16   Unfortunately, we don't have their addresses.  Most of those

17   witnesses are co-defendants in the case, or they were

18   co-defendants in other cases.  And I understand the U.S.

19   Attorney's office may not have that information in hand, their

20   addresses or whereabouts.  My understanding is that Probation

21   has that information, but they are reluctant to turn that

22   information over to us because of confidentiality purposes.

23         So what we're asking is that the Court order Probation,

24   U.S. Probation Office to provide those addresses to us,

25   whether they're incarcerated locally or in one of the county

1    detention centers or in the federal system or they are

2    residing elsewhere.

3             THE COURT:  Do you need this information -- When do

4    you need this information?

5             MR. THEOS:  Your Honor, I've spoken with the U.S.

6    attorneys about this.  We don't anticipate that we will

7    present our case until probably midweek next week.  So it's

8    not urgent, but I'm bringing it to the Court's attention

9    because we do need to have those individuals served with a

10   subpoena.  To the extent they may be incarcerated --

11            THE COURT:  I understand they may be in jail

12   somewhere, and they may be in New York, I don't know where

13   they are.  And so I understand you need them, but you don't

14   need an order, I gather, to have them here tomorrow.

15            MR. THEOS:  No, sir.  And, Your Honor, we provided a

16   list to the U.S. Attorney's office of those witnesses.  We

17   also filed it with the Court.

18            THE COURT:  I saw this 15 on that list.

19            MR. THEOS:  Some of them may be incarcerated, some of

20   them may not be.

21            THE COURT:  Well, Mr. United States Attorney, I think

22   it would be a good idea for you to -- with somebody who knows,

23   because I don't know if you know where they are.

24            MR. RICHARDSON:  We don't, Your Honor.  A number of

25   individuals, I think everybody knows where they are.  Jimmie

Harris, for example, is listed on there, he's a co-defendant
in this case, I think everybody is aware where Mr. Harris is.
A number of individuals were defendants in cases that are not
part of this matter, that were previously prosecuted and that
had finished serving whatever incarceration that they finished
serving.  At that point we don't know where they are.
Probation, for some of them, may know where they are, I'm not
sure, I obviously don't speak for Probation.  But I think
Probation may have that information.  I think Probation is
concerned, for good reason, about providing the addresses of
individuals who are cooperating against Mr. Ballard.

          THE COURT:  I understand.  I understand that.  I just
wondered, of the 15 on this list, that's the people you're
talking about, isn't it?

          MR. THEOS:  Yes, sir.

          THE COURT:  How many of the 15, Mr. United States
Attorney, do you know of their location or do you know --

          MR. RICHARDSON:  The vast majority of them, Your
Honor, are not in federal custody.  I can't give you an exact
breakdown, but my understanding is that we conveyed to
Mr. Theos the individuals that were not in custody, or the
belief that they were not in custody, such that we don't have
them.  We don't know where they are.  We, just like Mr. Theos,
could go to Probation and try to figure out where they are,
but I don't have that information.  I don't know it.

MR. THEOS:  Your Honor, I'm not interested in what
their addresses are, I just want to make sure they are served
with the subpoenas so that they are compelled to come to
court.  Whether the marshal service serves them, an
independent process server serves them, we don't need
personally that information.  I understand the concerns of the
Government.

THE COURT:  I do, too.  But if you prepare -- Are the
subpoenas prepared?

MR. THEOS:  They are.

THE COURT:  Well, first of all, they've got to be
served with the subpoena.  And I assume the only way that
somebody, if they're in custody, can be served with a
subpoena, the Marshal Service would have to do that.  Just
serve the subpoena, that's the main thing.

MR. THEOS:  Yes.

THE COURT:  Then come in and getting here, that's a
different story entirely.  You see, I don't, the Court
doesn't, of course, know how many of the 15 are incarcerated
and would have to be served by the United States Marshal
Service.

MR. THEOS:  Judge, I don't know which are
incarcerated and which are not.

THE COURT:  Well, you tell me you think Probation
knows.

1    MR. THEOS:  I assume Probation would have that

2  information, because even the ones that are not incarcerated,

3  my understanding is that most, if not all, are on supervised

4  release, so Probation would certainly have that information.

5    THE COURT:  Mr. United States Attorney, have you got

6  any suggestions before I --

7    MR. RICHARDSON:  Your Honor, I don't really have a

8  suggestion.  We don't know where they are, and so I don't --

9  I'm not sure what we can do to assist.  We --

10    THE COURT:  I don't know that you can.  I guess I

11  better get the head of the Probation department, our Probation

12  office, and give her this list that we're looking for, and see

13  if Probation, without being where they are, if they know -- if

14  they know where they are.  If they know where the 15 are, they

15  could let us know how many are incarcerated, without giving

16  names, and how many aren't.  Then we'd have to make some

17  arrangements to get those that are incarcerated served.  If

18  they're just on the street, not -- if they're not still under

19  supervised release, I don't know that Probation, Mr. Theos,

20  would know where they are.  And you say they're all under

21  supervised release.

22    Do you know, Mr. Marshal?

23    THE MARSHAL:  Your Honor, we serve subpoenas all the

24  time.  The only question we would have is who is going to pay,

25  since he's retained.

1          THE COURT:  I can't hear you.

2          THE MARSHAL:  We serve subpoenas all the time, Your

3     Honor.  The only question the Marshal Service will have is who

4     will pay for the service, since he's retained.  Generally

5     there's a fee that the defense --

6          MR. THEOS:  Actually, I'm appointed.

7          THE MARSHAL:  Okay.  If he's appointed, you issue an

8     order for us to serve the subpoenas, we'll serve them.

9          THE COURT:  We have to find out who he --

10         THE MARSHAL:  We'll find out, Judge.

11         THE COURT:  That takes care of just the issue of your

12    subpoenas.  He'll tell you how many he's going to serve.

13         MR. THEOS:  Thank you.  Okay.

14       Your Honor, if I may, there are -- there's some discovery

15    issues, and I've spoken with the U.S. Attorneys, I've spoken

16    with them yesterday afternoon, I also spoke with Mr. Phillips

17    this morning.  We are continuing to receive discovery

18    materials, and we actually received discovery materials, I

19    think the latest of which was about 4:15 this morning.  This

20    case has been going on for three years.

21         THE COURT:  You received discovery materials at

22    4:15 this morning?

23         MR. THEOS:  Yes, sir.  And I understand that it was

24    related to --

25         THE COURT:  The Court is impressed with the fact that

1    you were up at 4:15.

2              MR. THEOS:  I can't say that I was up at 4:15.

3              MR. RICHARDSON:  Mr. Phillips was up, Your Honor, not

4    Mr. Theos.

5              MR. THEOS:  I didn't get up till 5:30.  But I saw it.

6    And it was sent at 4:15 or 4:16, so I commend Mr. Phillips on

7    his dedication.

8              THE COURT:  And his diligence.

9              MR. THEOS:  His diligence and dedication.  But, Your

10   Honor, we have been provided from Friday, Saturday, Sunday,

11   Monday, this morning, with additional discovery.  And I

12   understand there may still be some outstanding discovery that

13   the Government intends to share with us.  The problem, as you

14   can well imagine, Mr. Ballard is on trial, the potential

15   sentence, if he's convicted, is life imprisonment, mandatory

16   life imprisonment.  So for us to receive information not just

17   on the eve of trial, but the morning of trial, puts me in a

18   heck of a position to review it, analyze it, digest it, and

19   then continue to prepare for the trial in the meantime.

20       So I guess my question is what other discovery is there

21   outstanding, number one.  And number two, there's still some

22   matters that we requested continuously and we still don't

23   have.  And I can read those matters to the Court, but we've --

24             THE COURT:  Let's get -- before we get to that, let's

25   find out how you discovered what you sent him.

1          MR. PHILLIPS:  Your Honor, this morning I sent a

2     summary from meetings that we had with witnesses late last

3     week.  So I -- you know, preparing for trial, we meet with the

4     witnesses, if there's something either they clarify or if it's

5     information that wasn't in the report that they -- new

6     information, I provided a summary of that.  So that

7     information was -- we didn't have until recently, because

8     that's when I was able to meet with witnesses.

9          And I don't think there's -- I mean, that's every trial

10     I've ever had, that comes from both sides, civil and criminal,

11     you know, as you prepare witnesses, new information comes.

12     Obviously if something doesn't match what the report says, we

13     disclose it so that they're aware.  And what the witness has

14     to say about that.  So that's what was sent this morning

15     early, and I went back through my notes, made sure I had

16     everything and sent that.  And those are for witnesses that

17     are testifying tomorrow, and maybe another one another day.

18          And, you know, I have -- we have some other witnesses that

19     are just coming into town from BOP that we haven't met with,

20     and they met with agents months ago, years ago.  We're going

21     to sit with them; obviously after that meeting with them we'll

22     provide any new information that they may have provided or

23     anything that is not consistent with a prior report.  So

24     there's nothing we can do about that.  We meet with them, you

25     know, and we provide the information as soon as we get it.

1       Another thing that I sent yesterday as I was, you know,

2  preparing for each witness, just going back through to make

3  sure there was nothing missed, I saw there was a summary for

4  Norman Robinson of his bond violations, and I thought that

5  could conceivably be impeachable material.  So I sent the

6  summary, it's a letter that the Probation sends to the Court.

7  That was sent, I think our office got it in January, but it

8  was just one of those things that -- all that, he's in this

9  case, and all of the warrants and the fact that he violated

10 his probation, all that was public record, that's on ECF in

11 this case.  But this provided a summary of his violations,

12 which were drug testing and then what he got violated and

13 revoked on his bond.

14      And then as far as I am concerned, I am -- they've been --

15 for Gernardo Cato, it's a defendant that's probably going to

16 testify tomorrow, he was out on bond, and then he got indicted

17 and was arrested.  The story about all that, which they may

18 want to try to impeach him with, they have reports that I

19 think outline that.  And I've offered to provide anything

20 else -- He didn't show up to a sentencing and then got

21 arrested after he was involved in some illegal activity in

22 going -- instead of going to the sentencing.  They should have

23 all that information.

24      But I'm trying to see, I'm checking with Probation to see

25 if, you know, there's a summary of any other bond violations

1    that may have been out there, and this was three or four years

2    ago when he was prosecuted in three separate cases.

3         THE COURT:  Well, let's do this.  If you come across

4    something that you furnish them late, I mean, right into the

5    trial or the day before they're going to examine a witness,

6    and it interferes with your ability to do it promptly, I'll

7    give you time to get ready.

8         MR. THEOS:  Thank you, Judge.

9         THE COURT:  That's the best thing to do, then you

10   don't have any reason that would bother you.

11        MR. THEOS:  I don't disagree, I just want to make

12   sure that I have it in sufficient time to --

13        THE COURT:  Well, if you're not satisfied that you

14   get it in sufficient time, and you have a valid reason with

15   which the Court agrees, you'll have time to go over it.

16        MR. THEOS:  Okay.  Thank you, Judge.

17     And I will provide -- I mean, I can make it a part of the

18   record, I can just provide counsel with the documents that are

19   still outstanding.

20     A few of these things that we've asked for, we don't yet

21   have.  I understand, according to Mr. Phillips, they're --

22   that information may not exist, and/or they may not call those

23   witnesses to trial, or they will be provided.  So it's to the

24   extent that something is going to be provided, for instance,

25   related to Marion Mack, who I understand the Government

1  intends to call today, whether they get to him or not, I don't

2  know, I would just, again, once I receive that information, I

3  will ask the Court at that time.

4          THE COURT:  All right, sir.

5          MR. THEOS:  One second, Your Honor.

6      (Brief interruption in proceedings.)

7          MR. THEOS:  That's all at this time, Your Honor.

8          THE COURT:  All right, sir.  Does the Government have

9  anything more?

10         MR. RICHARDSON:  No, Your Honor, I think we're ready

11  to proceed.

12      I apologize, we're trying to work some things out that

13  will alleviate some concerns for the Court.

14         THE COURT:  I have plenty of time for you to work

15  something out, so don't worry.

16      (Discussion held off the record.)

17         MR. THEOS:  Your Honor, the only other thing that I

18  would bring up is that it's my understanding that the

19  Government submitted a trial brief.  I know that trial

20  briefs -- I understand that a trial brief is not necessarily

21  mandatory or required, but my understanding is that the

22  Government did submit a trial brief.  I want to just voice my

23  objection to the submission of that trial brief to the Court.

24  And normally when we have a situation like this, I think we'd

25  all agree that this is a little bit of an unusual situation

because it's a bench trial rather than a jury trial.  The problem in submitting a trial brief to the Court, and I don't know whether you've had an opportunity to read it or not, Judge, but in the trial brief it doesn't just lay out the Government's theory and who the witnesses are and what the evidence to be submitted may be and who their expert witnesses are and what they might testify regarding, and what the legal issues -- what legal issues may arise during the trial.  But it is an argument by the Government as to their case.  It presents the facts in an argumentative fashion that indicates why their position should be accepted by the Court, why their witnesses should be believable, why their legal arguments are sound, and why any rulings associated with those legal issues should be ruled upon favorably.  And we believe that that's an improper submission to the Court.

Now, I received a copy of it Thursday afternoon.  I didn't realize that it had been forwarded to the Court until just now, because it wasn't filed, apparently wasn't filed.  So I don't -- I just realized, I just found out that it was actually provided to the Court.  And again, this is an unusual situation, but the analogy I would draw is you're the fact finder in this case, you're not only the judge regarding the law, but you're the judge of the facts, you're the fact finder.  And I believe that, you know, there is a risk of -- not that I don't have confidence, Judge, that you can

1    differentiate and separate the two, but I believe there's a

2    risk that it would taint you as the fact finder.  And I bring

3    that to the Court's attention because I've never been in this

4    situation before.  But it would be analogous, in my opinion,

5    to forwarding a trial brief to the prospective jurors that

6    would be sitting on the trial, because you are sitting in the

7    shoes and in the seat of the fact finder as well.

8         So hopefully you haven't read it, Judge, but I would ask

9    that it not be -- I ask it be made part of the record, first

10   of all.  And I would also indicate my objection to it being

11   submitted as well on hearsay grounds, because what has been

12   presented may or may not be admitted into evidence.

13        So I think that there's a risk that it is unduly

14   prejudicial, especially when it's submitted to the fact finder

15   prior to the commencement of the trial.

16             MR. RICHARDSON:  Your Honor, it was provided to your

17   staff on Thursday.  In the very communication that provided it

18   to your staff, was copied Mr. Theos and his counsel, Philip

19   Hammond.  So certainly the Government was making them aware

20   that it was following the standard practice that at least that

21   I follow in filing a trial brief in every trial that I do.

22   And the statements in that trial brief are statements of the

23   Government as attorneys.  And, you know, it's axiomatic that

24   those statements are not themselves evidence, the evidence we

25   will hear from the jury box and see in exhibits.  But it is a

1    statement in a trial brief, well provided for by the rules,

2    encouraged by the courts, I believe.  I have found them to be

3    very helpful.  And I think the factual statements in it are no

4    different from an opening statement, which we will give here

5    in a little bit, describing what the Government anticipates

6    the evidence will show.  What the evidence does show, which

7    will obviously be for Your Honor to consider, will be what

8    your decision is made on.

9         But certainly there's no problem, and indeed, it's

10   authorized and encouraged by the general rules and the local

11   rules that the Government and all parties provide trial

12   briefs.  So we did so here.  When it was provided on last

13   week, defense counsel made no objections to it then, made no

14   objections to our submission to the Court.  And so we think it

15   is entirely appropriate that Your Honor consider the

16   information in it, and particularly have available for it the

17   legal arguments that we set forward establishing, you know,

18   the evidentiary issues that we think might arise.  Not sure

19   whether they will arise or not, depends where the case goes.

20   But we provided that, it's helpful to the Court, it's plainly

21   authorized by the rules.  Nothing that they have suggested,

22   cited or otherwise argued, gives the Court any reason to

23   disregard an accepted practice of the Court.

24        We think Your Honor can rely on it, to the extent you find

25   it helpful; to the extent you don't find it helpful, you're

1    not going to rely on it.  But it itself is not evidence, and

2    we think it is perfectly permissible.

3            THE COURT:  Mr. Theos, I think it's a little

4    different than giving it to a jury, because the Court is

5    knowledgeable, supposedly, about what it can consider and what

6    it can't.  For instance, you know, I tell every jury that a

7    lawyer's statement isn't evidence when they go to make their

8    opening argument, or closing argument.  And I'm going to --

9    I've got it, and the -- I haven't read it closely, I glanced

10   over some of the legal issues, that was what I was concerned

11   with.  But what the factual issues that may be set forth in

12   here, the Court's not going to consider that until it's

13   presented to the Court by a witness.  And they say a witness

14   said -- if this trial brief quotes a witness, I'm not going to

15   consider that.

16        Now, if the witness testifies, I will consider it, not

17   because it's in this trial brief, because it's evidence from

18   the stand.

19        Now, I could see your argument that if you gave it to a

20   jury, they may not understand the difference, but I do.  And

21   so I don't think the trial brief has done anything except in

22   legal -- particularly in legal issues that it raises, help --

23   may be a benefit to the Court.  And certainly you have the

24   right to submit anything that you want to submit of a similar

25   nature.  If you want to submit something, you can do so.

1     MR. THEOS:  I understand, Judge.  Again, I didn't

2   realize it was submitted to the Court until a few minutes ago

3   when I asked Mr. Richardson.  So I understand your ruling.

4     THE COURT:  Now, if you want to, so your -- you made

5   some mention about part of the record; I didn't understand

6   what you said.  Whether you wanted to make it a part of the

7   record or you didn't want to make it a part.

8     MR. THEOS:  Your Honor, I would just ask it be marked

9   as Court's exhibit.

10     THE COURT:  All right, sir, we'll mark it as Court's

11   Exhibit 1 so we'll know what you're talking about if you talk

12   about it later.

13     MR. THEOS:  Yes, sir, thank you.

14     THE COURT:  All right, now, is there anything else?

15     MR. THEOS:  The only other thing, Your Honor, is I

16   would ask -- we want the witnesses sequestered, of course.  I

17   assume the Government would want the same thing with respect

18   to our witnesses.  And I believe that there are a number of

19   witnesses, at least I see a couple that are in the courtroom

20   now, that even for opening statement I would ask that the

21   witnesses be sequestered.

22     MR. RICHARDSON:  Your Honor, we agree with

23   sequestering the witnesses.  The only exception we provide to

24   that are, as is common, are for case agents.  And so --

25     THE COURT:  You're entitled to have your case agent.

1         MR. RICHARDSON: Right. So in that regard, John

2 Jeffer, Steve Migioia would be the two witnesses or the two

3 case agents, one is from DEA and one is from ATF. Mr. Evans,

4 who is in the back, will step out prior to testimony. We

5 don't think there's any -- we don't really care whether

6 they're here for opening or not; either way suits us.

7         THE COURT: And any witnesses that -- of course, that

8 applies to the defendant, too.

9         MR. THEOS: Certainly, Your Honor. And we do have a

10 witness list. I'm not sure if any of these folks are on the

11 witness list.

12         THE COURT: If you have anybody in here, they need to

13 be out. The Government has anybody in here, they need to be

14 out.

15     (Defendant's witness list was read aloud.)

16         THE COURT: Apparently you don't have any.

17         MR. THEOS: We don't have any. I assume the

18 Government, other than Mr. Migioia and Mr. Schroepfer, are the

19 only ones, and Mr. Evans, you said will be --

20         MR. RICHARDSON: He's already stepped out. Mr. Evans

21 has already stepped out.

22         THE COURT: What's your question, Mr. Theos?

23         MR. THEOS: I just wanted to make sure the Government

24 checked on its witnesses as all.

25         THE COURT: Two just came in.

1           MR. RICHARDSON:  We're going to check on that, Your

2    Honor.  To the extent there's an issue, we'll resolve it.

3        (Interruption in proceedings.)

4           MR. RICHARDSON:  None of those appear to be on either

5    side's witness list at this point.

6           THE COURT:  All right, sir.

7           MR. RICHARDSON:  We'll make every effort, Your Honor,

8    to ensure that the individuals that are --

9           THE COURT:  Is somebody going to answer the door when

10   people walk in and out?

11          MR. RICHARDSON:  We'll ask one of the agents to just

12   keep an eye and make sure as people come in and out that

13   they're aware of that limitation.

14          THE COURT:  All right, sir, anything else, Mr. Theos?

15          MR. THEOS:  No, sir.

16          THE COURT:  All right, sir.  Now, are you ready to

17   begin?

18          MR. RICHARDSON:  We are, Your Honor, we would begin

19   with sort of a brief opening statement for Your Honor, maybe

20   not quite as involved as we would do before a jury, then we'd

21   proceed to our first witness, who will be Special Agent

22   Schroepfer.

23          THE COURT:  I'm ready.

24          MR. RICHARDSON:  May it please the Court.  Your

25   Honor, Mr. Kittrell had prepared an opening for Your Honor

1    with great oratory flare.  I regret in the last hour getting

2    ready to talk to you, I've not done that, but I hope you'll

3    bear with me.  Giving you in hopes the sort of brief preview

4    of what the Government's going to establish, from the witness

5    stand as well as the exhibits that you're going to see.

6         In doing so, I want to hit on a handful of the

7    highlights of how the case began, how Mr. Ballard became

8    involved in this drug conspiracy, how he became aware of his

9    involvement in the drug conspiracy.  And then, in large part,

10   the focus of the case, which is going to be the attempted

11   murder of Ivory Brothers on June the 6th, that Mr. Ballard

12   orchestrated while he was in custody.

13        So I want to just walk through those briefly to give Your

14   Honor an overview of where we think the case is going to go,

15   and the evidence that you're going to hear.  This

16   investigation began with SLED Agent J.J. Evans, he's a

17   Walterboro boy, born and raised there, and he works for SLED.

18   And he got word about individuals selling large amounts of

19   crack cocaine in his hometown of Walterboro.  And he started

20   an investigation there along with local law enforcement

21   officers, and they started by looking into Ivory Brothers, who

22   ultimately becomes the victim who was shot in this case.  But

23   they started off by doing controlled buys of crack cocaine

24   from Ivory Brothers.

25        They did that in January, January 20th, January 27th, they

did it again on March the 31st, and then on I believe May the 4th they bought between a half ounce and ounce quantities of crack cocaine.

In doing that, they fairly well established that Mr. Brothers was involved in the drug trade, an issue I don't think there will be much dispute about before Your Honor.

But the next step, as Your Honor's familiar with, an investigation is to find out where Mr. Brothers was getting the crack cocaine and cocaine from.  So they did a number of things to do that.  They started off, they found out what car Ivory Brothers was driving, and it was a gold Cadillac Seville, and they put a tracker on it, a court authorized tracker, to see where Mr. Brothers was going.

They also talked to --

THE COURT:  What did the Supreme Court hold about that just recently, said you couldn't do it anymore, didn't they?

MR. RICHARDSON:  What they said is you have to have a court order.  They used to, pre-Jones, so three or four years ago, the Government was able or believed it was able, based on case law, to slap a tracker on without a court order.  We now need to come to the Court, be it Your Honor or a magistrate.

THE COURT:  I knew the Supreme Court had done something.

MR. RICHARDSON:  That was Jones decision.  But in

1    this case they got a court order before they put the tracker

2    on, and they were able to see Mr. Brothers was going to the

3    area where Martin Ballard dealt.  All right?  It's an area

4    over -- you'll hear the name a lot -- Ancrum Lane, Burr Hill,

5    those are the names you'll sort of hear, there's a Bi-Lo

6    parking lot right down off Old Orangeburg Road.  You'll hear

7    about those, because that's where -- that was Mr. Ballard's

8    area.

9        So they see that that's where Mr. Brothers is going.  That

10   gives them the idea that Mr. Brothers' supplier is Martin

11   Ballard.  But they need to confirm that.  So they come to Your

12   Honor, they apply for Title III wiretaps, first on Ivory

13   Brothers' phone, that's target phone one, the initial part of

14   the investigation.  And in doing that, they confirm what they

15   anticipated, that Martin Ballard was supplying Ivory Brothers

16   with cocaine that was being cooked, converted, using baking

17   soda and water, converted into crack cocaine and sold in the

18   Walterboro/Cottageville communities.  All right?

19       So based on that wiretap they eventually go up on a

20   wiretap, multiple wiretaps, with Your Honor's permission, on

21   Mr. Ballard.  And what they quickly realize about Mr. Ballard

22   is that he drops his phone every two or three weeks, or

23   sometimes less.  And you're going to learn that that's how

24   large-scale drug dealers like Mr. Ballard attempt to evade law

25   enforcement.  All right?  It makes it almost impossible to

wiretap, when they're doing such activity, dropping their
phone every couple of weeks. And you'll learn he had lots and
lots of phones. And the reason he had it, he was trying to
avoid wiretaps. He didn't do it very successfully, because
Ivory Brothers kept the same phone. And so we were able to
hear Mr. Ballard's drug dealing over Ivory Brothers' phone
over a period of time. And you're going to hear a number of
those calls. I'm not going to go through and describe them,
but in significant part what you hear in those calls are Ivory
Brothers talking to Martin Ballard about cooking powder
cocaine into crack cocaine. Taking the powder, combining it
with water and baking soda, heating it up, what is often
referred to as whipping it, and making it a hard substance
instead of a powder substance. That's what the crack cocaine
is. You'll hear the witnesses describe to you what that crack
cocaine is, and how it is then sold to users who smoke that
crack cocaine.

And that's the discussion you're going to hear back and
forth between Ivory Brothers and Martin Ballard, about how
much the weight increased when I converted it. So I take one
ounce, 21 -- 28 grams of powder cocaine, and I cook it into
crack cocaine, and I'm very interested in how much it weighs.
Because how much it weighs determines how much money I make
when I sell that crack cocaine. And that's the discussion
you'll hear between those two folks.

1    So then what you'll see, we're up on the wiretaps for a

2    period of time, the difficulty in intercepting Mr. Ballard,

3    given the frequency with which he drops his phones, but those

4    wiretaps don't stand alone either.  You're going to hear from

5    Mr. Brothers, who is going to describe their drug dealing

6    activity, but you'll also hear from a variety of other

7    individuals who were involved in this drug conspiracy, both

8    buying and selling cocaine from Martin Ballard.

9        You're going to hear from guys like Marion Mack, like

10   Norman Robinson, like Chase Mosley and others.  They are going

11   to corroborate and confirm what you'll be able to tell from

12   the wiretap calls themselves, that Martin Ballard was a large-

13   scale cocaine dealer, operating in and around the Summerville/

14   Cottageville area of South Carolina.

15       Then we'll also confirm what he was doing, because he was

16   arrested on March the 19th of 2012, after the grand jury,

17   federal grand jury here indicted him, law enforcement set up

18   operation to arrest him.  And when they arrested him, they did

19   so during a traffic stop.  To ensure safety of the officers,

20   they allowed him to leave his residence, suspecting he would

21   be armed.  He left his residence, then did a traffic stop on

22   him.  In doing so, they then placed him under arrest and they

23   searched him.  And when they searched him, they found in his

24   pocket a couple of things that are indicative of his drug

25   trafficking.  One, they found cocaine.  They found a gram of

cocaine in his pants pocket. They also found about $1976,
almost $2000. They also found, in his pockets, six different
cell phones.

        THE COURT: You say numbers or phones?

        MR. RICHARDSON: Phones. Six different cell phones
in various places on his person. They then do a search of the
vehicle, and in the vehicle they find five more cell phones,
indicative of his drug trafficking, trying to evade law
enforcement by using these various numbers. And they also
find a loaded cocked pistol. All right? And that pistol is
the charge that we see in count three that's the 924(c), his
possession of that firearm in furtherance of his drug
trafficking activity. All right? That's where we see in the
car.

    They also, that same day, execute a federal search warrant
on his residence. And in his residence they find five more
cellular telephones. I think we're up to 16, could be 15,
either 15 or 16 phones that Martin Ballard has at the same
time, trying to evade law enforcement.

    And he also has, in his garage, a cocaine press. You'll
get to see it, it is a metal stand with a box in it that
you'll hear described you use a hydraulic press to recompress
cocaine that's been cut. Adulterant has been added to it to
try to make more money, and they recompress it to make it look
like it's original. So you'll see he has this homemade

cocaine press in his garage, along with these five different cell phones.

After he's arrested, Ivory Brothers is also arrested. Not long thereafter, the Government provides discovery to defense counsel that reveals that from January of 2012, before the indictment, Ivory Brothers had been cooperating with law enforcement. He had been approached by agents, provided a target letter and given the option to cooperate or not. And he chose to cooperate. In cooperating, he described to law enforcement exactly what they knew already, that Martin Ballard was supplying him with large quantities of cocaine over an extended period of time.

When that information went out in discovery, the defendants learned about it. They learned that Ivory Brothers had been cooperating with law enforcement. At the first bar meeting before Your Honor, when Ivory Brothers and Martin Ballard are present, Martin Ballard confronts Ivory Brothers about it. Called him a snitch, said not nice things about him.

After Ivory Brothers walks off, Martin Ballard says to a guy sitting beside him, "I got stacks on that guy's head."

THE COURT: He has what?

MR. RICHARDSON: Stacks. Stacks, you'll learn, is a code phrase used in the drug business to refer to thousand dollar stacks of bills. In order to maintain, when you're

dealing with quantities of cocaine that Mr. Ballard dealt with, it's large sums of money, and you don't want to sit and count it all out. Might be 30, $40,000 at a time. And so the way they manage counting that is they group it together with rubber bands in stacks, a thousand dollars to a stack. So you'll hear them referred to from time to time, a stack, sometimes it's called a rack, R-A-C-K, but those are thousand dollar increments of cash. All right? And so he describes he's got thousands of dollars on Ivory Brothers' head.

He describes to other co-defendants, not at the bar meeting but at other instances, that they're all there because of Ivory Brothers, and that he's going to take care of that, that he's going kill Ivory Brothers, he's going to prevent the Government from prosecuting him and his co-defendants. And that's Martin Ballard telling people that that's what he's going to do.

Turns out that's exactly what he does. So we intercept the phone calls with Martin Ballard talking to a variety of people, but primarily Anthony Davis, who is a co-defendant of his. And Anthony Davis will describe to you how that happens, how he goes and visits him at the jail, how he understands that Martin Ballard's telling him, you got to get who they refer to as BJ, but Ivory Brothers, you've got kill Ivory Brothers. We can't let him testify against me, because I am not going to accept responsibility for what I've done, I'm

1  going to kill the witness instead.

2      And you'll hear these calls where he describes what

3  happened.  You're going to hear the call where he describes

4  what goes on.  But Anthony Davis is going to tell you exactly

5  what happens, exactly how they set this up, how he arranges

6  it, how they try to find one driver and that doesn't work, how

7  they try to find another driver, get-away driver for the

8  shooter, and they finally settle on Charles Sanders, Chuck

9  Chuck Sanders as the driver.  And that's one of Martin

10  Ballard's cousins.  They settle on Charles Sanders as the

11  driver, and Anthony Davis helps set that up.  And Charles

12  Sanders will describe to you how Martin Ballard and Anthony

13  Davis asked him to be the driver.

14      And Martin Ballard then realizes he has to have a hit man,

15  he has to have somebody to pull the trigger, and his guys

16  might not be hard enough to do that.  So he recruits a guy,

17  while in custody, Jimmie Harris.  You'll hear him referred to

18  by a variety of nicknames like Ming, Jim Black, he goes by a

19  variety of nicknames.  But Jimmie Harris, as you'll learn, he

20  is a certified hit man.  He is a guy who has done this before.

21  He has pulled the trigger before, and he doesn't hesitate when

22  he does it.  You'll hear Martin Ballard talk about how pleased

23  he is.  You'll hear on the phone calls.  And Anthony Davis

24  will describe for you how pleased he is that he's got a

25  certified hit man.

Now, you're not going to be surprised to learn that on those calls, Martin Ballard doesn't use the phrase hit man, that he doesn't say on those recorded jail calls, go kill Ivory Brothers. They speak in code. All right? Just like you'll hear on the phone calls and just like Your Honor is familiar with, he speaks in code.

And so what you're going to hear on those phone calls are an attempt to disguise what he's talking about. All right? And so he'll talk about things like finding a lawnmower to cut the grass, finding a tool to work on the truck. Those are codes for finding a gun to kill Mr. Brothers.

You'll hear him refer to Jimmie Harris, the hit man, as a certified mechanic. You'll also hear him joking about how everybody knows that Jimmie Harris is no mechanic, that he is a hit man, not a mechanic.

So what you'll see from those calls is an illustration that at no point are they talking about actually cutting the grass or actually working on a truck, they're talking about killing Ivory Brothers.

And one of the early calls sort of illustrates that, and I'm not going to belabor, we're going to play a number of those calls for you, not nearly all of them, because it would take us a week just to do that, but we're going to display some excerpts for you. But one of the early calls I think is pretty revealing, and it's a May 7th call where Martin Ballard

1    is talking to Davis and others on a three-way call, where

2    Ballard would call Davis, then Davis would call, in this

3    instance, Harris.

4            THE COURT:  Ballard was in jail?

5            MR. RICHARDSON:  Ballard was in jail.

6            THE COURT:  Where was Davis?

7            MR. RICHARDSON:  Davis was out, not indicted, not a

8    defendant.  He was a childhood friend of Martin Ballard's,

9    they'd grown up together, they were very very close friends.

10   So Martin Ballard would get on the jail phone.  And those jail

11   phones, as Your Honor is aware, they're recorded.  But what

12   Mr. Ballard would do to try to hide who he was, he wouldn't

13   use his own identification code, he'd use the identification

14   code of other individuals, other inmates, to try to hide that

15   that's who it was on the phone.  You'll be able to hear his

16   voice, and lots of people will explain to you that that's who

17   was making the calls.

18      But Mr. Ballard would call Mr. Davis on Mr. Davis' cell

19   phone, and then using the three-way call feature on a cell

20   phone, he would then loop somebody in, sort of like a

21   conference call.

22      And on May the 7th, Mr. Davis gets a call from Mr. Ballard

23   and loops in Mr. Harris.  And in that call Mr. Ballard slips,

24   right?  He's used to talking in code but he slips.  And what

25   he says is, I just talked to my lawyer, and he says that

1   they're going to do this on June the 19th.  This is June the

2   19th, 2013.  So it's a May 7th call.  My lawyer says they're

3   going to do this on June the 19th.  I need you to get a

4   lawnmower to cut the grass by then.

5       What Your Honor will see from your own order is that Your

6   Honor had just set the trial for June 19th in this case.  Your

7   Honor had just conveyed to defense counsel that the jury was

8   going to be selected on June the 18th, and that trial was

9   going to start on June the 19th.  And Mr. Ballard is calling

10  and telling Mr. Harris, who doesn't do landscape work and is

11  certainly not a mechanic, and telling him, they're going to do

12  this, they're going to do the trial on June 19th, you got to

13  get the grass cut by then.  Find a lawnmower.  Illustrating

14  he's not talking about getting the grass cut, he's not talking

15  about a lawnmower, he's talking about getting a gun to go kill

16  Ivory Brothers.

17      June the 6th, 2013 comes along.  On June the 6th

18  Mr. Ballard, at about 10:12 in the morning, puts that plan in

19  motion.  He calls Anthony Davis.  In that call he says, you

20  know that situation I've got, I'm calling to check on it.

21  Anthony Davis says, you know what, I'm going to get up my cuz,

22  I'm going hit up Cuz right now and see about doing it today.

23  The cuz here, we've talked about before, is Charles Sanders,

24  Chuck Chuck Sanders.  That's a 10:12 call.  At 10:19, just

25  like Mr. Davis said he was going to, he picks up the phone and

he calls Charles Sanders, and they discuss going to find Ivory

Brothers that day.

Well, for that to happen, for it to be effective, they've

got to have Jimmie Harris with them, because he's the trigger

man.  He's the actual stone-cold killer.  So they've got to

meet up with him.  So in a series of calls on June the 6th,

from 1:51 through about 2:30, you see Charles Sanders call

Davis, Davis call Harris, Charles Sanders call Davis again,

and then finally Charles Sanders and Harris get on the phone

together.  That's the connection that they needed to make.

And at that point, that's where we see, and you'll be able

to see through Special Agent Kunkle, the cell site data

showing Mr. Charles Sanders driving to where Mr. Harris lives,

and then driving back to Walterboro, where ultimately they

find and kill Ivory Brothers.

At 2:59 -- so 2:30, Charles Sanders and Mr. Harris finally

talk and get together.  At 2:59 Charles Sanders calls his

cousin, Garrick Sanders.  So there are two Sanders here,

Charles Sanders is the driver, Garrick Sanders really only

comes into play after the fact.  But Charles Sanders calls

Garrick Sanders, having already talked earlier that morning

about what they were going to do, trying to get Ivory

Brothers, but he calls his cousin and says, where is he?  Can

you tell me how I can find Brothers.  Garrick Sanders says no,

he doesn't want anything to do with it, I don't know.  I don't

1    know where he is.

2         Well, Charles Sanders then drives to 98 Oswald Court,

3    which is the home of James Bennett.  It's a trailer in a small

4    little trailer park.  You'll see pictures of it.  And what

5    happens is that Charles Sanders is driving his burgundy

6    Lincoln, same car he's been driving for awhile, everybody

7    knows it.  Charles Sanders is sort of a distinctive looking

8    guy.  You'll get to see him.

9         And right before Charles Sanders and Mr. Harris drive by

10   Mr. Bennett's house, who shows up but Ivory Brothers.  And

11   when he shows up, he goes inside, and Ivory Brothers and James

12   Bennett see Charles Sanders and Mr. Harris, the hit men, ride

13   past the front of their house.  Sort of strikes him as odd.

14   Why are they riding by, they're driving so slowly.  They

15   recognize the driver as Mr. Charles Sanders; they don't

16   recognize the passenger, because he didn't grow up in

17   Walterboro, he's not connected to these guys.

18        About ten minutes later, Ivory Brothers and James Bennett

19   are sitting on the couch when Jimmie Harris walks up to the

20   front door with guns in each hand, and opens fire with a

21   .40 caliber semi automatic and a .357 revolver.  They hit

22   Ivory Brothers between seven and ten times.  He's beat up so

23   bad they can't even tell how many times he was shot.

24        Mr. Harris flees, and gets back in the car with Charles

25   Sanders, and they leave.

1    EMS, law enforcement show up, attend to Mr. Brothers and

2    take him to the hospital.

3    Charles Sanders and the hit man, Mr. Harris, they then

4    have to get rid of the guns.  They drive to Mr. Sanders'

5    grandfather's house, they dump the guns in an old truck in the

6    yard, and call Garrick Sanders.  Charles Sanders calls his

7    cousin Garrick and says, I left something for you, I need you

8    to pick them up and get rid of them.  And Garrick Sanders

9    agrees.

10    He goes, he picks up the two guns and he takes them to his

11    brother's house in Mt. Pleasant, hides them in a shed.  The

12    two murder weapons get hidden in the shed by Garrick Sanders.

13    At that point the group's dispersed, law enforcement gets

14    involved, and an investigation begins.

15    But that's not the end of the day for Mr. Harris,

16    Mr. Davis and Mr. Ballard.  Because at about 9:29, you hear

17    Mr. Ballard talk to Mr. Davis, right after Mr. Davis talked to

18    Mr. Harris.  And Mr. Ballard asked Mr. Davis, how did it go?

19    What's going on?  And Mr. Davis hems and haws a little bit and

20    says, I don't know the result yet.  In other words, I don't

21    know whether he's dead or not.  It went well, but I don't know

22    what the result is yet.

23    And Mr. Ballard then asked, well, how is Ming, referring

24    to the hit man, Jimmie Harris, how's Ming?  Oh, he's good, he

25    got away clean.  How's our little cuz?  And you hear Davis at

that point get a little bit upset, he's like, man, it's not

good.  Cuz got his phone taken.  First it was the jack,

J-A-C-K, like a phone jack.  He got his jack taken.  They took

his jack.  And that's concerning, because that ties them back

to Mr. Davis and Mr. Ballard.  Right?  So they're concerned

that Charles Sanders' phone got taken from him, because that's

the first critical piece of the story.

And you hear him describing the shooting, talking about

how it happens.  And you'll also hear from other inmates who

were there when Martin Ballard was learning about all this,

and how excited he was when he learned that Ivory Brothers had

been shot, and how disappointed he was when he learned that

Ivory Brothers was going to live.  How he talked about how his

guys had failed him because they didn't finish the job.

That's what you're going to see from June the 6th, that

what Mr. Ballard did was arranged for the murder, attempted

murder, of the main witness against him, Ivory Brothers.  In

doing that, not only does it establish that he's guilty of

attempted murder, that's the second half of the indictment,

the charges that go along there, but it also establishes his

involvement in a conspiracy.  It shows the consciousness of

guilt that he had, and the willingness to do anything he could

to avoid responsibility for it.

Thank you, Your Honor.

THE COURT:  Does the defendant wish to make any kind

1    of opening statement?

2              MR. THEOS:  Yes.

3        (Brief interruption in proceedings.)

4              THE COURT:  All right, sir.

5              MR. THEOS:  May it please the Court, Your Honor.

6    Well, I thought that was going to be a brief overview by the

7    Government; instead, Your Honor, it was --

8              THE COURT:  The Court recognizes that there's no

9    facts been -- that's only what he hopes he's going to be able

10   to prove.

11             MR. THEOS:  I understand, and I know that the Court

12   will consider Mr. Richardson's proffer of testimony of all the

13   witnesses that he anticipates will testify consistently with

14   that.  That the Court recognizes that is Mr. Richardson's

15   opinion, which we greatly differ on, both what he believes the

16   witnesses will state, what he believes with respect to

17   Mr. Ballard's alleged involvement in either the drug

18   conspiracy or the shooting of Mr. Brothers.  And also his

19   interpretation of what he claims, what the Government claims

20   was the use of coded language related not only to drugs and

21   Mr. Brothers' drug conspiracy, but also with respect to the

22   shooting.  And I know that the Court accepts that as

23   Mr. Richardson's opinion, and Mr. Richardson's proffer of

24   testimony, and the Court will listen very carefully and

25   scrutinize the testimony of the actual witnesses.

1    And, Your Honor, that is why, if you wonder why

2  Mr. Ballard chose to have a bench trial, that is the reason.

3  You know, we talk about the presumption of innocence, and we

4  don't have a jury here to speak to, but Mr. Ballard chose to

5  have this trial before you, before you alone, because he had

6  faith that you would be able to distinguish between the truth

7  and fabrication, between a lie and forthrightness on the part

8  of these witnesses.

9    There is, as you know, as I know as a lawyer that's been

10  practicing law for well over 30 years, there really is a

11  presumption of jurors when they come into this courtroom, and

12  we know that because jurors tend to believe, tend to believe,

13  and sometimes we lawyers and we judges get caught up in the

14  same state of mind and the same opinion that the Government,

15  which has vast resources, the Government conducts an

16  investigation, a lengthy investigation, the Government

17  presents testimony and evidence to a grand jury, the

18  Government indicts an individual like Martin in this case,

19  Martin Ballard.  The Government then arrests Mr. Ballard, the

20  Government then determines it best to prosecute Mr. Ballard.

21    So when jurors walk into the courtroom, and I dare say a

22  lot of lawyers as well, they tend to believe that, well, he

23  must be guilty; the Government, with all of its resources,

24  would certainly not be prosecuting someone in Mr. Ballard's

25  shoes, in Martin's shoes, if he weren't guilty.

1    And, Your Honor, I know and Mr. Ballard knows and has

2    faith and trust in your ability to apply that presumption of

3    innocence, rather than that presumption of guilt, which I

4    believe we all succumb to in our practices.

5    And I guess it's over the years we have become somewhat

6    jaded, somewhat callous to that notion.  And Martin chose you

7    to hear this case because he knows that you are a judge that

8    will apply not just the law, but listen to these witnesses.

9    You know, I was discussing the case with a friend who is a

10   prominent member of our community here in Charleston, and she,

11   when I told her about the case, she looked at me and said,

12   well, how are you going to prove that Martin didn't do what

13   the Government claims he did?  And again, that is the belief,

14   and that is unfortunately sort of the standard that we

15   officers of the court tend to apply and sort of abide by when

16   we are involved in these sorts of lawsuits, because that's

17   what this is, this is a lawsuit, it's -- excuse me.

18           THE COURT:  Go ahead.

19           MR. THEOS:  This is a lawsuit by the Government, and

20   they have undertaken, undertaken the task, which is a

21   difficult task, and it's an enormous task to prove that Martin

22   Ballard is guilty.

23   Now, you heard Mr. Richardson say, and you may have read

24   some of it in the trial brief, that they intend to call a

25   number of witnesses.  Well, the first and the foremost

witness, Your Honor, is the person that this investigation was focused on. Ivory Brothers was the person who the Government received information about, who the Government believed was involved as a drug trafficker, who the Government believed was the primary source of cocaine and drugs in the Walterboro, perhaps even the Summerville/Dorchester County area. That is why they applied for the wiretap, that is why they investigated the case, because of Ivory Brothers. It wasn't because of Martin Ballard, it was Ivory Brothers.

You heard Mr. Richardson say that they conducted controlled buys. Well, they did. They conducted -- they conducted, my recollection is, four controlled buys. And Your Honor knows what a controlled buy is, they get a confidential informant or a cooperating individual who agrees to be wired and agrees to set up a deal with the target of their investigation. And the target, again, was Mr. Brothers, was Ivory Brothers.

Those four transactions involved surveillance, they involved audio and/or video recordings. And what I want the Court, when Mr. Brothers testifies or the agents testify, I want the Court to focus on not only what was done and what evidence there is, but what wasn't done and what evidence there is not. And in those transactions, it's crystal clear, and there's plenty of evidence that Mr. Brothers sold drugs to the informant, to the cooperating individual, and those four

1    buys are clearly established.

2         What you will not hear is that Mr. Ballard was involved in

3    any of those transactions.  You may hear that from

4    Mr. Brothers.  But what you won't hear from the agent or the

5    informant that was cooperating, is that Mr. Ballard was

6    present, that Mr. Ballard was seen, that Martin was in any way

7    physically involved in any of the transactions.  There was

8    surveillance.  Martin isn't anywhere on the surveillance.

9    There were recordings.  Martin's not present on any of the

10   recordings.

11        And think about this, Judge, what would have been the sure

12   fire way of determining -- because our understanding is, I

13   don't know what Mr. Brothers will say today or when he

14   testifies -- but our understanding is at some point he told

15   law enforcement, after he was given his deal, so to speak, and

16   we still don't know what that deal is, he's on the indictment

17   but he's not here, he's not being prosecuted, we don't quite

18   understand that either, there was no motion for severance,

19   there was no order of the Court severing his case, so we're

20   not quite sure why he's not on trial.  But that's something

21   that the Court should take into account.

22        But it's at some point he pointed the finger and said, oh,

23   yes, I got those drugs from Martin Ballard.  Well, what would

24   have been the easiest sure fire way of determining whether or

25   not Mr. Brothers was telling the truth, rather than relying on

1  a drug dealer, on a convicted felon, on somebody that it

2  was -- that is admittedly involved in the business.  And they

3  haven't done it to this day.  Why aren't there fingerprints,

4  why weren't the drugs -- they have the drugs, they have the

5  packages that the drugs were contained in, all they had to do,

6  all they had to do, which is -- they still could do -- is dust

7  those packages for fingerprints.

8           THE COURT:  Go ahead.

9           MR. THEOS:  All they should have done and could have

10  done and still should do, is dust those packages for

11  fingerprints, run the fingerprint analysis.  If Mr. Brothers

12  is telling the truth, Mr. Ballard's fingerprints should be on

13  those packages.  But if not, then Mr. Ballard is not being

14  truthful.  Mr. Ballard is lying.  He's lying to protect

15  himself.  And we believe, and wholeheartedly, that's exactly

16  what he's doing, is trying to help himself.  It's

17  understandable, that's what happens in these sorts of cases.

18  And jurors tend to believe the Government's explanation that,

19  well, we're sorry, but when we're dealing in this sort of

20  business, when we're in this sort of environment, we have to

21  call these types of people to the stand.  They're the only

22  people that can come in and testify.

23      Well, the people that you will hear testify on behalf of

24  the Government are thieves, they're burglars, they're drug

25  addicts, they're drug dealers, they are common criminals, they

are felons, they are people that lie, cheat, steal, and
contaminate our society.  They are not people that should be
believed.  They're people that we believe not only provided
inconsistent statements throughout, we continue to get them,
as we heard, we're continuing to get inconsistent statements
from these people, inconsistent with prior statements that
they've made.

So what we ask the Court to do is scrutinize not only what
they have to say on the stand, but what other statements they
have made.  And what I believe that you will see is that these
folks just can't be believed.

It's not necessarily about the Government proving
something beyond a reasonable doubt, it's whether you believe
that there is a reason to doubt what these people have to say.
Is there a reason to doubt that Mr. Brothers bought drugs from
Martin Ballard?  Is there a reason to doubt that Martin
Ballard sold drugs to some of these other folks?  I think that
what you'll see is their incredible inconsistencies.

You won't hear any testimony regarding dates, times, other
specifics, other particulars related to these alleged drug
transactions.  You'll hear testimony that is completely
divergent from some prior statements, from some sworn
testimony.  We believe that what you will find is that these
people are clearly lying.  And the reason that they're lying,
the reason that they're fabricating, the reason that they're

exaggerating, is so that they can help themselves. And again, we understand that. I don't blame these folks for trying to help themselves. But what they're doing in the process is they are trying to persuade you to convict a man that is not guilty of what he's been charged with. And what they are doing is they're perjuring themselves.

So hopefully, Your Honor, you will scrutinize everything that they have to say, you'll scrutinize those things that they don't say. And most importantly, you will consider what they have to say in light of the fact that there is no physical evidence to support anything that they've said. There are no drugs, there are no drugs related to the conspiracy that can be attributed to Martin. There is no money that can be attributed to Martin. There is no physical evidence.

The Government says, well, there are these phone calls. All these phone calls. Well, there are over 18,000 recorded phone calls. The Government has chosen very few of those phone calls, in an attempt to argue that, well, these folks are speaking in coded language. I guess you can listen to anything and offer your opinion as to what these people are saying. But listen to what these people say and listen to whether -- and look for evidence that tends to corroborate it or that conflicts with what they have to say. But with respect to those people that are going to testify from that

stand, they're completely different than Martin.  Completely

different.  Martin Ballard has no criminal record whatsoever,

Your Honor.  No criminal record.  He's 33 years old.  He's

lived most of his life in the Summerville Dorchester County

area.  He graduated from Summerville High School.  He has

three children.  And unlike these other folks that only, only

make a living, only make a living when they're out of prison,

because most of the time they're committing crimes and

incarcerated.

      But unlike them, Martin owned a trucking company.  And I

say owned in the past tense, because as a result of this

arrest on March the 19th of 2012, he's been incarcerated for

three years.  Three years awaiting this trial.  And again, we

continue to get information.  Lord knows what it's going to

show, you know, what other information we're going to receive

that either the Government claims is incriminating or that

tends to be exculpatory.  But Martin Ballard owned his own

business, which he's now lost.  It was a trucking business.

Martin Ballard, you will hear, Your Honor, Martin Ballard not

only owned his own business, but he made a substantial amount

of money.  And I can't recall the exact amount, but somewhere

in the neighborhood of 75 to $100,000 a year.  You'll hear

from our financial expert that Martin's lifestyle was not

lavish whatsoever.  Martin spent what he made, and the

financial reports and the financial analysis that was done by

1    a financial expert will show that the inflow of cash was

2    consistent with the outflow.

3         What do we see in these cases generally, Judge?  When

4    someone is arrested, we see that there's a large amount of

5    cash.  Mr. Richardson said there was $1900 or so recovered out

6    of his car.  What we normally see are hundreds of thousands of

7    dollars, tens and tens of thousands of dollars in cash that is

8    found either on the person, in the car, in the home.  None of

9    that was found.  There wasn't any.  And the reason there

10   wasn't any is because Martin Ballard wasn't in the business of

11   selling drugs.  Had he been, you would have found -- they

12   would have found cash, they would have found money.  Had he

13   been, wouldn't he, as we normally see, wouldn't he have been

14   driving luxurious cars and had two or three or four or ten

15   cars?  Had he been, would he own multiple homes, would he show

16   a luxurious lifestyle?  The reason none of those things are

17   present in this case is because of the simple fact of Martin

18   was not in the business.

19        Unlike all these other folks, Martin filed tax returns.

20   Those tax returns are consistent with his income from his

21   trucking business.

22        The Government may claim that Martin's -- that there was

23   some amount of money that was not consistent with the money

24   that he earned through his company, through his trucking

25   company, but we'll show you that that's just not true.  That

1    every dime that Martin made in his trucking company went to

2    support his lifestyle, and no more.  And there was no

3    lifestyle that's consistent with that of a drug dealer.

4        If Martin Ballard was the drug dealer that the Government

5    makes him out to be, then all of those things would be

6    present.  And we don't have any of them.  Not one, not two, we

7    don't have any of those factors to consider.

8        Now, it's interesting how different opinions there can be

9    in a case, the Government's position and their theory

10   regarding the case as well as ours.  But what the Government

11   has done is they've taken a tremendous, a tremendous leap of

12   faith, relying on what these folks have to say, relying on

13   their belief that they were speaking in some magical mystical

14   coded language.

15       Martin Ballard was not involved in the drug business.  And

16   I believe that you will see from these witnesses that -- and

17   the lack of evidence that the Government -- reason to doubt

18   what they say.  And the Government hasn't proven that case,

19   and proven that to be the case.  But with respect to the

20   shooting, because Martin wasn't involved in the drug business,

21   he would have no reason, no reason to seek to kill, as the

22   Government put it, or to harm Mr. Brothers in any way.

23       Mr. Ballard's been waiting for his day in court, you know,

24   he's been in front of you several times urging the Court to

25   hear his case.  We have been prepared, we were prepared two

years ago, over -- I guess about a year and a half ago, we had

drawn a jury, we were ready to proceed on the drug case.

Surely if Mr. Ballard were guilty of being involved in drug

selling, he would not have been so anxious to go to trial.

But the shooting, the shooting took place at some point.

And you pointed out a very interesting and relevant fact, and

that is that Martin was in the Georgetown detention center

when the shooting took place.  He wasn't out on bond, he

wasn't in the Charleston County detention center, he was in

the Georgetown County detention center.  And what the

Government would have you believe is that this mastermind was

able, through the use of telephones, to encourage, to

encourage four people, possibly even five, encourage those

people to try to kill someone.  Now, I understand that those

people have pled guilty, they've pled guilty to the shooting.

Mr. Harris has pled guilty to shooting Mr. Brothers.

Mr. Davis has pled guilty to his involvement in the shooting.

Mr. Sanders, Charles Sanders, has pled guilty to the fact that

he drove, that he drove Mr. Harris to the shooting and drove

him away from it.  And Mr. Garrick Sanders has pled guilty to

being involved in the disposal of the guns and participating,

at least peripherally, related to the shooting.

Martin Ballard didn't encourage, he didn't aid, he didn't

orchestrate, he had nothing to do with the shooting.  There

was no way he could stop it, but he certainly didn't start it,

he didn't ask for it, he didn't direct anybody to do it.  But
when you're in a detention center, you don't have any control
over what other people would do.

What was their motive?  Mr. Davis was a childhood friend,
known Martin most of his life.  Mr. Davis apparently took it
upon himself to do that which he believed was going to help
his friend, to rid the Government of one of its witnesses.

But Martin's not responsible for that.  Martin is not
responsible for the acts of third people.  There is no
evidence, no reliable evidence, no physical evidence.

They talk about these phone calls.  All you heard from
Mr. Richardson was his interpretation of what the Government
would claim is coded language associated with the shooting.
If Martin Ballard didn't believe that the Government could
track and coordinate in some way listening to those phone
calls, then surely if Martin -- surely Martin would have just
talked about taking care of Mr. Ballard.  Mr. Brothers.  About
killing Mr. Brothers, he would have just spoken about it.
Mowing the grass, fixing the truck, those things, it's absurd
to believe that those things are in some way associated with
the shooting.

The fact is that Mr. Davis orchestrated the shooting.  I
guess on one hand he should be commended for his allegiance
and his friendship to Martin Ballard.  On the other hand, he
should accept full responsibility for it.  Because Martin had

nothing to do with it. Mr. Sanders, Charles Sanders drove,

drove Harris, Mr. Harris to Mr. Bennett's house, and he shot

Mr. Brothers. And he's admitted that to this Court. He pled

guilty to it. Mr. Harris has shot and killed somebody else.

Mr. Harris has also shot other people, not only in this state

but in the State of North Carolina.

And apparently he doesn't have any qualms about shooting

people. But certainly Martin Ballard, who was in jail in the

Georgetown County jail, doesn't have any control over what

somebody like a Harris may do. And certainly he had no

control over what Mr. Davis orchestrated and what Mr. Davis

carried out. And my understanding is, based on what the

Government has provided, is that Mr. Davis will offer

testimony that at some point he visited Martin in one or both

of the detention centers, either Charleston County or

Georgetown County jail, and that is when he claims, again, to

help himself related to his admitted involvement in the

shooting, he claims that Martin gave him the instructions to

shoot Mr. Brothers.

We've got all the records from the Charleston County

detention center and the Dorchester County detention center.

Mr. Davis didn't visit him. So when you hear him say he

visited him, Your Honor, just know that he's lying. He did

not visit him in the jail. And if he lied about visiting him

in the jail, then what else is he lying about? He's lying

1    about Martin being the person that instigated this plan.  Mr.

2    Davis did it, Mr. Harris was involved, and did the shooting.

3    Mr. Sanders drove them, and Garrick Sanders helped dispose of

4    the guns.  Martin had nothing to do with that.

5        Now, well, when he was arrested on March 19, 2012, they

6    found a handgun in the car, they found some drugs on him.  And

7    that should be evidence enough that he's involved in a

8    conspiracy to sell or traffic or distribute drugs.  One gram

9    of cocaine was found on him.  One gram.  There's no dispute

10   about that.

11       You'll, unlike a lot of these cases in which defendants

12   don't testify, you're going to hear from Martin.  Martin will

13   explain to you that certainly, surely that was his cocaine,

14   but it was his cocaine for his own personal consumption.  And

15   it is against the law.  We don't downplay that, but it's not

16   evidence that he was involved in this Brothers drug

17   conspiracy.  And there's no evidence that those drugs that

18   were in his pocket, that one gram was intended for

19   distribution.  No evidence whatsoever.

20       The handgun that was in the car, that handgun, Martin was

21   asked, is there anything that could be considered dangerous or

22   would pose a threat, such as a weapon in the car, and Martin

23   said yes, there's a handgun in the center console.  Martin

24   cooperated fully.  He didn't resist in any way.  That handgun

25   is not connected in any way to drug trafficking.  It is a

1    handgun that Martin could lawfully possess, it was stored in a

2    place that the law allows.  And the only crime Martin

3    committed on that day when he was arrested on this original

4    indictment, was the fact that he possessed a small quantity of

5    cocaine, a gram of cocaine.

6         So, Your Honor, just -- and I've gone on a little longer

7    than I expected -- but again, we ask you, we urge you to

8    scrutinize every single witness and what they have to say.

9    Scrutinize what they don't say, scrutinize the fact that there

10   is a complete lack and absence of evidence to corroborate what

11   any of these witnesses have to say regarding Martin's alleged

12   involvement in Mr. Brothers' drug conspiracy, Mr. Brothers'

13   drug business.

14        And then listen to what these other folks have to say

15   related to the shooting.  Martin was not guilty, and was

16   adamant about trying his drug case, as you're well aware.

17   There was no reason for him, no reason whatsoever for him to

18   seek to injure or harm or kill Mr. Brothers.  Whoever these

19   folks were that orchestrated it and knew, because they've all

20   admitted it, they acted on their own without any aiding,

21   abetting, encouragement whatsoever from Martin Ballard.  They

22   should be held responsible for that, not Martin.

23        Thank you, Judge.

24             THE COURT:  Thank you.  Ready to proceed?

25             MR. RICHARDSON:  Your Honor, if you'd like to take a

JOHNNY EVANS - DIRECT EXAMINATION

1    break, or we can call our first witness.

2              THE COURT:  Well, let's start with the first witness.

3              MR. RICHARDSON:  Thank you, Your Honor.  Your Honor,

4    the --

5              THE COURT:  Unless you need to take a break.

6              MR. RICHARDSON:  Not at all.  Your Honor, the

7    Government calls J.J. Evans of the State Law Enforcement

8    Division.

9              THE CLERK:  State your name for the record, please.

10   A.  Special Agent Johnny Evans.

11        JOHNNY EVANS, a witness called by the Government, first

12   having been duly sworn, testified as follows:

13                        DIRECT EXAMINATION

14   BY MR. RICHARDSON:

15   Q.  Special Agent Evans, tell us where you work.

16   A.  I work for the South Carolina Law Enforcement Division.

17   Q.  How long have you been with SLED?

18   A.  Approximately eight years.

19   Q.  What kind of work do you do with them now?

20   A.  I'm assigned to the narcotics unit.

21   Q.  And how long have you been doing narcotics work for SLED?

22   A.  About six of those eight years.

23   Q.  Okay.  In addition to being a SLED agent, at the moment,

24   what else are you doing?  Are you trying to get some more

25   education?

1    A.   I'm a 3L at the Charleston School of Law.

2         THE COURT:  You're what?

3    A.   I said I'm a 3L at Charleston School of Law.

4    Q.   In your third year of law school?  You'll graduate in May?

5    A.   In December.

6    Q.   In December.  And you're going to night school, in

7    essence, to do that?

8    A.   Yes, sir.

9    Q.   As part of your work with SLED, what area do you cover,

10   where is your focus?

11   A.   The Low Country of South Carolina.  That includes

12   Charleston, Berkeley, Dorchester, Colleton, Hampton, Allendale

13   Counties in the lower part of the state.

14   Q.   Before you joined SLED, what kind of law enforcement

15   experience did you have?

16   A.   I was a master deputy at the Charleston County sheriff's

17   office, where I was assigned to the DEA task force, as well as

18   assigned to the K-9 unit.  Was also assigned to road patrol

19   there.

20        Before that, I was a deputy sheriff at the Colleton County

21   sheriff's office, where I was assigned to the K-9 unit.  And

22   also the Walterboro police department.

23   Q.   And fair to say -- we're not going to go through every

24   little bit of it -- you got pretty extensive training in sort

25   of narcotics and interdiction?

JOHNNY EVANS - DIRECT EXAMINATION

1    A.   I do.

2    Q.   You had hundreds of hours of training and on-the-job work

3    interviewing witnesses, doing search warrants, all those sorts

4    of things, right?

5    A.   Yes, sir, that's correct.

6    Q.   You've been involved in Title III investigations, right?

7    A.   I have.

8    Q.   How many Title III investigations have you been involved

9    with generally?

10   A.   Generally, say seven or eight.

11   Q.   And have you been the lead agent on any of those wiretaps?

12   A.   On two of them.

13   Q.   Okay.  One of them being the one we're here about, right?

14   A.   Yes, sir.

15   Q.   In 2011, when this investigation began, tell me how you

16   got involved and how the investigation started.

17   A.   I got a call from the Walterboro police department,

18   Sergeant Jason Chapman, as a routine call to ask me to come

19   down and help them --

20   Q.   Slow down just a little bit for us.  Everybody is nervous

21   on the witness stand, but slow down a little bit for us and be

22   sure we're speaking up.

23   A.   Okay.  I got a call from the Walterboro police department,

24   asking me to assist them with an investigation that they had

25   developed an informant, that they could not afford with their

1  budget to purchase the amount of narcotics that this informant

2  could purchase.

3  Q.  All right.  And so what did you do when the police

4  department called you in your role at SLED, what did you then

5  do?

6  A.  I traveled to Walterboro, met with Sergeant Chapman,

7  Corporal Kinard and the informant, and debriefed the

8  informant.

9  Q.  And just at a general level, what did you learn and what

10  did you set about doing?

11  A.  I learned that a gentleman named Ivory Brothers, also

12  known as BJ, was one of the major drug traffickers in the

13  Walterboro, Colleton County areas, and I initiated an

14  investigation into his drug trafficking.

15  Q.  What was the sort of first step that you -- not the first

16  step, but the first significant step that you took to try to

17  identify whether Mr. Brothers was involved?

18  A.  We used the informant to set up controlled purchases of

19  crack cocaine from Mr. Brothers.

20  Q.  And do you recall when the first time you did that in --

21  Was that January of 2011?

22  A.  Yes, I believe it was January 20th.

23  Q.  And I'm not going to walk through this for every single

24  buy, but just tell us generally how you conducted a controlled

25  buy.

1  A.  A controlled purchase is made when the informant would

2  basically make a telephone call to the target of the

3  investigation, in this case Mr. Brothers, and arrange to make

4  a purchase of crack cocaine, as in this case.  They would

5  discuss the price and the location that they were going to

6  meet.

7     After that, we would search the informant to ensure that

8  the informant had no contraband about his person or vehicle.

9  Then we would provide the informant with a recording device.

10  We would watch the defendant travel to the sales location,

11  meet with the -- we would watch the informant travel to the

12  sales location, meet with the target of the investigation.  We

13  would also have given the informant an amount of documented

14  Government currency to make the purchase with.  And then the

15  informant would travel to the location, meet with the target,

16  exchange the currency for the drugs, in this case crack

17  cocaine, and then travel back to the original meeting

18  location, where I would take the evidence that the defendant

19  purchased, then we would search the defendant again to make

20  sure that the defendant did not retain any of the contraband

21  for his own use, and deactivate the recorders.  And that's

22  basically how one goes.

23  Q.  Okay.  In the process of deciding to use that -- and there

24  are a number of investigative techniques you could use, right?

25  A.  Yes, sir.

1  Q.  In deciding to use or being able to use a controlled buy,

2  what's the first thing you have to have?

3  A.  You have to have an informant.

4  Q.  Right.  And in order to be an informant, what is required?

5  What are you looking for when you're trying to find an

6  informant for a particular target?

7  A.  You have to have an informant that's dealt with that

8  target in the past, in the capacity that you want the

9  informant to deal with them now.

10 Q.  And what happens if you have somebody who has not dealt

11 with the target; are you able to use that type of person as an

12 informant?

13 A.  No, sir.  It would be almost impossible to do that.

14 Q.  What about with respect to that informant cooperating with

15 law enforcement, what is important about that individual being

16 known or not known to be cooperating with law enforcement?

17 A.  The individual would not want to divulge that he was

18 cooperating with law enforcement, because if word got to the

19 target of the investigation, the target would no longer deal

20 with the informant.  So that it would not -- I mean, it would

21 hinder the investigation.

22 Q.  Then the final thing that I'll add, and you mentioned this

23 briefly, Walterboro didn't have enough money to do these types

24 of buys, so what else do you need to have in order to make

25 these types of controlled buys?

1    A.  Of course you have to have the currency, have to have

2    surveillance units, you have to have enough manpower to safely

3    do it.

4    Q.  It's not a cheap endeavor, right?

5    A.  Absolutely not.

6    Q.  So on January the 20th, and I'm going to just run through

7    these briefly, because we're not going to spend a lot of time

8    talking about them, but January 20th, you used an informant to

9    buy a half an ounce of crack cocaine from Ivory Brothers?

10   A.  That's correct.

11   Q.  On January the 27th you bought an ounce of crack cocaine

12   from Ivory Brothers?

13   A.  Yes, sir.

14   Q.  Roughly speaking, how much is an ounce of crack cocaine to

15   buy?

16   A.  During that time period you could buy an ounce from

17   anywhere from $850 to $1000.

18   Q.  And then again on March the 31st of 2011, you bought

19   another half ounce of crack cocaine?

20   A.  Correct, sir.

21   Q.  And then on May the 4th of 2011 you bought a final half

22   ounce of crack cocaine?

23   A.  Yes, sir.

24   Q.  During those controlled buys, what did you notice about

25   the vehicle that Mr. Brothers was driving?

JOHNNY EVANS - DIRECT EXAMINATION

1    A.  The first buys, Mr. Brothers drove a gold in color

2    Cadillac that was registered to Jamilla Marie, who through

3    surveillance we determined lived at 101 Ross Avenue in

4    Walterboro with Mr. Brothers.

5    Q.  Okay.  And based on identifying the vehicle that

6    Mr. Brothers was doing, did you get a court order to put a

7    tracker on his vehicle?

8    A.  Yes, sir.

9    Q.  And were you involved in actually putting it on the

10   vehicle?

11   A.  Yes, sir, I did surveillance while the other -- I think it

12   was Sergeant Chapman and Corporal Kinard actually put the

13   tracker on.

14   Q.  And to put a tracker on somebody's vehicle, how difficult

15   is that, what does it require doing?

16   A.  It requires coming to work when nobody else is basically

17   up, like middle of the night.  Some units conduct surveillance

18   to make sure nobody else is around, while the units that are

19   putting the tracker on actually physically crawl under the

20   vehicle and attach it with a magnet.

21   Q.  And in this particular -- What's the risk of doing that?

22   When you're sort of crawling around the middle of the night

23   putting a tracker on somebody's vehicle, what kind of risk are

24   you engaged in there?

25   A.  First of all, you're engaged in the risk that the

1    investigation may be discovered by the target, as well as

2    creeping around in the middle of the night, somebody might

3    think you're a burglar rather than law enforcement and take

4    action.

5            MR. RICHARDSON:  Beg the Court's indulgence one

6    moment.

7            THE COURT:  Where do you put a tracker on a car?

8    A.   In this case Mr. Brothers drove a Cadillac, and it's

9    covered underneath with a plastic covering to dampen the

10   noise.  So we had to pull the plastic covering back just a

11   little bit to be able to attach the magnet to underneath

12   bumper in the back.

13           THE COURT:  And it's really about the size of a small

14   magnet?

15   A.   It's approximately four-by-three.  It's in like a pelican

16   type case, I would guess, with a really strong magnet attached

17   to the bottom.

18           THE COURT:  All right.

19           MR. RICHARDSON:  Beg the Court's indulgence.  We're

20   trying to expedite the process of handing evidence up and

21   back.

22           THE COURT:  All right, sir.

23       (Discussion held off the record.)

24           MR. RICHARDSON:  Your Honor, with the defense's

25   agreement, the Government would move to introduce almost all

1    the evidence in the trial at this time.  They're stipulating

2    to it and we're going to agree to it, if it suits the Court, I

3    think it will expedite proceedings.

4        So at this time the Government would move to admit

5    Government's Exhibit 2 through 25.

6              THE COURT:  2 through 25?

7              MR. RICHARDSON:  Government's Exhibits 2, 3, 4, 5, 6,

8    7, 8, 9, 10, 11, 12, et cetera, to 25, as well as Government's

9    Exhibits 30, 31, 32, 33, 34, 35, 36, 37 and 38.

10             THE COURT:  Generally what are those exhibits?

11             MR. RICHARDSON:  They're a wide array of things, Your

12   Honor.

13             THE COURT:  They're what?

14             MR. RICHARDSON:  They're an array of different

15   things.  So we can walk through them.  Nos. 2 through 5 are

16   drug exhibits.

17             THE COURT:  Yes, sir.

18             MR. RICHARDSON:  No. 7 is GPS tracking data.

19             THE COURT:  Wait just a minute, I might have it here.

20   You said 2 through 25?  What numbers did you say, 2 through

21   25?

22             MR. RICHARDSON:  2 through 25 is the first batch,

23   Your Honor.

24             THE COURT:  What else?

25             MR. RICHARDSON:  I apologize, Your Honor.  And then

1  30 through 38.  That includes the various subparts for each

2  exhibit.

3          THE COURT:  Sir?

4          MR. RICHARDSON:  It also includes the subparts, like

5  30 has an A, B, C.

6          THE COURT:  I realize that.  You did not admit --

7          MR. RICHARDSON:  28 and 29 are the two that we

8  omitted for the time being.

9          THE COURT:  All right, sir.  Have you introduced them

10  physically?

11          MR. RICHARDSON:  They're here, Your Honor, we will

12  just pull them up as we need them, if that is acceptable to

13  the Court.

14          THE COURT:  If you're going to make a record and

15  you're introducing these, you better put them in evidence.

16          MR. RICHARDSON:  Yes, Your Honor.

17          THE COURT:  Have you given it to us to put it?

18          MR. RICHARDSON:  Not all of them, Your Honor.  We've

19  not provided them yet, but we will do that perhaps at the

20  first break.

21          THE COURT:  All right, sir.

22          MR. RICHARDSON:  Thank you, Your Honor.

23          MR. THEOS:  And, Your Honor, for the purposes of the

24  record, we previously discussed all of this, we've entered

25  into stipulations that both I and Martin Ballard have signed.

JOHNNY EVANS - DIRECT EXAMINATION

1    So we're fully aware of this and in agreement that stipulates

2    these can be submitted into evidence without objection.

3              THE COURT:  All right, sir.

4              MR. RICHARDSON:  Your Honor, we thought this approach

5    might just expedite the process.

6              THE COURT:  It will.  It will.  I'm not objecting to

7    it, I just want to be sure we have it.

8         (Government Exhibits 2 through 25 and 30 through 38

9    received.)

10             MR. RICHARDSON:  Thank you, Your Honor.

11        Permission to approach?

12             THE COURT:  Yes, sir.

13   BY MR. RICHARDSON:

14   Q.  I'm going to hand you Government's Exhibit 7.  What is

15   Government's Exhibit 7, what does that show for us?

16   A.  This is a return submitted to the Court for the GPS

17   tracking data that we obtained from February 3rd to

18   March 20th, from the tracker that we put on Mr. Brothers'

19   vehicle.

20   Q.  And we're not going to go through every single day and

21   look at every location that Mr. Brothers traveled, but what

22   did you notice about that, as part of your investigation, what

23   stood out to you and what did you then use to further your

24   investigation?

25   A.  I noticed that Mr. Brothers traveled to an address or near

1    an address on 11 occasions in Summerville, South Carolina,

2    near Ancrum Lane.

3    Q.  And what did that information, sort of for that little

4    over a month time period, the fact that he went there 11

5    times, what did you then do with that information?

6    A.  I approached Lieutenant Steve Young and Lieutenant Shawn

7    Gibbons of the Dorchester County metro narcotics unit to

8    inquire if they had knowledge of any high-level drug dealers

9    operating in around that area.

10   Q.  And what did you learn?

11   A.  From them --

12        MR. THEOS:  Your Honor, I'm going to object to

13   anything that he is about to testify what he was told by

14   others; that's clearly hearsay.

15        MR. RICHARDSON:  Your Honor, it's not hearsay.  What

16   we're describing here is how the investigation went forward.

17   And so that's clearly not hearsay, we've established that.

18        THE COURT:  I know, but did you ask him a question

19   about what somebody said?

20        MR. RICHARDSON:  I asked him what he learned and what

21   did he then do as a result of that.

22        THE COURT:  Well, he --

23        MR. THEOS:  Your Honor, that's a clever way of asking

24   what somebody said.

25        THE COURT:  Well, he can certainly testify as a

1   result of a conversation what he did.

2          MR. THEOS:  Absolutely, but not what the conversation

3   was.

4          THE COURT:  That's correct.

5   BY MR. RICHARDSON:

6   Q.  As a result of the conversation, who did you target as

7   part of your investigation?

8   A.  Mr. Ballard.

9   Q.  And in doing that --

10         THE COURT:  Excuse me; who did you say?

11  A.  Mr. Ballard, Your Honor.

12         THE COURT:  All right.

13  Q.  As a result of the conversation, you began targeting

14  Mr. Ballard.  What was the next step you did to target

15  Mr. Ballard?

16  A.  We applied for a Title III wiretap for Mr. Brothers'

17  telephone.

18  Q.  And why did you apply for a Title III on Mr. Brothers'

19  phone, in order to target Mr. Ballard?

20  A.  We had probable cause that Mr. Brothers was using that

21  telephone to not only sell drugs, but to purchase drugs from

22  Mr. Ballard.

23  Q.  And did you then get permission from the Court to

24  intercept wiretap calls on Mr. Brothers' phone?

25  A.  Yes, sir.

1    Q.  And as has been previously admitted, and I've shown you

2    earlier today, Government's Exhibit 8, this is the disk with

3    all of the calls intercepted over Mr. Brothers' phone, target

4    phone one, is that right?

5    A.  Yes, sir.

6    Q.  As a result of the interceptions that you made on this

7    phone, who did you apply to intercept next?

8    A.  Mr. Ballard's telephones.

9    Q.  And we used the term telephones.  How many different

10   phones and why did you apply to intercept Mr. Ballard on

11   multiple phones?

12   A.  Originally just one, but the number kept going inactive,

13   where there were no calls being made on that phone.  But we

14   would intercept Mr. Ballard on a different telephone on

15   Mr. Brothers' -- talking to Mr. Brothers.  So we would use

16   that probable cause to try to intercept the new telephone

17   number, but that number would go inactive.  And that happened

18   several times, all the way up to target telephone 14.

19   Q.  And what is the effect on law enforcement's ability to

20   continue its investigation when somebody drops phones so

21   frequently?

22   A.  It makes it almost impossible to gain any further evidence

23   from those telephones, because we can't process the paperwork

24   through the court system before that phone is no longer being

25   used.

1    Q.  And so based on Mr. Ballard dropping his phones

2    repeatedly, what did you do?  Or what did you not do, as the

3    case might be.

4    A.  We stopped trying.  It was not fruitful.  So we just

5    stopped trying to intercept his phones.

6    Q.  All right.  I have previously shown you Government

7    Exhibit 9, and this is the disk with the calls from target

8    phone ten.  You remember target phone ten?

9    A.  Yes, sir.

10   Q.  And target phone ten was active from October the

11   6th through October the 13th of 2011; do you remember that

12   one?

13   A.  Yes, sir, I remember that.

14   Q.  And this is all the calls that were intercepted on that

15   phone before that phone was disconnected or no longer used.

16   A.  Yes, sir.

17          MR. THEOS:  I'm sorry, could you repeat the dates?

18          MR. RICHARDSON:  The dates of target phone ten are

19   October the 13th -- excuse me -- October the 6th through

20   October the 13th, 2011.

21          MR. THEOS:  Thanks.

22          MR. RICHARDSON:  May we take a five minute recess?

23          THE COURT:  We'll be at ease for ten minutes.

24      (A recess was held at this time.)

25   BY MR. RICHARDSON:

JOHNNY EVANS – DIRECT EXAMINATION

1    Q.   Special Agent Evans, we were talking, right when we broke,

2    about the various Title III wiretaps on Mr. Brothers and

3    Mr. Ballard.

4    A.   Yes, sir.

5    Q.   During that time frame, tell me about what kind of

6    surveillance you and your team would do in connection with

7    those wire intercepts.

8    A.   We were able to intercept the phone call between

9    Mr. Ballard and Mr. Brothers, where Mr. Brothers was

10   requesting to purchase cocaine from Mr. Ballard.  And then we

11   were able to set up surveillance in and around the Ancrum Lane

12   area in Summerville, and observe Mr. Brothers travel in his

13   gold Cadillac to Ancrum Lane.

14         THE COURT:  Excuse me; you were able to observe

15   Mr. Brothers do what?

16   A.   He went in his gold Cadillac that he sold us the drugs in

17   before, he used that Cadillac to drive to Ancrum Lane in

18   Summerville.

19         THE COURT:  I see.

20   A.   Yes, sir.

21   BY MR. RICHARDSON:

22   Q.   And how many times did y'all do that, do you recall?

23   A.   I recall two.

24   Q.   The area over on Ancrum Lane, does it have a nickname

25   people refer to that area as?

1  A.  I've heard it called The Hill.

2  Q.  The Hill, okay.  So that's sort of -- the last wiretap

3  finishes up in 2011.

4  A.  Yes, sir.

5  Q.  Right?  Okay.  And then in January of 2012, what do you

6  decide to do in attempt to obtain a cooperating defendant?

7  A.  We served a target letter, a target of investigation

8  letter on Mr. Brothers.

9  Q.  And when you used the term you provided a target letter to

10  Ivory Brothers, what is a target letter?

11  A.  It's a letter that puts him on notice that he is the

12  subject of a federal investigation, and that he is able to

13  come in and cooperate with us, if he'd like to.

14  Q.  And what do you use, part of your, you know, this bag of

15  investigative techniques that you use, what is -- tell us how

16  you use a target letter as part of your investigations.

17  A.  We would let the person or the subject we serve the target

18  letter on, know that they're the target of an investigation,

19  and we would try to elicit their cooperation in filling in the

20  gaps in our investigation that they possibly knew.

21  Q.  Okay.  And tell me why, some of the reasons why, I don't

22  want an exhaustive list, but just some of the reasons why you

23  may choose to use a target letter, or why you may choose not

24  to use a target letter in a particular investigation.

25  A.  In my experience, I've always used a target letter to firm

1   up what I believed, so that the person would cooperate, and I

2   would be able to ask them questions, especially about a

3   wiretap, to identify voices or to confirm what we had learned

4   from an investigation, so that we knew it for an absolute

5   fact.

6   Q.   And why, why might you not use a target letter with a

7   particular individual or a particular investigation?

8   A.   A belief that they may not cooperate, or propensity of

9   violence or things of that nature that would be more of a

10  liability to the investigation than it would be a help.

11  Q.   And in January of 2012, what did you do, what did you do

12  when you provided Mr. Brothers that target letter, what did

13  you tell him?

14  A.   I told him that --

15  Q.   Generally.  I'm not asking to quote you, I can see your

16  face is like, I don't remember exactly.  Just generally what

17  did you convey to him when you had that first interaction with

18  him?

19  A.   That we would like for him to cooperate with our case, and

20  that we'd like for him to listen to some telephone calls to

21  identify people that were on the wiretap.

22  Q.   Okay.  And as a result of that approach, what did you do

23  the next week with Mr. Brothers?

24  A.   We conducted a debriefing of Mr. Brothers and played

25  numerous telephone calls, intercepted telephone calls for him,

1  so that he could tell us exactly who he was talking to.

2  Q.  And so do you recall how long it was between when you

3  approached Mr. Brothers with the letter, and when you actually

4  arranged to sit down and do that with him?

5  A.  It was a matter of days.  I can't remember exactly.

6       MR. RICHARDSON:  Beg the Court's indulgence, Your

7  Honor.

8       And just so it's clear, when you did that debriefing or

9  other activities that you were involved in as a law

10  enforcement officer, you reduced those to writing in a report,

11  right?

12  A.  An agent did.  I did not do it because I was not able to

13  get on the DEA system, but they -- another agent did those.

14  Q.  That's what happens when a lawyer asks a sloppy question.

15  The DEA or law enforcement would reduce it to writing and

16  provide that to our office.

17  A.  Yes, sir.

18  Q.  Might not be you in any particular circumstance.

19  A.  Correct.

20       MR. RICHARDSON:  Thank you.  If you would just answer

21  any questions, Agent Evans, that Mr. Theos may have for you,

22  I'd sure appreciate it.

23  A.  Yes, sir.

24       MR. RICHARDSON:  Thank you.

25                     CROSS-EXAMINATION

1    BY MR. THEOS:

2    Q.   Good afternoon.

3    A.   Hey, how are you doing today?

4    Q.   Good.  We've never met, or I can't remember we have or

5    not.

6    A.   I don't believe so, sir.

7    Q.   And certainly have never met and talked about this case.

8    A.   That is correct.

9    Q.   Why don't we start first with the target letter, I believe

10   it's 10 G.  Agent Evans, you said that you, based on your

11   experience, you've worked with confidential informants and

12   cooperating individuals many times over the years, correct?

13   A.   Yes, sir.

14   Q.   And you agree with me that it's important, it's important

15   to do everything possible, legally possible, to corroborate

16   not only the reliability of those informants, but also to

17   corroborate their involvement in the particular undercover

18   operations that they may be involved in, correct?

19   A.   Yes, sir.

20   Q.   All right.  And in the -- I mean, one of the reasons you

21   put audio recording devices or you conduct surveillance or you

22   conduct video recordings of those undercover operations, is to

23   make sure that you're keeping track of and monitoring

24   everything that is taking place in that undercover operation,

25   correct?

1    A.  Yes, sir.

2    Q.  And the reason you do that is, as reliable as these folks

3    may be or may have been in the past, you want to make sure

4    that they're doing everything properly on that particular

5    undercover buy, correct?

6    A.  Correct.

7    Q.  All right.  Now, with respect to Mr. Brothers, let me get

8    back to it, and I haven't asked you the identity of the

9    informant, and I certainly am not going to, because I don't

10   believe it matters.  But with respect to these informants,

11   they're generally people that have been in trouble in the past

12   with -- been under investigation in the past for criminal

13   activity, correct?

14   A.  Yes, sir.

15   Q.  People that more likely than not have also been convicted

16   of criminal activities, crimes, in the past, correct?

17   A.  Yes, sir.

18   Q.  And people, with respect to undercover buys and drug

19   investigations, they're people that have a fair amount of

20   experience in dealing with drugs and drug buys and drug sales,

21   correct?

22   A.  Yes, sir.

23   Q.  So I assume you use somebody along those lines, somebody

24   that is a criminal, somebody that has a criminal history,

25   correct?

A.  Yes, sir.

Q.  Somebody that has experience in buying and/or selling drugs, correct?

A.  Yes, sir, that's correct.

Q.  And it's for that very reason that your confidential informant in this case was able to set up buys from Mr. Brothers, correct?

A.  Yes, sir.

Q.  All right.  And he did set those up.

A.  Yes, sir.

Q.  With your cooperation and under your or other agents' supervision, correct?

A.  Correct, sir.

Q.  Because again, you wouldn't trust him on his own to do those things, you want to monitor everything he's doing, correct?

A.  Yes, sir, we monitor everything they do.

Q.  And you did monitor everything.

A.  Yes, sir.

Q.  On the January the 20th, 2011 purchase, I believe that was a half ounce of powder cocaine, is that correct?  Or was it crack?

A.  I think it was crack.

Q.  Okay.  But it was half an ounce, is that right?

A.  I believe so.

1  Q.  That was on January the 20th of 2011?

2  A.  I believe that's correct.

3  Q.  And the confidential informant that was used, was it the

4  same informant that was used in the other three undercover

5  buys?

6  A.  Yes, sir.

7  Q.  Now, on January the 20th of 2011, the first undercover

8  buy, was there audio recording or video recording or both?

9  A.  I believe there was both.

10  Q.  And was there also -- I assume with the video recording

11  then there was actual surveillance being conducted.  In other

12  words, you didn't just trust devices that may have been set up

13  in cars or at different locations, there was an agent that was

14  actually operating and had visual contact with your

15  confidential informant and Mr. Brothers, is that correct?

16  A.  Yes, sir.

17  Q.  And that agent would not have allowed either of them out

18  of his or her observation or his view during the transaction

19  itself, correct?

20  A.  Not necessarily.  We can't always know where the informant

21  or the defendant is going to go, so we do our best to maintain

22  visual surveillance.  But at times -- it's never 100 percent

23  guarantee that you're going to have eyes on the entire time.

24  Q.  But in that particular case you had video surveillance,

25  correct?

1   A.   Right.

2   Q.   The first one you said there was video surveillance.

3   A.   Yes, sir, but I don't want you to be under the

4   misconception that we are able to monitor what the video

5   camera sees at the time.

6   Q.   Well, let me put it this way.  During -- you've got an

7   audio and a video recording of this transaction, correct?

8   A.   Yes, sir.

9   Q.   And at no time was Martin Ballard's name mentioned,

10  correct?

11  A.   Correct.

12  Q.   And at no time did Mr. Ballard appear in the video,

13  correct?

14  A.   Correct.

15  Q.   And at no time -- at no time was Mr. Ballard -- was there

16  any observation of Martin Ballard being involved in that drug

17  transaction, correct?

18  A.   Correct.

19  Q.   Now, we don't have the exhibit here, but Exhibit 2 is a

20  package or is the actual drug that was seized as a result of

21  that transaction.

22  A.   Okay.

23  Q.   Okay?  My question to you is, after the confidential

24  informant made the purchase, I assume that -- from

25  Mr. Brothers, from Ivory Brothers -- I assume he brought it

1   back to you or another agent, correct?

2   A.  That's correct, sir.

3   Q.  And then that agent or you submitted it to SLED for

4   testing?

5   A.  Yes, sir.

6   Q.  In order to verify what the substance was?

7   A.  Yes, sir.

8   Q.  And that was done?

9   A.  Yes, sir.

10  Q.  And it was either powder or crack cocaine, correct?

11  A.  Yes, sir.

12  Q.  All right.  Now, a fingerprint analysis was not done of

13  that package, correct?

14  A.  No, sir.

15  Q.  Okay.  And certainly, certainly since at least after the

16  fact, at some point later, albeit a year later, when

17  Mr. Brothers began cooperating with you and the agents,

18  certainly if it hadn't been done before, it could have been

19  done then, a fingerprint analysis, to determine whether or not

20  Martin Ballard was involved in that drug deal, correct?  I

21  mean, that hadn't been done and it could have been done,

22  right?

23  A.  We could have fingerprinted it, yes.

24  Q.  And you didn't.

25  A.  No, sir.

1   Q.  But that would have been a way to verify whether or not

2   Mr. Brothers was telling the truth regarding where he claimed

3   he received drugs.  His source, correct?  Then we wouldn't

4   have had to rely on what Mr. Brothers said, right?  If we had

5   that analysis.

6   A.  I disagree.

7   Q.  Oh, you don't trust fingerprint analysis?

8   A.  No -- yes, sir, obviously fingerprint analysis has a long

9   history of being accurate.

10  Q.  And you agree with me that a fingerprint --

11          MR. RICHARDSON:  Objection, Your Honor, he's asking a

12  question and not letting him answer.

13          MR. THEOS:  I thought he answered the question,

14  Judge.

15          THE COURT:  I thought he had, too, but ask him again.

16  BY MR. THEOS:

17  Q.  You agree with me that the fingerprint analysis could have

18  been done and wasn't, correct?

19  A.  Correct.

20  Q.  Now, on January the 27th of 2011, you said the same

21  confidential informant was used?

22  A.  Yes, sir.

23  Q.  Surveillance video?  A surveillance video, was it video/

24  audio recorded, do you recall?

25  A.  Yes, sir, all four were exactly the same.

1   Q.  Okay.  So there are videos and audios in all of them?

2   A.  Yes, sir.

3   Q.  And if we were to play those audios and videos for Judge

4   Blatt, on all of them, so I won't go through each one of them

5   separately, the January 27th, 2011, the March 31st, 2011 and

6   May the 4th, 2011, those controlled buys by the confidential

7   informant from Ivory Brothers, if Judge Blatt were to watch

8   those videos and listen to those recordings, at no time would

9   he hear Martin Ballard's name mentioned, would he?

10  A.  That's correct.

11  Q.  And at no time would he see Martin Ballard in any of those

12  videos, correct?

13  A.  Correct.

14  Q.  And at no time, at no time was there any reference to

15  Martin Ballard as being involved in the transaction or being

16  the source of the drugs, correct?

17  A.  That's correct.

18  Q.  And it's also true that fingerprint analyses could have

19  been performed on each one of those subsequent three

20  controlled buys, correct?

21  A.  Correct.

22  Q.  But they weren't done, correct?

23  A.  You're correct.

24  Q.  And they haven't been done even up to this date.

25  A.  Correct.

1 Q. You would agree with me, wouldn't you, that that certainly

2 would be beneficial, at least at this point? If we had that

3 information? We'd know whether there was a fingerprint match

4 or not?

5 A. No, sir, I don't agree with that.

6 Q. Well, if Mr. Brothers, my understanding is at some point

7 Mr. Brothers said that at least on one or two, possibly all of

8 them, because I haven't heard from Mr. Brothers, but at least

9 on one or more of these transactions, that he received the

10 drugs from Mr. Ballard. Is that right?

11 A. Not exactly.

12 Q. Okay. Now, in the wiretaps, you agree with me that the --

13 we're referring to the T-III, the wiretaps of these various

14 phones, that there are over 18,000 recorded conversations?

15 A. Either recorded conversations or text messages, I think

16 that's probably a combination of both.

17 Q. All right. Now, in the course of those wiretaps and

18 listening to those, Mr. Brothers apparently identified -- my

19 last count was somewhere in the neighborhood of 12 people that

20 he had dealings with. At least 12. So he identified all

21 sorts of people as being involved, either selling drugs to or

22 purchasing drugs from, correct?

23 A. Correct.

24 Q. Now, these controlled buys were performed in January of

25 2011 through May of 2011, correct?

JOHNNY EVANS - CROSS-EXAMINATION

1   A.   Yes, sir.

2   Q.   Mr. Brothers began cooperating in January, January the

3   11th of 2012.

4   A.   That sounds right, yes.

5   Q.   At least that's what I heard on your direct testimony.

6   Between January, I believe it's the 20th, the first purchase,

7   first controlled buy, January the 20th of 2011, and

8   Mr. Brothers, the commencement of his cooperation, there were

9   no -- there were no purchases of drugs, no physical evidence

10  of purchases of drugs from Martin Ballard, correct?

11  A.   Correct.

12  Q.   No physical evidence of sales of drugs by Mr. Ballard,

13  correct?

14  A.   Correct.

15  Q.   So in that entire year, there is no evidence, no physical

16  evidence associated with what later became Mr. Brothers'

17  claims that Martin Ballard was his source of drugs, correct?

18  A.   Correct.

19  Q.   We have no drugs.  No drugs, correct?

20  A.   Correct.

21  Q.   Now, Mr. Brothers, beginning on January the 11th of 2012,

22  I believe that's the date that the proffer --

23          MR. THEOS:  Your Honor, may I approach?

24  Q.   I believe that that's the date of the proffer agreement?

25  Is that correct?

1    A.  January 11th, 2012, yes, sir, that's the target letter.

2    Q.  I'm sorry, not the proffer agreement, the target letter.

3    A.  Yes, sir.

4    Q.  Mr. Brothers began cooperating with you -- cooperating

5    with law enforcement from that date forward?  Or within a few

6    days of that date?

7    A.  Yes, sir.

8    Q.  And you testified earlier, I believe, that Mr. Brothers

9    indicated that his source, or at least one of his sources, was

10   Mr. Ballard for drugs?

11   A.  That's correct, sir.

12   Q.  So I assume that you followed up on that and attempted to

13   or made purchases through the use of either Mr. Brothers or

14   confidential informants of drugs for Mr. Ballard.  But that's

15   not the case, is it?

16   A.  No, sir, we didn't -- we made no controlled purchases from

17   Mr. Ballard.

18   Q.  At that point Mr. Brothers had not been indicted, correct?

19   A.  Correct.

20   Q.  He had not signed a proffer agreement.

21   A.  Correct.

22   Q.  He had not signed a plea agreement.

23   A.  Correct.

24   Q.  In other words, the fact that he was a target of the

25   Government's investigation was not known to anyone other than

1   law enforcement and Ivory Brothers, correct?

2   A.  No, sir, that's not correct.  We --

3   Q.  Maybe his lawyer as well.

4   A.  We had heard on -- from several different informants that

5   people in general knew that Mr. Brothers was being

6   investigated, and that --

7          MR. THEOS:  Your Honor, if you're going to tell us

8   what other people said, then I'm going to object.

9          THE COURT:  How about --

10          MR. RICHARDSON:  He asked the question.

11          THE COURT:  Wait just a minute.  I couldn't hear what

12   you asked.

13          MR. THEOS:  My question, Your Honor, was that at the

14   time that Mr. Brothers began cooperating, in light of the fact

15   there was no indictment, no arrest warrant, no proffer

16   agreement, no plea agreement --

17          THE COURT:  No arrest warrant for who?

18          MR. THEOS:  For Mr. Brothers.  In light of that fact,

19   his -- the fact that he was a target, was a private matter

20   between law enforcement and Mr. Brothers.

21          MR. RICHARDSON:  Your Honor, and Agent Evans is able

22   to answer that question by saying no.  We had heard that lots

23   of people were talking about the fact that he was a target.

24   That's directly responsive to the question.

25          THE COURT:  I thought he said that awhile ago, too.

1    MR. THEOS:  He did.

2    THE COURT:  What's the objection to the question and

3    the answer?

4    MR. THEOS:  Your Honor, he's already answered the

5    question, so -- but it appeared he was about to offer

6    testimony as to specific information that he received from

7    third parties.  But if he's not going to do that, then I'll

8    withdraw that objection.

9    THE COURT:  All right, sir.

10   BY MR. THEOS:

11   Q.  So Mr. Brothers was providing information --

12   A.  Yes.

13   Q.  -- to law enforcement.

14   A.  Correct, sir.

15   Q.  You had the benefit of being able to use confidential

16   informants.

17   A.  Yes, sir.

18   Q.  And continuing to use confidential informants in this

19   investigation, correct?

20   A.  Yes, sir.

21   Q.  And during that year period of time between the first

22   controlled buy and Mr. Brothers' cooperation, as you said,

23   there were no purchases, sales or buys from Martin Ballard.

24   A.  Correct.

25   Q.  And after Mr. Brothers began to cooperate, that's the case

1    as well, there were no -- there's no evidence, no physical

2    evidence of any sales or purchases from or to Martin Ballard,

3    correct?

4    A.  Correct.

5    Q.  In fact, the Government -- and when I say the Government,

6    I mean you as well, but the Government, you agents attempted

7    to set up two drug purchases with Martin Ballard, correct?

8    A.  Correct.

9            THE COURT:  You attempted to set what up?

10           MR. THEOS:  They attempted to set up controlled buys,

11   Your Honor, from Martin Ballard.

12           THE COURT:  And his answer to that was yes?

13           MR. THEOS:  Yes, they attempted.

14   BY MR. THEOS:

15   Q.  The truth of the matter is, there were no drugs sold or

16   purchased on those two attempts, correct?

17   A.  Correct.

18   Q.  Those two attempts were made when; do you recall?

19   A.  No, sir, I don't recall the dates.

20   Q.  They were after Mr. Brothers began cooperating though,

21   weren't they?

22   A.  Sir, I can't answer accurately.  I just do not remember

23   the dates.

24   Q.  Now, did your involvement with Mr. Brothers and his

25   cooperation, did it continue throughout the case?

1    A.   I was no longer involved as a decision-making case agent

2    after that, I was -- I helped monitor, I helped review

3    documents, things like that, but a different agent took over

4    as the case agent after Mr. Brothers began cooperating.

5    Q.   And who would that agent have been?

6    A.   Task Force Officer Herschel Tanner.

7    Q.   Is Mr. Tanner here?

8    A.   He's not in the courtroom.

9    Q.   So whatever decisions were made regarding the

10   investigation, the direction of the investigation, the

11   gathering of evidence, the interviewing of witnesses,

12   cooperating co-defendants, et cetera, Mr. Tanner would have

13   made -- Agent Tanner would have made those decisions?

14   A.   I made the decisions on interviewing the co-defendants of

15   Mr. Brothers that he had sold drugs to.  And then after that,

16   for Mr. Ballard, Task Force Officer Tanner handled that part.

17           MR. THEOS:  I beg the Court's indulgence, please.

18   Q.   Agent Tanner, the device that was used to intercept phone

19   calls, and I guess and record those calls, what type of device

20   is that?

21   A.   It's a computer device operated by -- owned and operated

22   by the Drug Enforcement Administration.

23   Q.   I've heard reference to a device called a Stingray device;

24   is that the device that was used?

25   A.   No, sir.

JOHNNY EVANS - CROSS-EXAMINATION

1    Q.  Do you know what type of device was used?

2    A.  It's a -- from what I understand, it's made by a company

3    called JSI, and it's called a T2S2.

4    Q.  And that's not the same thing as this Stingray device that

5    apparently is controversial?

6    A.  No, sir.

7              MR. THEOS:  I don't have any other questions, Judge.

8              THE COURT:  All right, sir.

9              MR. RICHARDSON:  Just a few, Your Honor.

10                        REDIRECT EXAMINATION

11   BY MR. RICHARDSON:

12   Q.  Agent Evans, what's a Stingray?

13   A.  A Stingray is able to give geolocations of a particular

14   cell phone when it's located by the software contained in the

15   Stingray system.

16   Q.  Sort of a traveling cell phone locator; is that a fair way

17   to describe it?

18   A.  It's a cell phone tower that's operated by someone to

19   determine the range and the proximity of a particular cell

20   phone to the vehicle that contains the Stingray.

21   Q.  In the course of your investigation, did you choose to use

22   a Stingray as part of your investigative techniques?

23   A.  No, sir.

24   Q.  How often during the course of your more than 15 years as

25   a narcotics officer, how often have you used every available

1   technique as part of any given investigation?

2   A.  Never.

3   Q.  Why not?

4   A.  It's cost prohibitive, and sometimes it just isn't

5   relevant.

6   Q.  What concerns do you have about particular investigative

7   techniques not just being not helpful but harming the

8   investigation?

9   A.  Um --

10  Q.  So as an example, when you place a tracker on a vehicle at

11  night, what type of concern do you have about using that

12  technique?

13  A.  That we may be discovered placing the tracker on.

14  Q.  And what concerns would you have about using an informant

15  that may well be known to cooperate with law enforcement?

16  A.  Their safety, absolutely their safety is in jeopardy if

17  they're known to cooperate with law enforcement.

18  Q.  And what kind of training and instruction do you have with

19  respect to putting people's lives at risk as part of drug

20  investigative work?

21  A.  We just don't do it.

22  Q.  Have you done drug investigations without using a Title

23  III?

24  A.  Yes.

25  Q.  Have you done drug investigations without doing a trash

1   pull?

2   A.   Yes.

3   Q.   Have you done drug investigations without doing controlled

4   buys?

5   A.   Yes.

6   Q.   Have you done drug investigations without doing

7   interdiction stops?

8   A.   Yes, sir.

9   Q.   Have you done drug investigations without doing search

10  warrants?

11  A.   Yes, sir.

12  Q.   Have you done drug investigations without getting people's

13  e-mails through search warrants?

14  A.   Yes, sir.

15  Q.   And we could go through another hundred possible

16  investigative techniques that you use or do not use, depending

17  on the circumstances.

18  A.   That's correct.

19  Q.   Mr. Theos asked you about informants and their conviction

20  records and their involvement in the drug business.  Why are

21  the informants that you end up using typically convicted of

22  crimes and involved in the drug business?

23  A.   Those are the people that can actually buy drugs, they

24  have the experience, and for what it's worth, the training to

25  get the job done.

1   Q.  Okay.  Why do you not go to St. Michael's and ask the

2   priest to do controlled buys for you?

3   A.  He's not typically involved in the drug business.

4   Q.  He talked to you a little bit about fingerprinting, and

5   you disagreed with him repeatedly about the need to do that.

6   Why was it not necessary or not helpful to fingerprint in this

7   particular case?

8   A.  Through our investigation, Mr. Brothers purchased powder

9   cocaine from Mr. Ballard, and brought it back to Colleton

10   County and converted it to crack and repackaged it to sell.

11   So there's no reason that Mr. Ballard's fingerprints would

12   have been on a package of crack that Mr. Brothers had created

13   himself.

14   Q.  And in your experience, how common is it that on a half

15   ounce crack package that you're able to get a useful

16   fingerprint?

17   A.  I've never gotten one, and I've tried many times.

18   Q.  We talked a little about Mr. Brothers, and we sort of

19   discovered this already, but why, in January of 2012, did

20   y'all make the decision not to use Mr. Brothers to make

21   controlled purchases from Martin Ballard?

22   A.  Mr. Brothers told us --

23        MR. THEOS:  Your Honor, I'm going to object to what

24   Mr. Brothers said.

25        MR. RICHARDSON:  Your Honor, we can ask him why he

1    did something.  This is exactly what he asked him.  And to the

2    extent that he can rely upon the reasons for that, that is

3    certainly permissible nonhearsay testimony, because it's not

4    being offered for the truth of the matter asserted, it's being

5    offered to explain the investigative actions taken.

6            THE COURT:  That would be correct, so long as he's

7    not offering it for the truth of the matter asserted.

8            MR. THEOS:  First of all, Your Honor --

9            THE COURT:  Well, since it's -- since it's only me, I

10   can either rule it -- we can ask the question, see what the

11   answer is, and then we can discuss it.  I can get rid of it.

12           MR. THEOS:  Your Honor --

13           THE COURT:  I think he can ask him -- Ask the

14   question again.

15   BY MR. RICHARDSON:

16   Q.  Why did you make the decision not to use Brothers to make

17   controlled buys of crack or powder cocaine from Martin

18   Ballard?

19   A.  His safety would have been in jeopardy, because we learned

20   that people other than law enforcement and Mr. Brothers knew

21   of his potential cooperation.

22           THE COURT:  Now, what's the objection to that?

23           MR. THEOS:  Your Honor, the question was asked a

24   little differently, and the answer was provided differently,

25   so I don't have any objection to that answer.

JOHNNY EVANS - REDIRECT EXAMINATION

1       THE COURT:  Okay.

2       MR. RICHARDSON:  Beg the Court's indulgence.

3   BY MR. RICHARDSON:

4   Q.  In doing surveillance as part of this case, Agent Evans,

5   describe for me how difficult it was to conduct surveillance

6   on the location where Martin Ballard was engage --

7       THE COURT:  Well, now, he hasn't said it was

8   difficult.

9   Q.  Describe --

10      MR. RICHARDSON:  Well, I said how difficult, so that

11  could be not difficult or very difficult.

12      THE COURT:  Yes, sir.  You asked him to describe how

13  difficult it was.  That's a different question.

14  BY MR. RICHARDSON:

15  Q.  Describe for us doing surveillance on Ancrum Lane.

16  A.  Ancrum Lane is a road that's occupied, as I understand it,

17  mainly by people that are related to each other or have known

18  each other for years.  Someone in a different vehicle that is

19  engaged in surveillance would easily be recognized on Ancrum

20  Road, Ancrum Lane.  It would absolutely thwart our

21  investigative purposes to attempt surveillance on Ancrum Lane

22  or to be able to be close enough to conduct a controlled

23  purchase on Ancrum Lane, where if something went bad, went

24  wrong, we could not respond in an appropriate amount of time

25  to help the informant.

JOHNNY EVANS - REDIRECT EXAMINATION

1   Q.  What is the impact, if any, on an investigation if

2   surveillance is identified or recognized by the target?

3   A.  The targets change their behavior and don't -- typically

4   don't continue the drug sales.

5           MR. RICHARDSON:  Thank you.  I appreciate it.

6       Your Honor, we'd ask that Agent Evans remain under

7   subpoena, on the chance that issues come up that we may need

8   to re-call him.

9           THE COURT:  He may have --

10          MR. THEOS:  I have a follow-up question, Your Honor,

11  or a couple of questions.

12                      RECROSS-EXAMINATION

13  BY MR. THEOS:

14  Q.  Agent Evans, with respect to the surveillance that you

15  just discussed, you said that with the use of the tracking

16  device on the gold Cadillac that Mr. Brothers drove, that

17  y'all were able to determine that two times he drove to the

18  area of Ancrum Lane that is also known as The Hill.  Correct?

19          THE COURT:  That he did what?

20          MR. THEOS:  That Mr. Brothers drove his gold Cadillac

21  to the Ancrum Lane area, otherwise known as The Hill area on

22  two occasions.  Testified to that on direct testimony,

23  correct?

24  A.  That was not through GPS, that was actually being able to

25  follow him, see him turn on Ancrum and then continue on

1   Orangeburg Road, so that we wouldn't be discovered on

2   surveillance.

3   Q.  Okay.  So the inference which I think you were trying to

4   get across to the Court was that he was up to no good, or a

5   drug deal, but the fact of the matter is that there's no

6   evidence regarding who he met with, if anyone, correct?

7   A.  There's telephone evidence that we intercepted calls

8   before and after, yes, sir.

9   Q.  But there is no surveillance evidence because, again, he

10  wasn't followed and there was no tracking device on his car,

11  correct?

12  A.  Correct.

13  Q.  And his car wasn't stopped afterwards and searched for

14  drugs or money, correct?

15  A.  Correct.

16          MR. THEOS:  No other questions, Judge.

17          THE COURT:  Anything else from the Government?

18          MR. RICHARDSON:  Nothing, Your Honor.

19          THE COURT:  You can be -- You want to excuse him, but

20  leave him subject to his subpoena?

21          MR. RICHARDSON:  Subject to re-call, Your Honor.

22          THE COURT:  All right.  Well, he can be excused, and

23  if they need you, they'll send for you.

24  A.  Yes, sir.  Thank you, Your Honor.

25          THE COURT:  It's 1:00 o'clock; we'll come back at

1    2:30.  Y'all have a good lunch.

2         (A recess was held at this time.)

3         THE COURT:  Have you explained to Mr. Ballard what

4    you would like?

5         MR. THEOS:  Yes, Judge, I was just finishing up.

6    I've explained it to him, Judge.

7         THE COURT:  Mr. Ballard, did you understand that your

8    attorney -- first of all, that you've got a right to be in

9    this trial every second that it goes on?  You understand that?

10        THE DEFENDANT:  Yes, sir.

11        THE COURT:  Your attorney wants to excuse you for two

12   or three minutes, or four or five, for a reason that he says

13   he's explained to you -- he explained it to me -- about your

14   identification.  You understand that?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  Is that agreeable with you?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  All right, sir.  Mr. Marshal, take him

19   somewhere.  Don't go too far.

20        (Defendant excused.)

21        THE COURT:  Now, where is your witness?  Are you

22   going to handle this witness?

23        MR. PHILLIPS:  Yes, sir.

24        MR. RICHARDSON:  It's just going to take a moment

25   while they're moving people, to get -- so they don't cross.

1    We obviously don't want them to cross in the hallway.

2              THE COURT:  You don't want them to bump into each

3    other.

4              MR. RICHARDSON:  Correct.

5              THE CLERK:  State your name for the record.

6    A.  Marion Mack.  M-A-R-I-O-N-M-A-C-K.

7       MARION MACK, a witness called by the Government, first

8    having been duly sworn, testified as follows:

9                        DIRECT EXAMINATION

10   BY MR. PHILLIPS:

11   Q.  Mr. Mack, can you tell the Court, can you describe how

12   tall Mr. Ballard is?

13   A.  I would guess -- I'm 5'6" -- maybe 5'7", 5'8", a little

14   taller than me.

15   Q.  What's his build?

16   A.  Excuse me?

17   Q.  His build.

18   A.  He's a little bigger than me, a little wider than me.

19   Q.  Can you describe how he keeps his hair or anything about

20   his hair?

21   A.  When I first met him, he had braids, but the last time I

22   saw him we was in Charleston together, he had a bald head.

23             THE COURT:  Last time you were talking -- what did

24   you say about his head?

25   A.  It was bald.

1      MR. PHILLIPS:  All right.  Answer any -- Jerry, do

2  you have something?

3                        CROSS-EXAMINATION

4  BY MR. THEOS:

5  Q.  Mr. Mack, does Mr. Ballard, does he have facial hair or no

6  facial hair?

7  A.  He got little sideburns connected.

8  Q.  And any earrings or anything, any --

9      THE COURT:  No, no, you're going too far.

10  Q.  You said you were 5'6"?

11  A.  Yeah, I think I'm about 5'6", in between there.

12  Q.  And you said that he's a little bigger than you.  How much

13  do you weigh?

14  A.  At this point I weigh, I think, about 189.  So I'm

15  guessing, you know, right around the same area, maybe 200,

16  he's at 200 something.  But like I said, I haven't seen him

17  since June, when I was in Charleston.

18      MR. THEOS:  No other questions.

19      THE COURT:  All right, sir.  All right.  Let's get

20  him.  Let's bring him back.

21      MR. PHILLIPS:  Yes, sir, we're ready.

22    (Defendant present.)

23                        DIRECT EXAMINATION

24  BY MR. PHILLIPS:

25  Q.  Let's start from the beginning.  Could you state your name

1    again for the record?

2    A.   Marion Mack.

3    Q.   And where were you born?

4    A.   Holly Hill.

5    Q.   And how old are you?

6            THE COURT:   Where were you born, Avondale?

7    A.   No, Holly Hill.  Holly Hill, South Carolina.

8    Q.   And how old are you?

9    A.   Thirty-one.

10   Q.   And what's your education?

11   A.   College.

12   Q.   Did you finish college?

13   A.   Two years of it.

14   Q.   Did you get a degree?

15   A.   No.

16   Q.   All right.  And just briefly tell the Court just some of

17   your legitimate employment that you've had since you became of

18   age.

19   A.   A musician, a nightclub manager and promoter, driving

20   truck, transporting vehicles, and basically I have a pressure

21   washing business afterwards.

22   Q.   And you've also been engaged in illegal activities,

23   correct?

24   A.   Yes.

25   Q.   Tell the Court about that and when you began that.

1    A.   Since about 2006.

2         THE COURT:   2000 what?

3    A.   Six.  Maybe a little farther back, like '05 or '06.  Up

4    until my incarceration.

5    Q.   What were you doing?

6    A.   Selling cocaine and marijuana.

7    Q.   All right.  And just tell the Court briefly how that came

8    about, and when you began selling cocaine and marijuana.

9    A.   Right after I got out of high school, you know, pretty

10   much just middlemanning different little deals.  And then

11   about 2008 I started getting -- engaging into more the larger

12   quantities, like buying kilos of cocaine and breaking them

13   down.

14   Q.   And how did you come about being able to buy kilos of

15   cocaine?

16   A.   I just saving my money up.  And then I ran into a Spanish

17   connection and, you know, that's how I started, you know,

18   purchasing cocaine from there.  I mean kilos from them.

19   Q.   And you would buy your kilos from him?

20   A.   Yes.

21   Q.   How long did you buy your kilos from him?

22   A.   For about a year, till he got arrested.  Back in '09.

23   Q.   Okay.  Well, we'll come back to that.  Now, do you have

24   any felony convictions for drug trafficking or drug charges?

25   A.   No, sir.

MARION MACK - DIRECT EXAMINATION

1   Q.  But you said you've been -- Where are you currently

2   living?

3   A.  Columbia.  Columbia, between Columbia and Holly Hill.

4   Q.  You're currently -- I'm saying where are you -- are you --

5   you're under arrest currently.

6   A.  Oh.

7   Q.  You're under indictment.

8   A.  Yes.

9   Q.  And you've been incarcerated since when?

10  A.  May 13th, 2014.

11  Q.  And you're currently under federal charges, correct?

12  A.  Yes.

13  Q.  Can you tell the Court what those charges are?

14  A.  Drug conspiracy, a count to distribute five kilos or more

15  of cocaine, money laundering, 924(c), and a marijuana charge.

16  Q.  And at some -- And you have a lawyer, right?

17  A.  Yes.

18  Q.  And at some point you -- did you begin to cooperate with

19  the Government?

20  A.  Yes.

21  Q.  I'm going to show you Government's Exhibit 10 E.  Do you

22  recognize this?  It's on the screen.

23  A.  Yes.

24  Q.  Tell the Court what that is.

25  A.  This is a proffer agreement that I signed stating that I

1  would be truthful about any of illegal activity and illegal

2  activity with others.

3  Q.  And what does it say if you aren't truthful; what's going

4  to happen to you?

5  A.  That I'll be charged with perjury and get another charge.

6  Q.  Now, I'm going to show you Government's Exhibit 10 B.  Do

7  you recognize that document?

8  A.  Yes, sir.

9  Q.  What is that?

10  A.  That's my plea agreement.

11  Q.  And you've -- let's go to the second-to-the-last page.  Is

12  that your signature?

13  A.  Yes, that's it.

14  Q.  All right.  And in this agreement you agree to also

15  cooperate with the Government.

16  A.  Yes.

17  Q.  And tell the Court about the agreement that you made

18  regarding your cooperation with the Government.

19  A.  Basically they dismiss the 924(c) and the marijuana

20  charge, and put in the plea agreement a possible for the 5K

21  and Rule 35.

22  Q.  Okay.  And what do you promise to do in this plea

23  agreement?

24  A.  Just be truthful and cooperate to the best of my

25  knowledge.

1  Q.  And what agreement has the Government made with you, if

2  you testify truthfully?

3  A.  That everything that's -- we agreed on in the plea

4  agreement would be fulfilled in the end.

5  Q.  And what happens if you don't tell the truth?  In this

6  agreement.

7  A.  That everything I would get for cooperation would be null

8  and void.

9  Q.  Would you get additional charges?

10 A.  Yes.

11 Q.  Now let's get back to your drug dealing.  Have you had --

12 Do you know Martin Ballard?

13 A.  Yes.

14 Q.  And how do you know Martin Ballard?

15 A.  I met Martin through Little Michael.

16      THE COURT:  Met him how?

17 A.  Through a guy named Little Michael I was dealing with.

18 Q.  And that's -- tell the Court how you knew Little Michael.

19 A.  Me and Little Michael, I met him playing cards at a

20 gambling spot one night down in Campbell Thicket.  And from

21 there we started having dealings.  And on two occasions

22 Little -- well --

23 Q.  Let's back up.  Dealings with what?

24 A.  Cocaine.

25 Q.  Tell the Court about that.  Were you supplying the cocaine

page number

1    or were you buying?

2    A.  I was supplying the cocaine to Little Michael at that

3    time.

4    Q.  And how much?

5    A.  He would get anywhere from like 42 grams to like 125 grams

6    from me at that time.

7    Q.  And that was powder cocaine?

8    A.  Yes.

9    Q.  And when was this -- when did this start happening,

10   what -- approximately when did it happen?

11   A.  Somewhere around '08, 2008.

12   Q.  And then tell us about -- you said you met Mr. Ballard

13   through Little Michael.  Tell the Court about that.

14   A.  Oh, one day Little Michael was on the way coming to see

15   me, he called me and told me --

16        MR. THEOS:  Your Honor, I'm going to object to what

17   anybody told this man.

18        MR. PHILLIPS:  Your Honor, he's testified that he was

19   in the drug conspiracy with Little Michael, and that they had

20   drug transactions, and this is a co-conspirator statement.  I

21   think we've established they had drug transactions with Little

22   Michael.  Mr. Michael calls him --

23        THE COURT:  Wait a minute.  Yes, sir?

24        MR. THEOS:  Your Honor, I don't believe either one of

25   those -- that Little Michael is in either one of these

1    indictments.  And if there's a conspiracy, then the

2    Government -- I think we need to establish conspiracy, but he

3    certainly shouldn't be allowed to testify as to what somebody

4    told him.

5            THE COURT:  It's your position he can testify if he

6    was in any conspiracy ten years ago, three years ago?

7            MR. PHILLIPS:  No, sir, this is a drug conspiracy,

8    and he's -- he's establishing how he met Mr. Ballard through

9    Mr. Michael.

10           THE COURT:  Are you talking about this drug -- about

11   what we're about here -- what we're here about today, or are

12   you talking about they -- this happened six or eight years

13   ago?

14           MR. PHILLIPS:  No.  This introduction is -- leads to

15   Mr. Mack's involvement with Mr. Ballard in this conspiracy.

16   We don't have to indict everyone in the conspiracy.

17           THE COURT:  I agree with that.  I don't disagree with

18   that.  But I'm concerned about letting in a co-conspirator's

19   statement, which Mr. Ballard -- I don't know that Mr. Ballard

20   was in that conspiracy.  Who is he going to quote?

21           MR. PHILLIPS:  Pardon me?

22           THE COURT:  Who is he fixing to quote?

23           MR. PHILLIPS:  He's about to quote Mr. -- Little

24   Michael, who he previously testified that he met Mr. Ballard

25   through Mr. Michael.

1    THE COURT:  That's all he's testifying, isn't it?

2    MR. PHILLIPS:  And he's saying he had his

3  relationship with Little Michael is a drug relationship.  I

4  can lay a better foundation, or attempt to.

5  BY MR. PHILLIPS:

6  Q.  Let me step back.  Have you ever dealt drugs with

7  Mr. Ballard?

8  A.  Yes.

9  Q.  When did you start dealing drugs with Mr. Ballard?

10  A.  2008.

11  Q.  And what kind of drugs were you dealing with Mr. Ballard?

12  A.  Cocaine.

13  Q.  And that began in 2008?

14  A.  Yes.

15  Q.  And who made the -- how did you meet Mr. Ballard to begin

16  selling drugs with him?

17  A.  Through Little Michael.

18  Q.  Okay.  And when Little Michael introduced you to

19  Mr. Ballard, what was the purpose of that introduction?

20  A.  To get some cocaine.

21  Q.  Who was going to get the cocaine?

22  A.  Well, Martin was going to get the cocaine.

23  Q.  From you?

24  A.  Well, through Little Michael.  Because he didn't know me

25  at that time, know what I'm saying, we didn't know each other

1    like that at that time.

2    Q.  Who was going to ultimately supply the cocaine?

3    A.  Me.

4    Q.  And who were you getting the cocaine from at that time?

5    A.  Rufino, the Spanish guy from Orangeburg.

6    Q.  The one that you mentioned eventually got arrested?

7    A.  Yes.

8         MR. PHILLIPS:  Your Honor, I'll just leave that other

9    line of questioning, this is fine.

10   BY MR. PHILLIPS:

11   Q.  Now, tell us about the first meeting that you had with

12   Mr. Ballard and what the transaction entailed.

13   A.  Well, when Michael came, he got, you know, what he

14   normally get from me, and then Mr. Ballard was with him.  And

15   then he told me that he wanted to purchase nine ounces.  So I

16   supplied it.  And at that point in time I passed the cocaine

17   into Michael's hand, and then he passed it to Mr. Ballard.

18   Q.  Where did this happen?

19   A.  At -- on 176 at a spot that I used to sell drugs from.

20   Q.  Was it a business?

21   A.  No, it was a home, residence.

22   Q.  Okay.  176; where was that?

23   A.  Holly Hill.

24   Q.  And it was for nine ounces?

25   A.  Yes.

MARION MACK - DIRECT EXAMINATION

1  Q.  How much did you charge for that nine ounces?

2  A.  I believe at that time like 7500, 8000 that I was

3  charging.

4  Q.  Now, did you have any other dealings with Mr. Ballard?

5  A.  One more occasion around that time with another

6  nine ounces, and you know, basically that was it.

7  Q.  How -- tell us about that transaction.

8  A.  The second time around when Michael came, you know, he

9  came back with him.  And then this time, you know, I got the

10  money from Mr. Ballard's hand and gave him the drugs.

11  Q.  And where did that occur?

12  A.  The same place.

13  Q.  And that was still 2008?

14  A.  Yes.

15  Q.  And it was nine ounces on both occasions?

16  A.  Yes.

17  Q.  What, if any, other dealings did you have with Mr. Ballard

18  regarding cocaine?

19  A.  The last time they came, Michael and a guy -- another guy

20  named Derrick and Mr. Ballard came, and they met me out in the

21  country, and we switched vehicles; they wanted to purchase

22  two kilos.

23  Q.  Let's slow down.  Out in the country; where was that?

24  A.  Place called Unity, like the country, that's what we call

25  it, the country.

1  Q.  Is it near Holly Hill or near Summerville or --

2  A.  It's more near Holly Hill, but it's like if you ever

3  traveled 27, it's like right in the -- near Highway 27 that

4  would lead you kind of down to their side.

5  Q.  And what year are we in?

6  A.  We're still like in '08.  This was the last transaction

7  around that time.

8  Q.  Now, you said you met in the country.  How did this

9  meeting come about?

10  A.  Well, Michael called me and said that, you know, they

11  was --

12       MR. THEOS:  Your Honor, I'm going to object to what

13  Little Michael may have said.

14       MR. PHILLIPS:  Your Honor, I think we've established

15  clearly there's a conspiracy, he said that he met for another

16  drug transaction in 2008, which is what he's describing, and

17  asked how that meeting came about.  And he says Mr. Michael,

18  Little Michael called him to set up this meeting to sell

19  drugs.  So I think that's clearly co-conspirator statement

20  made in the furtherance of the conspiracy.

21       THE COURT:  That's not -- that's an entirely

22  different conspiracy, I gather, than from this one.

23       MR. PHILLIPS:  Your Honor, I don't have the

24  indictment in front of me, but I believe we went back fairly

25  far.

MARION MACK - DIRECT EXAMINATION

1          THE COURT:  Let's see, I've got --

2          MR. PHILLIPS:  I believe we charged back to 2006.

3    We've charged Mr. Ballard with the entirety of what we know

4    about his drug -- and this would fall within that conspiracy.

5          THE COURT:  Well, let's see.

6          MR. PHILLIPS:  It's not limited to Mr. Brothers.

7          THE COURT:  Let's see how far the indictment -- I had

8    a copy of it right here.  2000 -- you go back to 2006.

9          MR. PHILLIPS:  Yes, sir, and this is in 2008.

10         THE COURT:  I think he can -- this indictment charges

11   conspirators, I'm sure it says named and unnamed.  I didn't

12   see it.  Let's see.  Maybe it doesn't.

13         MR. THEOS:  Your Honor, it states both known and

14   unknown, but it doesn't state both named and unnamed.  And I

15   would just point out, Your Honor, that there's no -- that even

16   if we believe what Mr. Mack says, that that would be a

17   separate conspiracy, and there's no nexus, and no nexus

18   established between that alleged drug transaction or those

19   transactions and that alleged conspiracy and the one that

20   we're on trial for today.

21         MR. PHILLIPS:  Your Honor, we have witnesses that

22   will testify that during that period that we alleged, they

23   were getting cocaine from Mr. Ballard.  In this case, we have

24   one that was supplying it.  I mean, the conspiracy that

25   Mr. Ballard was involved with was his dealing of cocaine,

MARION MACK - DIRECT EXAMINATION

1  that's what's on trial.  And I think it's appropriate to

2  establish during the conspiracy where his source of supply for

3  the cocaine was in this instance.

4         THE COURT:  Yeah, it does say known and unknown.  Who

5  told me it didn't say known and unknown?

6         MR. THEOS:  Your Honor, I said that it did say known

7  and unknown, but it did not reference named and unnamed

8  defendants.

9         THE COURT:  Well, known and unknown has the same --

10 You know what you do?  You remind me of Bob Bickerton, but I'm

11 going to let you ask the question.

12        MR. PHILLIPS:  Yes, sir.  That could be good and bad.

13        MR. RICHARDSON:  Your Honor, that sounds like a

14 compliment.

15        THE COURT:  It is in a way.  He knew more about the

16 rules of evidence than anybody I've ever seen.  But go ahead,

17 Mr. Phillips.

18        MR. PHILLIPS:  Your Honor, just for the record, we

19 anticipate Mr. Brothers will testify he was being supplied by

20 Mr. Ballard in 2008.  Anticipated testimony.  So this would

21 clearly fall within --

22        THE COURT:  I let you ask it so you can continue.  I

23 might change my mind.

24 BY MR. PHILLIPS:

25 Q.  Tell us how this meeting in the country, as you describe

1    it, came about.

2    A.   Little Michael called me one day he was like it was dry on

3    his end, he needed something.  So I told him like I didn't

4    have it on hand, he like he want -- he was like they wanted to

5    purchase two kilos.  At the time I didn't know who was "they,"

6    but when he met me, you know, it was him, the guy named

7    Derrick and Mr. Ballard.

8    Q.   Did you know Derrick's -- Had you ever seen Derrick

9    before?

10   A.   No.

11   Q.   Did you know his last name?

12   A.   No.

13   Q.   Street name?

14   A.   (Witness shakes head negatively.)

15   Q.   Continue, please.

16   A.   And so they met me.  We switched vehicles, because like I

17   say, I didn't have the two kilos in my possession.  So I told

18   Michael that I would have to go get it.  So we switched

19   vehicles, Michael was in his white pickup, I think it was a

20   GMC or Chevy.

21   Q.   So it was Michael's truck?

22   A.   Yeah.

23   Q.   What were you driving?

24   A.   I was driving a little Honda.

25   Q.   All right.

MARION MACK – DIRECT EXAMINATION

1    A.  And so, you know, they gave me the money, each one of them

2    gave me separate money.  I remember Mr. Ballard's money was in

3    bank wraps, in like a plastic -- I guess from the bank, you

4    know, the plastic seal they give you.

5    Q.  Do you recall how much money he gave you?

6    A.  I think it was about maybe 20, 25.

7    Q.  What was the total for the two kilos?

8         THE COURT:  Twenty or 25 what?

9    A.  Thousand.

10   Q.  And what was the total you were charging them for the

11   two kilos?

12   A.  Sixty.

13   Q.  Okay.  Please continue.

14   A.  And so, you know, I left, went to Orangeburg, got

15   two kilos, came back, met up with Michael, gave it to him,

16   and, you know, he left.  But when he came back, Mr. Ballard

17   wasn't with him when he came back, you know, got it, it was

18   just him and Derrick.

19   Q.  And do you remember, do you recall how much you made off

20   those two kilos?

21   A.  At that time I think I got them for like 28; I think it

22   was like 4000 total.

23   Q.  Who did you get the two kilos from?

24   A.  Rufino.

25   Q.  And so that's 2008.  Did you have any other dealings in

1   2008 with Mr. Ballard?

2   A.   No, that's it.

3   Q.   Okay.  Since then, have you had any other dealings with

4   him?

5   A.   In 2011 -- I didn't have none during that time.

6   Q.   And why was that?

7   A.   Because I had stopped for awhile.  You know.  I just

8   started, you know, doing my club thing and just really leaving

9   it alone.

10  Q.   All right.  So tell us what happened in 2011.

11  A.   Yeah.  I was coming from -- I was going -- actually going

12  to Summerville, and on the way I took 78 coming through, you

13  know, Ridgeville and Campbell Thicket and all that stuff.  So

14  I stopped at a four-way little gas station there.  And I

15  bumped into Little Michael.  And me and him was talking, and I

16  asked him, did he know anything.  And he told me like, you

17  know, that Mr. Ballard had, you know, some things going on,

18  and we was going to go down to the house where they was at.

19  Q.   Let's stop there.  When you asked him, do you know

20  anything, what were you talking about?

21  A.   I was talking about like did he know where any cocaine was

22  at.

23  Q.   All right.  Please continue.  What happened next?

24  A.   And so he was telling me that, you know, that they little

25  place wasn't too far from where he was at, but he had to go

1    get his daughter from school.  So he was like he would give me

2    directions and he would call and let Mr. Ballard know I was on

3    the way.

4        So I left from there, he gave me directions, I turned off

5    of 78 on Orangeburg Road that takes me through Jedburg and

6    through the back side of Summerville, just like a long

7    stretch.  And it's a -- you get way down there, it's a dirt

8    road on the right.  And, you know, I met Mr. Ballard back in

9    that dirt road.

10   Q.  Do you recall the name of the street?

11   A.  It's Acorn, Acrum.  Acrum, Acorn, something along those

12   lines.

13   Q.  All right.  Where did you meet Mr. Ballard?

14   A.  Well, went off on the dirt road and, you know, I passed it

15   first, you know, going up in there.  And then like you can

16   make like a little cul-de-sac, almost like turnaround a little

17   bit.  And when I came back, on the left I turned up and kind

18   of went up the driveway like at this tree or whatever the case

19   may be, and I met him, it was like a tree with him and some

20   guys was hanging out at right there.

21   Q.  All right.  And what happened next?

22   A.  I told him that, you know -- you know, I seen Michael, and

23   he was like Mike already told him what was up.  So I told him

24   I only had like 7500 on me.  And, you know, I told him that I

25   would bring him the rest of the money back, what he wanted.

1  Q.  What were you buying?

2  A.  I was trying to get nine ounces at that time.

3  Q.  And what was he charging?

4  A.  I think it was like 9000.  Nine thousand, because I think

5  it was 1500 that I owed him.

6  Q.  And what did he say about being short?

7  A.  He was like, you know, I told him I would be right back,

8  at least if not that afternoon, like later on the next day.

9  And he was like, no problem.  So I came back, and the next

10 day, and I brought the 1500 to him, gave it to him.  And then

11 one of my friends, he wanted a half kilo, so you know, I

12 didn't meet him at the tree that next time.  Right before you

13 get to the dirt road it was a house right off the dirt road,

14 right before the dirt road actually.  And I met him in that

15 yard, and that's when I got the half kilo from him.

16 Q.  Do you remember anything specifically about that house?

17 A.  Basically had like a -- well, it was kind of like up on

18 like a little hill somewhat, and you know, I remember the

19 truck, 18 wheeler being parked kind of like next to the house,

20 like backed up.

21 Q.  And what happened?  So you went in the house and met

22 Mr. Ballard?  Is that what you did?

23 A.  Yeah, kind of met him like -- I walked on the porch, and

24 he came to the door, and then I went like in the -- like

25 through like a little living room area towards the kitchen,

1    but I didn't go all the way in the kitchen.  And I gave him,

2    you know, the money, and he gave me a half kilo.

3    Q.  How much did he charge you?

4    A.  Seventeen five.

5    Q.  Did you notice anything else when you were inside that

6    house?

7    A.  I saw some money on the table, and looked what appeared to

8    be like maybe, you know, wrapped up like maybe like two or

9    three, you know, kilos.  But it wasn't open, so I can't really

10   say that's what it was.  But from me knowing the -- you know,

11   how kilos come wrapped, you know, that's what it seemed to be.

12   Q.  And did anything else happen while you were at the house?

13   A.  Other than that, no.  Coming out, you know, coming out the

14   door, me and him was talking.  And, you know, he got on his

15   phone, and I guess he said something about somebody Chase

16   pulling up or whatever, and I seen the Escalade, but I never

17   seen if that was the guy or whatever.

18   Q.  What color was the Escalade?

19   A.  White.

20   Q.  Now, during the dealings with Mr. Ballard, have you ever

21   seen him with a gun?

22   A.  The one time at the -- at the house when he was -- went to

23   get the phone out his pocket to get on the phone, you know --

24             THE COURT:  What was your answer to that?  Go ahead.

25   A.  Sir?

1    THE COURT:  What's the answer to the question about

2  the gun?

3  A.  Yes.

4  Q.  Tell us what you saw.  You were telling us, I think the

5  judge just wants you to finish answering.

6  A.  Oh, he was reaching into his pocket like I could see the

7  bulge of the gun at the butt of it, you know, on his waist.

8  Q.  Did you see enough of the gun to describe it?

9  A.  Just pretty much, you know, seemed to be chrome, like it

10  wasn't a whole bunch showing, know what I'm saying, I really

11  wasn't trying look too hard, but I know a gun when I see one.

12  Q.  And that was on the last occasion?

13  A.  Yes.

14  Q.  How much drugs did you buy on that occasion?

15  A.  Half a kilo.

16  Q.  Did you ever see him with a gun on any other occasion?

17  A.  Not that I can recall.  Like I think pretty much I think

18  the first time I saw him like you can see the bulge through

19  his shirt, but you know, I didn't physically see the gun like

20  I did the last time.

21  Q.  What kind of cars did you see Mr. Ballard driving during

22  the time you dealt with him?

23  A.  Well, at the tree he was saying he had a bubble Chevy, red

24  Chevy, 24s or 26s.

25  Q.  When you say 24s or 26s, what are you referring to?

MARION MACK - DIRECT EXAMINATION

1    A.  Rim.  Rim size.

2           THE COURT:  You're referring to what?

3    A.  Rim size.  Other than that, you know, the other time at

4    the house, I can't say if the car that was in the yard was his

5    or not.  We seen each other at a bunch of street races and

6    stuff like that, so I mean, I seen him in his Mercedes and his

7    dually truck, the white dually truck.

8    Q.  This last -- the last thing we were talking about this,

9    this last transaction, was that your last drug dealing with

10   Mr. Ballard?

11   A.  Yes, sir.

12   Q.  Have you seen him since that time?

13   A.  Yes, sir.

14   Q.  Where?

15   A.  I'm thinking we was out on bond, we was at a street race,

16   and then after that just at Charleston -- not -- yeah, at the

17   jail in Charleston.

18   Q.  And did you -- don't tell us what they were, but did you

19   have any conversations at either of these occasions?

20   A.  At the street race, yes, and then in Charleston, I mean,

21   just a brief -- yeah.

22   Q.  Did you have any drug conversations?

23   A.  No.

24          MR. PHILLIPS:  One moment, Your Honor.  Please answer

25   any questions Mr. Theos has for you.

MARION MACK - CROSS-EXAMINATION

1    A.  Okay.

2                        CROSS-EXAMINATION

3    BY MR. THEOS:

4    Q.  Mr. Mack, you are indicted in a second superseding

5    indictment for how many counts?

6    A.  Two.  On the superseding.  No, three.  Three.  I'm sorry.

7    Q.  I can show it to you.  You're indicted in count number

8    one, conspiring to distribute cocaine, correct?

9    A.  On my original indictment I was just indicted on one

10   count.

11   Q.  I'm talking about the second superseding indictment.

12   A.  Okay.  It was four counts total.

13   Q.  The one that you've entered the plea agreement on.

14   A.  Yes.  Four counts total.

15   Q.  You're indicted -- there's six counts total, you're

16   indicted in four of them, correct?

17   A.  Yes.

18   Q.  And one of them is for what we call a 924(c) count, which

19   is possession of a firearm during the commission and

20   furtherance of your drug dealing, correct?

21   A.  Yes, sir.

22   Q.  And that carries a mandatory minimum sentence, does it

23   not?

24   A.  Yes, sir.

25   Q.  Which would run consecutive to whatever sentence you

1  received on the drugs or any other count, correct?

2  A.  Yes, sir.

3  Q.  And in accordance with your plea agreement that's been

4  made an exhibit, in accordance with that plea agreement, you

5  are pleading guilty to count one, which is the conspiracy

6  count.

7  A.  Yes, sir.

8  Q.  And all those other three counts are being dismissed, is

9  that correct?

10  A.  No, sir.

11  Q.  That's not correct?

12  A.  That's not.

13  Q.  Which other counts are you pleading guilty to, two?

14  A.  Two.

15  Q.  The 924(c) count, that's being dismissed, correct?

16  A.  Yes, sir.

17  Q.  As well as the other count.

18  A.  The marijuana count, yes, sir.

19  Q.  The marijuana count.  All right.  So in exchange for your

20  entering this guilty plea, you received at least a five-year

21  reduction of your potential sentence, which would have run

22  consecutive to your other charges, correct?

23  A.  Yes, sir.

24  Q.  All right.  And the basis for that plea agreement was that

25  you would provide substantial assistance, correct?

MARION MACK - CROSS-EXAMINATION

1    A.  Yes, sir.

2    Q.  And what that means is that you would assist the

3    Government in prosecuting others, essentially, correct?

4    A.  Yes, sir.

5    Q.  That you would tell them everything you knew about the

6    drug business.

7    A.  Yes, sir.

8    Q.  Everything you knew about drug -- people selling drugs,

9    people buying drugs, people in the drug business, correct?

10   A.  Yes, sir.

11   Q.  And you also agreed, as you said earlier, to be truthful.

12   A.  Yes, sir.

13   Q.  And you understood, in entering that agreement, that that

14   meant that if you were not truthful, then the Government could

15   pursue prosecution on all counts, the plea agreement would be

16   null and void, and you could also be prosecuted for additional

17   criminal charges, is that correct?

18   A.  Yes, sir.

19   Q.  Now, you also agreed as part of that, you agreed to submit

20   to any polygraph tests that the Government might offer,

21   correct?

22          MR. PHILLIPS:  Objection, Your Honor.

23          MR. THEOS:  Your Honor, they introduced this, this is

24   the Government's exhibit, they've introduced it.  I certainly

25   have the right to cross-examine --

MARION MACK – CROSS-EXAMINATION

1      THE COURT:  I haven't stopped you.

2      MR. THEOS:  Thank you.

3  A.  Yes, sir.

4  Q.  All right.  You have not been offered any polygraph tests,

5  correct?

6  A.  No, sir.

7  Q.  You haven't been tested on whether or not you are being

8  truthful or have been truthful with the Government related to

9  any of the information you provided, correct?

10  A.  Yes, sir.

11  Q.  Now, as a result of your proffer agreement, which was

12  signed on -- it was signed on July the 7th, I believe, do you

13  have it in front of you?

14  A.  No, they took it off the screen.

15  Q.  I'll hand it up to you.  This is a copy, but you take a

16  look at it.  Is that your signature on the last page?

17  A.  Yes, sir.

18  Q.  And what is the date?

19  A.  21st of July.

20  Q.  What year?

21  A.  2014.

22  Q.  So on July the 7th, 2014, you agreed to provide

23  cooperation to the Government and agreed to disclose

24  everything you know about the drug business --

25      THE COURT:  You've already been over all this.

1        MR. THEOS:  I understand, Your Honor, if you just

2    grant me a little leeway.

3    BY MR. THEOS:

4    Q.  You agreed to do those things, correct?

5    A.  Yes, sir.

6    Q.  And then ultimately on February the 4th of 2015 you signed

7    the plea agreement.  So that is about six months, six to seven

8    months later, correct?

9    A.  Yes, sir.

10   Q.  All right.  Now, as a result of the proffer agreement, you

11   met with various agents on one, two, three, four, five

12   different occasions, correct?

13   A.  Yes, sir.

14   Q.  You met with them first on August the 11th, 2014, and that

15   was shortly after the proffer agreement was signed, is that

16   right?

17   A.  Yes, sir.

18   Q.  And on July -- I'm sorry, on August the 11th of 2014 you

19   were in the Dorchester County police department, right?

20   A.  No, sir.

21   Q.  Well, that's what the report -- Is it your testimony you

22   weren't at the Georgetown --

23   A.  You said Dorchester?

24   Q.  -- police department?

25   A.  You said Dorchester.

MARION MACK - CROSS-EXAMINATION

1   Q.  I'm sorry, Georgetown police department.

2   A.  Yes, sir.

3   Q.  You were at the Georgetown police department?

4   A.  Yes.

5   Q.  And there were agents present, Agent Rodney Rape was

6   present and he interviewed you, is that correct?

7   A.  Yes, sir.

8   Q.  Your lawyer was there with you?

9   A.  Yes, sir.

10  Q.  Mr. Stavrinakis?  Is that right?

11  A.  Yes, sir, correct.

12  Q.  And when you were interviewed, you were truthful in your

13  interview, your information you proffered, were you not?

14  A.  Yes, sir.

15  Q.  And you disclosed everything you knew at that time,

16  correct?

17  A.  Well, one of the questions they asked me at that point in

18  time.

19  Q.  Wasn't it part of your proffer agreement that you would

20  disclose everything that you knew about people in the drug

21  business and your knowledge about drug activities?  Isn't that

22  true?

23  A.  Well, most of my proffers were basically about when we

24  went into each meeting, was basically about what -- they

25  wanted to know what was involved in my case at that point.

MARION MACK - CROSS-EXAMINATION

1    Q.  Well --

2    A.  And then -- and then as we got farther down the road,

3    other things came up, and they started asking me more

4    questions.  That's when we got some more down into basically

5    who I was dealing with otherwise.

6    Q.  Well, let's talk about what you told them, what you

7    disclosed on August the 11th of 2014.  You told them -- you

8    provided them with 15 different individuals that you were

9    buying drugs from or selling drugs to, correct?

10   A.  I couldn't say how many.  You know, all --

11   Q.  Let's go through them.  You told them that a person by the

12   name of Five, the nickname of Five?

13   A.  Five?

14   Q.  F-I-V-E.

15   A.  I never heard of that.

16   Q.  So you deny telling Officer Agent Rape that a source of

17   your marijuana was somebody by the name of Five?

18   A.  Five?  I don't --

19   Q.  You deny that?  It's okay if you deny it, I'm just asking

20   you the questions.

21   A.  I just don't recall Five right now, I just don't recall

22   that.  When -- on August 11th, my first proffer was basically

23   about my beginning stages of dealing marijuana, stuff like

24   that.  When it came down to everything else --

25   Q.  Well, on August the 11th of 2014, when you were

MARION MACK - CROSS-EXAMINATION

1  interviewed, you told them that Five was your source of supply

2  of marijuana.  So are you now denying that?

3  A.  I mean, it could be true, but what I'm saying is that's

4  like from 2000 -- from the time what they proffered on me at

5  the beginning of my proffer session in 2011 was the beginning

6  of my drug dealing.  So I mean, the Five, you know, at that

7  time back then, yes.

8  Q.  Could be?

9  A.  Could be, yeah.

10  Q.  You're not certain, but it could be?

11  A.  Yeah.

12  Q.  And then you also -- you also told them that you began to

13  get a larger supply of marijuana from somebody -- from

14  somebody by the name of Little B?

15  A.  Yes.

16  Q.  Is that true, or you don't recall that either?

17  A.  Little B?  No.

18  Q.  You don't recall that either?

19  A.  No.

20  Q.  Okay.  You don't deny that's what you told them at the

21  time.  As you sit here today, you just don't recall that,

22  correct?

23  A.  Those names you're saying, like -- I don't --

24  Q.  And then in 2004 is when you began apparently to sell

25  cocaine, or was it 2005 or '6?  Which was it?

MARION MACK – CROSS-EXAMINATION

1   A.   About '05.

2   Q.   Okay.  So if you told them in that interview of August the

3   11th, 2014, which was not quite a year ago, if you told them

4   that you began selling powder cocaine in 2014, that would not

5   have been true?

6   A.   If I told --

7   Q.   Because you actually, as you --

8          THE COURT:  Let him answer the question you asked

9   him.

10  A.   You asked me if I told them that I started selling cocaine

11  in 2014?

12  Q.   2004.

13  A.   2004?  That's what you're saying?  Asked me if I told them

14  that I started selling cocaine in 2004?

15  Q.   I'm asking you that question because today you said you

16  began in 2005 or 2006, so I'm asking if you -- is it true that

17  you told them you began in 2004?

18  A.   I mean, like 2004 to -- like 2004, 2005, 2006, those were

19  my beginning stages of selling any drugs.

20  Q.   So as you sit here today, you really can't be certain

21  whether it began in 2004 or 2005 or 2006, but it was somewhere

22  in that --

23  A.   2004, like the end of 2004, yeah, I can honestly say that.

24  The end of 2004 going into 2005.  So yeah, I can honestly say

25  from 2004 going into 2005.

MARION MACK - CROSS-EXAMINATION

1  Q. And you're comfortable with that answer?

2  A. Yes.

3  Q. And at that time you were being supplied by somebody by

4  the name of Donell Williams, is that correct?

5  A. Yes.

6  Q. How many times would you say you made purchases from

7  Mr. Williams?

8  A. Maybe four, five.

9  Q. That would be it? That's your testimony?

10 A. A few times. Yeah.

11 Q. So if you told the agents back on August the 11th, 2014,

12 that it was over ten times, that wouldn't have been true, or

13 is your testimony today not true? Which --

14 A. I mean, my testimony is true, but the way I have come out

15 of the proffer meetings is from speaking on how many times

16 that I make a transaction, and they calculate, you know, they

17 calculate any more times. So I can honestly say that I

18 probably said that they asked me about particular deals

19 between individuals, and I might have said, you know, well, I

20 did that four or five times, and then they asked me a total at

21 the end and I may say, you know, like ten times, but you

22 know --

23 Q. So you might have told them ten, but it was really four?

24 A. Well, I'm just saying in between and -- I would round out

25 the time I knew him and actually dealt with him and ten.

1  Q.  All right.  And you were selling that cocaine to a fellow

2  by the name of Crab?

3  A.  Yes.

4  Q.  Nickname Crab?  How many times would you say you sold Crab

5  cocaine?  That you got from Mr. Williams.

6  A.  I mean, basically that was the only person I was really

7  dealing with to him, so about the same.

8  Q.  So it was either four or five times or over ten times?

9  Whatever --

10 A.  Yeah, about right at ten or a little better.

11 Q.  But a minute ago you said there was four or five, so --

12 A.  I just told you ten right before we went into that.

13 Q.  So you're going to stick with ten?

14 A.  Yes.

15 Q.  Now, at the end of 2005, you began dealing with a Spanish-

16 speaking person?  Is that what you testified to earlier?

17 A.  Yes.

18 Q.  And this person, his nickname was Shark?

19 A.  No, that's a different guy.

20 Q.  That's a different person.

21 A.  Yes.

22 Q.  So if you told the agents in 2005 that the Spanish-

23 speaking person that you began dealing with had the nickname

24 of Shark, then you would have been either lying or mistaken

25 then?

1   A.  No.

2   Q.  Or are you lying or mistaken now?

3   A.  No.  I remember Shark.

4   Q.  So you remember Shark.  So was that a person that was

5   supplying you in 2005?

6   A.  No.

7   Q.  That's what you told the agents.

8   A.  I just -- had to have been 2006, because I told them after

9   my cousin passed.

10  Q.  So if you told the agents it was Shark, then you were --

11  then that wasn't true?

12  A.  I told the agents that Shark was supplying me, and that

13  was true, Shark did supply me.

14  Q.  But not in 2005?

15  A.  No.

16  Q.  So again, my question is, if that's what you told the

17  agents, that Shark was providing you with drugs in 2005, that

18  would not have been true?

19  A.  Exactly.

20  Q.  Okay.  Now, sometime after that you began -- you began

21  brokering deals, acting as a middleman for some associates of

22  Shark's, is that right?

23  A.  Yes.

24  Q.  So would that have been 2005 or 2006; do you have any

25  idea?

1   A.  It would be around 2006.

2   Q.  And one of those people -- one of those people, one of

3   those associates, had the nickname of Fat Boy?

4   A.  Yes.

5   Q.  Is that right?

6   A.  Yes.

7   Q.  And so how many times would you say you dealt with Fat Boy

8   in buying or selling drugs?

9   A.  I can't really recall the number right now.  Maybe -- Fat

10  Boy, I dealt with him quite often, like, you know, maybe six,

11  seven times.

12  Q.  Six or seven times?

13  A.  Yes.

14  Q.  But what quantities would you deal with him in?

15  A.  He would bring like a kilo or two at a time.

16  Q.  And was it cocaine or was it marijuana?

17  A.  Cocaine.

18  Q.  Not marijuana?

19  A.  They brought me some marijuana, too.

20  Q.  Well, we don't want to know whether it was probably

21  marijuana.

22  A.  I didn't say probably, I said they brought me some

23  marijuana too.

24  Q.  I'm sorry?

25  A.  I said they brought me marijuana also.

1   Q.  So how much marijuana did you get from him?

2   A.  Approximately 30, 40 pounds, 50 pounds.

3   Q.  So if you told the agents you got 75 to 100 pounds of

4   marijuana from Fat Boy during this time frame, that wouldn't

5   have been true?

6   A.  Yes, it would be true.

7   Q.  Well, which is it?  Thirty to 50 pounds, or 75 to a

8   hundred?

9   A.  I mean, you asked me a total quantity, then I would say

10  it's 75, maybe a hundred.  But you asked me did I have any

11  other dealings besides cocaine, and I said yes, marijuana.

12  And --

13  Q.  Well, we'll let the judge be the judge of what your answer

14  was.

15      Now, you also said that you were purchasing and being

16  supplied marijuana from a fellow by the name of Lonell

17  McFadden, who was also -- his nickname was June?  Is that

18  right?

19  A.  I don't recall -- I mean, he was in my case and -- but I

20  don't recall saying -- getting marijuana from June.  No.

21  Q.  All right.  So again, if that's what you told the agents

22  on August the 11th, 2014, then that would not have been true?

23  Is that right?

24  A.  I mean, if it's in my proffer, then it's true.  I mean --

25  like I don't -- I went through a whole bunch of things in the

1    proffer.  And so with some of the things that I said, you

2    know, when they were asking me certain questions, some things

3    they wrote down, I can't say they made a mistake and wrote

4    something different.  But I will say that I have dealings with

5    Lonell, yes, and cocaine dealings, I just don't recall ever

6    saying that I got weed from Lonell.

7    Q.  But the problem though is you're here to testify, and

8    you're supposed to tell the truth.  And so if what you're

9    testifying to today is different than what you proffered, then

10   that creates a problem; you understand that, don't you?

11   A.  Yes, sir, I can certainly see that.

12   Q.  Now, when did you -- you apparently at some point began

13   dealing with another Spanish-speaking person by the name of

14   Rufino?

15   A.  Yes, that's the one, yeah.

16   Q.  And Rufino is -- Rufino is also in -- is Rufino indicted

17   in your indictment?

18   A.  No, sir.

19   Q.  When did you start dealing with Rufino?

20   A.  In 2008.

21   Q.  And Rufino was a source of cocaine for you?

22   A.  Yes.

23   Q.  So Rufino was a source of cocaine, and Lonell McFadden was

24   a source of cocaine?

25   A.  Yes.

1   Q.  Samuel Richards apparently was a source of cocaine for

2   Lonell McFadden, correct?

3   A.  Yes.

4   Q.  And my understanding is that you made several purchases of

5   kilos from Mr. Rufino?

6   A.  Yes.

7   Q.  And were they kilo purchases, ounce purchases?

8   A.  Kilo.

9   Q.  Okay.  And how many kilos would you say you purchased from

10  Mr. Rufino?

11  A.  Altogether I would guess the whole time, about 25.

12  Somewhere up in there.

13  Q.  And the people you were selling to at that time, they were

14  who?

15  A.  Do you want me to say the names?  Well.  Little Michael,

16  of course a guy named Dre.

17  Q.  I'm sorry?

18  A.  A guy named Dre.

19  Q.  Can you spell that?

20  A.  D-R-E.

21  Q.  Who else?

22  A.  Guy named Jermain.

23  Q.  Jermain?

24  A.  Yes.

25  Q.  Do you know a last name?

1    A.   No, I can't.

2    Q.   Who else?

3    A.   Mr. Ballard at one point.

4    Q.   How about Big Boo?

5    A.   Big Boo?

6    Q.   Yeah, were you selling some of this cocaine you were

7    getting from Mr. Rufino to Big Boo?

8    A.   No.

9    Q.   Were you selling some of the cocaine you were getting from

10   Mr. Rufino to a fellow with the nickname of Jelly?

11   A.   Yes.

12   Q.   Let me ask you this.  Since you now recall selling to Dre,

13   Little Michael and Jermain, why didn't you tell that to the

14   agents when you interviewed with them in August of 2014?  You

15   only told them about Big Boo and Jelly, but now you say you

16   don't recall Big Boo.  Why didn't you tell them?

17   A.   Like I say, you know, when we was talking about some of

18   this stuff, like the topic just got switched, like to

19   meetings.  I mean, you're an attorney sitting with your

20   client, and you watch the meetings go from asking one question

21   with two agents, to going to directly and specifically a whole

22   nother route.  And then the meeting is off at that point, and

23   then when you come back to the next meeting, they don't even

24   go back to what you were talking about the first time, and

25   which was what happened in my situation.  We went from how I

MARION MACK - CROSS-EXAMINATION

started -- I can recall this -- how I started off, to some of

the dealings that I had, till that meeting was over. Then

went right into specifically my case. Which when they started

to, I guess, wiretap me or whatever, and then the proffer

meetings was directly basically about the wiretaps, up until

we got back to a point to who I was supplying, like coming

backwards.

Q. Well --

THE COURT: Mr. Theos, I've been sitting up here for

30 minutes listening to different names and different people.

Y'all asked me to hear this. I don't need any more on this

kind of thing.

MR. THEOS: I won't go through each one of them, but

I would like to make a point with each interview, Your Honor,

but I will not continue this line of questioning.

THE COURT: I think this is a good time to stop.

BY MR. THEOS:

Q. Mr. Mack, you were interviewed extensively on August 11th,

2014; your lawyer was present, and at least one DEA agent was

present, correct?

A. Yeah, two agents and my lawyer.

Q. Okay. And you gave them, according to my count,

information regarding 15 different individuals that you --

that were your -- primarily your source and some other

individuals that you purchased that you sold drugs to,

1    correct?

2    A.   Yes.

3    Q.   Not once did you mention Martin Ballard's name, did you?

4    A.   At that point, I did.  At that point I did, at the end of

5    the meeting I did.  And that's how we ended up getting back to

6    Mr. Ballard.  I'm just being honest.  Like --

7    Q.   I've got the agents' report here, and there is absolutely

8    no reference --

9         THE COURT:  He didn't write that report now.

10   A.   I mean, I understand what you're saying, but the point I'm

11   making is that at the end of a lot of meetings, when they

12   close their notebooks, they were asking me about other guys

13   and we were talking about the situation, and they wouldn't

14   take notes.  Then when we got back to a point where

15   Mr. Ballard came into play, that's when I gave my proffer on

16   the, you know, the small part of time that I had dealings with

17   him.

18   Q.   Well, so if Mr. Ballard's name is not mentioned or

19   referenced whatsoever in the August 11th, 2014 report, it is

20   because the agents neglected to put it in there?

21   A.   Well, I think at that point because of where I fell at the

22   bottom of doing my proffer, I was like the last person in my

23   case to do a proffer, and so they were more interested in the

24   dealings that I had gone on in my own case, versus all this

25   other stuff, you know.  And that's what we went into a whole

1   lot of -- my case was a whole lot of wiretapping, they was

2   trying to, I guess, pretty much get some things together on

3   who were making statements on me, you know.

4   Q.  On September the 23rd, 2014, you were interviewed again.

5   A.  Um-hum.

6   Q.  Is that right?

7   A.  Yes, sir.  I think.

8   Q.  And that interview, again, took place at the Georgetown

9   police department?

10  A.  I believe so.  I don't -- I don't know the exact dates,

11  but I believe sometime in September.

12  Q.  I've got your report in front of me, I'm just trying to

13  push through this.  If you question the date, I'll show it to

14  you.

15  A.  I mean, I'm just saying September, okay.

16  Q.  And in that interview of September the 19th, 2014, your

17  lawyer was also present, correct?

18  A.  Yes.

19  Q.  And again, my camp is that you offered information

20  regarding 16 individuals that were either your source, or

21  people you were selling to.  And I can go through all the

22  names, but I'll spare the judge going through all those names,

23  but you offered the names of 16 different individuals.

24  A.  Um-hum.

25  Q.  Not once did you mention Martin Ballard's name in that

1    second interview.

2    A.  Like I said, sir, all my proffers were basically going

3    back and forth, except my first proffer, about the people in

4    my case had already proffered on me and gone through my

5    wiretaps and everything that was going on.  So when it got

6    back around to Mr. Ballard, then my agent, you know, he came

7    back and he saw me with another agent different from, you

8    know -- it was -- normally my agent was Mr. Rape and Mr. Van,

9    but this time he came back with another guy.

10   Q.  So again, if Mr. Ballard's name is not included in the

11   names that you provided to law enforcement, with your attorney

12   present, then agents just neglected to write it down?  They

13   neglected to make a record of it?

14   A.  I'm guessing so, that's what you got in your reports, like

15   I don't know what all they put in the reports once I tell them

16   what I tell them.  I can't really say.

17   Q.  Now, you were interviewed again on October the 10th of

18   2014.  And again, that was at the Georgetown police

19   department, that was pursuant to your proffer agreement, and

20   this one was to review your wiretap calls; you remember that

21   one?

22   A.  Yes.  I had quite a few reviewing that.  But --

23   Q.  And at that time you provided information regarding Whaley

24   Woodly.

25   A.  Yes.

MARION MACK - CROSS-EXAMINATION

1    Q.   An Hispanic male that you met at Mr. Woodly's house?

2    A.   Yes.

3    Q.   Do you remember that?

4    A.   Yes.

5    Q.   A fellow by the name of Carlos, nickname Carlos, his name

6    is Jose Alfredo Siero Renoso?

7    A.   Yes.

8    Q.   And somebody by the name of Country?

9    A.   Yes.

10   Q.   Also Lonell McFadden?

11   A.   Um-hum.

12   Q.   His nickname is June.  A person by the name of Corey and a

13   person by the name of Curtis Green.

14   A.   Yes.

15   Q.   And those were based on the wiretaps that the Government

16   had on your phone, correct?

17   A.   Some of the names that you called out had nothing to do

18   with the wiretaps or the case, but yes.

19   Q.   So again, in that interview you neglected to mention one

20   time that Martin Ballard was involved in drug dealings with

21   you in any fashion whatsoever.

22   A.   Yes, sir.

23   Q.   And again, this was pursuant to your proffer agreement in

24   which you agreed to be completely truthful and forthcoming,

25   correct?

1  A.  Yes, sir.

2  Q.  On October the 31st you again were interviewed, and again

3  at the -- I'm sorry, October the 28th.  And again, that's at

4  the Georgetown police department.

5  A.  Yes, sir.

6  Q.  Pursuant to your proffer.  And you provided information

7  regarding a number of individuals, 22 individuals on that

8  different -- on that date.  I can go through all of them, I

9  won't, but I can if you want me to, but not one time in your

10  discussion, in your proffer with those agents with your lawyer

11  present, not one time did you provide any information about

12  Martin Ballard, did you?

13  A.  You got the names in front of you.  If you say it wasn't

14  in there, it wasn't in there.  I mean --

15  Q.  And if it wasn't in there, you didn't provide them the

16  information, correct?

17  A.  I provided information, but you know, I -- once again, I

18  can't say what they wrote down, like I just know how my

19  proffer meetings went.  I understand what you saying, but I

20  know how my proffer sessions went.

21  Q.  Again, on December the 9th, 2014, about a month and a half

22  or so before your plea agreement, this time you were at the

23  Georgetown County detention center.

24  A.  Yes.

25  Q.  And you remember that interview?

MARION MACK - CROSS-EXAMINATION

1    A.  I don't specifically remember it.

2    Q.  At that time you provided information regarding Joel

3    Robinson, Lance Sellers, Troy Whaley and somebody named Leo

4    One and some other people.

5    A.  Yes.

6    Q.  Again, you did not mention Mr. Ballard in any way in that

7    meeting.

8    A.  Actually, that was the second time that I actually did

9    mention Mr. Ballard.

10   Q.  So if you mentioned Mr. Ballard, then again, it was the

11   agent's fault in not referencing that in their report.

12   A.  I would guess so.

13   Q.  Agent's mistake.

14        THE COURT:  What did you say, agent's what?

15   BY MR. THEOS:

16   Q.  Agent's mistake?

17   A.  Yes, sir.

18   Q.  Agent's neglect?

19   A.  I would guess so, yes, sir.

20   Q.  Now, the first time that you really did mention

21   Mr. Ballard's name to law enforcement was on January the 27th,

22   2015, and that was --

23        THE COURT:  You've got to be the most interviewed

24   person I've ever seen.

25   Q.  They talked you to a lot, didn't they?

1  A.  I told you, like I said, at the end of the day, you know,

2  my case, what was going on, and I got arrested in Atlanta when

3  I came back to South Carolina, like everybody else had

4  proffered on me.  So my case, when they started proffering me,

5  asking me questions, like you know, it would get me like

6  10:00, and they would end by lunchtime, and that's why I guess

7  I kept having meetings.  You know, it wasn't my fault.

8  Q.  In fact, one of the interviews they cut short and had to

9  stop because they felt that you weren't being truthful with

10  them, is that right?

11  A.  No, that wasn't the case.

12  Q.  If that was in one of those reports written by the agents

13  that interviewed you, again, you would say agent's mistake,

14  it's neglect and that wasn't true?

15      THE COURT:  You said it was in there now.  There's no

16  evidence before the Court that it was in there.

17      MR. THEOS:  We've got them, they've been produced,

18  Your Honor, I'm happy --

19      THE COURT:  I didn't mean you asked him if it was in

20  there.  You've got to ask him something that -- apart --

21  BY MR. THEOS:

22  Q.  At any time were you deceptive or did the agents believe

23  you -- expressed to you that they believed you were being

24  deceptive in your interviews?

25      MR. PHILLIPS:  Objection, Your Honor, foundation.  He

MARION MACK - CROSS-EXAMINATION

1    can't testify to what the agents believed.

2            THE COURT:  Go ahead, ask the question, let's go.

3    BY MR. THEOS:

4    Q.  At any time was it expressed to you by any of these agents

5    during your proffer interviews that they believed you were

6    being deceptive and weren't being truthful?

7    A.  Well, I would say that the reason the meeting was ended

8    was because at that point in time my attorney had requested

9    lined sheets, or the wiretap information, and they believed

10   that I had heard the wiretaps, and pertaining to the questions

11   they was asking me, and I didn't have a chance to hear it or

12   see the line sheet.  So they wanted to end the meeting till

13   the attorney got a chance to get with me and go over

14   everything with me and then continue the meeting from that

15   point.

16   Q.  Now, on -- again, back to January 27th, when you were

17   interviewed -- I'm sorry, January 26th, when you were

18   interviewed related to Mr. Ballard.

19   A.  Yes.

20   Q.  You were interviewed by Agent Rape and Agent Migioia, is

21   that correct?

22   A.  Yes, sir.

23   Q.  Now, you testified that you supplied Little Michael in

24   2008, the first time with Little Michael, you supplied him

25   with nine ounces of -- nine ounces of cocaine, is that right?

1    A.  Yes.

2    Q.  What was the date?

3    A.  I can't tell you what day it was.

4    Q.  Was it in January, was it in February, was it in March, do

5    you have any idea what month it may have been?

6    A.  No.

7    Q.  Was it spring, summer, winter or fall?  Can you --

8    A.  I mean, I would say, you know, a little after August,

9    maybe -- maybe around this time, sometime maybe a little -- I

10   can't remember the month.  I would be sitting up here lying to

11   you if I told you I remember the month.

12   Q.  Sometime a little after August, but about the time now?

13   This is May.

14   A.  I mean, like I said, I would be sitting here lying to you

15   if I told you I could tell you the day and month.  If I could

16   tell you the month, then I could tell you the day, and I

17   can't.

18   Q.  You can't tell us the month, can't tell us the season, you

19   can't tell us the date.  Can you tell us what time of day it

20   was?

21   A.  It was like middle of the day.

22   Q.  I'm sorry?

23   A.  Most likely the middle of the day, because I wouldn't do

24   nothing after dark.

25   Q.  So it was most likely the middle of the day; you can't

1    tell us what time it as?

2    A.  No.

3    Q.  And you didn't have anybody else with you that could

4    corroborate or support what you've testified to about that, do

5    you?

6    A.  I mean, other guys at the house, I mean, they know I had

7    dealings with Little Michael, but I mean, no one -- walking up

8    to the car didn't sell me nothing.

9    Q.  And can you tell us what -- who was driving what type of

10   cars?

11   A.  Little Michael was driving one time.  Well, both times he

12   was driving, but -- his car.  Yes, sir.  A Camry.  He had a

13   Camry, green Camry.

14   Q.  What kind of Camry?

15   A.  Green Camry.

16   Q.  And was Mr. Ballard, was he driving a car?

17   A.  No.

18   Q.  Not on that first buy?

19   A.  Not on the second one either.

20   Q.  And the second one you said took place about a week later?

21   A.  Yes.

22   Q.  And so of course since we don't know what season, month or

23   day, we don't know what a week later means.  You don't -- you

24   can't tell us when that was either.

25   A.  A week later?

1   Q.  Week later from the first, but since you don't know when

2   the first one was, you can't tell us when the second one was,

3   it was just sometime about a week later?  That's about all you

4   can tell us?

5   A.  Yeah.

6   Q.  You said that there was a third buy.

7   A.  Yes.

8   Q.  And that was also in 2008?

9   A.  Yes.

10  Q.  But again, you can't tell us a date, time, season,

11  anything, any details?

12  A.  Well, I told him, in detail on how we end up meeting,

13  where we met at and switching cars and -- you know.

14  Q.  An area called Unity, which is near Holly Hill?

15  A.  Yes.

16  Q.  So your testimony is that all three of these alleged deals

17  took place in the Holly Hill area?

18  A.  Yes.

19  Q.  Not in the Summerville area, not in the Walterboro area,

20  but in Holly Hill area?

21  A.  Yes.

22  Q.  Okay.  Now, you then said that you had one other dealing

23  with Martin Ballard.

24  A.  Yes, sir.

25  Q.  And that was in 2011.

1  A.  Yes.

2  Q.  So three years later?

3  A.  Yes.

4  Q.  What were you doing in between?

5  A.  I was just basically running my clubs and promotion and

6  doing work.

7  Q.  You weren't involved in the drug business for those three

8  years?

9  A.  Not too much, no.

10  Q.  Well, I mean, not too much in the drug business is like

11  saying you were just a little bit pregnant.  Were you in the

12  drug business or not?

13  A.  I mean, like I said, you know, not too much on the aspect

14  of me doing it from day to day like I was back in 2008, no.

15  Q.  But you were still in the drug business.

16  A.  Well, yes.

17  Q.  Now, when -- in 2011 would it have been in the first part

18  of the year, as you seemed to indicate to the agents, the

19  first half of the year or so?  2011?

20  A.  I didn't -- they didn't ask me what part of the year it

21  was.

22  Q.  Can you tell us --

23  A.  I mean --

24  Q.  -- whether it's in the, you know, January, February,

25  March, April, May, can you tell us?

1  A.  I'm pretty much lost right there.

2  Q.  Can you give us your best guess?  If you had to say when

3  it was, what would you say?

4           THE COURT:  If he doesn't know, he doesn't know.

5           MR. PHILLIPS:  We object to him guessing.

6           THE COURT:  I agree.  You can ask him if he knows.

7  If he doesn't, he can't guess.  When he says he doesn't --

8  when he says he doesn't know, you can suggest the time to him

9  and let him say if it was that.

10 BY MR. THEOS:

11 Q.  Would you agree with me that it was most likely in the

12 first half of 2011?

13 A.  Sir, I couldn't agree with that.  I mean I couldn't --

14 because I can't really tell you what month was it or when was

15 it.

16 Q.  You only had one dealing though, in 2011?

17 A.  No, actually two.

18 Q.  My understanding was you had one dealing, and then you

19 went over a second time to this house that you claimed you

20 went to.

21 A.  Um-hum.

22 Q.  But you didn't -- I don't remember you testifying, and I

23 haven't read it anywhere that you actually purchased or

24 provided drugs in that second visit.

25 A.  The second visit was a half kilo.

1   Q.   Okay.  You sure?

2   A.   Yes.

3   Q.   You're sure that wasn't the first visit?

4   A.   No.

5   Q.   What was the first visit?

6   A.   Nine ounces.

7   Q.   And the second visit, you said, was a half kilo?

8   A.   Yes.

9   Q.   And if that's true, why didn't you tell the agents that

10  when you --

11          MR. PHILLIPS:  Objection.

12          THE COURT:  You can't hold him from a statement that

13  he didn't sign, unless he signed it, or he didn't write.

14          MR. PHILLIPS:  Your Honor, and he's reading it wrong,

15  Your Honor.

16          THE COURT:  Well --

17          MR. PHILLIPS:  It doesn't say what he's saying.  If

18  he's going to cross-examine him on it, he has to at least be

19  accurate, and it clearly says he returned, and that's when he

20  purchased the half kilo.

21      (Counsel consult off the record.)

22  BY MR. THEOS:

23  Q.   Now, so you went to this house on three occasions then?

24  A.   No, two.  I didn't go to the house on the second occasion.

25  The first occasion I went to -- I guess, you know, where they

1    hang out in the neighborhood, like a -- I don't know how far

2    right -- it's real close to the house though, off the dirt

3    road.

4    Q.  You can't identify the house for us, what it looked like;

5    was it a mobile home, was it a brick house?

6    A.  It was a house with a screened porch on it.  I didn't

7    really recall if -- if it was brick or block.

8    Q.  I heard you testify earlier about a tree.

9    A.  Yes, up in the road.

10   Q.  Was that in the same area?

11   A.  I'm assuming so, because the road was right next from the

12   house.

13   Q.  Okay.

14   A.  So you would pass the house to get to the road to turn in

15   where you go down to the tree.

16   Q.  Okay.  And earlier you testified about, I believe, about a

17   Mercedes?

18   A.  Yes.

19   Q.  Okay.  And that was a Mercedes you say you saw Mr. Ballard

20   driving?

21   A.  Yeah, we was at a bike race one night.

22   Q.  Okay.  And that is the gold Mercedes that you mentioned

23   before?

24   A.  Yes.

25   Q.  Mr. Mack, you have not entered your guilty plea yet, is

MARION MACK - CROSS-EXAMINATION

1   that correct?

2   A.  No, sir.

3   Q.  And when are you scheduled to do that?

4   A.  I don't know right now.

5   Q.  And the entering of that plea and your compliance with the

6   plea agreement and then ultimately your sentence hinges on

7   your cooperation and your testimony here, does it not?

8   A.  Yes.

9           MR. PHILLIPS:  Nothing further from the Government.

10          THE COURT:  Wait a minute.

11          MR. THEOS:  I don't have any further questions.

12          MR. PHILLIPS:  I apologize.  We have no further

13  questions, Your Honor.

14          THE COURT:  All right, you may be excused then.

15          MR. PHILLIPS:  The marshal is going to get our next

16  witness, who is Norman Robinson.

17          THE CLERK:  State your name for the record.

18  A.  Norman Robinson.

19     NORMAN ROBINSON, a witness called by the Government, first

20  having been duly sworn, testified as follows:

21                      DIRECT EXAMINATION

22  BY MR. PHILLIPS:

23  Q.  State your name for the record.

24  A.  Norman Robinson.

25  Q.  How old are you?

1  A.  Twenty-nine.

2  Q.  Where were you born?

3  A.  Alvin, South Carolina.

4  Q.  Alvin?  A-L-V-I-N?

5  A.  Yeah.

6  Q.  And where have you lived most of your life?

7  A.  Summerville.

8  Q.  And what kind of education do you have?

9  A.  A G.E.D.

10  Q.  And tell the Court briefly about your legitimate job

11  history.

12  A.  I worked overseas for like four months, then I was working

13  at Auto Tech in Summerville.

14  Q.  What kind of training do you have, what were you doing

15  overseas and at Auto Tech?

16  A.  Mechanic.

17  Q.  And you've also engaged in illegitimate or illegal

18  employment as well, correct?

19  A.  Yeah.

20  Q.  In fact, you have a criminal history, you were convicted

21  of assault of a high and aggravated nature in 2004?

22  A.  Yeah.

23  Q.  And you were convicted of failure to stop for blue light,

24  trafficking cocaine and unlawful carrying of a pistol in 2007?

25  A.  Yeah.

NORMAN ROBINSON – DIRECT EXAMINATION

1    Q.  Or thereabouts?

2    A.  (Witness nodded affirmatively.)

3    Q.  And distribution of marijuana in 2007?

4    A.  Yeah.

5    Q.  And in 2010, distribution of crack cocaine within a

6    school?

7    A.  Yeah.

8    Q.  Two separate charges?

9    A.  Yeah.

10   Q.  And have you pled guilty in this case?

11   A.  Yeah.

12        THE COURT:  You say in this case, was he indict --

13   was he a defendant in this case?

14        MR. PHILLIPS:  Your Honor, actually I'll clarify

15   that.

16   BY MR. PHILLIPS:

17   Q.  You were indicted in this case that we're present for with

18   Ivory Brothers and other co-defendants, correct?

19   A.  Yes.

20   Q.  And you pled guilty and resolved your position in this

21   case, but you pled to an information, is that right?

22   A.  Yes.

23   Q.  A different charge?

24   A.  Yes.

25   Q.  It wasn't originally indicted.

1    A.   Yes.

2    Q.   What was that charge that you pled guilty to?

3    A.   Using a communication device to facilitate a drug

4    transaction, I think.

5    Q.   And we're going to show you Government's Exhibit 10 N.   If

6    you'd look at that screen.   Is that the information you pled

7    guilty to?

8    A.   Yeah.

9    Q.   In September of last year?

10   A.   Yeah.

11   Q.   And we're going to put up Government's Exhibit 10 CC.

12   Before you pled guilty did you enter an agreement with the

13   Government?

14   A.   Yeah.

15   Q.   And let's go -- Do you recognize that document?

16   A.   Yeah.

17   Q.   What is it?

18   A.   The plea agreement.

19   Q.   And if we go to page seven, is that your signature on page

20   seven of Exhibit 10 CC?

21   A.   Yeah.

22   Q.   Now, what is your understanding of the agreement that you

23   made with Government in this case?

24   A.   To tell the truth.

25   Q.   Okay.   And tell the truth regarding what?

1    A.  My participation.

2    Q.  In what?

3    A.  In this case.

4    Q.  Okay.  And what, in return, has the Government agreed to

5    do if you tell the truth and cooperate in this case?

6    Truthfully.  What's your understanding?

7    A.  About my plea?

8    Q.  Yes, sir.

9    A.  Yeah, like I completed my -- the charge that I plead to.

10   Q.  Okay.  And that's the only agreement the Government has

11   made that -- that you would be allowed to plead to that

12   information as opposed to the original indictment?

13   A.  Yes.

14   Q.  Okay.  Now, prior to entering your plea, did you enter

15   into a proffer agreement?

16   A.  Yes.

17   Q.  This is Government's Exhibit 10 Q.  Is that the proffer

18   agreement you entered into?

19   A.  Yeah.

20   Q.  And in that agreement what did you promise to do?

21   A.  Tell the truth.

22   Q.  Now, we've gone over the criminal history and you have

23   drug convictions.  When you did you start selling drugs?

24   A.  When I was like 16.

25   Q.  What kind of drugs were you selling?

NORMAN ROBINSON - DIRECT EXAMINATION

1   A.  Marijuana.

2   Q.  And how long did you sell marijuana?

3   A.  It was like sort of off and on till like 18 almost.

4   Q.  And did you start selling any other kind of drugs?

5   A.  Yeah.

6   Q.  What did you start selling?

7   A.  Crack.

8   Q.  When did that start?

9   A.  About like -- I was like 16 when I started selling the

10  crack, and it was like 13 when I started doing the marijuana.

11  Q.  Okay.

12          THE COURT:  How old are you now?

13  A.  Twenty-nine.

14  BY MR. PHILLIPS:

15  Q.  Now, you started selling crack; were you buying your crack

16  or were you buying powder cocaine?

17  A.  Buying crack.

18  Q.  All right.  Then you would resell it?

19  A.  Um-hum.

20  Q.  Did you ever start buying powder cocaine?

21  A.  Yeah.

22  Q.  When did that start?

23  A.  When I was like about like 21, when I started buying

24  powder.

25  Q.  And what would you do with the powder cocaine?

NORMAN ROBINSON - DIRECT EXAMINATION

1  A.  Cook it up.

2  Q.  When you say cook it up, when would you cook it up, what

3  does that mean?

4  A.  Like I would turn it into crack.

5  Q.  Okay.  And so you cooked crack before?

6  A.  Yeah.

7  Q.  On many occasions?

8  A.  Yeah.

9  Q.  Can you tell the Court how you cooked crack, and different

10  methods you used.

11  A.  Like I was like if I wanted the purest, I just put less

12  baking soda and just cook it down in the microwave.  Like put

13  it in a jar.

14  Q.  When you cook -- Let's just take it from the beginning.

15  What do you need to cook crack?

16          THE COURT:  Has that got anything to do with me?

17          MR. PHILLIPS:  It does, Your Honor, because it will

18  relate to later things in the case.

19          THE COURT:  All right.

20          MR. PHILLIPS:  We'll go through it quickly.

21  BY MR. PHILLIPS:

22  Q.  Briefly, just tell what materials you need to cook crack.

23  A.  A glass jar, baking soda and water.

24  Q.  And what else?

25  A.  And a hanger or fork.

1    Q.   Okay.  Do you need cocaine?

2    A.   Yeah, and cocaine.

3    Q.   So you said if you want it more pure, you would do what?

4    A.   Heat it up and like drop it back down and just let it set

5    up.

6    Q.   And what is that called?

7    A.   Drop.

8    Q.   What do you call that?

9    A.   Drop.

10   Q.   And is there another method you would use?

11   A.   Yeah, like you can whip it to double it.

12   Q.   And what does that mean?

13   A.   Like making more.

14   Q.   How would you whip it, how would you double it?

15   A.   Well, you got to stretch it, like whip it with a fork or

16   something.

17   Q.   So you whip the cocaine with the fork?

18   A.   (Witness nodded affirmatively.)

19   Q.   What else do you add to the cocaine?

20   A.   Baking soda.

21   Q.   Okay.  All right.  And you have been selling -- did you

22   ever sell powder cocaine?

23   A.   Yeah.  On and off.

24   Q.   Okay.  You've been selling powder and crack cocaine up

25   until your arrest in this case?

1   A.  (Witness nodded affirmatively.)

2   Q.  Okay.  Did you ever -- Do you know Martin Ballard?

3   A.  Yes.

4   Q.  Do you see him in the courtroom today?

5   A.  Yes.

6   Q.  Can you tell the Court where he is?

7   A.  Right there.

8   Q.  And describe him for the Court.

9   A.  Glasses and bald head.

10          MR. PHILLIPS:  The record will reflect the defendant

11  identified Mr. Ballard.

12  Q.  How do you know Mr. Ballard?

13  A.  I met him through my cousin.

14  Q.  Who is your cousin?

15  A.  Wallace.

16  Q.  What's his last name?

17  A.  Felder.

18          MR. THEOS:  I couldn't hear.

19  Q.  Spell it.  Just spell it for the Court.

20  A.  His last name?

21  Q.  Yeah.

22  A.  F-E-L-D-E-R.

23          THE COURT:  I didn't need -- I could spell that.

24          MR. PHILLIPS:  Your Honor, they didn't hear.  I was

25  just making sure the --

1    MR. THEOS:  I just couldn't hear it back here.

2    MR. PHILLIPS:  I apologize.  That was for Mr. Theos'

3  benefit.

4  BY MR. PHILLIPS:

5  Q.  About when did this happen?  When did you meet

6  Mr. Ballard?

7  A.  It was around like March, April, 2011.

8  Q.  All right.  And tell me how that meeting came about.

9  A.  I needed to get some stuff, and he had just came home, so

10  I hollered at him.

11  Q.  When you said he had his game on, what do you mean?

12  A.  Hum?

13  Q.  When you said he had his game on, what do you mean?

14  A.  No, I said I needed to get some stuff.

15  Q.  Okay.  What stuff did you need?

16  A.  Some cocaine.

17  Q.  And why did you contact him?  Mr. Ballard.

18  A.  Because he told me he had a good price, my cousin told me

19  I could get it for like a good price.

20  Q.  From Mr. Ballard?

21  A.  Um-hum.

22  Q.  And real quickly, before you started dealing with

23  Mr. Ballard, who were you getting your cocaine from?

24  A.  A man named Dave.

25  Q.  And why did you stop dealing with Mr. -- this David?

1    A.  It was kind of like garbage sort of.

2    Q.  Okay.  And after that, after you stopped dealing with

3    Dave, that's when you started dealing with Mr. Ballard?

4    A.  Well, like I went to prison, and then when I came home,

5    that's when I meet up with Ballard, like that's when my cousin

6    came home.

7    Q.  So tell us about when you first started buying cocaine

8    from Mr. Ballard.

9    A.  Like I wasn't really doing too much in that time, so I

10   hollered at him, some small stuff, and like I would get like

11   tens.  Then I was like go down and get sevens.

12   Q.  When you say tens, what do you mean?

13   A.  Like ten grams.

14   Q.  Of what?

15   A.  Crack.

16   Q.  Okay.  So you were buying it already cooked?

17   A.  Yeah.

18   Q.  And when you said sevens, what do you mean?

19   A.  Like seven grams.

20   Q.  In this quantity, in this amount, how long were you making

21   purchases from Mr. Ballard in 2011?

22   A.  That's like, you know, sometimes like take me like a week

23   or so just to move the ten or something like that.  Sometimes

24   it was like I lose out and crush it or something like that, so

25   I had to go back down.  So it was like I might have it like a

1  week, week or two, something like that.

2  Q.  About how many purchases of this amount did you make,

3  approximately?

4  A.  Probably dealt like 20 or 30 times.

5  Q.  And for approximately how many ounces of crack cocaine?

6  A.  About like I'd say about like six.

7  Q.  Okay.  Did you ever buy powder cocaine from Mr. Ballard?

8  A.  Yeah.

9  Q.  How much did you buy of powder cocaine?

10  A.  Half ounce.

11  Q.  Only a half ounce?

12  A.  Um-hum.

13  Q.  During the dealings you had with him?

14  A.  Um-hum.

15  Q.  What were you going to do?  What did you do with that half

16  ounce?

17  A.  I cooked it.

18  Q.  Into crack?

19  A.  Yeah.

20  Q.  Was there anything of significance regarding that crack

21  cocaine that you -- or that cocaine that you eventually turned

22  into crack?

23  A.  Yeah, I got arrested with it.

24  Q.  Okay.  So we've talked about your dealings generally.

25  Where would you purchase crack cocaine from Mr. Ballard?

1  A.  Like under the tree or at the top of the road at this

2  house.

3  Q.  Where was that?  What street?

4  A.  Ancrum Lane.

5  Q.  And when you said under the tree, can you describe that to

6  the Court?

7  A.  It's on a dirt road like off to the right.

8  Q.  What road is Ancrum Lane off of?

9  A.  Orangeburg.

10  Q.  Okay.  So you went down Ancrum Lane and there's a tree?

11  A.  Yeah.

12  Q.  And where would Mr. Martin be when you met with him?

13  A.  Like at the tree, or he be coming to the tree or

14  something.

15  Q.  Okay.  And that's where your exchange would occur?

16  A.  Um-hum.

17  Q.  And how much were you paying for this amount of crack

18  cocaine?

19  A.  Like 300 for the ten and like 200 for the sevens.

20  Q.  The cocaine that you bought from Mr. -- or crack cocaine

21  that you bought from Mr. Ballard, was that the only cocaine

22  that you ever saw in his presence?

23  A.  No.

24  Q.  Tell the Court about that.

25  A.  Saw him like kind of like a brick one time.

1    Q.  A brick?

2    A.  Yeah.

3    Q.  What do you mean by a brick?

4    A.  A kilo.

5    Q.  Tell the Court about that time.

6    A.  I came up there, and like me -- I had a girl with me, and

7    we pulled up and he was out there, and like --

8    Q.  Where was he when you pulled up?  Where did you pull up?

9    A.  Under the tree.

10   Q.  Okay.  And you had a girl with you?

11   A.  Yeah.

12   Q.  What happened?

13   A.  Like I guess when he saw the girl, he was want to show up

14   or something, so like ran across the road and came back out

15   and he whipped the brick out.  First I didn't saw it, then

16   when I saw it I was like, he's tripping man.  I hollered at

17   him, I'm like I'll holler at you later.  So when I got in the

18   car she was like, he pulled out a brick.  And I'm like, man,

19   we're running with dog, like, man, he hot.  So I was like

20   yeah.

21   Q.  And when you say a brick, you're talking about what

22   appeared to be a kilo of cocaine?

23   A.  Yeah.

24   Q.  Did he do anything else while y'all were out there?

25   A.  Counted some money and stuff.

1    Q.   Tell the Court about that, what do you mean?

2    A.   I mean he just whipped some money out like counting

3    through them.

4    Q.   Was that money that was -- that you had given him?

5    A.   No, some other money.

6    Q.   What did you think about that situation with him showing

7    the brick and the money?

8    A.   Like real reckless, man, like I was thinking like he was

9    crazy, man, like he didn't know who I had in the car and he

10   did all that, like -- reckless.

11   Q.   Now, did you ever -- have you ever seen Mr. Ballard cook

12   crack cocaine?

13   A.   Yeah.

14   Q.   Tell the Court about that.

15   A.   We was at the house off of Orangeburg, and I went over

16   there to holler at him, and when I got there he was cooking

17   up.

18   Q.   When you say he was cooking up, and he is being

19   Mr. Ballard?

20   A.   Yeah.

21   Q.   What was he doing?  What did you see him do?

22   A.   Like cooking the crack, whipping it.

23   Q.   He was whipping it?  What was he doing when he was

24   whipping it?

25   A.   Like doubling it.  Stretching it.

1    Q.  When you said double, what are you talking about, the
2    weight?
3    A.  Yeah.
4    Q.  And what physically was he doing, describe that to the
5    Court.
6    A.  Like he was spinning it with a fork.
7    Q.  So Mr. Ballard was spinning what with the fork?
8    A.  The cocaine.
9    Q.  Okay.  Did you talk to him about that?
10   A.  Yeah, I was looking at it, I was like, dang, that thing
11   like jumping, isn't it?
12   Q.  What did you say?
13   A.  I was saying like it was jumping, like expanding, like
14   doubling.
15   Q.  I'm sorry, I spoke over you.  When you said it was
16   jumping, what do you mean by that?
17   A.  Like it was doubling.
18   Q.  And given your experience cooking crack cocaine, what did
19   that mean to you?
20   A.  Like it was pretty good.
21   Q.  What was good?
22   A.  The cocaine.
23   Q.  And why; what was good about it?
24   A.  Like it was doubling real like -- it wasn't hard to double
25   it like.  It was doubling really easy.

1  Q.  Does that have anything to do with the purity?

2  A.  Yeah, it was pretty good doing it like that.

3  Q.  We're going to play a phone call in a minute, but I just

4  have a quick question.  What vehicles have you seen

5  Mr. Ballard driving?

6  A.  Like platinum colored Benz and --

7  Q.  What kind -- a Benz, you said?

8  A.  Yeah, Mercedes.

9  Q.  All right.

10  A.  And a dually truck.

11  Q.  Any other cars?

12  A.  A red convertible old school car.

13  Q.  Now, during your dealings with him in 2011, did you ever

14  see him in possession of a firearm?

15  A.  Yeah.

16  Q.  And tell us about that.  How often, where would he have

17  it, tell the Court that.

18  A.  He had pretty much pretty regularly.

19  Q.  Could you describe the gun?

20  A.  It was a chrome gun.  Like a 45 probably, 40 or 45.  Be

21  like a 45.

22  Q.  Now, did you ever see any other transactions Mr. Ballard

23  had with other people with drugs?

24  A.  Yeah.

25  Q.  Tell the Court about that.

1    A.  One of them, we was at the house, and another dude that

2    pulled up, and like he serve him a little -- a big bag of

3    cocaine.

4    Q.  What was that -- you said a dude; what was he driving?

5    A.  An Escalade.

6    Q.  And do you know who that was?

7    A.  Cheddar.

8    Q.  Cheddar?

9    A.  (Witness nodded affirmatively.)

10   Q.  Do you know his real name?

11   A.  Chase Mosley, I believe it is.

12   Q.  Can you describe what he looked like?

13   A.  Big tall dude, bald head, big beard.

14   Q.  All right.  Now, in this case you received the discovery,

15   and when you met with the agents you listened to a phone call,

16   didn't you?

17   A.  Yeah.

18   Q.  And it was a phone call as part of this investigation?

19   A.  Yeah.

20   Q.  And you read a transcript as well?

21   A.  Um-hum.

22   Q.  And --

23        MR. PHILLIPS:  Your Honor, for you and your clerk's

24   convenience, it's in the binder, going to be on the screen as

25   well, the transcript.  This is going to be call 397.  It's

1   Exhibit 9 B.  We're going to publish that.

2      (Audio recording was played.)

3       MR. PHILLIPS:  It's been admitted at the beginning;

4   we're going to publish it now.

5       THE COURT:  All right.

6      (Audio recording was played.)

7   BY MR. PHILLIPS:

8   Q.  For the record, that call was recorded as part of the

9   wiretap on October 6, 2011.  Mr. Robinson, could you hear that

10   call clearly?

11   A.  Yeah.

12   Q.  Did you recognize the voices on that call?

13   A.  Yeah.

14   Q.  Who was on that phone call?

15   A.  Me and Ballard.

16   Q.  Martin Ballard?

17   A.  Yeah.

18   Q.  All right.  And when you asked -- when y'all are talking

19   about a girl talking about a little four something for real,

20   what were y'all referring to?

21   A.  Cocaine.

22   Q.  Who was the girl?

23   A.  Yevette.

24   Q.  Yevette who?

25   A.  Calvin.

1  Q.  And so tell the Court what y'all talking about?

2  A.  Yevette had called me and asked me if -- if I think he

3  would deal with her.  And I'm like you, got to holler at him.

4  That's when he called, then she called back and was saying

5  like he say I was supposed to come or something like that.

6  And I was like, I don't know.  So next thing I know, the whole

7  thing went dead.  But she told me that she was looking like

8  four or half from him or something like that.

9  Q.  And four and a half of what?

10  A.  Ounce of cocaine.

11  Q.  And when you said she wanted that from him, who was she

12  referring to?

13  A.  Martin.

14  Q.  Okay.  And when he said, "I give you that bread and you

15  cover that with her, like that, or do you feel like messing

16  with her like that," what were y'all talking about?

17  A.  If I go and did the deal.

18  Q.  If you would do the deal?

19  A.  Yeah.

20  Q.  When he told you, "If I give you that bread," what did you

21  understand that to mean?

22  A.  Like give me the cocaine.  Go take it to her.

23  Q.  Would you be the middleman?

24  A.  Yeah.

25  Q.  Now, later, it's line -- about line 14 or 15, you stated,

1   "My side's hot, them boys sitting on your stuff."  What were

2   you talking about?

3   A.  The police been on my side.

4   Q.  And how; what did you see?

5   A.  I saw the narcotic truck.

6   Q.  Doing what?

7   A.  Sitting there looking like -- at my house, and looking at

8   us in the yard and stuff.

9   Q.  And I'm going to -- this is page three of the transcript.

10  When you said the Charger, Explorer and Silverado truck, what

11  were you describing?

12  A.  The narcotic car.

13  Q.  And when -- in line nine -- excuse me.  In line 11, when

14  Mr. Ballard stated, "No, man, so you shut that bitch all the

15  way down," what did you understand him to mean?

16  A.  Stop everything.

17  Q.  Stop everything; what?  What did you stop?

18  A.  All the activity.

19  Q.  What activity?

20  A.  My drug activity.

21  Q.  Okay.  This is page four, line eight.  You stated, "That's

22  when I been like dirty as a bitch, I went back in the house

23  and get clean, come back outside."  What were you meaning, or

24  what were you talking about?

25  A.  I had some drugs on me.

1    Q.   Is that what being dirty meant?

2    A.   Yeah.

3    Q.   And how did you get clean?

4    A.   I put it up.

5    Q.   Why did you do that?

6    A.   Because the police been outside.

7    Q.   And on the next page, it's line four, Mr. Ballard stated,

8    "They probably wait to come out of that bitch, so you got to

9    go, you got glide really easy."  What did you understand him

10   to mean in that exchange?

11   A.   Say it again?

12   Q.   When he told you, "You got to glide real easy, you got

13   switch up on their ass now," Mr. Ballard told you that, what

14   did you understand that to mean?

15   A.   I got to move light like, like watch out, move around

16   there, get up out of there.

17   Q.   And why was that?

18   A.   Because it was hot, like, they probably done catch me or

19   something.

20   Q.   Okay.

21        MR. PHILLIPS:   One moment, Your Honor.

22   Q.   Now, you talked about the transactions you had.  Why did

23   you stop dealing with Mr. Ballard, or did you stop dealing

24   with him?

25   A.   Yeah, like -- like he was -- he talked reckless on the

1  phone.  And like I always get little feelings like something

2  ain't right with these phones, man.  And like if I called him,

3  I be like I'm rolling, then he call me back, what you trying

4  to do, that way and talking crazy, man, like every time I go

5  around there, always see police.

6  Q.  Okay.  When you were dealing with him, did he have a lot

7  of phones?

8  A.  Yeah.

9  Q.  So he was changing his phones often?

10  A.  Yeah.

11  Q.  Okay.  After last time you dealt with him with drug

12  dealings, have you had any other dealings with him?

13  A.  No.

14  Q.  Have you come across him since you've been arrested?

15  A.  I mean, I seen him in jail, but --

16  Q.  Did y'all have any conversations about your dealings?

17  A.  Oh, no.

18  Q.  Did he ever say anything about the case?

19  A.  No.  He was flipping me off.

20  Q.  He flipped you off?

21  A.  (Witness nodded affirmatively.)

22  Q.  Okay.  Was that before or after you started cooperating?

23  A.  After.

24       MR. PHILLIPS:  Okay.  Please answer Mr. Theos'

25  questions.

1                        CROSS-EXAMINATION

2     BY MR. THEOS:

3     Q.  Mr. Robinson?

4     A.  Yes.

5     Q.  How long have you been in jail?

6     A.  I did 13 months, and I got out on bond in like -- going on

7     four months now.

8     Q.  And while you're out on bond you were using drugs?

9     A.  Yeah.

10              THE COURT:  When he got on bond, what did you ask

11    him?

12              MR. THEOS:  While he was out on bond he was using

13    drugs, is my question, Judge.

14    A.  Yeah, I smoked some marijuana.

15    Q.  Were you also selling drugs?

16    A.  No.

17    Q.  Just buying and using it?

18    A.  I only used one time.

19    Q.  One time?  Well, while you were out on bond, you actually

20    were -- your bond was violated and your bond was revoked, is

21    that right?

22    A.  Yes.

23    Q.  And that was because you -- for a couple different

24    reasons, right?

25    A.  Because I didn't report, and I wasn't working no more.

1    Q.  You didn't report that that company you talked about when

2    you were questioned by Mr. Phillips, that you were actually

3    terminated from that job on December the 8th.  Right?

4    A.  Yes.

5    Q.  And when you were terminated, you were supposed to advise

6    Pretrial Services so they could monitor what you were doing

7    and whether you were working.  Correct?

8    A.  Yes.

9    Q.  And you didn't advise them of that, did you?

10   A.  No.

11   Q.  In fact, you actually lied to them, you pretended like you

12   were still working, and you continued to leave your residence,

13   leave where you were living, in order to make Probation or

14   Pretrial Services believe that you were still working.

15   Correct?

16   A.  No, I just didn't notify them until she caught me.

17   Q.  Well, didn't you continue to leave your residence in the

18   mornings like you were going work?  And then come back in the

19   afternoons?  Didn't you do that in an effort to hide the fact

20   that you weren't working anymore?

21   A.  No, I leave in the afternoon and come back at night, but

22   yeah.

23   Q.  All right, I got the times wrong, but the point's the

24   same.  You were pretending to be working and you would leave

25   in the afternoons and come back at night to make Pretrial

1   Services believe you were still working, right?

2   A.  Yeah.

3   Q.  When, in fact, you weren't working.

4   A.  No.

5   Q.  So you were lying to them, weren't you?

6   A.  I never had talked to nobody.

7   Q.  You were lying by not disclosing that information; you

8   kept the truth from them, didn't you?

9   A.  I guess, yeah.

10  Q.  You also -- and that went on from December the 8th through

11  December the 23rd, is that right?

12  A.  Yes.

13  Q.  So total of 16 days or so?

14  A.  Yes.

15  Q.  Right?  My math might be wrong, but it's a lot of days

16  that you misled Probation and Pretrial Services, correct?

17  A.  Yes.

18  Q.  And during that time you were also smoking pot, isn't that

19  right?

20  A.  No.  The pot was back in '13.

21  Q.  I'm sorry?

22  A.  I got caught smoking the pot back in '13.

23  Q.  So the first time you were out on bond, you were smoking

24  pot?

25  A.  I only been on bond one time.

1   Q.  So I'm a little confused.

2   A.  I got out in May, and I got caught in October.

3   Q.  Got caught --

4   A.  Smoking the marijuana in October.  And I not smoked no

5   more ever since then.

6   Q.  So that violation was in October, and then this other one

7   took place in December?

8   A.  Yeah.  January.  Well, December, yeah.

9   Q.  December.  And as a result of those violations, you

10  were -- your bond was revoked, you were put back in jail?

11  A.  No, they didn't violate me on the marijuana one, they

12  just -- I just did classes.

13  Q.  But they did violate you on --

14  A.  The job thing.

15  Q.  -- the job violation?

16  A.  Yeah.

17  Q.  Failure to report.

18  A.  (Witness nodded affirmatively.)

19  Q.  And you've been in jail ever since?

20  A.  Yeah.

21  Q.  And where have you been in jail?

22  A.  In Georgetown.

23  Q.  The whole time?

24  A.  Yeah.

25  Q.  Now, you know that when you violated the terms of your

1  bond you also violated the terms of your plea agreement, don't

2  you?  Did you know that?

3  A.  No.

4  Q.  Well, your plea agreement, do you have your plea agreement

5  in front of you?

6  A.  Huh-uh.

7  Q.  Do you have it in front of you now?

8  A.  Yeah.

9  Q.  If you look at page three, paragraph five, you agreed to

10  comply and abide by all federal and state laws, did you not?

11  A.  Yes.

12  Q.  And you agreed that smoking pot is a violation of state

13  law, correct?

14  A.  Yes, but the violation was before I pled though.

15  Q.  Violation -- so you broke the law before you entered this

16  agreement, is that what your testimony is?

17  A.  Yes.

18  Q.  And you agree with me that violating the conditions of

19  your bond is also a violation of federal law, because those

20  laws are applicable to you while you are out on bond.  So

21  after September the 11th, 2014, you failed to comply and you

22  violated the term of your bond condition, which is a violation

23  of the federal laws, correct?

24  A.  I guess.

25  Q.  Have you entered your guilty plea?

1    A.   Yeah.

2    Q.   You haven't been sentenced?

3    A.   (Shakes head negatively.)

4    Q.   And your sentence, you know that your sentence hinges on

5    what assistance you provide the Government in this case

6    against Martin Ballard.  You know that.

7    A.   Yes.

8    Q.   And you know that if you do not testify as the Government

9    anticipates and hopes that you testify, to help convict Martin

10   Ballard, that you will not get any sort of credit in your

11   sentence; you understand that?

12   A.   I mean, I understand that I'm supposed to tell the truth.

13   Q.   Now, you said you started smoking pot when you were 13,

14   and then started abusing drugs at that same time?  From age 13

15   to age 29, you have been a drug addict, is that fair to say?

16   A.   I mean --

17   Q.   You've been dependent on drugs for the last 16 years,

18   right?

19   A.   Not really.  Like I wasn't on it like that, not like you

20   trying to make it seem, no.

21   Q.   Well, you participated in a federal program entitled PIER,

22   person incarcerated entering recovery.

23   A.   Yeah.

24   Q.   And wasn't the purpose of that program to address your

25   addiction and your dependence on drugs?

1   A.   Yeah.

2   Q.   You wouldn't have been allowed in that program if you

3   weren't a drug addict and drug dependent, would you have been?

4           MR. PHILLIPS:  Your Honor --

5           THE COURT:  I don't think -- I'm not so sure what the

6   law is, but I doubt if he knows or is in a position to know,

7   from what I know about that program, what the admission

8   requirements are, unless you go over them with him or

9   something.

10          MR. THEOS:  Let me rephrase the question.

11  BY MR. THEOS:

12  Q.   You were put into that program because of your drug

13  addiction and dependency, right?

14  A.   No, I enrolled in it myself.

15  Q.   Because you believed and felt that you had a drug

16  addiction and dependency, correct?

17  A.   No, because I was told that that program helps you.

18  Q.   Helps you what?  Helps you recover from your --

19  A.   Helps you, like that's like a federal program, told it

20  would help you with your federal case.

21  Q.   So you entered the program in order to try to help

22  yourself with the case.

23  A.   Yeah, that was the understanding I got when I was in the

24  jail, but then once I got into the program, I learned the real

25  reason of it.

NORMAN ROBINSON – CROSS–EXAMINATION

1    Q.  And that was to help you with your addiction dependence?

2    A.  Yeah, well --

3    Q.  It didn't quite work though, because you smoked pot again

4    when you got out, right?

5    A.  Yeah.

6    Q.  Now, you were interviewed four times by law enforcement,

7    is that correct?  On April the 11th of 2012, April the 27th of

8    2012, January the 26th of 2015, this year, and then yesterday.

9    Is that correct?  Does that sound right?

10   A.  Not yesterday.

11   Q.  Well, then when were you -- when was the last time you

12   were interviewed by the U.S. Attorney's office or DEA agents?

13   A.  Like last week sometime.

14   Q.  The end of last week?  And in that interview, when you met

15   with them, the purpose of that meeting was to prepare you to

16   testify today, correct?

17   A.  Yes.

18   Q.  They went over with you the questions they were going to

19   ask and the answers they wanted to hear from you today,

20   correct?

21   A.  No, not no answers.

22   Q.  You didn't provide them with the answers to the questions

23   when you met with them last week?

24   A.  I mean, the same thing I said was the same thing I said

25   from the beginning.

1  Q. So you prepared, based on the questions, you pre -- you

2  answered their questions and you prepared your answers for

3  today's testimony, correct?

4  A. I mean, I didn't have to prepare, like it was what it was

5  from the get-go.

6  Q. Um-hum. Now, with respect to Jig, how many times would

7  you say you bought drugs from Jig?

8  A. I don't know, I'd say about -- a good bit of time,

9  probably about when -- more than ten times.

10 Q. All right. And can you give us any dates that you bought

11 drugs from Jig?

12 A. That was back when I came from overseas, back in like '04,

13 '05.

14 Q. Well, but can you give us a year?

15 A. 2004, 2005.

16 Q. And can you give us any dates, either the month or a

17 particular week?

18 A. Back in like -- man -- I would say about -- I would say

19 about December, January, something like that.

20 Q. Of 2004?

21 A. (Witness nodded affirmatively.)

22 Q. Locations where the deals took place?

23 A. Out in like --

24 Q. Tough to remember, isn't it?

25 A. I mean, like I say -- St. Stephens or Moncks Corner.

1   Q.  Like St. Stephens or Moncks Corner?  You began buying

2   crack, my understanding is you began buying crack from

3   somebody named Nino -- or Nino?  Does that ring a bell?  Does

4   that sound familiar?

5   A.  Yeah, but I was buying crack before that.

6   Q.  Who were you buying crack from before that?

7   A.  From my cousin.

8   Q.  What's your cousin's name?

9   A.  Drew.

10  Q.  And when were you buying crack from him?

11  A.  When I was like 16.

12  Q.  But you can't give us dates or times or specific locations

13  when you were buying crack from Drew, can you?

14  A.  I was in Alvin.

15  Q.  All right.  In the Alvin area?

16  A.  (Witness nodded affirmatively.)

17  Q.  But months, time of year, specific dates, you can't give

18  us any of that information, can you?

19  A.  I mean, back when I was like 16.

20  Q.  All right.  With respect to your crack buying from Nino,

21  can you tell us what month that was, what time of year it was,

22  what time of day it was?  Can you give us any of that specific

23  information?

24  A.  I mean it was like back in like -- that was around like

25  the -- around like '06.  It was more like -- it was around

1  like school time when I met him.

2  Q.  School lasts for nine months.

3  A.  Yeah, like in the beginning part.

4  Q.  Any time from August or September through the end of May?

5  Sometime in that general time frame?

6  A.  Yeah.

7  Q.  My understanding is you only bought from him for about two

8  weeks, but so there was a two-week time period sometime

9  between August and May that you bought drugs from, just can't

10  tell us where that two weeks might have fallen?

11  A.  No, sir, about two weeks.

12  Q.  Okay.  Nino is the one who taught you how to cook crack?

13  A.  Um-hum.

14  Q.  Who is Nino; what's his name?

15  A.  I knew him by Nino.

16  Q.  How much dope, how much cocaine do you think you bought

17  from Nino over whatever time frame you were dealing with him?

18  A.  I would say about probably a brick or so.

19  Q.  I'm sorry?

20  A.  Probably bought a brick from him.

21  Q.  And a brick means --

22  A.  A kilo.

23  Q.  One kilo.  So you didn't buy three, four, five, six kilos?

24  Three to five kilos?

25  A.  Could have been like -- I could have bought a brick or two

1  from him, I believe.

2  Q.  Okay.  Well, was it one brick or was -- one brick is equal

3  to one kilo, is that right?

4  A.  Yeah.

5  Q.  So a minute ago when you said it was one kilo, and then I

6  asked you whether it could have been three to five kilos,

7  you --

8  A.  It could have been a brick or two.

9  Q.  Okay.  So if it could have been one kilo, could have been

10  two kilos, it could have been three, four or five kilos, you

11  just don't really know, do you?

12  A.  No.  No, I ain't bought that much from him.

13  Q.  So you didn't buy three to five kilos from him?

14  A.  No, I ain't bought no five --

15         THE COURT:  Does that really make any difference?

16         MR. THEOS:  I think it does, Your Honor, it goes his

17  credibility and reliability as a witness.  He's an historical

18  witness that says he bought certain amounts.

19         THE COURT:  All right.

20  BY MR. THEOS:

21  Q.  2006, 2007, was that the time you started buying cocaine

22  from someone in Atlanta?

23  A.  Um-hum.

24  Q.  And who was that?

25  A.  I don't know the dude.

NORMAN ROBINSON - CROSS-EXAMINATION

1    Q.  Do you know what the dude looked like?

2    A.  Yeah, he was a tall, kind of muscled-up dude.

3    Q.  I'm sorry?

4    A.  He was tall, kind of like muscled up like.  He was a built

5    dude.

6    Q.  Was he black, was he white?

7    A.  Black dude.

8    Q.  I'm sorry?

9    A.  He was a black dude.

10   Q.  Can you tell us anything about his appearance, what he

11   looked like, other than being muscular and black?

12   A.  He was tall, he had like a bald head.  Like --

13   Q.  And my understanding is you made somewhere in the

14   neighborhood of 50 trips to Atlanta to buy drugs from him?

15   A.  About that.

16   Q.  Okay.  Well, where would you meet him?  Would you go to

17   his house, would you go to an apartment, would it be a hotel,

18   where did you meet him?

19   A.  I met him at this house, and sometimes I met him in a

20   parking lot, or sometimes like somebody else would come.

21   Q.  Can you give us an address?

22   A.  I ain't know the address.

23   Q.  Did you have anybody else with you when you made those

24   trips?

25   A.  My cousin went with me one time.

1    Q.  One time one out of 50?

2    A.  (Witness nodded affirmatively.)

3    Q.  And who was that?

4    A.  Wallace.

5    Q.  The same person you talked about before?

6    A.  Um-hum.

7    Q.  Can you give us dates that you went there or months that

8    you went there?  Other than just being between 2006 and 2007?

9    Can you give us any details?

10   A.  Like I went there until I got arrested.  In like December

11   '07.

12   Q.  All right.  Now, you were sentenced to 17 months in '07,

13   is that right?

14   A.  No.

15   Q.  What were you sentenced to?

16   A.  I wasn't sentenced in '07.

17   Q.  Well, as a result of the 2007 arrest, you were convicted

18   of trafficking cocaine, is that right?

19   A.  That was in '08.  I got sentenced in '09.

20   Q.  All right.  And so you were convicted in '08, sentenced in

21   '09, and did you serve a sentence?

22   A.  I was sentenced in '08.  I mean in '09.  That's when I

23   did -- I did 17 in county and I did 11 up the road.

24   Q.  I'm sorry, when you say 17, you mean 17 months?

25   A.  Seventeen months.

1    Q.  And which county jail?

2    A.  Charleston.

3    Q.  And then 11 months where?

4    A.  Turbeville.

5    Q.  So a total of 28 months from when to when?

6    A.  From April of '08 till August of 2010.

7    Q.  So your dealings with -- did you have any dealings with

8    Martin Ballard before you were incarcerated?

9    A.  Which time?

10   Q.  That time.

11   A.  No.

12   Q.  Now, you were -- when you were released in '09, you

13   started selling marijuana again, and powder cocaine, is that

14   right?

15   A.  No.  I wasn't released in '09.

16   Q.  I thought a minute ago you said you were.  When were you

17   released?

18   A.  In 2010.

19   Q.  What date?  What day and what month?

20   A.  August 13th, 2010.

21   Q.  You remember that day and month, right, but you don't

22   remember any days or any months of any of your drug deals, do

23   you?  Do you?

24   A.  Not the exact days, no.

25   Q.  But you were selling, you don't deny the fact you were

1   selling marijuana and powder cocaine, right?

2   A.  Yeah.

3   Q.  Then you again were convicted of a crime and sentenced to

4   three years, correct?

5   A.  No.  That was before I even got sentenced in '09.  That

6   charge was pending.

7   Q.  I'm sorry?

8   A.  That charge was pending, that charge happened in -- I

9   think that was February of '08.

10  Q.  My understanding is that you were arrested on September

11  the 8th of 2011, according to the rap sheet that I was

12  provided by the Government.  Is that not true?

13  A.  September -- Yeah.  Could -- I believe I got arrested in

14  September.

15  Q.  Okay.  And then you were --

16  A.  No, it wasn't September, it was November, I believe it

17  was.

18  Q.  So you don't know when -- do you know when you were

19  arrested?

20  A.  Yeah, I was arrested in November.

21  Q.  November of --

22  A.  '11.

23  Q.  And when were you sentenced?

24  A.  I haven't been sentenced yet.

25  Q.  That's still pending?  According to the rap sheet that I

1   received, unless I read it wrong.

2           MR. THEOS:  One second, Your Honor.

3       (Brief interruption in proceedings.)

4           THE COURT:  It's time to stop anyway.  Why don't you

5   get this straight before you come in here in the morning.

6       Have you got something you want to ask him?

7           MR. THEOS:  No, sir.

8           THE COURT:  Is there anything that anybody needs to

9   know before we break?  All right.  We'll be in recess till

10  10:00 in the morning.

11          THE MARSHAL:  Your Honor --

12          MR. PHILLIPS:  Judge?

13          THE MARSHAL:  May I approach, sir?

14      (Discussion held off the record.)

15          THE COURT:  Wait a minute now, the marshal has a

16  problem.  How much longer are you going to be?

17          MR. THEOS:  I shouldn't be much longer.

18          THE COURT:  Because the time you've been wasting.

19          MR. THEOS:  I shouldn't be much longer.

20          THE MARSHAL:  Thank you.

21  BY MR. THEOS:

22  Q.  Now, with respect to your claims that you bought drugs

23  from Martin Ballard, you can't give us any dates that you

24  allegedly bought drugs from Martin Ballard, can you?

25  A.  No, just like the time frame.

NORMAN ROBINSON - CROSS-EXAMINATION

1   Q.  You can't give us any specific dates or specific times

2   regarding --

3           MR. PHILLIPS:  We object.  He's asked and answered

4   that.

5           THE COURT:  I don't know that you've asked him.

6   BY MR. THEOS:

7   Q.  You can't give us any times that you purchased drugs from

8   Martin Ballard, can you?

9   A.  I mean, I can't give you no exact date, but -- like time

10  frame, yeah.

11  Q.  I mean when -- like the year 2011?  Is that sort of the

12  general time frame you can give us?

13  A.  That's the only time I dealt with him in 2011.

14  Q.  All right.  Can you tell us when the last time you bought

15  drugs from Martin Ballard is?  Was it April of 2011, March of

16  2011, May of 2011?

17  A.  I believe like November, the day I got arrested for the

18  trafficking.

19  Q.  And when were you arrested?

20  A.  I think it was like November, if I'm not mistaken.

21  Q.  2011?

22  A.  Yeah.

23  Q.  So when was the last time you claim you bought drugs from

24  Martin Ballard?

25  A.  November of 2011, I believe.

1    Q.  And the time before that?

2    A.  Probably like a couple weeks or so before that or

3    something.

4    Q.  With respect to each time you claim you bought drugs from

5    Martin Ballard, you can't give us a date for each individual

6    purchase, can you?

7    A.  No, not an exact date.

8    Q.  And you can't give us -- you can't tell us who else was

9    present each and every time that you claim you bought drugs

10   from Martin Ballard, can you?

11   A.  I mean, sort of I could.

12   Q.  Sort of?  You can't tell us each time you bought -- you

13   claim you bought drugs from Martin Ballard, who you sold those

14   particular drugs to, can you?

15   A.  I mean, yeah, I sort of could.

16   Q.  Now, you talked about seeing a clear plastic bag on a

17   table under a tree in Ancrum Lane area.  You didn't test what

18   was in that clear plastic bag, did you?

19   A.  No.

20   Q.  So what appeared to you to be a brick of cocaine could

21   have been something else, couldn't it?

22   A.  I mean, yeah, but --

23   Q.  Could have been?

24   A.  It wasn't.

25   Q.  Well, you just said yeah, it could have been.

1   A.  No, I said no, it wasn't.

2   Q.  Okay.  Well, if you didn't test it, if you didn't taste

3   it, if you didn't see anybody using it, and the package wasn't

4   opened, all you can say is it appeared to be a brick of

5   cocaine.  Correct?  You don't know for certain.

6   A.  I mean, I know it was.

7   Q.  Somebody told you it was?

8   A.  I mean --

9   Q.  Now, the last time you met with DEA was last week,

10  correct?

11  A.  Yeah.

12  Q.  And the U.S. Attorney's office.  Prior to that, with all

13  these other interviews, you never once mentioned that you saw

14  Martin Ballard with a gun, did you?  Not one time?

15  A.  Yeah.

16  Q.  Yeah, you did, or no, you didn't.

17  A.  Yes, I did.

18  Q.  Now, when you were interviewed by the agents last week, I

19  asked you whether you were prepared for your testimony.  You

20  actually -- you actually, in reviewing and preparing for your

21  testimony, you provided seven different corrections to your

22  prior statements, did you not?

23  A.  Yeah.

24  Q.  Okay.  So there were errors and/or -- and/or incorrect

25  information or lies that were provided to DEA and the U.S.

1  Attorney's office before, that you corrected, is that --

2          MR. PHILLIPS:  Your Honor --

3  Q.  In other words, you changed your testimony.

4  A.  No.

5          THE COURT:  I don't think he said that.

6          MR. THEOS:  I'm sorry, Your Honor, I didn't hear you.

7          THE COURT:  You used the word lies, you used the word

8  incorrect, and you used another adjective to describe the

9  testimony that he -- or the statement.  Then you said lies.

10  And I just said, well, let him go -- He objected to you using

11  the word lies.

12          MR. THEOS:  I understand.  Your Honor, what I'm

13  referring to is the report that was provided --

14          THE COURT:  I understand what you're referring to,

15  they were getting ready, I guess, to go over the case, that's

16  what you've been indicating.

17          MR. THEOS:  Yes, sir, and that report that was

18  provided to us --

19          THE COURT:  Had some corrections in it.

20          MR. THEOS:  It states in the face of that report that

21  there were corrections that were made to prior statements.  In

22  other words, there were -- there were incorrect --

23          MR. PHILLIPS:  Your Honor, just to clarify the

24  record, it was for one prior statement, it wasn't prior

25  statements, it was a correction to one prior statement, one

1    report that he never saw in 2011.

2           THE COURT:  You're arguing about something that just

3    doesn't mean anything.  Let's go.  I mean, how you term it.

4           MR. THEOS:  One second, Your Honor.

5           THE COURT:  I just said you called it a lie; I don't

6    necessarily --

7           MR. THEOS:  I understand I called it a lie, the

8    Government calls it a correction, you're right.

9        One second, Your Honor.  Just one last question, Your

10   Honor.

11   BY MR. THEOS:

12   Q.  In 2011 did you have a girlfriend by the name of Joy?

13   A.  No.  Joy was back in 2008.

14   Q.  2008.  But you had a girlfriend by the name of Joy?

15   A.  Yeah, back in 2008.

16   Q.  And you found out sometime after that, that Martin Ballard

17   was having a sexual relationship with Joy, did you not?

18   A.  No.

19   Q.  You never found that out?

20   A.  Huh-uh.

21   Q.  Okay.  And that's not why you're in here testifying

22   against Martin, because you found out --

23   A.  No, man.

24   Q.  -- he was having a relationship with your girlfriend?

25   A.  No, man, I left Joy alone.

NORMAN ROBINSON - CROSS-EXAMINATION

1     MR. THEOS:  That's all.

2     MR. PHILLIPS:  Nothing from the Government, Your

3 Honor.

4     THE COURT:  All right.  Now, Mr. Marshal.

5     THE MARSHAL:  Thank you, sir.

6     THE COURT:  We're going to be in recess till

7 10:00 o'clock in the morning.

8

9     (Court adjourned at 5:18 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATION

        I, Debra L. Potocki, RMR, RDR, CRR, Official Court
Reporter for the United States District Court for the District
of South Carolina, hereby certify that the foregoing is a true
and correct transcript of the stenographically recorded above
proceedings.




S/Debra L. Potocki
_____

Debra L. Potocki, RMR, RDR, CRR