1          IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF SOUTH CAROLINA
2                CHARLESTON DIVISION

3
UNITED STATES OF AMERICA      :      VOLUME II
4                             :
          vs.                 :
5                             :
MARTIN LOUIS BALLARD          :      2:12 – CR – 232
6

7

8          Trial continues in the above-captioned matter on

9    Wednesday, May 6th, 2015, commencing at 10:18 a.m., before

10   the Hon. Sol Blatt, Jr., in the United States Courthouse,

11   Courtroom III, 81 Meeting St., Charleston, South Carolina,

12   29401.

13

14
APPEARANCES:
15
                    JULIUS N. RICHARDSON, ESQUIRE,
16                  PETER T. PHILLIPS, ESQUIRE, Office of the
                    U.S. Attorney, P.O. Box 978, Charleston, SC,
17                  appeared for the Government.

18                  JERRY N. THEOS, ESQUIRE and
                    PHILIP R. HAMMOND, ESQUIRE, P.O. Box 399,
19                  Charleston, SC, appeared for defendant.

20

21

22
          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
23      Official Court Reporter for the U.S. District Court
                         P.O. Box 835
24                  Charleston, SC  29402
                       843/723-2208
25

1                          I N D E X

2

3      WITNESS:  NATHAN ROLLINS

4      Direct Examination by Mr. Richardson..................... 208
       Cross-Examination by Mr. Theos........................... 212
5      Redirect Examination by Mr. Richardson................... 218

6

7      WITNESS:  MICHAEL MAXWELL

       Direct Examination by Mr. Richardson..................... 219
8      Cross-Examination by Mr. Theos........................... 223
       Redirect Examination by Mr. Richardson................... 227
9      Recross-Examination by Mr. Theos......................... 228

10

11     WITNESS:  MICHAEL CRUMLEY

       Direct Examination by Mr. Richardson..................... 228

12

13     WITNESS:  MATTHEW SIMONETTI

14     Direct Examination by Mr. Richardson..................... 232
       Cross-Examination by Mr. Theos........................... 237
15     Redirect Examination by Mr. Richardson................... 240
       Recross-Examination by Mr. Theos......................... 241

16

17     WITNESS:  HELEN CREEL

18     Direct Examination by Mr. Richardson..................... 242
       Cross-Examination by Mr. Theos........................... 251

19

20     WITNESS:  JAMAL McELVEEN

21     Direct Examination by Mr. Phillips....................... 254

22

       WITNESS:  STEVEN MOSLEY
23

       Direct Examination by Mr. Phillips....................... 293
24

25

1    MR. RICHARDSON:  One issue I wanted to put on the

2    record, I've discussed this with Mr. Theos, and that I don't

3    believe there's any concern about it, but the Government's

4    Exhibit 4, which was introduced yesterday, was a quantity of

5    crack cocaine.  That quantity of crack cocaine has actually

6    accidentally been destroyed; we no longer have it.  As part of

7    an evidence retention policy it was destroyed, we don't have

8    it, so we withdraw that exhibit.  It doesn't make any

9    substantive difference where we are in the case, so we'll

10   withdraw that.

11        THE COURT:  Is that satisfactory with defendant?

12        MR. THEOS:  It does, Your Honor.  We understand it's

13   been destroyed.  We're not sure the reason for it.  The

14   importance of it certainly would go hand in hand with any

15   arguments I have related to the other drugs that have been

16   preserved and presented as evidence.  Doesn't change our

17   position related to those drugs, Judge, in other words.

18        THE COURT:  I mean, he's saying that the exhibit has

19   been destroyed, as I understand it.

20        MR. THEOS:  I understand.

21        THE COURT:  Accidentally.

22        MR. RICHARDSON:  Yes, sir.

23        THE COURT:  And he's apparently given a number to it,

24   and he doesn't have the exhibit, so he wants to withdraw the

25   number.

1            MR. RICHARDSON:  Exactly, Your Honor.

2            THE COURT:  Now, is that satisfactory?

3            MR. THEOS:  That is satisfactory, Judge.

4            THE COURT:  Okay.

5            MR. THEOS:  Your Honor, one other matter, if you

6     don't mind, that Mr. Richards and I discussed.  If you recall

7     yesterday, when I was cross-examining Mr. Robinson regarding

8     his record, there was some confusion, and the Government

9     objected to my questioning regarding a conviction that -- an

10    arrest and conviction that occurred in 2010.  And I don't know

11    if you recall that.  But I've got the rap sheet that was

12    provided by the Government, and I want to make this for the

13    record, it does, in fact, reflect that there was an arrest in

14    2010 of Mr. Robinson, and that arrest was for trafficking

15    cocaine.  The arrest took place on October the 26th of 2010.

16    As you recall, Mr. Robinson denied that, and the Government

17    objected.  But the rap sheet does, in fact, reflect that he

18    was charged with trafficking cocaine, ten grams or more, but

19    less than 28 --

20            THE COURT:  Well, is that in evidence?

21            MR. THEOS:  It is not in evidence, but I'm happy to

22    introduce it in evidence, as this was provided by the

23    Government.

24            MR. RICHARDSON:  Your Honor, the only confusion,

25    there's no doubt that he had a trafficking charge.  There was

1    only a dispute about the date, whether it was 2010 or 2011.

2    Mr. Robinson maintained it was 2011.  I believe the correct

3    information is, in fact, 2011, but Mr. Theos is correct, the

4    rap sheet does say 2010.  As Your Honor's aware, rap sheets

5    are sometimes more reliable than others.  But from our

6    perspective, I don't think it needs to be made an exhibit, it

7    doesn't really make any difference, it's a matter of time, not

8    substance.

9         MR. THEOS:  Your Honor, it also reflects that he was

10   sentenced to three years incarceration, and which our position

11   is the -- in direct conflict with what his testimony was

12   regarding not only the arrest and the conviction, but also his

13   incarceration.  So I would like to introduce it as an exhibit.

14        THE COURT:  Well, the Government doesn't have any

15   objection to that?

16        MR. RICHARDSON:  Your Honor, it's not actual

17   evidence, it's hearsay and inadmissible to show whether he was

18   convicted or whether he was sentenced.  It's not evidence of

19   his conviction or evidence of his sentence.  If he wants to

20   introduce a certified public record to establish that, he's

21   entitled to do that, but he's not entitled to rely on hearsay

22   as part of a rap sheet to prove up those facts.

23        THE COURT:  Well, is that something that you

24   furnished him?  I say you, I mean the Government.

25        MR. RICHARDSON:  We provided a rap sheet for every

1    witness, yes, we did.

2         THE COURT:  What you're saying is you're not

3    guaranteeing the authenticity.

4         MR. RICHARDSON:  The rap sheet is in the system, but

5    that's why we don't rely on a rap sheet to prove a conviction,

6    we rely on a certified court document to prove a conviction,

7    because that's what's reliable, not a rap sheet.  And so we

8    provide rap sheets to be useful, but they are hearsay, and

9    only would point someone to where the right documents would

10   be.

11        THE COURT:  I don't think the rap sheet normally

12   would be admissible, I agree with.  I don't know what they

13   were provided, in answer to what they were provided.  I don't

14   know what assurance, the fact that you gave it to them, would

15   have on your being able to object to something that you gave

16   him.  But ordinarily you've got to have -- you've got to have

17   it certified, or you've got to have somebody who is a

18   custodian of the record be here to verify it.  You've just got

19   a document that the Government gave you, and here they are

20   objecting to admissibility because it's not certified.

21        MR. RICHARDSON:  We'll withdraw our objection and

22   just ask the Court to admit it, and you weigh it for whatever

23   evidentiary value it might have.

24        THE COURT:  That's a good solution.

25        MR. THEOS:  Sounds like a good solution, and I'd just

1    point out that Mr. Schroepfer, Agent Schroepfer is here,

2    that's who apparently obtained the rap sheet, so --

3          THE COURT:  Let me tell you something.  I stopped you

4    several times yesterday, and I want you to -- you can not

5    cross-examine a witness on a document that he didn't prepare,

6    he's never seen, he doesn't know what -- he's never had

7    anything to do with it.  You can't cross-examine him on that

8    document.  You tried to do it several times yesterday.  Now,

9    you can't -- if he's never seen it, and somebody else wrote

10   it, and it's never been shown to him and he hasn't verified

11   what's in there, and he doesn't know what somebody else wrote

12   down, you can't cross-examine him on it.  And there's no way

13   you can do that.

14       Go ahead.

15         MR. THEOS:  Your Honor, I assume I can cross-examine

16   him on any prior inconsistent statement that he's given to law

17   enforcement.

18         THE COURT:  Well, but you can't use that as an

19   inconsistent statement.  You can put the person up, but you

20   can't use a document to say he gave an inconsistent statement

21   when he's never seen the document, he didn't have anything to

22   do with the preparation of it, the people that prepared it are

23   not testifying.  You can't use a document to show any

24   inconsistent statement.  That doesn't show anything.

25         MR. THEOS:  I didn't -- my intent was not to use the

1    document, my intent was to demonstrate that he had previously

2    given an inconsistent statement.  And he can --

3         THE COURT:  How do you know he gave an inconsistent

4    statement, when he hasn't seen the document, he didn't have

5    anything to do with drawing it up.  The fellow who prepared it

6    is not here.

7         MR. THEOS:  Well, the fellows that prepared it are

8    here, Judge, they're witnesses for the Government.

9         THE COURT:  Well, then you can ask them.

10        MR. THEOS:  Well, I don't -- Am I not allowed to ask

11   the witness whether he previously gave a statement that stated

12   A, B and C to the Government?

13        THE COURT:  You can ask him if he told them, if he

14   told somebody that, yeah.  But that's not what you were doing.

15   Just keep in mind that that statement can't be used in any way

16   as proof of what he said.  Because he hasn't seen it, he

17   didn't prepare it, he doesn't know what's on it.  The people

18   who prepared it are not here.  They may be here, but they

19   haven't testified.  And that statement -- you just can't do

20   that.

21        MR. THEOS:  But you're not restricting me from asking

22   him whether he previously made the statement.

23        THE COURT:  No.  No.  You can ask him if he made a

24   statement, you just can't hold that statement out and read

25   from it and then indicate that that's what he said.

NATHAN ROLLINS – DIRECT EXAMINATION

1      MR. THEOS:  I understand your point, Judge.

2      THE COURT:  All right, sir.  Let's go.

3      MR. RICHARDSON:  The Government calls Sergeant Nathan

4  Rollins.

5      MR. THEOS:  With respect to the rap sheet we're going

6  to introduce, we will provide a clean copy either this

7  afternoon or tomorrow, and introduce it as Defendant's

8  exhibit.  The copy that I have here today has got my notes on

9  it.

10      THE COURT:  All right, sir.

11      THE CLERK:  State your name for the record.

12  A.  Nathan Rollins.

13      NATHAN ROLLINS, a witness called by the Government, first

14  having been duly sworn, testified as follows:

15                    DIRECT EXAMINATION

16  BY MR. RICHARDSON:

17  Q.  Tell us what you do.

18  A.  I'm currently employed at the Berkeley County Sheriff's

19  Department, and I'm assigned to the K-9 unit.  Been there for

20  approximately eight years.

21  Q.  And what is your primary role with the K-9 unit at

22  Berkeley?

23  A.  In the K-9 unit I conduct a lot of traffic stops, assist

24  narcotics, different agencies.

25  Q.  Okay.  We're going to sort of cut down to the important

1    part of the day, all right, so March 19th of 2012, do you

2    remember where you were that day?

3    A.  Yes.

4    Q.  Tell us generally what your role was to be on March 19.

5    A.  I was contacted by someone from the DEA Charleston office,

6    either the night before or the morning of March 19th, 2012, to

7    conduct a traffic stop utilizing my fully marked patrol

8    vehicle in Berkeley County.

9    Q.  And that morning of March 19th, tell us what happened, how

10   did you identify what truck to stop and what did you do?

11   A.  I believe it was approximately 8:00 o'clock in the morning

12   I was notified either via cell phone or radio, that agents

13   were conducting surveillance at a residence in Felder Creek

14   neighborhood, which is located in Berkeley County.  I was

15   somewhere on Jedburg Road near the interstate.

16       They advised me that the vehicle left the residence and it

17   was occupied by the defendant, Martin Ballard.  They gave me

18   the description of the vehicle, 2011 white in color GMC Sierra

19   pickup truck bearing a South Carolina license plate P439407.

20   And that it was heading in the direction of Dorchester County

21   on Jedburg Road.

22       I observed the vehicle pass my stationary location,

23   conducted a lawful traffic stop, it was just outside of

24   Berkeley County at the Dorchester County line, and it was

25   occupied by the defendant.

NATHAN ROLLINS - DIRECT EXAMINATION

1   Q.  All right.  After you made the traffic stop on the

2   vehicle, you approached the vehicle, and what did you do with

3   Mr. Ballard?

4   A.  I conducted a passenger-side approach to the vehicle, and

5   through the window I observed the defendant, Martin Ballard,

6   in the driver's seat operating the truck.  I also observed

7   two, maybe three young children in the vehicle.

8   Q.  And what did you do at that point?

9   A.  I requested Mr. -- the defendant to step to the back of

10  the vehicle where my patrol vehicle was.  There was a two-lane

11  highway, there was a lot of morning traffic.  There wasn't

12  enough room on the shoulder of the grass for, of course, a big

13  dually to pull over safely.  So I asked him to step out to the

14  back of the truck.  Advised him of his warrant and placed him

15  under arrest.

16  Q.  Okay.  And you mentioned the term dually.  What kind of

17  truck was this that you pulled over?

18  A.  It was a brand new very nice large white truck.

19  Q.  When you refer to dually, means it has two tires on each

20  side on the rear axle?

21  A.  Yes.

22  Q.  After you placed Mr. Ballard under arrest, did other DEA

23  law enforcement officers show up at that point?

24  A.  Yeah, I can't recall the number of agents that arrived on

25  scene, but they did arrive on scene to assist me.

NATHAN ROLLINS - DIRECT EXAMINATION

1   Q.  At some point during that time did you search Martin

2   Ballard for what he had on his person, in his pockets, that he

3   had on him?

4   A.  Search incident to arrest after Mr. Ballard was placed

5   into handcuffs, search of his person revealed clear plastic

6   bag containing white powder substance; in his pants pocket

7   there was an amount of currency; and multiple as cell phones.

8           MR. RICHARDSON:  Permission to approach, Your Honor?

9   Q.  I'm going to show you two exhibits, Government's

10  Exhibit 17 and Government Exhibit 18 B.  You see those?

11  A.  Yes.

12  Q.  What is Government Exhibit 17?

13  A.  Appears to be a white powder substance in a clear Ziploc

14  bag.

15  Q.  And this was placed into evidence by Mike Maxwell, is

16  that -- Was he present during that stop?

17  A.  He was, he was there assisting me.

18  Q.  Okay.  I'm going to show you Government's Exhibit 18 B.

19  And what are these?

20  A.  Those are cell phones.

21  Q.  Okay.  And G S Mike Maxwell also placed those into

22  evidence on that day, March 19?

23  A.  Yes.

24  Q.  Okay.  After the traffic stop -- well, before that, you

25  said you found some cash also; what did you do with that cash?

1  A.  All the contraband that was located at the time of his

2  arrest was placed on the hood of my patrol vehicle and it was

3  gathered and collected by DEA.

4  Q.  Okay.  Did you then subsequently assist with the search

5  warrant at Mr. Ballard's residence?

6  A.  I did.

7      MR. RICHARDSON:  Sergeant Rollins, if you have the

8  chance to answer any questions he has, I appreciate it.

9  A.  Yes, sir.

10     (Brief interruption in proceedings.)

11                        CROSS-EXAMINATION

12 BY MR. THEOS:

13 Q.  Officer Rollins, when you first recognized the car, saw

14 the vehicle that you were supposed to pull over, did you turn

15 your siren on or your blue light?

16 A.  The blue lights were activated.

17 Q.  Okay.  And Martin Ballard pulled over, did he not?

18 A.  Yes.

19 Q.  He didn't attempt to flee --

20 A.  No.

21 Q.  -- in his vehicle?  Once he was pulled over he didn't

22 attempt to jump out of the car and run?

23 A.  No.

24 Q.  He didn't resist, he didn't resist you in any way?

25 A.  No.

NATHAN ROLLINS - CROSS-EXAMINATION

1  Q.  He cooperated fully with you, correct?

2  A.  From myself and placing him in custody, yes.

3  Q.  Okay.  He wasn't combative in any fashion?

4  A.  No.

5  Q.  Wasn't threatening in any way?

6  A.  No.

7  Q.  And, in fact, when you asked him whether he had any

8  weapons or anything that could be considered dangerous in the

9  car, he told you that there was a handgun in the center

10  console of the vehicle, correct?

11  A.  I don't recall if he asked me -- or if I asked him that

12  question or if a DEA agent asked him that question.  But I

13  recall that question being asked and him answering and stating

14  that there was a firearm in the vehicle.

15  Q.  So he wasn't trying to hide that fact, in other words.

16  A.  No.

17  Q.  Correct?  And the handgun was found, was found in the

18  center console, correct?

19  A.  I believe so.  I don't recall myself searching the

20  vehicle; I stayed with the defendant.

21  Q.  But you would agree with me that a handgun in a center

22  console is an appropriate place, a lawful place for a handgun

23  to be located or situated in a vehicle, correct?

24  A.  Yes, back rear compartment would be lawful.

25  Q.  So it was not being unlawfully transported?

1    A.   At the time of the arrest, no, it was not.

2    Q.   And you heard Martin explain that this handgun was

3    registered to and belonged to his girlfriend, the mother of

4    one of his children, Miss Melissa McCleary. You heard him say

5    that, didn't you?

6    A.   I do not recall that.

7    Q.   You heard him also indicate that this vehicle was the

8    vehicle that was normally driven by his girlfriend, did you

9    not?

10    A.   I do not recall that statement.

11    Q.   You didn't hear that? The vehicle was registered to his

12    mother, was it not?

13    A.   I don't recall. I don't have the registration in front of

14    me, so --

15    Q.   Now, the cocaine that was seized, you testified, I believe

16    it was Exhibit No. 17, that cocaine was found in Martin's

17    pocket?

18    A.   Correct.

19    Q.   Pants pocket, jacket pocket, which pocket?

20    A.   From what I recall, it was a pants pocket.

21    Q.   And Martin didn't resist your discovery or your seizure of

22    that cocaine, did he?

23    A.   No.

24    Q.   The cocaine that was found, which is again marked as

25    Exhibit 17, that was approximately one gram of cocaine?

NATHAN ROLLINS - CROSS-EXAMINATION

1    A.  Approximately.

2    Q.  And that cocaine was packaged in one clear plastic baggie,

3    as it's seen here today in the courtroom?

4    A.  I don't recall how many times it was packaged, I remember

5    it was in a clear plastic baggie.  I don't know if it was

6    wrapped in several or --

7    Q.  Well, you testified on direct that it was in one clear

8    plastic baggie.  And that's consistent with how it is shown

9    here in this exhibit, correct?

10   A.  This exhibit, there's one clear plastic baggie like a

11   sandwich bag and a white powder substance.

12   Q.  All right.  So again, the cocaine found in Martin's pocket

13   was in one clear plastic baggie, correct?

14   A.  Yes.

15   Q.  And there was nothing found in the vehicle, there weren't

16   any scales found in the vehicle, there weren't any other clear

17   plastic baggies that were found in the vehicle, correct?

18   A.  I did not search the truck.  I was standing with the

19   defendant on the side of the road while he was in custody.

20   Q.  So I guess my point is there was nothing found in the

21   vehicle which would indicate that this cocaine was for

22   anything other than Martin's personal --

23        MR. RICHARDSON:  Objection, Your Honor.  He's already

24   said he didn't search the truck, so there's no foundation for

25   that question.

NATHAN ROLLINS - CROSS-EXAMINATION

1     MR. THEOS:  I asked a different question, Judge.

2     THE COURT:  Ask the question again.

3  BY MR. THEOS:

4  Q.  There was nothing in the vehicle that was consistent with

5  Martin having this cocaine for any use other than personal

6  use, correct?

7  A.  I did not search the truck.  So I haven't seen any

8  evidence or tow sheets stating what the inventory of the

9  vehicle -- I don't know.

10  Q.  Now, you testified about the cell phones that were found

11  in the vehicle, and that was Exhibit 18 B.  Correct?  Did you

12  find the --

13     MR. RICHARDSON:  Objection, Your Honor, he's

14  misstating the record.  Those weren't found in the vehicle,

15  those were found on his person.

16     THE COURT:  Go ahead.

17  BY MR. THEOS:

18  Q.  Regardless of whether they were found on his person or in

19  the vehicle, did you take possession of those cell phones?

20  A.  I removed several cell phones, approximately six, from his

21  person.

22  Q.  All right.  And you indicated before that he had two or

23  three children, two or three children in the vehicle with him,

24  correct?

25  A.  There were children, yes.

NATHAN ROLLINS - CROSS-EXAMINATION

1    Q.  And this was early in the morning, correct?

2    A.  Yes, approximately 8:00 a.m.

3    Q.  And he was, he told you he was taking these children to

4    school, did he not?

5    A.  I recall him telling me that he was taking them to

6    Walterboro.

7    Q.  And he told you that three of the phones were his

8    children's phones, and that he did not allow the children to

9    take the phones into school, did he not?

10   A.  I do not recall him making that statement.

11   Q.  No.

12            THE COURT:  What was your answer to that question?

13   A.  I don't recall him ever stating that the phones belonged

14   to the children.

15            THE COURT:  All right, sir.

16   Q.  The cash that you referenced, that cash was found on

17   Mr. Ballard?

18   A.  Yes.

19   Q.  And it was found in his wallet or his pocket, loosely?

20   Can you describe it, please?

21   A.  From what I remember is that the money was loose, there

22   was some in the wallet, some in his pockets.  And just

23   pertaining to the report, it states that there was a

24   counterfeit $100 bill in his wallet.

25   Q.  But the cash was not -- the cash that was found was not

1    held together by a rubber band, or it wasn't in any sort of

2    plastic bag of some sort, it was just on his person, as would

3    normally be carried by any individual, correct?

4    A.  I don't recall the denominations of the currency.  I don't

5    recall -- it was not in a plastic bag, whether it was rubber

6    banded or not, I don't remember if it was or not rubber

7    banded.

8    Q.  It wasn't anything unusual about how it was packaged, is

9    my point, isn't that correct?  Otherwise you would have noted

10    it.

11    A.  Correct.

12          MR. THEOS:  No other questions, Judge.

13          THE COURT:  Anything else, Mr. Richardson?

14          MR. RICHARDSON:  Just one, Your Honor.

15                  REDIRECT EXAMINATION

16    BY MR. RICHARDSON:

17    Q.  Approximately how old were the children, Sergeant?

18    A.  Ages two to four?

19          MR. RICHARDSON:  Thank you.  Nothing further, Your

20    Honor.

21          THE COURT:  All right, sir, you may be excused.

22          MR. RICHARDSON:  Your Honor, the Government calls

23    Michael Maxwell.

24          THE CLERK:  State your name for the record.

25    A.  Michael Maxwell.

MICHAEL MAXWELL – DIRECT EXAMINATION

1    MICHAEL MAXWELL, a witness called by the Government, first

2    having been duly sworn, testified as follows:

3                         DIRECT EXAMINATION

4    BY MR. RICHARDSON:

5    Q.  Tell us briefly where you work and what you do.

6    A.  I'm a supervisory special agent for the Drug Enforcement

7    Administration.  I'm currently stationed in the Hague,

8    Netherlands.

9    Q.  And when did you return to South Carolina from the

10   Netherlands?

11   A.  Last night.

12   Q.  We appreciate you flying in for this.  Tell us when -- in

13   March of 2012, tell us what your role was then, where were you

14   stationed and what was your role?

15   A.  I was the group supervisor of the Charleston DEA task

16   force.

17   Q.  And on March the 19th of 2012, tell us what the plan was

18   for that morning and what your role in it was.

19   A.  That morning we had a federal arrest warrant for Martin

20   Ballard.  We established surveillance at his residence, and

21   the plan was to execute the arrest warrant on Mr. Ballard when

22   he departed his residence.

23   Q.  And then what happened?

24   A.  So surveillance indicated that Mr. Ballard had gotten into

25   his vehicle with two small children, and departed his

1  residence.  Deputy Rollins from Berkeley County initiated a

2  traffic stop in his marked patrol vehicle, and placed

3  Mr. Ballard under arrest.

4  Q.  And when did you arrive in relation to when the car was

5  stopped?

6  A.  I arrived shortly after he placed Mr. Ballard in custody,

7  in handcuffs, I believe.

8  Q.  And once he was placed in custody, tell us what did you

9  ask Mr. Ballard?

10  A.  I was concerned because there were two small children in

11  the vehicle.  I asked Mr. Ballard if there were any weapons in

12  the vehicle that the children might get ahold of and harm

13  themselves with.  He said there was a firearm in the center

14  console of the vehicle.  I walked up to the vehicle, I secured

15  the firearm.

16  Q.  Okay.  Your Honor, may I approach?  I'm going to show you

17  Government Exhibit 16 A.  Do you recognize that?

18  A.  Yes, sir, I do.

19  Q.  I'm also going to show you, while we're here, 16 B and C.

20  You see these?

21  A.  Yes, sir.

22  Q.  You recognize those as well?

23  A.  Yes, sir, I do.

24  Q.  What is Government's Exhibit 16 A?

25  A.  It's a Taurus nine millimeter handgun that was found in

1    the center console of Mr. Ballard's vehicle.

2              THE COURT:  Tell me again what that is.

3    A.   That's a nine -- Taurus nine millimeter handgun that was

4    found in the -- Mr. Ballard's vehicle in the center console.

5              THE COURT:  All right, sir.

6    Q.   And this is the firearm that Mr. Ballard told you was in

7    the center console?

8    A.   Yes, sir.

9    Q.   And then Government Exhibit 16 B and C, this is the

10   magazine and the rounds that were loaded into that gun?

11   A.   As I secured the firearm, there was one round in the

12   chamber, the hammer was in the cocked position.

13             THE COURT:  You said there was a round in the

14   chamber?

15   A.   Yes, Your Honor.  I ejected the round, ejected the

16   magazine, unloaded the firearm.

17   Q.   When you mentioned that the hammer was in the cocked

18   position, what does that mean?

19   A.   So that type of weapon, there's what's called a long pull

20   and short pull.  The long pull causes the first round to send

21   the round out of the chamber, leaving the last -- leaving the

22   hammer in the cocked position.  And that's just a very short

23   pull, a very small touch of the trigger to get the next round

24   to come out.

25   Q.   So when the hammer's cocked, it's ready to fire really

MICHAEL MAXWELL - DIRECT EXAMINATION

1    easily?

2    A.  It's ready to fire very easily.

3    Q.  Were you also present for the search of Mr. Ballard's

4    person?

5    A.  Yes.

6    Q.  And what did you see -- did you conduct the search or did

7    you just observe it?

8    A.  I just observed it.

9    Q.  And what did you see found on the defendant?

10   A.  Approximately six cell phones, a cellophane baggie

11   containing a white powdery substance, and a wallet, I believe.

12   Q.  Okay.  And was there cash found?

13   A.  There was approximately $1900 cash found.

14   Q.  Showing you just briefly Government Exhibit 17 that you

15   placed into evidence, is that the cocaine that was found on

16   Mr. Ballard?

17   A.  Yes, sir, it is.

18   Q.  And Government Exhibit 18 B that you also placed into

19   evidence.

20   A.  Yes, sir.

21   Q.  Are those the six cell phones that were found in

22   Mr. Ballard's pockets?

23   A.  Yes, sir.

24   Q.  Did you also then participate in the search of the white

25   dually pickup truck that Mr. Ballard was driving?

MICHAEL MAXWELL - DIRECT EXAMINATION

1    A.  Yes.

2    Q.  And tell me just briefly, not everything that was found,

3    but did you find any cell phones during that search?

4    A.  There were several cell phones found inside the vehicle.

5    Q.  And then what about any shell casings, did you find any

6    shell casings?

7    A.  I believe that there was a shell casing that was found

8    between the window and the molding of the vehicle, the front

9    window and the molding of the vehicle.

10   Q.  Sort of by where the windshield wipers are?

11   A.  By where the windshield wipers are, yes.

12   Q.  And then did you also participate in a search of the

13   residence, Martin Ballard's house?

14   A.  Yes, sir.

15          MR. RICHARDSON:  Mr. Maxwell, if you just answer any

16   questions that Mr. Theos might have, I'd appreciate it.

17   A.  Yes, sir.

18                      CROSS-EXAMINATION

19   BY MR. THEOS:

20   Q.  Agent Maxwell, when you arrived at the scene and began

21   speaking with Martin Ballard, he wasn't combative in any way,

22   was he?

23   A.  No, sir.

24   Q.  Wasn't belligerent in any way?

25   A.  No, sir.

1  Q.  Cooperated fully with you?

2  A.  Yes, sir.

3  Q.  And when you asked him whether or not there were any

4  weapons or any dangerous devices in the vehicle, he

5  immediately told you about the handgun, correct?

6  A.  Yes, sir.

7  Q.  And he told you where the handgun was located?

8  A.  Yes, sir.

9  Q.  And it was located in the center console of the vehicle,

10  is that correct?

11  A.  Yes, sir.

12  Q.  And that is a lawful place for a weapon or a handgun to be

13  transported in a vehicle, correct?

14  A.  I believe so, sir.

15  Q.  So that would not be in violation of any law, correct?

16  A.  No, sir.

17  Q.  And he told you that that handgun was registered to his

18  girlfriend, Melissa McCleary, did he not?

19  A.  I don't recall having that conversation with him, sir.

20  Q.  All right.  Might he have told you that and you just don't

21  recall?

22  A.  I don't remember.  I remember the conversation as I walked

23  back to the police car.  And we identify ourselves as federal

24  agents.  Mr. Ballard said he knew who we were, and he had

25  friends in jail, and they're okay.  That's the only --

MICHAEL MAXWELL – CROSS-EXAMINATION

1  Q.  Let me ask you this.  Did you ultimately run a check on

2  the handgun to determine to whom it was registered?

3  A.  I did not, no.

4  Q.  Do you know who did that?

5  A.  No, sir, I don't.

6  Q.  Do you know that the result -- do you know what the

7  results of that investigation were?

8  A.  I'm not aware.

9  Q.  Now, the cocaine was seized, you've already stated it was

10  in this one clear plastic baggie, which is Exhibit 17.

11  Correct?

12  A.  I believe it was Exhibit 8.  Yes.

13  Q.  Exhibit 17 --

14  A.  Yes, sir, I'm sorry.

15  Q.  Okay.

16  A.  Government's Exhibit 17, yes, sir, DEA Exhibit 8.

17  Q.  And it was found in one clear plastic baggie, correct?

18  A.  Yes.

19  Q.  And it was in Martin's pocket, correct?

20  A.  Yes.

21  Q.  Martin didn't do anything to attempt to conceal the fact

22  that he had cocaine on him?

23  A.  No, sir.

24  Q.  And the cocaine was packaged in a fashion that was

25  consistent with personal use and not distribution, correct?

1  A.  Yes, sir, that's correct.

2  Q.  Now, the firearm in question, is this it?

3  A.  Yes, sir.

4  Q.  And this is Exhibit 16 A.

5  A.  Yes, sir.

6  Q.  I'm not real familiar with firearms, but does this firearm

7  have a safety device on it?

8  A.  Yes, sir, I believe it does.  Here, it's located here.

9  Q.  And is that safety device now in the on position or off

10  position?

11  A.  It's in the fire position.

12          THE COURT:  It's in what?

13  A.  I believe it's in the fire position now, sir.

14  Q.  Which means it's in the off position, so to speak?

15  A.  It's in the position where if the hammer was -- if the

16  hammer was released, if there was a full magazine placed

17  inside the gun and the slide was released, it would be ready

18  to fire.

19  Q.  And can you manipulate that safety mechanism so that it's

20  in the on position or safety position?

21  A.  Yes, sir.

22  Q.  To demonstrate it for us?

23  A.  Well, I would have to take the safety lock off as well as

24  the tie restraint.

25  Q.  So just so you can explain it to the Court, how would you

MICHAEL MAXWELL – CROSS-EXAMINATION

1   activate it?

2   A.  This lever to the back of the weapon would --

3           THE COURT:  You have the gun between your head.

4   A.  I'm sorry, Your Honor.  This lever would be flipped up,

5   and be resting against this portion of the slide.

6   Q.  So it would be in sort of the exact opposite position that

7   it is now?

8   A.  Yes, it would be in a vertical position.

9   Q.  Vertical position?

10  A.  Yes, sir.

11  Q.  And when this pistol was seized, the safety device was on

12  in the vertical position, was it not?

13  A.  Yes, sir, it was.

14  Q.  So it was not ready to fire, it was -- the safety device

15  was on?

16  A.  Safety device was on.

17  Q.  So it couldn't have been fired unless the safety device

18  was turned off?

19  A.  That's correct.

20          MR. THEOS:  No other questions, Judge.

21          THE COURT:  Mr. Richardson, anything else?

22          MR. RICHARDSON:  One quick question, Your Honor.

23                     REDIRECT EXAMINATION

24  BY MR. RICHARDSON:

25  Q.  If you were holding that firearm, how long would it take

1  you to change the safety?

2  A.  Very very fast.  Not even a second.

3  Q.  It's set up so you flip it with your thumb?

4  A.  Flip it with your thumb and get a round off very quickly.

5        MR. RICHARDSON:  Nothing further for this witness.

6        MR. THEOS:  Your Honor, I have one final question.

7                    RECROSS-EXAMINATION

8  BY MR. THEOS:

9  Q.  The vehicle itself, it was registered to Martin Ballard's

10  mother, was it not?

11  A.  I believe so, yes, sir.

12        THE COURT:  That everything?

13        MR. RICHARDSON:  That's everything, Your Honor.

14        THE COURT:  You may be excused.

15        MR. RICHARDSON:  Your Honor, the Government calls

16  Task Force Officer Michael Crumley.

17        THE COURT:  Mr. Theos, I'm not keeping these

18  witnesses.  If you want any of them kept, you let me know.

19        MR. THEOS:  Yes, sir, thank you, Judge, I will.

20        THE CLERK:  State your name.

21  A.  Michael Crumley.

22     MICHAEL CRUMLEY, a witness called by the Government, first

23  having been duly sworn, testified as follows:

24                    DIRECT EXAMINATION

25  BY MR. RICHARDSON:

## MICHAEL CRUMLEY - DIRECT EXAMINATION

1    Q.  Officer Crumley, tell us where you work and what you do.

2    A.  I work at the Berkeley County sheriff's office.  I work in

3    the Office of Professional Standards, I'm a polygraph examiner

4    and I work in internal affairs.

5    Q.  And what is your current rank with the sheriff's office?

6    A.  I'm a lieutenant.

7    Q.  Lieutenant, in March of 2012, what was your role within

8    the sheriff's office and otherwise, what were you doing at

9    that point?

10   A.  At that point I was a corporal, I was assigned to U.S.

11   Drug Enforcement Administration as a task force officer.  I

12   represented and assisted there.

13   Q.  I want to focus in on a very narrow set of circumstances

14   for you.  On March the 19th were you involved in the traffic

15   stop and arrest of Martin Ballard?

16   A.  Yes.

17   Q.  After the traffic stop was effected, how long after before

18   you showed up?

19   A.  It was pretty much immediate.

20   Q.  And what was your role during the arrest and subsequent

21   search of Mr. Ballard?  What did you do?

22   A.  So I was part of that traffic stop on a shoulder of the

23   road which is on Jedburg Road right about where the interstate

24   interchange is.  And so I pulled over behind the marked patrol

25   vehicle and just stood by and witnessed what went on as Martin

MICHAEL CRUMLEY - DIRECT EXAMINATION

1   Ballard was taken into custody.

2   Q.   Okay.  Were there anybody else present other than

3   Mr. Ballard in the truck when it was stopped?

4   A.   I believe there were some minor children, too, I believe.

5   Q.   And how were they handled?  Were they old enough to take

6   care of themselves?

7   A.   No.

8   Q.   Roughly how old were they?  I know that's a hard thing to

9   guess, but --

10   A.   I want to recall they were maybe around four years of age.

11   Ballpark figure there.

12   Q.   Ballpark?

13   A.   Right.

14   Q.   I won't hold you to guessing ages, I promise.  After the

15   arrest of Mr. Ballard, what did you do with those children?

16   Where were they -- how were they handled?

17   A.   Well, I believe the children remained in the vehicle, and

18   I know an adult was summoned to the location to take custody

19   of them.

20   Q.   Okay.  I'm going to show you Government's Exhibit 20.

21   During the search of the outside of Mr. Ballard's white dually

22   pickup truck, do you recognize this item as having been found?

23   A.   Yes.

24   Q.   And what is Government's Exhibit 20 that was found on the

25   outside of Mr. Ballard's truck?

MICHAEL CRUMLEY - DIRECT EXAMINATION

1   A.  That's a spent shell casing.  I believe it's a

2   nine-millimeter, it's been fired.  Yes, it's a spent

3   nine-millimeter shell casing.

4   Q.  After the traffic stop, I'm not going to belabor

5   everything you did that day, I'm just trying to hit a few

6   things to piece the story together.  But after March the 19th,

7   how were you involved in connection with the money that was

8   found in Mr. Ballard's pocket?

9   A.  All right.  So the money that was found in his pocket was

10  seized that day and secured in the non-drug evidence locker at

11  the DEA office.  On the 22nd, March 22nd, I went and obtained

12  that money that was sealed in a DEA evidence bag from the

13  evidence custodian, and I took that and seized it on a state

14  level.  And I took the bag, opened the bag in front of my

15  supervisor, counted the money.

16  Q.  And then after you counted it, what did you do with it?

17  A.  That money was subsequently deposited into the sheriff's

18  office account, seizure account.  And then forfeiture

19  proceedings were brought in the Circuit Court in Berkeley

20  County.

21  Q.  In preparing that money did you also prepare a sheet

22  that -- describing the type of bills that were found and the

23  total amount of money that was located?

24  A.  Yes.

25  Q.  And the total amount of money was $1976?

MICHAEL CRUMLEY - DIRECT EXAMINATION

1  A.  Yes.

2  Q.  And it had three hundred dollar bills and ten fifty dollar

3  bills?

4  A.  That's correct.

5  Q.  And then a number of smaller bills.

6  A.  That's correct.

7          MR. RICHARDSON:  Lieutenant Crumley, if you just

8  answer any questions that Mr. Theos might have, I'd appreciate

9  it.

10 A.  Certainly.

11         MR. THEOS:  I don't have any questions, Judge.

12         THE COURT:  All right.  You people weren't going to

13 let the feds get that money, were you?

14 A.  They were gracious.

15         THE COURT:  You may be excused.

16         MR. RICHARDSON:  They didn't offer it to me, Your

17 Honor.

18    The Government calls Matt Simonetti.

19         THE CLERK:  State your name for the record, please.

20 A.  Matthew P. Simonetti.

21    MATTHEW SIMONETTI, a witness called by the Government,

22 first having been duly sworn, testified as follows:

23                      DIRECT EXAMINATION

24 BY MR. RICHARDSON:

25 Q.  Officer Simonetti, tell us where you work and what you do.

MATTHEW SIMONETTI – DIRECT EXAMINATION

1  A.  I'm currently employed with the Summerville police

2  department as a detective corporal, and I'm assigned to the

3  DEA as a task force officer.

4  Q.  And in March of 2012, you were also a task force officer

5  with the DEA.

6  A.  Correct.

7  Q.  And were you involved in the traffic stop and subsequent

8  search of Mr. Ballard, his vehicle and his house?

9  A.  Correct.

10  Q.  That was on March the 19th.  Tell me just briefly what was

11  your role that day, what did you do?

12  A.  I established surveillance on Mr. Ballard's residence,

13  prior to the briefing of the rest of the officers, just to

14  make sure that Mr. Ballard still remained in the residence.

15  If he were to depart, I was to advise the other officers that

16  he was leaving, direction of travel, and anything else that

17  was pertinent.

18  Q.  And what did you see that morning?

19  A.  I established a position close to Mr. Ballard's residence,

20  sat there for a little while.  Observed Mr. Ballard exit the

21  residence, go to his pickup truck, start it up, go back into

22  his residence, and a short time later he exited with two

23  children, got into the vehicle, departed the residence towards

24  Jedburg Road.

25  Q.  And what type of vehicle was it?

1  A.  It was a white GMC pickup truck with a dually.

2  Q.  Were you familiar with that pickup truck prior to that

3  day?

4  A.  I was.

5  Q.  How were you familiar with that light dually pickup truck

6  prior to March 19th?

7  A.  Prior surveillances; also just obtaining the information

8  from the case agents.

9  Q.  And prior surveillances, who had been observed driving

10  that truck?

11  A.  Mr. Ballard.

12  Q.  Okay.  After Mr. Ballard was stopped -- Let me back up.

13  What information did you provide to Deputy Rollins about the

14  vehicle, where it was going and why it was stopped.

15  A.  I didn't provide any of that information.  The officers

16  were already aware that Mr. Ballard had an arrest warrant.  I

17  advised when he was departing the residence, and that the

18  children were inside of the vehicle and which direction that

19  they were traveling.

20  Q.  Okay.  After the stop occurred, did you go to the scene of

21  the traffic stop?

22  A.  I did.

23  Q.  And while you were there, were you involved in the

24  subsequent search?  Were you involved in the subsequent search

25  of the vehicle?

MATTHEW SIMONETTI – DIRECT EXAMINATION

1    A.   I was.

2    Q.   And I'm going to show you what's been previously marked as

3    Government's Exhibit 18A.  Do you recognize those items?

4    A.   Yes, I do.

5    Q.   And what are they?

6    A.   They are cell phones and cell phone chargers.

7    Q.   And where were these five cell phones located?

8    A.   Inside of the vehicle.

9    Q.   And they're separate from the six that were found on his

10   person?

11   A.   Correct.

12        THE COURT:  Where were those found?

13   A.   In multiple spots within the vehicle.  Some were in this

14   center console, some were on the driver's seat, passenger's

15   seat, just various locations.

16   Q.   Were any of these cell phones found in the pockets of the

17   children that were in the car?

18   A.   No.

19   Q.   With respect to Mr. Ballard's house, what was your role in

20   that search?

21   A.   I was to photograph the residence prior to the residence

22   being searched.  I was also to photograph anything of

23   evidentiary value, prior to it being moved.  And then I was

24   also the seizing -- not the seizing agent, but the acquiring

25   agent.  And then my role was to give it to Task Force Officer

MATTHEW SIMONETTI - DIRECT EXAMINATION

1   Crumley, who was going to wind up being the seizing agent.

2   Q.  I'm going to show you just a handful of items that were

3   seized from the house.  This is a little heavy.

4   A.  Yeah.

5   Q.  Do you recognize that item?

6   A.  I do.

7   Q.  Okay.  And was that one of the items that you seized from

8   Martin Ballard's house?

9   A.  That is one of the items that I acquired.

10  Q.  And why is it that you seized this item?

11  A.  That item is what we call a kilogram press or a kilo

12  press.  It's a homemade device that's used to compress

13  cocaine.

14  Q.  And how is that item used to compress cocaine?

15  A.  With this particular press they would usually use some

16  type of weight in order to press the cocaine down.  Some other

17  presses use jacks in order to provide some force to make

18  everything nice and tight.

19  Q.  And in doing that, that helps create that solid brick of

20  cocaine?

21  A.  Correct.

22  Q.  I'm going to show you Government's Exhibit 21, and what

23  are these items in Government's Exhibit 21?

24  A.  More cell phones.

25  Q.  Okay.  And where were these cell phones located?

A. These would have been found inside of the -- Mr. Ballard's residence.

Q. And I'm going to show you Government's Exhibit 21 C; and what is this?

A. It's a box of miscellaneous paperwork from inside of Mr. Ballard's residence.

THE COURT: Box of what?

A. Miscellaneous paperwork.

Q. Financial records, receipts, those sorts of things?

A. Correct.

MR. RICHARDSON: If you would answer any questions, Detective Simonetti, that Mr. Theos might have, I'd appreciate it.

CROSS-EXAMINATION

BY MR. THEOS:

Q. Mr. Simonetti, who else resided in the residence with Mr. Ballard -- Well, first of all, what was the residence address that you had under surveillance?

A. I believe it was -- and it's been several years now, correct me if I'm wrong -- I believe it was 106 Springview? Something like that.

Q. And where is that located?

A. It's in the Felder Creek subdivision in Summerville on the Berkeley County side.

Q. All right. And residing in that residence with Martin

MATTHEW SIMONETTI - CROSS-EXAMINATION

1   Ballard were his children?  And otherwise -- Were they not?

2   A.  Yes.

3   Q.  And also his girlfriend, Melissa McCleary, who is the

4   mother of one of his children, correct?

5   A.  As far as I'm aware, yes.

6   Q.  Now, the cell phones, I believe it was Exhibit 18 A that

7   you testified about a few minutes ago, those cell phones that

8   were as you stated that were found in various locations of the

9   vehicle, those cell phones, none of them were activated, isn't

10  that correct?

11  A.  I have no idea if they were activated or not.  I did not

12  see if they had power to them; they were collected and placed

13  into evidence.

14  Q.  So you don't know whether they were operational or not?

15  A.  I have no idea.

16  Q.  Now, with respect to the cell phones that you testified

17  about that were found in the house, and I believe that was

18  18 A?  Mr. Simonetti, Government's Exhibit 21 B, which you

19  testified about earlier, those cell phones were the cell

20  phones that were found in the residence?

21  A.  Correct.

22  Q.  And with respect to those cell phones, you're aware of the

23  fact that they also were not operational and they were not

24  phones that were activated.

25  A.  I am not aware if they were functional, activated or not.

MATTHEW SIMONETTI - CROSS-EXAMINATION

1    Q.  And to your knowledge, there was no -- do you know whether

2    any check was done to determine whether these phones were

3    active, or just old phones that were laying around the house?

4    A.  I -- if they were, it wasn't done by me.

5    Q.  Now, with respect to the cocaine, or as you put it, the

6    kilo press that was found, and this is Exhibit 21 A, that was

7    found in a garage, is that right?

8    A.  Correct.

9    Q.  And the garage is positioned where with respect to the

10   living quarters?

11   A.  If you're looking at the front of the residence, it's

12   forward and to the left of the living quarters.

13   Q.  And as you said, in order for a kilo press to be

14   operational so that it can -- as Mr. Richardson put it, so

15   that it can press the drugs to form this brick of cocaine, in

16   order for it to be operational, there either must be a

17   hydraulic jack that would provide the pressure necessary to

18   form the brick, or a weight of significant -- a significant

19   weight to enable this to be operational, correct?

20   A.  I would agree that it would take some type of jack and

21   some type of weight.

22   Q.  Now, there was no weight or jack found with this kilo

23   press, as you put it, was there?

24   A.  With this particular press, no, there was no weight or

25   jack found.

MATTHEW SIMONETTI - REDIRECT EXAMINATION

1  Q.  Therefore, this kilo press, as it was found and as it sits

2  here today, is not operational, is it?

3  A.  No, it wouldn't be.

4          MR. THEOS:  No other questions, Judge.

5          MR. RICHARDSON:  Quick follow-up.

6                    REDIRECT EXAMINATION

7  BY MR. RICHARDSON:

8  Q.  Detective Simonetti, when we talk about a jack, do you

9  have a jack in your car?

10  A.  I do.

11  Q.  What do you use that jack for in your car?

12  A.  To jack up my vehicle if I need to change a tire.

13  Q.  Have you ever seen a vehicle that did not have a hydraulic

14  jack in that car?

15  A.  I have seen vehicles without a hydraulic jack inside of

16  the vehicle.

17  Q.  And every car that you've ever had, had a hydraulic jack

18  in it?

19  A.  It did not have a hydraulic jack, it had some other kind

20  of jack.

21  Q.  Has a jack of some sort?

22  A.  Correct.

23  Q.  Bad question.  But cars, all cars have a jack in it in

24  case they have a flat tire, right?

25  A.  Usually, yes.

MATTHEW SIMONETTI – RECROSS-EXAMINATION

1    MR. RICHARDSON:  Nothing further.

2                    RECROSS-EXAMINATION

3    BY MR. THEOS:

4    Q.  Mr. Simonetti, there's a big difference between a car jack

5    and a hydraulic jack that would be necessary to operate this

6    kilo press, isn't there?

7    A.  I'm not going to argue semantics, nor am I going to argue

8    how much force a standard jack nor a hydraulic jack places

9    when it's trying to compress nor lift.  I'm not a physicist,

10   so I wouldn't know.

11   Q.  I understand and I appreciate that.  But you stand on your

12   testimony that for this to be operational, the hydraulic jack

13   would be necessary, right?

14   A.  I believe I said it would need a jack or weight.

15                    MR. THEOS:  No other questions, Judge.

16                    THE COURT:  Let me ask you.  Would an ordinary car

17   jack, could you use that to operate this thing?

18   A.  You could use a standard car jack, I just don't know if a

19   standard car jack would give enough pressure to compress.

20                    THE COURT:  You could fit it in there.  It would fit

21   around there to press some?

22   A.  It could.  Depending on the particular type of jack, since

23   there's so many variations of jacks.

24                    THE COURT:  All right, sir, go ahead.  Any other

25   questions?  All right.  You may be excused.  Thank you.

HELEN CREEL - DIRECT EXAMINATION

1      MR. RICHARDSON:  Your Honor, the Government calls

2  Helen Creel.

3      MR. THEOS:  Your Honor, could we take a five minute

4  break, please?

5      THE COURT:  Maybe ten.

6   (A recess was held at this time.)

7      MR. RICHARDSON:  The Government calls Helen Creel.

8      THE CLERK:  State your name for the record.

9  A.  Helen Creel.

10   HELEN CREEL, a witness called by the Government, first

11  having been duly sworn, testified as follows:

12                  DIRECT EXAMINATION

13  BY MR. RICHARDSON:

14  Q.  Morning, Miss Creel, how are you doing today?

15  A.  I'm doing well; thank you.

16  Q.  A little nervous?

17  A.  Yes.

18  Q.  You look like you are.  It will be all right.  Tell me

19  where did you grow up?

20  A.  In Summerville, South Carolina.

21  Q.  And did you graduate from high school there?

22  A.  I did.

23  Q.  What did you do after high school?

24  A.  I went to the College of Charleston.

25  Q.  What kind of work do you do now, Miss Creel?

HELEN CREEL – DIRECT EXAMINATION

1  A.  I'm a paralegal at a civil firm here in Charleston.

2  Q.  And prior to becoming a paralegal, what kind of work did

3  you do before that?

4  A.  I worked at T Mobile and another call center, and also the

5  solicitor's office for the First Judicial Circuit.

6  Q.  That's here in Charleston?

7  A.  In Charleston.

8  Q.  All right.  Have you got kids?

9  A.  I do.

10  Q.  How old are they?

11  A.  Thirteen, seven and six.

12  Q.  And you've previously married but divorced now?

13  A.  That is correct.

14  Q.  In 2012 do you recall entering into a proffer agreement

15  with the Government?

16  A.  Yes, I do.

17  Q.  I'm going to hand you Government Exhibit 10 F.  Do you

18  recognize that one?

19  A.  Yes, sir, I do.

20  Q.  Is that your signature on the last page?

21  A.  Yes, sir, it is.

22  Q.  And tell us what your understanding of that proffer

23  agreement is, what's it require you to do?

24  A.  To tell the truth.

25  Q.  Okay.  Do you know Martin Ballard?

HELEN CREEL - DIRECT EXAMINATION

1   A.  Yes.

2   Q.  Do you see him here in the courtroom?

3   A.  Yes, I do.

4   Q.  And can you describe where he's sitting?

5   A.  He's sitting over to the right side of the room.

6   Q.  How did you first know Martin?

7   A.  I went to high school with Martin.

8   Q.  At Summerville High?

9   A.  At Summerville High School.

10  Q.  Did y'all graduate together about the same time?

11  A.  No, we didn't.

12  Q.  In between when you graduated from high school and 2011,

13  did you have any dealings or interactions with Mr. Ballard?

14  A.  No, sir.

15  Q.  Tell me how in 2011 you became reacquainted and got back

16  up knowing Mr. Ballard.

17  A.  I was driving down Boone Hill Road, and he was pulling out

18  of a gas station and we met up at a stoplight.

19  Q.  And when he pulled up beside you, rolled down the window,

20  did you recognize him then?

21  A.  I did.

22  Q.  Tell me what happened.  During that meeting, what

23  occurred?

24  A.  We just exchanged phone numbers.

25  Q.  And subsequent to that did you get a phone call from him?

1  A.  About two weeks later, yeah.

2  Q.  And as a result of that phone call, what did you do?

3  A.  We went to dinner.

4  Q.  Where did you go to eat?

5  A.  We went to California Dreaming.

6  Q.  And did he pick you up?

7  A.  Yes, he did.

8  Q.  What was he driving when he picked you up?

9  A.  A silver Mercedes.

10  Q.  Although we'll get to it, during the course of your

11  interactions with Mr. Ballard -- in the course of your

12  interactions with Mr. Ballard did you see him driving other

13  vehicles?

14  A.  I saw him driving a Dodge Ram.

15  Q.  And what other cars did you know he had?

16  A.  Like an old school car with -- older model car with rims.

17  Q.  Talk about rims, you mean that are inside the wheels?

18  A.  Yes.

19  Q.  Were they larger than normal?

20  A.  Yes.

21  Q.  Okay.  And is it convertible?

22  A.  Yes, sir.

23  Q.  After dinner -- That was the first date you'd been on,

24  right?

25  A.  Yes.

HELEN CREEL - DIRECT EXAMINATION

1    Q.  After dinner that night, what did he give you for your

2    birthday?

3    A.  We -- he gave me some money so that I could go shopping.

4    Q.  And how much money did he give you?

5    A.  Approximately $600.

6    Q.  How long after that did you see Martin again?

7    A.  It was about another two weeks.

8    Q.  And where did you go to see him at that time?

9    A.  He came to my apartment.

10   Q.  And when he came to your apartment, I don't want to go

11   into every detail about it, but what did he subsequently leave

12   to go get?

13   A.  He came back with cocaine.

14   Q.  So how did cocaine come up during the course of your

15   conversation?

16   A.  We were discussing my ex-husband, and he had heard that my

17   ex-husband used drugs, and asked if I had ever, you know, used

18   drugs with him.

19   Q.  Okay.  And had you used cocaine before?

20   A.  Yes.

21   Q.  When did you first start using cocaine?

22   A.  Around 2006.

23   Q.  And at the time you met back up with Mr. Ballard in 2011,

24   were you still using cocaine at that point?

25   A.  No, I wasn't.

1   Q.  When had you stopped?

2   A.  I had stopped at the beginning of 2011, around January.

3   Q.  And you met up with Mr. Ballard when, in --

4   A.  May of 2011.

5   Q.  And after you had that conversation with Mr. Ballard about

6   cocaine, what happened?  What did he do?

7   A.  He said that he had to leave for a minute, but he would be

8   back.

9   Q.  Okay.  And when he came back, what did he have?

10  A.  Some cocaine.

11  Q.  And what did he do with the cocaine?

12  A.  He gave it to me.  To try.

13  Q.  And what did you do with the cocaine?

14  A.  I used it.

15  Q.  And this is powder cocaine, right?

16  A.  Yes, powder cocaine.

17  Q.  Did Mr. Ballard use the cocaine?

18  A.  No, he didn't.

19  Q.  During all the time that you spent with Mr. Ballard, did

20  you ever see him use cocaine?

21  A.  No, I did not.

22  Q.  Were you with Mr. Ballard and other people where other

23  people were using cocaine?

24  A.  Yes.

25  Q.  And in spite of that, you never saw him use cocaine at

HELEN CREEL - DIRECT EXAMINATION

1    all?

2    A.  I never saw him use cocaine.

3    Q.  After that meeting with Mr. Ballard, at your apartment

4    where you got cocaine from him then, did you continue getting

5    cocaine from Martin?

6    A.  I did.

7    Q.  And what kind of quantities of cocaine were you getting

8    from him?

9    A.  Approximately half a gram to a gram.

10   Q.  And how often were you getting a half a gram or a gram of

11   cocaine from Martin Ballard?

12   A.  Every one to two weeks.

13   Q.  And how long did that last?  You met him in May of 2011;

14   how long did you continue getting cocaine from Martin Ballard?

15   A.  Through November of 2011.

16   Q.  Okay.  And the first time -- when you got cocaine from

17   Mr. Ballard at your apartment, did you pay him for that

18   cocaine?

19   A.  No, I didn't.

20   Q.  At some point did you start paying him for the cocaine?

21   A.  Yes, I did.

22   Q.  Where would you go when you were getting cocaine from

23   Mr. Ballard, where would you go meet him to get cocaine?

24   A.  He would come to my house, I would go to his house.

25   Q.  When you say to his house, where was that?

HELEN CREEL - DIRECT EXAMINATION

1  A.  It was off of Old Orangeburg Road over the 26 overpass to

2  the right, a subdivision on the right-hand side.

3  Q.  Was it a dirt road?

4  A.  No.  Not -- off of Old Orangeburg Road, that way also near

5  Ancrum Lane, but also going out towards Jedburg.

6  Q.  So two different ones.  One over by toward Jedburg, you

7  went to that house?

8  A.  Yes.

9  Q.  And then you also went to a house over on Ancrum Lane,

10  that's the dirt road house?

11  A.  Yes.

12  Q.  How would you get in contact with Mr. Ballard in order to

13  get cocaine from him?

14  A.  I would call him or text him.

15  Q.  Okay.  How often did Mr. Ballard's phone number change?

16  A.  Approximately he had about four different phone numbers in

17  the time that I dealt with him.

18  Q.  And how would you get those phone numbers from him, how

19  would you know he changed phone numbers?

20  A.  Because he would call me from a different number.

21  Q.  During the course of your dealings with Mr. Ballard, did

22  you see him with firearms?

23  A.  Yes.

24  Q.  And how much do you know about firearms?

25  A.  I don't know a lot about firearms.

HELEN CREEL - DIRECT EXAMINATION

1    Q.   Okay.  But you'd see him with one from time to time?

2    A.   Yes.

3    Q.   And can you describe it in any way?

4    A.   It was -- one was black and another was silver.  I mean

5    that's --

6    Q.   And were they semiautomatic modern looking guns?

7    A.   No.

8    Q.   You're not sure?

9    A.   I don't --

10   Q.   I can see you looking at me like you have no idea.  Okay.

11   That's fine.

12        And in 2011, this time period, where were you working?

13   A.   I was working at the solicitor's office in Dorchester

14   County.

15   Q.   And at Mr. Ballard's request did you provide him

16   information from the solicitor's office?

17   A.   I did.

18   Q.   And what type of information did you provide Mr. Ballard

19   from the solicitor's office?

20   A.   With an incident report of an ongoing case that was on the

21   docket.

22   Q.   And that ongoing case was involving Mr. Ballard?

23   A.   Yes.

24   Q.   And did you also provide him information about the type of

25   undercover cars that narcotics officers were driving?

HELEN CREEL - CROSS-EXAMINATION

1  A.  Yes, I did.

2  Q.  And what kind of car did you tell him that they were using

3  at that point in time?

4  A.  Dodge Charger.

5          MR. RICHARDSON:  Miss Creel, if you'd answer any

6  questions Mr. Theos might have, I'd appreciate it.

7  A.  Yes.

8                    CROSS-EXAMINATION

9  BY MR. THEOS:

10  Q.  Miss Creel, as you said, you were involved with Martin

11  from about May of 2011 through November 2011?

12  A.  Yes.

13  Q.  Is that right?  And during that time period y'all were

14  involved in a romantic sexual relationship, were you not?

15  A.  In a sexual relationship.

16  Q.  You wouldn't characterize it as romantic, you would

17  characterize it instead as sexual?

18  A.  That's correct.

19  Q.  In fact, on at least one occasion you were involved with

20  Martin and another woman in a threesome and using cocaine

21  related to that engagement, that sexual engagement, were you

22  not?

23  A.  That's correct.

24  Q.  And as you said, during that time period you were using

25  cocaine on a regular basis, correct?

HELEN CREEL - CROSS-EXAMINATION

1  A.  Yes.

2  Q.  And so your dependence and your addiction to cocaine

3  was -- if we were to believe that it stopped in January and

4  restarted in May, that it was thriving from May 2011 through

5  November 2011, correct?

6  A.  That is correct.

7  Q.  You were using it on -- as much as you could get your

8  hands on it and as often as you could get your hands on it,

9  you were using it, right?

10  A.  About every one to two weeks I was using it.

11  Q.  And Martin, the person you were involved in the sexual

12  relationship with, Martin was the one that you relied upon to

13  give you that cocaine, correct?

14  A.  That's correct.

15  Q.  And he did that.  He provided you with the cocaine that

16  you wanted and you needed, did he not?

17  A.  That's correct.

18  Q.  Now, at no time did you see Martin sell any drugs to

19  anybody, did you?

20  A.  No.

21  Q.  At no time did you overhear Martin talking with anybody

22  about selling drugs, did you?

23  A.  No.

24  Q.  At no time did you see any evidence, because you said you

25  went to Martin's house, at no time did you see any evidence

HELEN CREEL - CROSS-EXAMINATION

1    that would have caused you to believe that Martin was involved

2    in selling drugs, did you?

3    A.   That's correct.

4    Q.   The only thing you knew about Martin with respect to

5    cocaine was that he was getting you the cocaine you wanted and

6    you needed, correct?

7    A.   That's correct.

8    Q.   Now, you signed a proffer agreement on May the 22nd, 2012,

9    correct?

10   A.   I did.

11   Q.   And in that proffer agreement you agreed to provide

12   information to the Government related to Martin Ballard, did

13   you not?

14   A.   That's correct.

15   Q.   And you were told that if you provided information to the

16   Government and followed through with testifying regarding that

17   information, that you would not be prosecuted for your use and

18   your distribution, because receiving is the same as

19   distribution, you would not be prosecuted for your involvement

20   with cocaine.

21        MR. RICHARDSON:  Objection, Your Honor, that's not

22   accurate.

23        MR. THEOS:  Your Honor, this is cross-examination;

24   I'm entitled to this.

25        THE COURT:  He's entitled, Mr. Richardson, to ask her

HELEN CREEL – CROSS-EXAMINATION

1  if she –- let's see what her answer is going to be.  Now ask

2  the question.

3  BY MR. THEOS:

4  Q.  It was your understanding, was it not, that if you

5  provided information related to Martin Ballard and then came

6  to court to testify against Martin Ballard, that you would not

7  be prosecuted for your involvement related to cocaine and the

8  information you provided.

9  A.  That's correct.

10  Q.  So that's what you've done.

11  A.  Yes, sir.

12  Q.  And you've done it in order to avoid prosecution, correct?

13  A.  That's correct.

14        MR. THEOS:  No other questions, Judge.

15        THE COURT:  All right.

16        MR. RICHARDSON:  Nothing further, Your Honor.

17        THE COURT:  You may be excused.

18        MR. PHILLIPS:  Jamal McElveen is our next witness,

19  Your Honor.

20        THE CLERK:  State your name for the record.

21  A.  Jamal McElveen.

22     JAMAL McELVEEN, a witness called by the Government, first

23  having been duly sworn, testified as follows:

24                    DIRECT EXAMINATION

25  BY MR. PHILLIPS:

JAMAL McELVEEN - DIRECT EXAMINATION

1  Q. Just for the record again, could you state your name?

2  A. Jamal McElveen.

3  Q. And how old are you?

4  A. Forty.

5  Q. Where were you born?

6  A. Charleston, South Carolina.

7  Q. Have you lived in Charleston most of your life?

8  A. Yes.

9  Q. What kind of education do you have, where did you go to

10  school?

11  A. North Charleston High School.  Got a G.E.D.  Didn't

12  graduate.

13  Q. And what kind of work have you done since you graduated

14  from -- got your G.E.D.?

15  A. Held several different jobs.  Mechanic work, telemarketer.

16  Q. Okay.  Mr. McElveen, you also have some criminal

17  convictions as well.

18  A. Yes.

19  Q. And you were convicted in Federal Court of carjacking and

20  being a felon in possession?

21  A. Yes, possession of a weapon.

22  Q. When was that?

23  A. The crime happened in January of 1996, conviction in 1998.

24  Q. And you had a felon in possession, so you had a prior

25  felony conviction; what was that for?

JAMAL McELVEEN - DIRECT EXAMINATION

1    A.  Possession of a narcotics, possession of a stolen car.

2    Q.  Okay.

3    A.  Discharging a firearm.

4    Q.  Now, you were also convicted in 2013 of failure to stop

5    for blue light.

6    A.  Yes.

7    Q.  And that was in State Court?

8    A.  Yes, State Court.

9    Q.  And you have also been convicted of a federal crime in

10   2000 -- 2011?  2013, excuse me.

11   A.  Yes, possession of cocaine with intent to distribute.

12   Q.  Now I'm going to hand you -- well, we're going to show you

13   Government's Exhibit 10 K.  This is your -- Do you recognize

14   that document on the screen?

15   A.  Yes.

16   Q.  Tell the Court what that document is.

17   A.  That's my plea agreement.

18   Q.  If we go to the second-to-last page, page nine, is that

19   your signature on page nine?

20   A.  It's not on page nine.

21   Q.  Here, we'll do it the old-fashioned way.

22        MR. PHILLIPS:  If I may approach, Your Honor?

23        THE COURT:  All right, sir.

24   Q.  Is that your signature there?

25   A.  Yes, it is.

JAMAL McELVEEN - DIRECT EXAMINATION

1  Q.  All right.  Now, this is an agreement you made with the
2  Government to resolve your drug charges in Federal Court most
3  recently, correct?
4  A.  Yes.
5  Q.  And what did you agree to do in this plea agreement?
6  A.  Cooperate fully.
7  Q.  All right.  And cooperate fully regarding what?
8  A.  Any of my drug activities, known or unknown to the Court.
9  Q.  Okay.  And did you agree to cooperate truthfully?
10  A.  Yes.
11  Q.  And what happens if you don't cooperate and provide
12  truthful information?
13  A.  I was told I'd be held for perjury.  And possibly receive
14  more time.
15  Q.  And you've been sentenced in this case, in the case we're
16  talking about where the subject of this plea agreement?
17  A.  Yes.
18  Q.  And what was your sentence?
19  A.  Sixty months.
20  Q.  All right.  And prior to your sentencing did you -- you
21  cooperated with the Government?
22  A.  Yes.
23  Q.  Was a motion filed on your behalf by the Government?
24  A.  Yes.
25  Q.  And at your sentencing?

1    A.  Yes, it was.

2    Q.  And was your sentence reduced, based on that motion?

3    A.  Yes, it was.

4    Q.  All right.  Now, you talked about some legitimate jobs

5    that you had, and could you tell us about any illegitimate

6    work that you've done?

7    A.  Transported and sold cocaine, robberies.

8    Q.  Robberies of who?

9    A.  Other drug dealers.

10   Q.  Okay.  And let's focus on the transporting of cocaine.

11   When did you start doing that?

12   A.  Around 2008.

13   Q.  All right.  And could you tell the Court how that came

14   about?

15   A.  I established a connection in McAllen, Texas.  And after

16   establishing that connection I began to purchase and transport

17   kilos of cocaine from McAllen, Texas, back to Charleston.

18   Q.  How many kilos would you get at a time?

19   A.  It would vary.  It would vary between one maximum --

20   minimum and maximum ever was about six.

21   Q.  And how were you bringing them back?

22   A.  By road on transportation in a car.

23   Q.  And how long did that connection last?  In McAllen.

24   A.  Until my incarceration in 2011.

25   Q.  At any point did you switch sources of supply?

1  A.  I have a couple different sources.

2  Q.  In McAllen?

3  A.  In McAllen, yes.

4  Q.  That initial source, did that continue all the way

5  through, or did you leave that source and turn to another at

6  some point?

7  A.  It didn't continue all the way through, it was back and

8  forth.

9  Q.  And why was that?

10  A.  Sometimes that source was unavailable.

11  Q.  And how did you -- so you secured another source in

12  McAllen?

13  A.  Yes, I secured a secondary source of purchasing cocaine.

14  Q.  And how did you come about that source?

15  A.  Through a friend that I met here in South Carolina.  A

16  friend named Maria, she introduced me to a family member of

17  hers who just happened to be in the same area.

18  Q.  And then you began getting cocaine from that individual?

19  A.  Yes.

20  Q.  How much cocaine were you getting?

21  A.  Like I said, it varied.  I would always work on a cash

22  only basis, so I would purchase between one to four or five,

23  six kilos at a time from that person.

24  Q.  Okay.  Now, and this second source, when did you start

25  dealing with that individual?

1 A. Around 2009, 2010.

2 Q. Now, when you were getting these kilos, how often were you

3 getting them?  Like how often a month?

4 A. The times varied.  Sometimes once a month, sometimes

5 twice; very very seldom three times a month.

6 Q. And what were you doing with the kilos when you got back

7 to Charleston?

8 A. I would sell them when I came back.

9 Q. Who did you sell them to?

10 A. Various people.  Like different people around the city.

11 Q. Well, who was your -- who did you primarily sell to?

12 A. Xavier McElveen.

13 Q. And who is that?

14 A. It's a relative, deceased.

15 Q. Okay.  And did you ever sell to Martin Ballard?

16 A. I never sold anything to Martin Ballard.  The arrangement

17 that we had was he would actually give his money up front and

18 I would procure the purchase and bring it back and deliver it

19 to him.  But me personally selling anything to him, it wasn't

20 ever mine, he would buy it up front.

21 Q. Okay.  We'll get into that.  Now, how did you meet Martin

22 Ballard?

23 A. I meant him through Xavier.

24 Q. And how did Xavier know him?

25 A. He told me that they met --

1          MR. THEOS:  I'm going to object.

2          THE COURT:  I sustain that.

3    BY MR. PHILLIPS:

4    Q.  Do you know where Mr. Ballard and Mr. McElveen met?

5    A.  He said that --

6    Q.  Don't tell us what he said at this point.

7    A.  I don't know personally, I just know what he said.

8    Q.  Okay, then we'll move on.  But at some point you were

9    introduced to Mr. Ballard by Mr. McElveen.

10   A.  Yes.

11   Q.  When was that?

12   A.  In 2010.

13   Q.  All right.  So when you met -- tell us about that meeting

14   in 2010 with Mr. Ballard; what purpose was that meeting?

15   A.  That purpose was he told me that he had someone who was

16   interested in buying cocaine, and he told me he can get them a

17   decent price.  The price I had was cheaper than what he was

18   purchasing at currently.

19   Q.  This was Mr. McElveen brokering this meeting?

20   A.  Yes.

21   Q.  All right.  And did he tell you at that time who you were

22   meeting with?

23   A.  He just told me --

24          MR. THEOS:  Your Honor, again, I object to what

25   somebody told him.

JAMAL McELVEEN - DIRECT EXAMINATION

1      MR. PHILLIPS:  Your Honor, this was a

2  co-conspirator --

3      THE COURT:  Wait just a minute.

4      MR. PHILLIPS:  I apologize.

5      THE COURT:  They engaged allegedly in this cocaine

6  conspiracy.

7      MR. THEOS:  Your Honor, I think he can ask questions

8  about what Mr. Ballard may have said, but not about what

9  somebody that's deceased may have told him in that meeting.

10      MR. PHILLIPS:  Your Honor --

11      MR. THEOS:  That person is not part of this

12  conspiracy.

13      THE COURT:  You asked him -- Repeat your question.

14      MR. PHILLIPS:  Your Honor -- well, now I've forgotten

15  the question.

16  BY MR. PHILLIPS:

17  Q.  What was the purpose of this meeting?

18  A.  The purpose of the meeting was for two of us to meet.

19      THE COURT:  You and who, Mr. Ballard?

20  A.  Yes, sir, me and Mr. Ballard.

21      THE COURT:  All right.  Go ahead.

22  BY MR. PHILLIPS:

23  Q.  And to meet for what purpose?

24  A.  To see if we can come to an understanding concerning the

25  price of -- and the purchasing of cocaine.

JAMAL McELVEEN - DIRECT EXAMINATION

1    Q.  Okay.  And where did y'all meet?

2    A.  At the fairgrounds off of Ladson Road.  I mean off of

3    Highway 78.

4    Q.  And what did you and Mr. Ballard discuss regarding

5    cocaine?

6    A.  We discussed different prices, and we came to an

7    understanding that if I could deliver on the price that I told

8    him, that we could work together.

9    Q.  All right.  And did y'all make a plan for you to procure

10   cocaine from Mr. Ballard?

11   A.  Yes.

12   Q.  Tell the Court about that.

13   A.  The initial purchase was kind of sort of a test run, it

14   was only for half a kilo of cocaine.  And I received the money

15   from him and --

16   Q.  You received the money from who?

17   A.  I received the money from Xavier, the first time.

18   Q.  And that was for the half kilo of cocaine?

19   A.  Yes.

20   Q.  And you had agreed upon that half kilo with Mr. Ballard at

21   the fairgrounds?

22   A.  Yes.

23   Q.  Okay.  And what happened next?

24   A.  The trip went on as planned, and I came back --

25              THE COURT:  Talk louder.

1  A.  The trip went on as planned.  I came back and I delivered

2  the cocaine.

3  Q.  Who did you deliver -- well, before I go to that, how much

4  money did you get from Mr. McElveen on Mr. Ballard's behalf?

5  A.  Fourteen thousand dollars.

6  Q.  Do you remember anything particular about the money?

7  A.  Just that it was -- it was what I would call large money.

8  Q.  Explain that to the Court, what do you mean by that?

9  A.  Well, during my trips I would normally fly down, so going

10  through the TSA in the airport, can't have extremely large

11  amounts of money.  So I would have to have the money shrunken

12  down into all hundreds, by going to different local banks and

13  exchanging twenties and fifties and tens for hundreds.  And

14  that would make the money much smaller.  Or when the money

15  came to me it was in small bills, so it was a large amount of

16  money.

17  Q.  And that's how the money was that you received from

18  Mr. McElveen on Mr. Ballard's behalf?

19  A.  Yes.

20  Q.  Now, you said you delivered the half kilo of cocaine.  Who

21  did you deliver that to?

22  A.  I delivered it to Mr. Ballard.

23  Q.  And where did y'all meet?

24  A.  The initial meeting was at a Wal-Mart on Main Street.

25  Q.  Main Street where?

JAMAL McELVEEN – DIRECT EXAMINATION

1    A.   In Summerville.

2    Q.   Okay.  And tell us what happened at that meeting.

3    A.   I gave him the cocaine and we spoke very briefly and we

4    went our separate ways.

5    Q.   Do you recall what he was driving at that meeting?

6    A.   Not nothing that stood out, no.

7    Q.   Okay.  Do you recall what he was driving in the first

8    meeting at the fairgrounds?

9    A.   No, he never drove a very distinctive car that it was like

10   rental cars.  Nothing that ever just stood out.

11   Q.   Now, what happened after you delivered that half kilogram

12   of cocaine to Mr. Ballard in Summerville?

13   A.   We spoke briefly later, and after we spoke, we came to an

14   understanding of purchasing other kilos of cocaine.

15   Q.   Now, when you came to that understanding, did you meet

16   again or did y'all talk on the phone?

17   A.   We met.

18   Q.   Where did you meet?

19   A.   We met several different times, but normally when we met

20   for the purchases, it was at an -- outside or near a local

21   bank, make a deposit.

22   Q.   We'll get to that.  Now I'm talking about after you

23   delivered the half kilo, your next meeting.  Where y'all came

24   to the understanding that you were going to get more cocaine

25   for Mr. Ballard.  Do you recall where that meeting occurred?

1   A.  Not exactly, no.

2   Q.  Now, when y'all discussed getting more cocaine, what did

3   y'all talk about?

4   A.  We just talked about the prices and --

5   Q.  Did he tell you how much he wanted you to get?

6   A.  He wanted more than I could supply.

7   Q.  How much?

8   A.  He wanted -- I told him the max I can get for him is

9   two kilos at a time.

10   Q.  And how much did he ask for?

11   A.  He didn't ask for a certain amount, he just wanted more

12   than that.

13   Q.  And why couldn't you get him more than two?

14   A.  Because if I got him more than two, then I wouldn't have

15   any for myself.

16   Q.  And did that have to do with how you were transporting it

17   back at this time?

18   A.  Yes, the way that it was being transported was -- wouldn't

19   allow me to get more than around five at a time.

20   Q.  Tell the Court how you were transporting it and why you

21   could only be five kilos?

22   A.  Because at that time I was coming through a check point in

23   the south Texas area called the Falfurrias check point, and

24   coming through that check point you had to body wrap the

25   cocaine to your body. And it's just hard to get more than

JAMAL McELVEEN - DIRECT EXAMINATION

1    five kilos body wrapped to a person at a time.

2    Q.  Why did you want to have it body wrapped to you as opposed

3    to keeping it in the car?

4    A.  Because it's much easier for the dogs that the narcotic

5    dogs to pick up on the scent.

6            THE COURT:  Because why?  I didn't understand you.

7    A.  Because it's much easier for the narcotic dogs to pick up

8    on the scent of the drugs when it's in the car.

9    Q.  Now, so y'all agreed upon that you were going to get him

10   two kilos per trip.

11   A.  Yes.

12   Q.  What were you going to get paid?  What were you making off

13   of this, anything?

14   A.  Not really making a profit.  What I was doing is using the

15   extra money to take care of my transportation fees.

16   Q.  So were you charging him -- what were you going to charge

17   him per kilo?  Or what did you charge him per kilo?

18   A.  Total, 26,000.

19   Q.  And what did that include?

20   A.  That included the purchase and transportation.

21           THE COURT:  How much did you say?

22   A.  Twenty-six thousand.

23   Q.  All right, sir.  At this meeting at Ryan's, y'all agreed

24   upon two kilos, and did you then make a trip?

25   A.  Yes.

1  Q.  Before that trip did he provide you money?

2  A.  Yes, he did.

3  Q.  Did y'all ever talk about the large money?

4  A.  Yes, we actually had a discussion and came to an

5  understanding that I told him how to make the money smaller,

6  and he agreed to it.

7  Q.  Now, when you were going out to Texas were you flying

8  every time?

9  A.  Not every time, no.

10  Q.  Okay.  So after that agreement when y'all discussed

11  two kilos, you made your next trip, how many trips did you

12  make along these lines where you brought him back two kilos

13  approximately?

14  A.  In all honesty, I can't remember the exact amount of

15  trips, but I remember between four to five trips.

16  Q.  Okay.  And where would you meet with Mr. Ballard when you

17  returned to give him the cocaine?

18  A.  We never met in North Charleston, but just different

19  locations in Summerville.

20  Q.  Could you tell the Court some of those locations?

21  A.  One was a small restaurant across from the Summerville

22  High School.  Apartment complexes.  Just different random

23  places.

24  Q.  And you said you made four to five trips where you

25  obtained two kilos for Mr. Ballard?

1  A.  Yes, that I can remember.

2  Q.  And when did that begin again?

3  A.  Early 2010.

4  Q.  And when did it end?

5  A.  The last trip was December 2010.

6  Q.  Other than the half kilogram you brought in the first

7  time, was it always two kilograms?

8  A.  Yes.

9  Q.  Okay.  Now, tell us about that last trip, what happened on

10  that last trip in December.

11  A.  In December I opted to take a road trip, wasn't able to

12  get to the bank, so I had a large amount of money.  Drove down

13  to Texas, was pulled over in Beaumont, Texas.  When I was

14  pulled over, I had a little over $100,000 and it was

15  confiscated.

16  Q.  And whose money was confiscated?  Whose money made up that

17  $100,000?

18  A.  It was comprised of four different people.  My money,

19  Mr. Ballard's money, Mr. McElveen's.  I'm sorry, two

20  McElveens, Xavier, Jamal and Mr. Ballard.

21  Q.  Was it more than $100,000?

22  A.  Yes, sir.

23  Q.  How much of that money was Ballard's; do you remember?

24  A.  A little over 40,000.

25  Q.  How much cocaine were you set to get him on that trip?

JAMAL McELVEEN - DIRECT EXAMINATION

1   A.  I was supposed to get five kilos.

2   Q.  Okay.  Now, when they seized that money, what happened

3   next with your dealings with Mr. Ballard?

4   A.  He pretty much went sour.

5   Q.  Did you talk to him about the seizure?

6   A.  Explained to him about it.  He wanted some kind of

7   compensation, it was none to be had, so we was at an impasse.

8   Q.  And did y'all have any other drug dealings after that?

9   A.  No.

10          THE COURT:  I didn't understand how the seizure,

11  exactly how the seizure took place.  Tell me that again.

12  A.  I was driving west on Interstate 10, and a state trooper,

13  a Texas state trooper pulled us over.

14          THE COURT:  You said pulled us.  There was somebody

15  with you?

16  A.  Yes, sir, me and Xavier McElveen.

17          THE COURT:  Go ahead.

18  A.  He pulled us over and did a search of the car and found a

19  large amount of money.  We were arrested for money laundering.

20          THE COURT:  Well, they let you go?

21  A.  We were arrested.  We were arrested, had to post bond.

22          THE COURT:  And that was when you were going with

23  $100,000.

24  A.  Yes, sir.

25          THE COURT:  All right, sir.  Go ahead.

JAMAL McELVEEN - DIRECT EXAMINATION

1  BY MR. PHILLIPS:

2  Q.  Before we leave that, when Mr. Ballard delivered you the

3  money, where would y'all meet for him to deliver the money, or

4  what would y'all do?

5  A.  It was never a long meeting, we would meet, and like I

6  said, random places in the Summerville area, we'd exchange

7  money.  No real small talk.

8  Q.  What did you do with the money when he gave it to you;

9  would it depend on how you were going to travel?

10  A.  Yes, depends on how I would travel, but normally I would

11  take it, put it in a secure place.  I would go to my bank,

12  make a deposit, so that I would have money on the debit card.

13  But after that I would take the money into a secure place.

14  Q.  Okay.  Now, after those last dealings in December of 2010,

15  did you ever come across Mr. Ballard again?

16  A.  On the streets, no.

17  Q.  Okay.  Well, did you ever -- on the streets or -- did you

18  come across him somewhere else?

19  A.  Yes, in the county jail.

20  Q.  Tell us about that meeting.  How did y'all come across one

21  another?

22  A.  We actually bumped into each other in the same cell block.

23  We had -- I'm sorry?

24  Q.  What charges were you serving at that time?

25  A.  That's when I was serving my federal charges.

JAMAL McELVEEN - DIRECT EXAMINATION

1  Q.  Okay.  So you bunked across from one another in the cell

2  block; tell us what happened.

3  A.  We just had -- just had random conversation, nothing -- we

4  didn't have any illegal conversation, we just talked about

5  different things.

6  Q.  Had you been transferred from another cell block?

7  A.  Yes.

8  Q.  Did he talk to you about anyone that was in that cell

9  block where you just left?

10  A.  Yes, he asked me what cell block I came from, I told him,

11  and he said he wish he knew I was in there, he would have

12  asked me to do something to somebody that was in that cell.

13  Q.  And who's that?

14  A.  Somebody he called Slim.

15  Q.  Do you know Slim's real name?

16  A.  No.

17  Q.  Okay.  Did he tell you why he wanted you to do something

18  to that individual?

19  A.  He said he was telling on him.

20  Q.  Telling on him what?

21  A.  He said that he was informing on him.

22  Q.  In his case?

23  A.  In his case, yeah.

24  Q.  Now, what happened -- how long were y'all in the same cell

25  block?

1    A.  Less than 24 hours.

2    Q.  And what happened?

3    A.  He was moved the next day.

4    Q.  Where was he -- Do you know where he was moved to?

5    A.  No.  Found out later that he was moved to Georgetown.

6    Q.  Okay.  Is that the last contact you had with Mr. Ballard?

7    A.  Yes.

8    Q.  Okay.  Now, while you've been incarcerated, did you come

9    across an individual named Jimmie Harris?

10   A.  Yes.

11   Q.  Tell the Court about -- How do you know Jimmie Harris?

12   A.  I really don't know Jimmie Harris personally; I met him in

13   jail.

14   Q.  Okay.  Do you know what his nickname is?

15   A.  Jim Black.

16   Q.  What was it?  Say it again?

17   A.  Jim, J-I-M, Black.

18   Q.  When did you meet Mr. Harris?

19   A.  In 2013.

20   Q.  And did you have any conversations with Mr. Harris --

21           THE COURT:  What year, 2000 what?

22   A.  Thirteen.

23   BY MR. PHILLIPS:

24   Q.  When you met with Mr. Harris -- well, just tell us, did

25   y'all hang out in jail, what was y'all's relationship in jail?

JAMAL McELVEEN – DIRECT EXAMINATION

A.  We had several conversations about various different things.

Q.  Did he ever talk to you about a shooting that he was involved in?

MR. THEOS:  Your Honor, I'm going to object to anything Mr. Harris may have said to --

THE COURT:  What are you objecting to, sir?

MR. THEOS:  Well, the Government is trying to elicit testimony from Mr. McElveen regarding what somebody else told him.

THE COURT:  Yes, sir.

MR. THEOS:  And that's hearsay.

THE COURT:  Under normal circumstances.

MR. THEOS:  I believe under these circumstances as well, Judge.

THE COURT:  What connection have they shown with Mr. -- with this witness and the witness he was talking to?

MR. THEOS:  Your Honor, Mr. Harris is a co-defendant in this case, and I assumed that Mr. Phillips is attempting to elicit testimony from Mr. McElveen regarding what Mr. Harris told him or may have told him, or what Mr. McElveen claims he told him, and that's hearsay.

MR. PHILLIPS:  Your Honor, it's admissible under Rule 804(b)(3), it's a statement against Mr. Harris' penal interests to a non-law enforcement witness.

JAMAL McELVEEN - DIRECT EXAMINATION

1        THE COURT:  Wait just a minute.

2        MR. PHILLIPS:  And, Your Honor, we briefed this issue

3    in our pretrial brief on page 35.

4        THE COURT:  What?

5        MR. PHILLIPS:  We briefed this issue in our pretrial

6    brief on page 35.

7        THE COURT:  All right, sir.

8      (Brief interruption in proceedings.)

9        THE COURT:  To start with, weren't all these people

10   involved in this drug conspiracy?

11       MR. PHILLIPS:  Yes, Your Honor.  We're shifting now

12   to Mr. McElveen had information about his involvement with

13   Mr. Ballard, but his -- he also has information regarding the

14   shooting.  And we're shifting now to the shooting conspiracy.

15   To the extent that that's part of the drug conspiracy, yes,

16   he'd be involved in the drug conspiracy.

17       THE COURT:  That's not the information you're

18   soliciting from him.

19       MR. PHILLIPS:  Well, he -- yes, it is, because the

20   shooting is part of the drug conspiracy as well.  It's, you

21   know, so that the conspiracy can continue on.  But also

22   there's a separate conspiracy, or you can consider the

23   conspiracy of the shooting itself, that these statements were

24   made in that conspiracy, but also against Mr. Harris' penal

25   interests.

1    THE COURT:  Well, he wasn't involved -- is he charged

2    in the shooting conspiracy?

3    MR. PHILLIPS:  Mr. McElveen?

4    THE COURT:  Yes, sir.

5    MR. PHILLIPS:  No, sir, Mr. Harris was.

6    THE COURT:  Mr. Harris is charged in it.

7    MR. PHILLIPS:  Yes, sir.

8    MR. THEOS:  Your Honor, he's also not charged in the

9    drug conspiracy.  This witness.

10    THE COURT:  All right, sir, now what was --

11    MR. PHILLIPS:  Your Honor, I asked -- he said he came

12    across -- he met Mr. Harris, and I had asked if -- he was

13    about to testify --

14    THE COURT:  Don't you answer any of this.  All right,

15    go ahead.

16    MR. PHILLIPS:  Your Honor, I asked -- well, I guess

17    let me -- I can -- this is the question I would like to ask.

18    Did Mr. Harris tell you about his involvement in any criminal

19    activity.  That's probably the best way to start.  And then I

20    anticipate that he will talk about the conversations that Mr.

21    Harris had, implicating Mr. Harris in the shooting, which is

22    obviously against his penal interests.

23    THE COURT:  And what is your position?  It wouldn't

24    be against Mr. Harris' interests, penal interests?

25    MR. THEOS:  Your Honor, my objection is based on a

1  couple of different things.  First and foremost, in order to

2  qualify as an exception under Rule 804(a)(4)(B), the

3  declarant, the alleged declarant of that statement, must be

4  unavailable.  Mr. Harris is available.  And he has been

5  subpoenaed by us to testify, but he's certainly available.

6  And because he is available, and, therefore, not unavailable,

7  this witness can't testify.  It doesn't fall within one of the

8  exceptions to the hearsay that is recited and explained in

9  Rule 804.  And it would deny us the opportunity of obviously

10  confronting the witness regarding what he claimed to have said

11  to this witness.

12      Now, nothing would prevent the Government from calling

13  Mr. Harris as a witness.  And Mr. Harris, again, is available,

14  he's pled guilty in the shooting portion of this.

15      THE COURT:  This 804, doesn't it apply when the

16  declarant is unavailable as a witness?

17      MR. PHILLIPS:  It does, Your Honor, but Mr. Harris,

18  while he has pled guilty, he's still -- he's unavailable,

19  because he would likely plead the Fifth and --

20      THE COURT:  I mean, until he does that -- seemed like

21  to me you may be getting the cart before the horse.  Until he

22  does indicate his unavailability, or you can't find him or

23  he's dead or something, you can't assume he's unavailable when

24  he's physically -- you know where he is physically.  And it

25  just seems to me that this whole Rule 804 only applies when a

1 declarant is unavailable.

2    Now, there's no evidence before the Court that you've

3 presented that he's unavailable.

4         MR. PHILLIPS:  All right, Your Honor, we'll --

5         THE COURT:  I mean, if he comes up here and takes the

6 Fifth or won't testify or -- that's a different matter.

7         MR. PHILLIPS:  Okay.  Well, Your Honor, our plan, we

8 will call Mr. Harris, and then we'd ask for leave to recall

9 Mr. McElveen based on that.

10         THE COURT:  All right, you can do that.

11         MR. PHILLIPS:  All right, Your Honor, at this time we

12 have no further questions for Mr. McElveen.

13         THE COURT:  All right, sir.

14         MR. THEOS:  Your Honor, Mr. Phillips approached me at

15 the last break and provided me with some information that

16 we -- discovery information we had not previously been

17 provided.  Obviously just finding out 30 minutes ago, we need

18 an opportunity to understand exactly what that information is,

19 and determine how to use it with respect to cross-examination

20 of Mr. McElveen.

21         THE COURT:  Does it involve this witness?

22         MR. THEOS:  Yes, sir.

23         THE COURT:  How long do you need?

24         MR. THEOS:  Your Honor, I'm not quite sure what it is

25 because I haven't seen it.

JAMAL McELVEEN – DIRECT EXAMINATION

1    MR. PHILLIPS:  It's just information that came about

2  in my meeting with him regarding one statement and a couple

3  paragraphs in the statement.  So I don't think it will take

4  that long.

5    THE COURT:  We'll stay here, but we'll be at ease and

6  you go outside or go somewhere or go in my library, if you

7  want, and sit down and talk and see how long it's going to be.

8    (Brief interruption in proceedings.)

9    MR. PHILLIPS:  Your Honor, what we'd like to do, if

10  it pleases the Court, I'm going to ask a few questions on

11  direct regarding his arrest in the federal case that pertain

12  to the issue we're talking about.

13    THE COURT:  You're saying his federal case, now which

14  case are you talking about?

15    MR. PHILLIPS:  The federal case he pled guilty to,

16  the charges that led to his federal case, I'm going to ask a

17  few questions about that which pertain to the report that

18  we're discussing.  And then we'd ask, given the time, maybe

19  ask to break for an early lunch to give them time to digest

20  that with the information that I learned in that meeting with

21  him, which we've just gone over.  So that's sort of what we

22  agreed upon, and they feel like that would give them enough

23  time to adequately prepare, based on that information.

24    THE COURT:  You talking about over the lunch break?

25    MR. PHILLIPS:  Yes, sir.

JAMAL McELVEEN – DIRECT EXAMINATION

1          THE COURT:  Is that correct?

2          MR. THEOS:  That's correct, Judge.

3          THE COURT:  Go ahead and ask your questions.

4   BY MR. PHILLIPS:

5   Q.  In July of 2011 were you stopped by the South Carolina

6   Highway Patrol?

7   A.  Yes.

8   Q.  And what happened when they stopped you?  What were you

9   carrying in the car?

10  A.  A kilo of cocaine.

11  Q.  And who was with you?

12  A.  Cedric Myers.

13  Q.  Was there anyone else with you in the car?

14  A.  A female; I don't know her name.

15  Q.  Now, the Highway Patrol found the kilo of cocaine; were

16  you questioned at that time?

17  A.  Yes.

18  Q.  Where were you questioned?

19  A.  Initially on the side of the road, and later at a truck

20  weigh station.

21  Q.  All right.  And did you provide any information or did you

22  begin to cooperate at that time?

23  A.  Yes.

24          THE COURT:  He said yes; yes to what?

25  A.  Yes to his question.

1    MR. PHILLIPS:  To providing information and

2  cooperating at that time.

3    THE COURT:  All right.

4  BY MR. PHILLIPS:

5  Q.  And who did you speak to?

6  A.  DEA agent; I don't know his name.

7  Q.  Now, what did you tell him about?

8  A.  At that time I told him that I was bringing cocaine back

9  for someone.

10  Q.  All right.  And did you tell them where you got the

11  cocaine from?

12  A.  Yes.  I told them I got it from Texas.

13  Q.  Did you tell them who you got it from?

14  A.  Yes.

15  Q.  And regarding who you got it from, did you accurately and

16  truthfully tell them who that was?

17  A.  The person who I procured it from, yes.

18  Q.  Now, regarding the people who you told the agent you were

19  getting it from, did you tell the truth?

20  A.  No.

21  Q.  Did you tell them -- did you not -- did you give him names

22  or provide him names?

23  A.  Yes, I did.  But it was an attempt to not have the person

24  that was with me charged.

25  Q.  And who was that?

1    THE COURT:  Excuse me, an attempt what?

2    A.  I was basically trying -- I was basically trying for the

3    person that was with me to not be charged, so that they can be

4    released on the scene.

5    Q.  And who was that?

6    A.  Cedric Myers.

7    Q.  Was that cocaine for Cedric Myers?

8    A.  No, it was -- No.  The cocaine was mine.

9    Q.  The cocaine was yours?

10   A.  Yes.

11   Q.  But you said it belonged to someone else?

12   A.  Yes.

13   Q.  Now, were you charged with -- were you charged in State

14   Court for that cocaine?

15   A.  Initially started in State Court, yes.

16   Q.  And then were you later charged in Federal Court?

17   A.  Yes, I was indicted federally.

18   Q.  Tell the Court about that.  Did you bond out?

19   A.  Yes, I received a $200,000 bond, I bonded out.  And after

20   I bonded out, approximately three weeks later I believe I was

21   indicted in the federal -- before the -- for conspiracy and

22   for the drugs.

23   Q.  And how did you find out about that indictment?

24   A.  I went to -- I went to try to retrieve the possessions

25   that I had in the truck, and during that time a DEA agent told

1    me that I was in a process of being indicted.  So when he told

2    me that, I fled.

3    Q.  You fled?

4    A.  Yes.

5    Q.  You tried to avoid being arrested on the federal charges?

6    A.  Yes.

7    Q.  Can you tell the Court about that?

8    A.  Sure.  I went to my condo, I put some of my own personal

9    blood, different furniture, different areas of the condo, I

10   packed up some things, took a large amount of money and I

11   fled.

12   Q.  How were you eventually arrested?

13   A.  Came back to Charleston to visit a family member, and was

14   pulled over in a traffic stop and I attempted to flee, and

15   after a short chase I was arrested.  And my fingerprints were

16   ran and found out that I was a fugitive.

17   Q.  And you've been incarcerated ever since?

18   A.  Yes.

19          THE COURT:  When was that?

20   A.  February 15th, 2013.

21   Q.  That's when you were arrested?

22   A.  Yes.

23   Q.  When did you originally flee?

24   A.  August the 10th, 2011.

25   Q.  Okay.  So you -- Okay.

JAMAL McELVEEN - DIRECT EXAMINATION

1      THE COURT:  About a year and a half?

2  A.  Yes, sir.

3      MR. PHILLIPS:  Your Honor, at this time we'd ask to

4  break, and I'll make sure they understand regarding that

5  report, and we could come back earlier, if you'd like, or --

6  whatever the Court --

7      THE COURT:  Well, now, I don't want anybody talking

8  to this witness.

9      MR. PHILLIPS:  Your Honor, I think -- Yes, sir.  We

10  won't be meeting with him.

11      THE COURT:  I mean, what do you plan?  What is it

12  that the defendant -- who is it the defendant's got to talk

13  to?

14      MR. PHILLIPS:  They don't have to talk, we just

15  didn't want to go in -- we didn't want to sit in there and --

16  they just want to make sure they have a clear understanding of

17  what he stated in the meeting regarding that traffic stop.

18  And so --

19      THE COURT:  It doesn't require them trying to

20  interview him?

21      MR. PHILLIPS:  No, sir.  No, sir.  They just asked

22  for that time just to make sure, because he's got, you know,

23  Mr. McElveen has a long history that there's a lot of

24  information regarding Mr. McElveen, so I believe they just

25  need time --

1       MR. THEOS:  Your Honor, we don't need to, of course,

2  speak with Mr. McElveen outside of the courtroom.  But we were

3  just provided some information that we would like to make sure

4  we understand, for purposes of cross-examination.  And

5  apparently, and I didn't see it, but apparently last night we

6  were provided with another e-mail with additional information

7  that I haven't -- I didn't see.  And I'd like to review that

8  before I cross-examine Mr. McElveen.

9       THE COURT:  All right, Mr. Marshal, you keep this

10  witness separate from anybody else.

11      THE MARSHAL:  Yes, sir, I will.  Do you want to give

12  him the rules on not talking to anybody?

13      THE COURT:  Yes, sir, I'm going to do that.  Don't

14  you talk to anybody about this case or anything during this

15  break period.

16  A.  Yes, sir.

17      THE COURT:  The marshal, I guess, will give you

18  lunch, but you don't talk to anybody about anything.  All

19  right, sir, now let's take him.  You go on.  You can be

20  excused.

21    Now, you were talking about Rule 804.  Is this going to

22  eliminate --

23      MR. PHILLIPS:  No, sir.  We're still going to --

24  because this is just regarding, you know, their impeachment of

25  him regarding -- all he has testified about is his alleged

1   involvement in the drug conspiracy.  We're going to still need

2   to bring Mr. Harris and --

3           THE COURT:  Then we better have Mr. Harris here when

4   we come back from --

5           MR. PHILLIPS:  I think we're going to --

6           MR. RICHARDSON:  Mr. Harris is not immediately

7   available.  He's not in the Charleston area.  I just spoke

8   with his counsel, and his counsel indicated that he advised

9   his client to take the Fifth Amendment and not testify.  But

10  his counsel advised that he does not know whether Mr. Harris

11  will follow that advice or not.  So what we proposed doing is

12  bringing Mr. Harris on Monday, and give his counsel a chance

13  to speak with him in advance and put him on the witness stand

14  and ask that question.  Whether he's going --

15          THE COURT:  How are you going to get rid of this

16  witness?  Do we know what Mr. Harris is going to do?

17          MR. RICHARDSON:  What we would ask for you to do is

18  conditionally take that testimony from this witness.  We

19  couldn't do it in front of a jury, but we think with a judge,

20  we could conditionally take that testimony, let him describe

21  what he would testify, if permitted.  And if it turns out that

22  Mr. Harris is available, in that case then we would have a

23  different discussion about whether you should consider the

24  information or not.

25          THE COURT:  Well, you wouldn't do that with a jury,

JAMAL McELVEEN - DIRECT EXAMINATION

 1    that's true, because you can't unring a bell very easy.  But I

 2    don't know whether the defendant wants to agree to that.  It

 3    wouldn't hurt my feelings one way or another.

 4        MR. THEOS:  Judge, we would not agree to that.  I

 5    think it's -- before the Court decides whether or not

 6    Mr. McElveen should be allowed to testify pursuant to 804, I

 7    believe that we first need to find out if Mr. Harris is indeed

 8    going to take the Fifth and/or otherwise unavailable.

 9        MR. RICHARDSON:  That will be okay, Your Honor, so

10    we'd ask after we finish with Mr. McElveen today, he be held

11    under subpoena and we'll --

12        THE COURT:  How are you going to finish with

13    Mr. McElveen until you know whether Mr. Harris is going to

14    testify?

15        MR. RICHARDSON:  We would just have to re-call him

16    next week for a brief piece of testimony.  If Mr. Harris is

17    unavailable as we anticipate he will be, then we will just

18    recall Mr. McElveen for a short piece of testimony just on

19    this limited information.

20        THE COURT:  So you don't intend to try to get in --

21    you mentioned a moment ago, go ahead and put it on the record,

22    you're not going to do that.

23        MR. RICHARDSON:  It doesn't sound like Your Honor or

24    defense is inclined to that suggestion, I thought it might

25    expedite things.

JAMAL McELVEEN – DIRECT EXAMINATION

1    THE COURT:  Well, we want to expedite, but we don't

2    want to expedite it at the risk of violating the rules and

3    violating people's rights.

4    MR. RICHARDSON:  I understand that.

5    THE COURT:  And so how much longer do you plan to be

6    with this witness if you eliminate any question involving

7    Mr. Harris, how much longer have you got?

8    MR. RICHARDSON:  Your Honor, the Government would be

9    done with him at that point.  Obviously would then turn to

10   Mr. Theos.

11   THE COURT:  I know that, but I mean -- if you're

12   through with him except for how Mr. Harris is involved.

13   MR. PHILLIPS:  Yes, sir.

14   THE COURT:  Well, he can't very well question him

15   until he knows what is going to happen to Mr. Harris, can you?

16   Or can you?  Are you willing to --

17   MR. THEOS:  Well, Your Honor, I guess -- I guess I

18   could question him regarding what he's already testified to, I

19   could cross-examine him related to this testimony and withhold

20   further examination or cross-examination pending what we find

21   out about Mr. Harris' testimony.  Or, in the alternative, I

22   could wait.

23       The only problem I envision is if Mr. Harris does, in

24   fact, testify, then we'd have to bring Mr. McElveen back for

25   the sole purpose of me cross-examining him based on what he's

1  already testified to.  But whatever the Court wants, I'll do.

2      THE COURT:  Well, my thought is that we might as well

3  just put off anything more with Mr. Harris -- I mean

4  Mr. McElveen -- and find out what Mr. Harris is going to do.

5  And then when we make whatever ruling we're going to make,

6  then you're free to cross-examine him on everything that he's

7  said.

8      MR. THEOS:  That's fine with me, Your Honor.  I would

9  just ask, the Government indicated that they might not be able

10  to get him here till Monday.  I'm not -- I don't know where

11  he's situated.  It would be great if they could get him here

12  before that.

13      MR. RICHARDSON:  We can not get him here today, Your

14  Honor, just logistically.

15      THE COURT:  Well, we had planned to hold court

16  yesterday, today, skip tomorrow and be back Friday.  This

17  week.

18      MR. THEOS:  Okay.

19      THE COURT:  Isn't that what I had said?

20      MR. RICHARDSON:  Yes, Your Honor.

21      THE COURT:  And that would put Monday --

22      MR. THEOS:  That's fine with me, Your Honor.

23      MR. RICHARDSON:  So just scheduling-wise, Your Honor,

24  I spoke to his counsel, I'm sorry, but we're trying to do a

25  few things at the same time.  Spoke -- speaking with his

1    counsel, I -- I think getting Mr. Harris here on Monday is the

2    most likely scenario to address.  I would propose --

3         MR. THEOS:  That's fine with me, Your Honor.

4         MR. RICHARDSON:  I'd propose, obviously whichever

5    y'all prefer, but I think it probably makes more sense for you

6    to address Mr. McElveen, go ahead and cross-examine him.  It

7    may be that at the end of the day we just skip all of this.

8    So I would think it would make some sense, let's address where

9    we are today; if we choose to re-call him, then we can address

10   that issue at that point.

11        MR. THEOS:  I appreciate Mr. Richardson's advice, but

12   I think it probably makes more sense from an effective

13   assistance of counsel standpoint to wait until Mr. Harris --

14   till Mr. McElveen -- till we know that he's completed his

15   testimony on direct, before I conduct cross.

16        THE COURT:  Well, I think that's more appropriate to

17   get all of his direct testimony that the Court's going to let

18   in, let's get it in the record, then you can cross-examine him

19   on what's in the record.

20        MR. THEOS:  Yes, sir.

21        THE COURT:  Now let me see, is that going to be

22   satisfactory with the Government now?  If you've got some

23   reason it's not, you tell me.

24        MR. RICHARDSON:  It is, Your Honor.

25        THE COURT:  It just doesn't sound like it is.

JAMAL McELVEEN - DIRECT EXAMINATION

1    MR. RICHARDSON:  Your Honor, I'm not much of a poker

2    player.  I think that would be just fine, Your Honor.  I think

3    that will be just fine.

4    THE COURT:  Well, looked like your companion there is

5    disagreeing with that now.

6    MR. RICHARDSON:  He's not disagreeing, Your Honor, he

7    was just asking where we were going for lunch.  That will suit

8    the Government just fine.

9    THE COURT:  Then you've got -- and we're coming back

10   at 2:30.  You've got a witness ready at 2:30?

11   MR. RICHARDSON:  We'll have Chase Mosley will be the

12   first witness after lunch.

13   THE COURT:  Something wrong with that?

14   MR. THEOS:  No, I don't have any objection, of

15   course.  I don't think I have the right to object.

16   THE COURT:  I thought you were walking to start

17   something.  All right.  Now, is everything all set now?

18   MR. RICHARDSON:  I think so.

19   MR. THEOS:  Judge, the only thing maybe we should

20   bring to your attention now is this same issue, same 804 issue

21   with respect to Mr. McElveen, we believe will also arise with

22   respect to Mr. Mosley.

23   THE COURT:  Mr. who?

24   MR. THEOS:  To the Government's next witness.

25   MR. PHILLIPS:  Not Mr. Mosley.  That's why we're

1    doing Mosley.

2        (Discussion held off the record.)

3        MR. RICHARDSON:  I think we'll be back at 2:30 and

4    ready to see you then.

5        THE COURT:  All right.  We'll be in recess till 2:30.

6        (A recess was held at this time.)

7        THE COURT:  One thing that occurred to us from

8    earlier, not to me, but is this statement that you're talking

9    about going to be against Harris' penal interests, or would it

10   be against the defendant's penal interests?

11       MR. PHILLIPS:  It's the declarant, which is Harris.

12   And Harris' statement is against penal interests, and he's the

13   declarant.

14       THE COURT:  I mean, I know that's what it's got to

15   be.

16       MR. PHILLIPS:  It does -- it has -- it is -- he talks

17   about Mr. Ballard, but we don't believe -- well, there is no

18   confrontation because it's nontestimonial.  So confrontation

19   clause issue, because it's not a testimonial statement.

20   Between Harris and another inmate.

21       THE COURT:  Well, anyway, the marshal said he's going

22   to be here Friday.  I believe that's right.

23       THE MARSHAL:  Your Honor, he'll be in Charleston,

24   yes, sir.  But I think they don't want him till Monday.

25       MR. PHILLIPS:  Can we approach?

JAMAL McELVEEN - DIRECT EXAMINATION

1      MR. RICHARDSON:  Your Honor, with scheduling issues,

2  I think now that we've sort of gotten Mr. McElveen off the

3  stand, we'll be ready to take that issue up on Monday.  We've

4  got other people that are going to be here on Friday.

5      THE COURT:  That suits me fine.  I just thought if

6  y'all wanted him early, then we could get him early.

7      MR. RICHARDSON:  We'll take that issue up on Monday,

8  Your Honor.

9      THE COURT:  Okay.  Then let's get going.

10      MR. PHILLIPS:  Yes, sir, the Government calls Steven

11  Chase Mosley.

12      THE COURT:  I'm sorry I'm late.  I used to sit around

13  the courtroom as a lawyer thinking, wonder what that judge is

14  doing back there while we're out there waiting for him, all he

15  does is keep us waiting; I'm never going to do that.  I try

16  not to do it, but I failed today and I apologize.

17      THE CLERK:  State your name for the record.

18  A.  Steven Chase Mosley.

19      STEVEN MOSLEY, a witness called by the Government, first

20  having been duly sworn, testified as follows:

21                    DIRECT EXAMINATION

22  BY MR. PHILLIPS:

23  Q.  State your name for the record.

24  A.  Steven Chase Mosley.

25  Q.  And you can probably just -- just sit normal -- If we need

1   you to move forward, we'll let you know.

2   A.  Okay.

3   Q.  Where were you born?

4   A.  Summerville, South Carolina.

5   Q.  How old are you?

6   A.  Thirty.

7   Q.  And what kind of education do you have?

8   A.  High school.

9   Q.  Where did you go to high school?

10  A.  Summerville High School.

11  Q.  And you graduated from there?

12  A.  No.

13  Q.  Did you get a G.E.D.?

14  A.  No.

15  Q.  So you didn't finish high school?

16  A.  No.

17  Q.  Okay.  Now, what kind of work have you been involved in

18  since you ended high school?

19  A.  Framing houses.

20  Q.  All right.  Is that all that you've done?

21  A.  Framing houses and doing like security work for clubs a

22  long time ago.

23  Q.  Okay.  What have you done most recently?

24  A.  Driving truck.

25  Q.  Okay.  And have you ever worked with the Town of

STEVEN MOSLEY - DIRECT EXAMINATION

1    Summerville?

2    A.  Yes, sir.

3    Q.  When did you work with Town of Summerville?

4    A.  From 2007 -- from 2007 to 2012.

5    Q.  Okay.  Why did you leave there?

6    A.  Drug charges.

7    Q.  The drug charges in this case?

8    A.  Yes, sir.

9    Q.  Okay.  Let's get to that.  Have you pled guilty in this

10   case?

11   A.  Yes.

12   Q.  I'm going to hand you -- look on that screen, this is

13   Government's Exhibit 10 DD.  Do you recognize that document?

14   A.  Yes, sir.

15   Q.  What is it?

16   A.  My plea agreement.

17   Q.  All right.  And if we could go to the second-to-last page.

18   We'll just do it the old-fashioned way and hand it up.

19            MR. PHILLIPS:  May I approach, Your Honor?

20            THE COURT:  Yes.

21   Q.  Is that your signature on that document?

22   A.  Yes.

23   Q.  All right.  What did you promise to do in this plea

24   agreement with the Government?

25   A.  Tell the truth.

STEVEN MOSLEY – DIRECT EXAMINATION

1    Q.  All right.  Tell the truth about what?

2    A.  About my activities.

3    Q.  Illegal activities?

4    A.  Yes.

5    Q.  Okay.  And what agreements has the Government made with

6    you in this agreement, as you understand them?

7    A.  It would benefit me to be truthful.

8    Q.  Well, what is your understanding of what has the

9    Government promised to do in this agreement if you testify

10   truthfully or cooperate truthfully?

11   A.  Benefit me.

12   Q.  Okay.  Now, what happens if you don't tell the truth in

13   this agreement?

14   A.  More charges.

15   Q.  And you also entered into a proffer agreement in this

16   case, and that's 10 D?  Government's Exhibit 10 D?  Did you

17   enter into a proffer agreement in this case?

18   A.  Yes.

19   Q.  And what did you promise to do in that agreement?

20   A.  Excuse me?

21   Q.  What did you promise to do in that agreement?

22   A.  Speak truthfully.

23   Q.  And that was prior to your guilty plea?

24   A.  Yes.

25   Q.  Okay.  Now, you talked about your legitimate employment

STEVEN MOSLEY - DIRECT EXAMINATION

1   and you pled guilty in this case.  Tell the Court about your

2   involvement with drugs.

3   A.  I started selling drugs back in 2009.

4   Q.  When?  When in 2009?

5   A.  Summer, July, August.

6   Q.  Okay.  And how did that come about?

7   A.  Times were a little rough; I wanted to make some extra

8   money.

9   Q.  And who did you go to?

10   A.  Martin Ballard.

11   Q.  Why did you go to Martin Ballard, if you wanted to sell

12   drugs?

13   A.  I knew he had the drugs.

14   Q.  How did you know that?

15   A.  Word on the street.

16   Q.  Okay.  Had you ever had any conversations with him about

17   selling drugs prior to 2009 when you started, yourself?

18   A.  Not really, no.

19   Q.  Okay.  So tell us about when you approached Mr. Ballard to

20   begin to sell drugs.

21   A.  When I approached him in 2009?

22   Q.  Yes.  When you started.

23   A.  Repeat the question.

24   Q.  Tell the Court about when you -- how it came about, how

25   you met him, how you started selling drugs with Mr. Ballard.

STEVEN MOSLEY – DIRECT EXAMINATION

1    A.   I met him, you know, since we were younger, and back in

2    2009 things got rough, and I went to him.

3    Q.   Where did you go to him?

4    A.   On the dirt road.

5    Q.   What dirt road? Do you know the name of it?

6    A.   Ancrum Lane.

7    Q.   How long had you known Mr. Ballard before this time in

8    2009?

9    A.   Since I was about eight or nine.

10    Q.   Did y'all go to school together?

11    A.   Yes, yes.

12    Q.   So you went to Ancrum Road, you met with him?

13    A.   Yes.

14    Q.   And what did you tell him?

15    A.   I needed him to hook me up.

16    Q.   Hook you up with what?

17    A.   Some cocaine.

18    Q.   And how much cocaine did you buy from Mr. Ballard?

19    A.   A half an ounce.

20    Q.   All right. And then what would you in turn do with that

21    half an ounce?

22    A.   Cut it and sell it.

23    Q.   When you say cut it, what do you mean?

24    A.   Put baking soda with it, sell it.

25    Q.   And what effect did adding the baking soda, what did that

STEVEN MOSLEY - DIRECT EXAMINATION

1  do?

2  A.  It makes more, the quantity more.

3  Q.  So you could sell more?

4  A.  Yes.

5  Q.  Now, how much did you -- do you recall how much you paid

6  Mr. Ballard for a half ounce of cocaine?

7  A.  I believe it was between four and 450.

8  Q.  And is that a price during the time of your dealings?

9  A.  Yes.

10  Q.  Okay.  Now, tell us about the quantities that you were

11  dealing with Mr. Ballard once you started in 2009.

12  A.  Started with a half an ounces, then I would go up to an

13  ounce or two.

14  Q.  An ounce or two?

15  A.  Yeah, here and there I would.

16  Q.  So a half ounce was the least amount you bought.

17  A.  Right.

18  Q.  And two ounces was the most?

19  A.  Two, maybe three.

20  Q.  Two, maybe three?  All right.  And how often -- how long

21  did you purchase cocaine from Mr. Ballard?  Was it always

22  powder cocaine?

23  A.  Yes.

24  Q.  Okay.  How long did you purchase in these quantities

25  cocaine from Mr. Ballard?

STEVEN MOSLEY - DIRECT EXAMINATION

1    A.  From 2009 up to 2012.

2    Q.  And why -- what happened in 2012?

3    A.  He got arrested.

4    Q.  Now, you mentioned Ancrum Lane.  When you would meet --

5    Well, the first time you met with Mr. Ballard, where exactly

6    on Ancrum Lane did y'all meet?

7    A.  We would meet right there under a little hang out.

8    Q.  Under a hang out?

9    A.  Yeah.

10   Q.  Well --

11   A.  Under the tree, we would call it.

12   Q.  Okay.  And so he would sit under a tree and you'd meet him

13   there?

14   A.  Yes.

15   Q.  And when you conducted your drug transactions with

16   Mr. Ballard, were other people present from time to time?

17   A.  From time to time, people might be out there.

18   Q.  Okay.  And beginning in July or August of 2009 when you

19   started buying that half ounce from him, how often would you

20   buy from Mr. Ballard those quantities of cocaine?

21   A.  Weekly.

22            THE COURT:  What was your answer to that?

23   A.  Weekly.

24   Q.  Do you know how -- do you know how -- approximately how

25   much total you bought from Mr. Ballard?

STEVEN MOSLEY – DIRECT EXAMINATION

1   A.  As far as what?

2   Q.  The weight.  Do you know how much total --

3   A.  Over the time?

4   Q.  Over the time period, yes, sir.

5   A.  No, I'm not sure.

6   Q.  Okay.  Now, during your dealings with Mr. Ballard under

7   the tree -- Well, is that the only place you dealt with him?

8   A.  Yes.

9   Q.  Had you ever seen him with a firearm during your dealings,

10  drug dealings with him?

11  A.  I saw him with a chrome gun.

12  Q.  How often did you see that gun?

13  A.  Whenever I would see him, talk to him in the truck or

14  whatever.

15  Q.  And where would he keep it?

16  A.  Just in the middle part.

17  Q.  All right.  Did you ever do --

18          THE COURT:  Kept it where?

19  A.  In the middle console of his truck.

20          THE COURT:  Where?

21  A.  The middle console of the truck.

22          THE COURT:  Okay.

23  BY MR. PHILLIPS:

24  Q.  And then you saw --

25  A.  Yes, sir.

STEVEN MOSLEY - DIRECT EXAMINATION

1   Q.  Now, you've reviewed -- One moment, please.  Now, do you
2   have a street name that you're aware of?
3   A.  Cheddar.
4   Q.  Now, when you purchased this cocaine, you mentioned that
5   you cut it.  Did you ever turn it into crack cocaine?
6   A.  Yes, from time to time, yes.
7   Q.  How would you do that?
8   A.  I would cook it.
9   Q.  And just briefly, I know -- briefly just explain how you
10  cooked crack cocaine.
11  A.  I would put it in a microwave with baking soda and cook
12  it.
13  Q.  And then what would you do when it came out of the
14  microwave?
15  A.  Sell it.
16  Q.  You would take it out of the microwave and package it and
17  sell it, or did you do anything else?  Was there another step?
18  A.  No.
19  Q.  Okay.  Now, during this time when you were dealing with
20  Mr. Ballard, did you ever discuss with him that you were
21  cutting the cocaine or turning it into crack?
22  A.  Yes.
23  Q.  So he knew you were doubling it?
24  A.  Yes.
25  Q.  Now, during the course of your involvement in this case

1  you've listened to phone calls that were recorded between you

2  and Mr. Ballard, is that right?

3  A.  Yes.

4  Q.  And if you could listen to -- this is call number 502,

5  from October 7, 2011, and it is Exhibit 9 H.

6      (Audio recording was played.)

7  Q.  We're going to continue to play that, but -- that call,

8  but I have a couple questions.  So you recognize the voices on

9  that call?

10  A.  Yes.

11  Q.  Who was on that call?

12  A.  That's mine and Mr. Ballard.

13  Q.  And in the first part of that call y'all talk about

14  someone from Hollywood.  Do you recall what that discussion

15  was about?

16  A.  No, not right off, no, I don't.

17  Q.  Then the conversation turns to a gray Crown Vic and you

18  say dark gray.  What were y'all talking about there?

19  A.  An undercover police car.

20  Q.  And he was telling you they were on 78?

21  A.  Yes.

22  Q.  What's 78?

23  A.  Highway 78.

24  Q.  And you stated that, "Over there on fire," what did you

25  mean by that?

STEVEN MOSLEY – DIRECT EXAMINATION

1   A.  A lot of police over there.

2   Q.  Okay.  Now, during this time you were working for the Town

3   of Summerville?

4   A.  Yes.

5   Q.  Did you ever provide Mr. Ballard with information about

6   police cars?

7   A.  Yes, one time.

8   Q.  Pardon me?

9   A.  Yes.

10  Q.  Did you say -- Tell us what you told him.

11  A.  I told him about a white Tundra.

12  Q.  And who did that white Tundra belong to?

13  A.  I believe the Town of Summerville undercovers.

14  Q.  Undercover what?

15  A.  Police.

16  Q.  And did he ask you for that information?

17  A.  Yes.

18  Q.  And we'll play the rest of the call.

19      (Audio recording was played.)

20  Q.  The rest of that call sounds like y'all talking about

21  football.  Is that what y'all talking about?

22  A.  Yes.

23  Q.  Summerville High School football?

24  A.  Yes.

25  Q.  So in the rest of that call what you're talking about is

STEVEN MOSLEY - DIRECT EXAMINATION

1    what you're talking about.

2    A.   Right.

3    Q.   Now we're going to move on to another call, this is

4    Government's Exhibit 9 F.  This call occurred on October 10,

5    2011.  If you'd listen to this, then I have some questions for

6    you.

7         (Audio recording was played.)

8    Q.   Do you recognize the voices on that phone call?

9    A.   Yes, that's me and Mr. Ballard.

10   Q.   And when it states -- "Well, leaving out the barber shop

11   and you heading on that dirt road," what dirt road were y'all

12   referring to?

13   A.   Ancrum Lane.

14   Q.   And just while we're on that, can you just briefly

15   describe to the Court where Ancrum Lane is located?

16   A.   Off Old Orangeburg Road.

17   Q.   In Summerville?

18   A.   Yes.

19   Q.   Now, when it states yeah, he already got that money, was

20   that Mr. Ballard?

21   A.   Excuse me?

22   Q.   When it states you had already got that money, that was

23   Mr. Ballard speaking?

24   A.   Yes.

25   Q.   And just tell us what this call's about.

STEVEN MOSLEY - DIRECT EXAMINATION

1   A.  It's about drugs.

2   Q.  Had you ordered drugs from him?

3   A.  Yes, I was trying to purchase some.

4   Q.  Now, when it says let me owe you that stack 13, that's you

5   speaking?

6   A.  Yes.

7   Q.  And what were you talking about there?

8   A.  Owing him some money.

9   Q.  How much?

10  A.  I believe like 1300.

11  Q.  And why did you need to owe him $1300?

12  A.  For the drugs.

13  Q.  Okay.  How much drugs were you getting at this point?  I

14  mean how much drugs were you ordering in this call?

15  A.  In that call, an ounce.

16  Q.  Okay.  And stack, what does that mean?

17  A.  Thousand dollars.

18  Q.  So when you asked whether you could owe it, were you

19  asking him to front you the drugs?

20  A.  Yes.

21  Q.  Now, typically did you have to pay for the drugs in full,

22  or did he front you drugs or give you drugs on consignment?

23  A.  Most of the time I would pay it in full.

24  Q.  Okay.  But occasionally would you be able to --

25  A.  Yes.

STEVEN MOSLEY – DIRECT EXAMINATION

1    Q.  And when you said I'll give you something, I'll give you

2    something for that, he's talking about the cocaine?

3    A.  Yes.

4    Q.  All right.  I'm going to move to the next call.  And this

5    is call number 1261, it's Government's Exhibit 9 E.  And it's

6    from October 10th, 2011.

7         (Audio recording was played.)

8    Q.  Do you recognize the voices on that call?

9    A.  Yes.

10   Q.  Who's on that call?

11   A.  Me and Mr. Ballard.

12   Q.  And the individual states, "you know this 76 that you gave

13   me last night, you know that, right?"  Is that Mr. Ballard?

14   A.  Yes.

15   Q.  And what is he talking about?

16   A.  Some money I borrowed from him in the purchase of some

17   drugs also.

18   Q.  And so how much money did you borrow from him?

19   A.  I borrowed $7000 from him.

20   Q.  And what was that for?

21   A.  At the time I was trying to get a house.

22   Q.  What were you going to do with that 7000?

23   A.  I was going to put it in my bank account.

24   Q.  For a downpayment?

25   A.  At the time it was like a -- when they want to track the

STEVEN MOSLEY – DIRECT EXAMINATION

1  money to make sure you have it in the account before closing,

2  like a paper trail.

3  Q.  Okay.  Now, how did he give you that $7000?

4  A.  Cash.

5  Q.  And you said it was also for drugs as well, you owed him

6  for drugs?

7  A.  Yes.

8  Q.  And how much did you owe him for drugs?

9  A.  Seven hundred.

10  Q.  All right.  And then so when he's asking -- when he's

11  telling you it's 76 and you tell him it was 77, what's going

12  on there?

13  A.  He was saying it's a hundred dollars short.

14  Q.  Now, did you go and meet with him?

15  A.  Yes.

16  Q.  What happened when y'all met?

17  A.  Gave him the hundred dollars.

18  Q.  The next call is Government's Exhibit 9 G, call 1498.

19      (Audio recording was played.)

20          MR. PHILLIPS:  We're going to pause it, then we'll

21  continue to play it.

22  Q.  Do you recognize the voices on this call?

23  A.  Yes.

24  Q.  And whose voices are on the call?

25  A.  Me and Mr. Ballard.

STEVEN MOSLEY – DIRECT EXAMINATION

1  Q. And the person that says, "Checking low.  You done make

2  something happen yet?  I make something happen every day, well

3  hell come pay the man that you owe," who was that?

4  A. Mr. Ballard.

5  Q. And the person that said, "Goddamn you call me for $300,"

6  who was that?

7  A. Me.

8  Q. And what were y'all talking about?

9  A. Money that I owe him for drugs.

10 Q. And specifically powder cocaine?

11 A. Yes.

12 Q. Do you recall how much this transaction was for?

13 A. No, not at the time.

14     MR. PHILLIPS:  We'll play the rest of the call.

15  (Audio recording was played.)

16 BY MR. PHILLIPS:

17 Q. So the person stating, "Don't find the reason out why no

18 one will be able to say that the rest of the year, don't you

19 be the person," is that Ballard?

20 A. Yes.

21 Q. And what's he talking about there?

22 A. Don't be the reason to find out for trouble.

23 Q. Is that regarding paying him the money back?

24 A. Yes.

25 Q. Now, he's the one that says, "All that thing needs is some

STEVEN MOSLEY - DIRECT EXAMINATION

1   gas in it," that's Mr. Ballard?

2   A.  Yes.

3   Q.  And you said, "Oh, yeah, yeah, it's real start -- real

4   start --"  What did you say, oh yeah?

5   A.  Yes, that's me.

6   Q.  "It's real decent."?

7   A.  Yes.

8   Q.  What were y'all talking about?

9   A.  Cocaine.

10  Q.  And what specifically were you talking about?

11  A.  Cooking it.

12  Q.  Cooking it?

13  A.  Yes.

14  Q.  We're going to continue playing it.

15      (Audio recording was played.)

16  BY MR. PHILLIPS:

17  Q.  So when you said, "It's real decent," what were you

18  talking about regarding the cocaine?

19  A.  Cooking it into gains.

20  Q.  Into gains?

21  A.  Yeah, gains off of it.

22  Q.  Were you talking about the quality of the cocaine?

23  A.  Yes.

24  Q.  Tell the Court, if you have good quality cocaine and you

25  cook it, what does that mean for you?

STEVEN MOSLEY – DIRECT EXAMINATION

1    A.  It increases more.

2    Q.  And Mr. Ballard said that, "I have that doing something

3    stupid last night.  I'll tell you when I see you."  And then

4    he states, "I got some of the fresh drank soda."  What did you

5    take that to mean?

6    A.  Baking soda.

7    Q.  And when he said, "That MF-er got ballistic on a boy,"

8    what did you understand that to mean?

9    A.  It did real good.

10   Q.  When you say it did real good, what do you mean?

11   A.  That cocaine came back good.  Did good in the cooking.

12   Q.  When you're cooking cocaine and it's a good quality, if

13   you cooked an ounce, what could you expect for good quality

14   for it to increase to?

15   A.  Double.

16   Q.  Okay.  All right, we'll play the rest of the call.

17       (Audio recording was played.)

18   BY MR. PHILLIPS:

19   Q.  All right.  Now, before we shift gears, you said that you

20   were buying from Mr. Ballard up until his arrest in this case,

21   is that right?

22   A.  Yes.

23   Q.  Did you continue selling drugs after that?

24   A.  Yes.

25   Q.  Who were you getting your drugs from?

STEVEN MOSLEY - DIRECT EXAMINATION

1   A.  Michael Williams.

2   Q.  Now, how did you know Michael Williams?

3   A.  I met him, you know, just out on the street.

4   Q.  Okay.  And what were you buying from him?

5   A.  Half ounce, ounces.

6   Q.  And when did you stop buying from him?

7   A.  When I was arrested.

8   Q.  Now, in your case you sold to an informant, is that right?

9   A.  Yes.

10  Q.  And whose cocaine was that?

11  A.  Michael Williams.

12  Q.  And when that occurred, had Mr. Ballard already been

13  arrested?

14  A.  Yes.

15  Q.  Okay.  Now, during your involvement of this case did you

16  ever learn that Mr. Ivory Brothers -- Do you know who

17  Mr. Brothers is?

18  A.  Now, yes.

19  Q.  How do you know him now?

20  A.  A guy in this case.

21  Q.  Okay.  And did you learn that he was cooperating in this

22  case?

23  A.  Yes.

24  Q.  And did you learn that he had been shot?

25  A.  Yes.

STEVEN MOSLEY - DIRECT EXAMINATION

1   Q. When did you find out approximately he had been shot?

2   A. I would say the day after it happened.

3   Q. Who told you?  Well, just tell us who told you, don't tell

4   me what they said.

5   A. A friend of mine called me and told me.

6   Q. Now, before we switch gears, what kind of cars during this

7   period did you drive?

8   A. White Town Car, Expedition and an Escalade.

9   Q. What color is the Escalade?

10  A. White.

11          MR. PHILLIPS:  Your Honor, if we could have five

12  minutes, I want to make sure we have these transcripts

13  straight so they can follow along.

14          THE COURT:  We'll just be at ease.

15          MR. PHILLIPS:  Thank you.

16      (Brief interruption in proceedings.)

17          MR. PHILLIPS:  Your Honor, we're handing up some

18  transcripts.  Some of these will be on the screen, but they --

19  we're handing up some transcripts that some of those didn't

20  make it into our notebook, can be added to the notebook, and

21  some will be on the screen, but some were made -- just

22  recently finished.  So we want to hand you those.  Those are

23  the calls we're about to go over.

24          THE COURT:  All right.

25          MR. PHILLIPS:  If the Court please, we're ready to

STEVEN MOSLEY – DIRECT EXAMINATION

1  return.

2  BY MR. PHILLIPS:

3  Q.  Now, Mr. Mosley, you talked about you were arrested in

4  this case.

5  A.  Yes.

6  Q.  And at some point -- well, at some point you decided that

7  you were going to cooperate.

8  A.  Yes.

9  Q.  When did you meet with the DEA or decide to cooperate,

10  start cooperating?

11  A.  January 3rd.

12  Q.  What year?

13  A.  2014.

14  Q.  And after you did that, did you have contact with

15  Mr. Ballard?

16  A.  Yes.

17  Q.  Tell us how that -- tell us about that first contact after

18  you cooperated.

19  A.  We spoke on the phone, and he went to jury selection and

20  heard my name called.

21  Q.  So up until that point, were you set to go to trial?

22  A.  Yes.

23  Q.  And he told you that your name was called?  Your name was

24  called during jury selection?

25  A.  Yes.

STEVEN MOSLEY - DIRECT EXAMINATION

1   Q.  Now, after you cooperated, did you meet with him?

2   A.  Yes.

3   Q.  And what happened when y'all met?

4   A.  Met with him at visitation at the jail.

5   Q.  What did you talk to him about?

6   A.  The meeting.

7   Q.  The meeting with who?

8   A.  The agents.

9   Q.  And what was Mr. Ballard's reaction?

10  A.  He said that I had messed up.

11  Q.  Was he angry?

12  A.  Yes.

13  Q.  Did he threaten you in any way?

14  A.  No.

15  Q.  Now, you also spoke to him on the phone while he was in

16  the jail about this matter.

17  A.  Yes.

18  Q.  And we're going to play some phone calls and go through

19  that.  Now, when you met with him, did he -- he was angry with

20  you and said you messed up.  Did he tell you anything else

21  that you needed to do?

22  A.  He told me to write a letter.

23  Q.  Was that during the meeting when you first told him?

24  A.  No, that was a few days after.

25  Q.  Meaning on the phone?

1   A.  Yes.

2   Q.  Okay.

3       MR. PHILLIPS:  Just one moment, the audio's coming

4   up, Your Honor.  And, Your Honor, for everyone's benefit, this

5   one is not going to be on your screen.  If you want to follow

6   the transcript, it's the hard copy that we passed up.  This

7   first call didn't make it to the presentation.

8       THE COURT:  I have it.

9       MR. PHILLIPS:  This call 1935 is what we're calling

10  it, it's part of Exhibit 15.

11      (Audio recording was played.)

12  BY MR. PHILLIPS:

13  Q.  Do you recognize the voices on that call?

14  A.  Yes.

15  Q.  Who do you hear on that call?

16  A.  Davis and Martin Ballard.

17  Q.  Who's Davis?

18  A.  Anthony Davis.

19  Q.  And how do you know him?

20  A.  From being with Martin Ballard.

21  Q.  And what nicknames does Davis have?

22  A.  Buggy.

23  Q.  That's how you know him?

24  A.  Yes.

25  Q.  Did Mr. Ballard have any nicknames?

STEVEN MOSLEY - DIRECT EXAMINATION

1   A.   Lou.

2   Q.   Okay.  All right.  We'll continue the call.

3        (Audio recording was played.)

4   Q.   Do you recognize the voices on this part of the call?

5   A.   Yes.

6   Q.   Whose voices are they?

7   A.   Mine and Mr. Ballard.

8   Q.   All right.  And who said, "I done -- I'll not say the

9   word, but -- done well -- I'll say the word -- I done fuck it

10  up, huh?"  Who was that?

11  A.   That was me.

12  Q.   What were you referring to?

13  A.   I was referring to talking with the agents.

14  Q.   And then when -- after that, is it Mr. Ballard that said,

15  "Your people might not like it, but that's what it's going

16  for."  And this is on page three of the transcript, lines five

17  through six.  "But your people might not like it, but that's

18  what it's going -- what it going for."  Do you know what he

19  was talking about there?

20  A.   My attorney.

21  Q.   You're stating your attorney wouldn't like it?

22  A.   Right.

23  Q.   Wouldn't like what?

24  A.   If I was to reject the -- reject -- I mean go back on my

25  word.

STEVEN MOSLEY - DIRECT EXAMINATION

1   Q.   Okay.  To go back on what you had told the agents?

2   A.   Yes.

3        (Audio recording was played.)

4   Q.   And in that portion of the call Mr. Ballard says, "It's

5   guidelines and that's how it go bottom line."  This is page

6   three of the transcript, line 19.  "You put that there.  Now

7   you got to kill it now," to line 20.

8        What was he referring to in that part of the call?

9   A.   The amount of cocaine I talked with the agents.

10  Q.   All right.  And when he said you have to kill it now, what

11  did you take that to mean?

12  A.   Go back on it.

13  Q.   Go back on it?

14  A.   Yeah, go back on what I told them.

15       (Audio recording was played.)

16  Q.   All right, this is page four of the transcript.

17  Mr. Ballard states, "That's how they did the first N word from

18  the start with.  These are the ones you made it."  Do you know

19  who he was referring to?

20  A.   Brothers.

21  Q.   And what about Brothers, that he was cooperating?

22  A.   Yes.

23  Q.   And then later Mr. Ballard says, "Your thing was so much

24  better because I didn't go on you."  That's lines 15 through

25  16 on page four of the transcript.  "That N word went on all

1  them people from that country.  He went in with them, so they

2  know who they was.  I ain't went in.  You made your number."

3  What was he talking about there?

4  A.  The amount of cocaine.

5  Q.  And when he said he went on all them people from that

6  country, do you know who he was talking about?

7  A.  Brothers.

8  Q.  And when he said, "I didn't go on you," what did he mean?

9  A.  He didn't tell on me.

10  Q.  And he didn't tell on you about what?

11  A.  The cocaine.

12  Q.  The fact that y'all been dealing with each other?

13  A.  Yes.

14  Q.  And he said, "You made your number.  You ain't had no

15  number."  What did he mean?

16  A.  That I gave my own self a number -- I mean the amount of

17  cocaine I had.

18  Q.  And -- Okay.

19      (Audio recording was played.)

20  Q.  Now we're still on page four of the transcript.  Is that

21  you that stated, "You think I should -- you think I should

22  just hold out till they waiting on it, then F them up that

23  way?"

24  A.  Yes.

25  Q.  Now, what did you mean by that?

STEVEN MOSLEY - DIRECT EXAMINATION

1    A.  Blowing the trial.

2    Q.  And how were you going to blow the trial?

3    A.  When trial started, had a letter.

4    Q.  Now, when you were telling him this, when you were

5    suggesting this, to wait and blow the trial, did you intend to

6    actually do that?

7    A.  No.

8    Q.  Did you intend to stop cooperating?

9    A.  No.

10   Q.  So were you telling -- during these discussions about

11   taking back your statement, were you telling Mr. Ballard the

12   truth, that you were going to actually take back your

13   statement?

14   A.  No, I was lying.

15   Q.  Why was that?

16   A.  I wanted -- for family, for my family to be safe.

17   Q.  Say it again?

18   A.  My family to be safe.

19   Q.  So you were fearful for your family?

20   A.  Yes.

21   Q.  Why were you fearful for your family?

22   A.  I didn't want anything to happen to them.

23   Q.  And that was because of what?

24   A.  Because of all the stuff that was going on at the time.

25   Q.  Your cooperation against Ballard?

STEVEN MOSLEY - DIRECT EXAMINATION

1    A.  Yes.  Yes.

2        (Audio recording was played.)

3    Q.  All right.  So now we're on page five of the transcript.

4    Now, you stated, "I had a plan though.  I got something up I'm

5    going work through."  Right?

6    A.  Excuse me?

7    Q.  You said you had a plan that you were going to work

8    through, something you were going to work through.

9    A.  Yes.

10   Q.  And did you really have a plan?

11   A.  No.

12   Q.  Okay.  Now, when he said, "It come on that black fucker --

13   right after -- when you talked and shit did nothing," who was

14   he referring to?

15   A.  Him.

16   Q.  Did he refer to himself as that in y'all's calls?

17   A.  Yes.

18   Q.  And then later, in line 20 to 22, he says, "They just need

19   more point to come with some of the same type similar story so

20   when it's time for them to point and talk on that day in

21   March, that's what they need, more people on that."  What did

22   you understand him to be talking about?

23   A.  More people for the trial.

24   Q.  Do you recall when the trial was set?  That time?

25   A.  March 10th.

STEVEN MOSLEY - DIRECT EXAMINATION

1  Q.  Okay.  And then when he states, this is page six, line two

2  through four, "You just got to just tell your damn people,

3  man, you ain't going with that.  That's all to it, because I'm

4  still going.  This what they going to do if you still like

5  that, we ain't going to let you get nothing if you don't come

6  in.  You dig?"  What was he referring to, who was your damn

7  people?

8  A.  My wife.

9  Q.  Okay.  And you ain't going with that, what did he want you

10  to do?

11  A.  Take back, take it back, what I said to the agents.

12      (Audio recording was played.)

13  Q.  Is that Mr. Ballard that said, "There ain't no way in the

14  world I could have laid anything on you, nothing."?

15  A.  Yes.

16  Q.  What was he talking about?

17  A.  Cocaine.

18  Q.  Well, what do you mean?

19  A.  As far as telling on me.

20  Q.  So he was saying he wouldn't -- there's no way in the

21  world he would tell on you?

22  A.  Right.

23      (Audio recording was played.)

24  Q.  Now, when he's talking about "How would you pay an MF-er

25  to cooperate," what's he talking about?

STEVEN MOSLEY - DIRECT EXAMINATION

1    A.  My lawyer.

2    Q.  Did you retain your lawyer?

3    A.  Yes.

4    Q.  Did you originally have a public defender prior to that?

5    A.  Yes, for the start, yes.

6    Q.  But you went and got your own lawyer and paid?

7    A.  Right.  Yes.

8    Q.  And when he said, "You could have saved them chips," what

9    is he talking about?

10   A.  I could have just kept the public defender.

11   Q.  If you were to do what?

12   A.  Cooperate.

13   Q.  Okay.  Let's continue, please.

14      (Audio recording was played.)

15   Q.  Now, we're on page eight of the transcript, line 21.  Is

16   that Mr. Ballard who says, "Why would he put himself in

17   something else?  I ain't putting him in there, you know?"

18   A.  Yes.

19   Q.  What's he talking about?

20   A.  Repeat it one more time.

21   Q.  He says, "Why would he put himself in something else?  I

22   ain't putting him in there, you know?"  What is he talking

23   about?

24   A.  He was talking about me as far as referring to if the

25   roles were different.

STEVEN MOSLEY - DIRECT EXAMINATION

1      MR. PHILLIPS:  Please continue.

2      (Audio recording was played.)

3    Q.  I'm on page nine of the transcript.  When he says he can

4    "show you a scale like where your point level is, your

5    history, that's all -- that's all you get your time for,

6    history and your F-ing level," and the transcript is in

7    audible.  Can you tell what he says there?

8    A.  He's talking about as far as the guidelines.

9    Q.  And what was your understanding regarding the guidelines

10   and what he's talking to you about?

11   A.  The Sentencing Guidelines.

12   Q.  And what is he telling you here that all you get your time

13   for history and your level, what was he talking about?

14   A.  I'll be sentenced on my guideline range.

15   Q.  And what is your guideline range based on?

16   A.  My history.

17   Q.  And what else?

18   A.  And that's all.  I mean that's all I know.

19   Q.  Okay.  What about the quantity of drugs?

20   A.  Yeah, quantity of drugs, yes.

21      MR. PHILLIPS:  Let's continue.

22      (Audio recording was played.)

23      MR. PHILLIPS:  All right.  We're going to play

24   another call.  This is January 11th, this is also part of

25   Exhibit 15.

1    (Audio recording was played.)

2    BY MR. PHILLIPS:

3    Q.  Do you recognize those voices?

4    A.  Yes.

5    Q.  Who are they?

6    A.  Martin Ballard and Anthony Davis.

7    Q.  We're on page two of the transcript for this call, 2036,

8    noted on January 11, 2014.  And we'll continue on.

9    (Audio recording was played.)

10   Q.  Now, do you recognize that new voice?

11   A.  That's me and Mr. Ballard.

12   Q.  Okay.  And that's Mr. Ballard who's on page three,

13   paragraph eight, line eight down, talking about waiting until

14   the time what you been thinking about doing, is that him?

15   A.  Yes.

16         MR. PHILLIPS:  We can continue.

17   (Audio recording was played.)

18   Q.  Now, we're on page four of the transcript, line 16.  "You

19   should have said -- you should have said don't fuck with

20   that."  Is that you?

21   A.  Yes.

22   Q.  What were you talking about?

23   A.  The meeting with the agents.

24   Q.  And Mr. Ballard says, on line 18, "I had tell you that.  I

25   tell you that.  Not me, I told you not me.  I did."  What was

STEVEN MOSLEY - DIRECT EXAMINATION

1  he talking about?

2  A.  Talking about him with the agents.

3  Q.  Had he told you not to talk about him to the agents?

4  A.  Yes.

5  Q.  Prior to this?

6  A.  Yes.

7      (Audio recording was played.)

8  Q.  We're on page five of the transcript, line four.  He asked

9  you how Big TB looking since he came over.  Do you know who

10  he's talking about?

11  A.  Torian.

12  Q.  Torian who?

13  A.  I can't recall his name.

14  Q.  And what is he talking about Torian?

15  A.  How he cooperated, he don't look the same.

16  Q.  What does he mean he don't look the same?

17  A.  He just can't live a regular life.

18  Q.  Why is that?

19  A.  Because he cooperated.

20  Q.  Well, what was the consequence of the cooperating or why

21  he can't live a normal life?

22  A.  Because he cooperated.

23  Q.  How has that changed his life, as you understand it?

24  A.  He just can't, you know, I guess can't go places like he

25  used to.

1  Q.  All right.  Let's continue.

2      (Audio recording was played.)

3  Q.  We're on page five of the transcript.  He says, "I told

4  you that," this is line 16 -- line 17, "you know what I mean?

5  What the hell you think I been telling you?  I tell you this

6  shit about the boy on the dirt road, you said his daddy just

7  died.  That's what I been thinking.  You know what I'm saying?

8  You're like, okay, so you could still get that little shit.

9  That's what I been thinking you was doing."

10     What was he talking about there?

11 A.  I can't recall that at this time.

12 Q.  Okay.  But you did talk -- prior to going in to meet with

13 the agents, did you talk to Mr. Ballard and tell him you were

14 going to do that?

15 A.  Yes.

16 Q.  And did he tell you what you could and couldn't talk

17 about?

18 A.  Yes.

19 Q.  And did he tell you any specifics, people you should talk

20 on?

21 A.  No, he just told me just don't tell on him.

22 Q.  Okay.

23     (Audio recording was played.)

24 Q.  We're on page six of the transcript here.  When he says,

25 "You add that up.  Line 11.  How many years that is from that

1    year until when, 12?  There ain't nothing low about that."

2    Line 14.  What's he talking about?

3    A.  The amount of cocaine.  I told the agents.

4    Q.  Okay.

5        (Audio recording was played.)

6    Q.  We're on page eight of the transcript, line 23.

7    Mr. Ballard says, "There's a way to clear this shit up and

8    keep the shit gangster."  What was he talking about?

9    A.  I believe as far as me writing a letter.

10   Q.  And what was the purpose of that?

11   A.  So I'll be taking back what I told the agents.

12   Q.  And then on page nine you say, "He put it on FaceBook."

13   Who were you talking about and what were you talking about?

14   A.  When I cooperated.

15   Q.  What happened on FaceBook?

16   A.  Someone put it on FaceBook.

17   Q.  That you were cooperating?

18   A.  Yes.

19   Q.  And what did that -- how did that make you feel?

20   A.  Not too good.

21   Q.  Why?

22   A.  Because it put my family in danger.

23       MR. PHILLIPS:  You can continue, please.

24       (Audio recording was played.)

25   Q.  Now we're on page 12 of the transcript.  Mr. Ballard tells

1    you, "Just keep it low, stay low out there and keep it cool,

2    ain't no time to be going out, you know, we'll now be low."

3    What did you understand that to mean?

4    A.  Just wait till things blow over.

5              MR. PHILLIPS:  Now we're going to move on to the next

6    call.  And, Your Honor, the next call is January 14th, 2014,

7    this is also part of Exhibit 15.

8              THE COURT:  Mr. United States Attorney, you don't

9    think I could keep up with who these people are, what they're

10   talking about?

11             MR. PHILLIPS:  Yes, Your Honor, that's why I'm trying

12   to stop it and go through.  I was letting some of it play just

13   because I wasn't interested in part of it, but they had asked

14   I play all of it.  But if you'd like me to be more specific,

15   I've been highlighting passages, but --

16             THE COURT:  Well, it's your case, but I just

17   wondered, since I guess you're introducing this --

18             MR. PHILLIPS:  Yes, sir, and I'm introducing the

19   transcripts as well.

20             THE COURT:  So what you want me to do is, I assume,

21   is look this over.

22             MR. PHILLIPS:  Yes, sir.

23             THE COURT:  Well, do you need -- if you want me to

24   look the whole thing over, what are you gaining by playing it

25   and putting --

STEVEN MOSLEY - DIRECT EXAMINATION

1        MR. PHILLIPS:  Your Honor --

2        THE COURT:  Other than him stopping it at times, I

3   can understand you might want to stop, you know, in one

4   particular thing, but you're just putting him -- 90 percent of

5   this thing is going in here, or maybe not 90, but just a lot

6   of dirty words and dirty talk.

7        MR. PHILLIPS:  Yes, Your Honor, there are particular

8   portions I'm interested in, but Mr. Theos had talked to me, we

9   hadn't agreed on every case, but because there was a lot of it

10  that was pertinent, he had asked that we play the whole thing

11  or he was going to object if we didn't play the whole thing.

12       THE COURT:  That's a different matter.  I didn't know

13  that.

14       MR. PHILLIPS:  That's why we're going through this

15  exercise.  But I'll try to do a better job of highlighting,

16  from our perspective, what we'd like the Court to look at,

17  then obviously they'll highlight what they want you to look

18  at, I assume.

19       THE COURT:  All right.

20       MR. PHILLIPS:  So now we're on January 14, 2014,

21  Exhibit 15, we've noted as call 1054 and begins on page two of

22  the transcript.

23     (Audio recording was played.)

24       THE COURT:  What page are you on?  Where are you in

25  this book?

STEVEN MOSLEY – DIRECT EXAMINATION

1          MR. PHILLIPS:  These are the transcripts we handed

2   up.

3          THE COURT:  I've got --

4          MR. PHILLIPS:  That's on page two.

5          THE COURT:  I have page two, but I got the wrong page

6   two.  Whose conversation -- Why is this sheet number one?

7          MR. PHILLIPS:  I can ask him right now.

8   BY MR. PHILLIPS:

9   Q.  Do you recognize the voices on this phone call?

10  A.  Yes.

11  Q.  Who was talking?

12  A.  Martin Ballard and Anthony Davis.

13         MR. PHILLIPS:  And, Your Honor, this is call

14  January 14, 2014.

15         THE COURT:  I was looking at the right one,

16  apparently.  Is this the one that's headed United States

17  against Martin Lewis Ballard and Charles Anthony Sanders,

18  January 14, 2014, 1054?

19         MR. PHILLIPS:  Yes, sir.

20         THE COURT:  That's the right one, I just couldn't

21  pick him up.

22         MR. PHILLIPS:  Would you like us to start over so you

23  can follow it?

24         THE COURT:  No, I don't need you to start over, just

25  tell me where you are.

STEVEN MOSLEY - DIRECT EXAMINATION

1    (Brief interruption in proceedings.)

2         MR. PHILLIPS:  We're now on page three, just said

3    "with my people, so when I spit --"

4         THE COURT:  I see the words "your people."

5         MR. PHILLIPS:  Page three at the top, "my people."

6         THE COURT:  All right, sir, go ahead.

7    (Audio recording was played.)

8         MR. PHILLIPS:  A few questions.

9    BY MR. PHILLIPS:

10   Q.  Who are the voices you hear at this point in the call?

11   A.  Martin Ballard and mine.

12   Q.  And when he asked you in line 14, this is page four of the

13   transcript, line 14, "You ain't no -- went nowhere yet to say

14   anything else on that thing," and you answered "No," on line

15   17, what are y'all talking about?

16   A.  The agents.

17   Q.  He's asking you whether you talked to the agents again?

18   A.  Yeah, the agents, um-hum.

19        MR. PHILLIPS:  Then we'll continue.

20   (Audio recording was played.)

21   Q.  We're on page five at the top, line one.  "You know you

22   got to come in and point, point at that -- line two -- that

23   little black MF-er," who was he referring to?

24   A.  Himself.

25   Q.  And what was he talking about pointing?

STEVEN MOSLEY - DIRECT EXAMINATION

1    A.  On trial.  At trial.

2    Q.  That you were going to come in at trial --

3    A.  Yes.

4    Q.  -- and talk about him?

5    A.  Yeah, I would have to, yes.

6         MR. PHILLIPS:  We'll continue.

7       (Audio recording was played.)

8    Q.  Now, at line eight he says, "Well, peep the move.  How you

9  feel about doing that though?"  Did you know he was talking

10  about peep the move?

11    A.  No.

12    Q.  But he says, "How you feel about doing that?"  What was he

13  referring to?

14    A.  Going to trial.

15    Q.  Blowing the trial by your testimony?

16    A.  Yes.

17       (Audio recording was played.)

18    Q.  In line 20 it talks about the squirrel, nasty little

19  squirrel, what's he talking about?

20    A.  The fellow who set me up, the informant.

21    Q.  That was for the controlled buy?

22    A.  Yes.

23         MR. PHILLIPS:  Please continue.

24       (Audio recording was played.)

25    Q.  On page six of the transcript Mr. Ballard states, "Now, on

STEVEN MOSLEY - DIRECT EXAMINATION

1    the backlash of all this if you come through, they're still

2    only going to be able to hit with the regular, the initial

3    stuff."  What was he talking about?

4    A.   The controlled buy.

5    Q.   And so he was telling you that was -- if you backed out,

6    that that's all you'd be heard on at sentencing?

7    A.   Yes.

8         (Audio recording was played.)

9    Q.   We're still on page six, this is lines 23 through 25, he

10   says, "What's the word I'm trying to think of."  Let me back

11   up.  Line 21.  "But with not having no damn -- let me see

12   what's the word I'm trying to think of -- this is

13   Mr. Ballard -- you know what I used to have all the time?  You

14   know what I'm saying?"  What was he talking about, what did

15   you understand him to be talking about?

16   A.   Cocaine.

17   Q.   That's what he used to have all the time?

18   A.   Yes.

19        MR. PHILLIPS:  Now we're going to be on page seven.

20        (Audio recording was played.)

21   Q.   So we're on page seven of the transcript, and he says --

22   Mr. Ballard says in line eight, "You already know you

23   confirmed you going to do good."  Then on line 12 he says,

24   "Your whole shit will be situated while you -- if that come

25   that far, that --" and then line 14 "-- that thing we ride up

STEVEN MOSLEY – DIRECT EXAMINATION

1    there to see the game in, I'll take care of all of that,

2    everything through your sister or whatever, you know what I'm

3    saying?"  What was he talking about, what did y'all ride up to

4    the game in?

5    A.  My Escalade.

6    Q.  And he was saying he would take care of all of that, what

7    did you understand him to be telling you?

8    A.  After sentencing, if I go to jail he'd take care of my

9    bills.

10         MR. PHILLIPS:  Okay.  Please continue.

11         (Audio recording was played.)

12   Q.  So we stopped on page eight of the transcript and he tells

13   you, "Play like you going to point."  What is he talking

14   about?

15   A.  Coming to trial.

16   Q.  And what does he mean, play like you're going to point?

17   A.  Testify against him.

18   Q.  Now, the initial calls, these jail calls that we talked

19   about, y'all talk about almost immediately going to tell your

20   lawyer that you recanted your statement; that was the initial

21   plan, right?

22   A.  Yes.

23   Q.  And by this time, by these last two calls, had the plan

24   changed?

25   A.  Yes.

STEVEN MOSLEY - DIRECT EXAMINATION

1   Q.  What was the new plan?

2   A.  To blow the trial.

3   Q.  And so were you going to pretend to be cooperating until

4   the day of trial?

5   A.  That's what he wanted me to do, yes.

6       (Audio recording was played.)

7   Q.  We're still on page eight, line 14, Mr. Ballard tells you,

8   "They don't care, because if they really care, they would had

9   said, look here, let me put you up in this spot where that

10  other MF-er at out of town."  What was he talking about there?

11  A.  Me moving, having -- having y'all put me up, the agents.

12  Q.  Having who put you up?

13  A.  The agents.

14  Q.  And why?

15  A.  For cooperation.  For my cooperation.

16  Q.  Had you -- during this time did you express concern about

17  your safety to our office and to the agents?

18  A.  Yes.

19  Q.  And was any offer made to you to move you?

20  A.  Yes.

21  Q.  And did you take us up on that offer?

22  A.  No.

23  Q.  Now, when he says that they'll put you up in a spot with

24  that other guys out of town, do you know who he was talking

25  about?

STEVEN MOSLEY - DIRECT EXAMINATION

1    A.  Yes.

2    Q.  Who?

3    A.  Brothers.

4          THE COURT:  Who?

5    A.  Brothers.

6          MR. PHILLIPS:  All right, please continue.

7    (Audio recording was played.)

8    Q.  We're at the top of page ten.  When they talk about

9    someone being downgraded, what was he talking about?

10   A.  Herschel Tanner.

11   Q.  Who is Herschel Tanner?

12   A.  One of the agents.

13   Q.  And what did you understand that to mean, what was he

14   telling you?

15   A.  He's no longer an agent, he works for the Town of

16   Summerville.

17   Q.  As a police?

18   A.  Yes.

19          MR. PHILLIPS:  Please continue.

20   (Audio recording was played.)

21   Q.  We're on page ten at the middle and he's telling you,

22   "Ain't got to take a quarter more, tell them that times are

23   hard," what was he talking about there?

24   A.  Paying my attorney.

25   Q.  So he was telling you not to pay your attorney any more?

STEVEN MOSLEY - DIRECT EXAMINATION

1   A.  Right.

2           MR. PHILLIPS:  Please continue.

3       (Audio recording was played.)

4   Q.  Okay.  So we're on the bottom of page ten -- Mr.

5   Ballard -- line 25.  "I ain't going to keep -- then we go over

6   to page 11, line one, "-- can't really say so much on here,

7   but unless you want to come up here today in that name.  You

8   know what I'm saying?  Or you do think that's a good idea?

9   What you think?"  And you respond, "No, let's just keep it

10  clean just to be on the safe side."  When he said, "I can't

11  really say much on here, but unless you want to come up here

12  today in that name," what was he talking about?

13  A.  Coming to visit him under another name.

14  Q.  Another name?  You would put a different name down?

15  A.  No, he would.

16  Q.  Tell the Court what he was talking about.

17  A.  When I come to visit him, ask for a different person.

18  Q.  All right.  And had that been -- where did that -- well,

19  is this the first time you had heard about that plan --

20  A.  Yes.

21  Q.  -- from Mr. Ballard?

22  A.  Davis called me and told me to go see him.

23          MR. THEOS:  Your Honor, I object to what someone else

24  may have told him.

25          MR. PHILLIPS:  Well, okay.

STEVEN MOSLEY – DIRECT EXAMINATION

BY MR. PHILLIPS:

Q.  Prior to that, did you learn -- he says, "Come up here today in that name."  Do you know what name he was referring to?

A.  Yes.

Q.  What name were you supposed to use when you go visit him?

A.  Andy Cohen.

Q.  Andy what?

A.  Cohen.

Q.  Cohen?

A.  Yes.

Q.  And you learned of that named from Mr. Davis?

A.  Yes.

Q.  So you -- so just so we're clear, you would show your I.D. and say you're visiting Mr. Andy Cohen?

A.  Yes.

Q.  And then what was your understanding what would happen next?

A.  That we would discuss the --

Q.  Who would you discuss it with?

A.  Martin Ballard.

    (Audio recording was played.)

Q.  So line seven of page 11 of the transcript he says, "Just be cool.  Because worst case scenario, they can turn around and try to hit my ass with obstruction.  See what I'm saying?

STEVEN MOSLEY – DIRECT EXAMINATION

1   Know what I'm saying?"  What was he talking about there?

2   A.  When I come visit him, he was -- instead of come visit him

3   under his name, come see him as Andy Cohen.

4   Q.  And when Mr. Ballard was talking about getting hit with

5   obstruction, did you know what he was talking about?

6   A.  Yes.

7   Q.  Tell the Court what he was talking about.

8   A.  Me and him discussing the trial.

9       (Audio recording was played.)

10  Q.  That's the end of the call.  Page 11 of the transcript we

11  just heard he says, "I'm going to call Bra let them know to

12  just lay off all that talk and rah rah shit."  What was he

13  talking about?

14  A.  Talk in the streets about me cooperating.

15  Q.  And during -- again, the plan changed and he's talking

16  about you blowing the trial.  Were you intending, when you

17  were talking to him, did you ever intend to actually go

18  through with blowing the trial?

19  A.  No.

20  Q.  Why were you playing along and talking to him in this

21  manner?

22  A.  In fear of my safety.

23          MR. PHILLIPS:  All right.  Your Honor, we have two

24  more calls, then we'll be close to wrapping up.  In fact,

25  we'll wrap up.  Your Honor, this one is on the screen and will

1    track.  It was just a matter of timing when we got the

2    transcripts in time, so it will be on your screen, if you want

3    to follow that way, but you also have a hard copy as well.

4              THE COURT:  I've got mine.

5              MR. PHILLIPS:  So this is January 17, 2014, call 2108

6    and it's part of Exhibit 17 as well.  And we'll start playing

7    this call.

8              THE COURT:  Let me ask you something, when you make a

9    call at the jail, you're not limited in the time you can talk?

10   When you have --

11   A.  When someone calls you --

12             THE COURT:  What?

13   A.  -- from the jailhouse?

14             THE COURT:  Yeah.

15   A.  Yes.

16             THE COURT:  You are limited?

17   A.  Yeah, I think the call is like 15 minutes.

18             THE COURT:  I see.  All right.

19   BY MR. PHILLIPS:

20   Q.  So it's clear, was Mr. Ballard calling you directly or

21   were you calling Mr. Ballard from the jail?  To the jail?

22   Were you making the call to the jail?

23   A.  No.

24   Q.  How were you getting in touch with him?

25   A.  Through Anthony Davis.

STEVEN MOSLEY - DIRECT EXAMINATION

1   Q.  So Mr. Davis was receiving the call from Mr. Ballard.

2   A.  Yeah.

3   Q.  And then Mr. Davis would then call you?

4   A.  Yes.

5   Q.  And how would you talk to Mr. Ballard?

6   A.  On three-way.

7          THE COURT:  You were using a cell phone?

8   A.  Yes, sir.

9   Q.  It was like a conference call?

10  A.  Yes.

11  Q.  Okay.  So Mr. Ballard wasn't directly calling your number?

12  A.  No.

13      (Audio recording was played.)

14  Q.  He's talking fast there; who's on this phone call?

15  A.  Mr. Ballard.

16  Q.  You recognize his voice?

17  A.  Yes.

18  Q.  And did you recognize the other voice he's talking to?

19  A.  Me.

20  Q.  Okay.  And does it start with you?

21  A.  Excuse me?

22  Q.  Did the call start with you?  Were you the first voice

23  with Mr. Ballard on that call?  Is there someone else on the

24  call?

25  A.  Davis.

STEVEN MOSLEY – DIRECT EXAMINATION

1  Q.  Okay.  Now, line 13 of this transcript says, "I was

2  waiting until I get another pipe, because I ain't know how the

3  other pipe is."  What did you take that to mean?  What's a

4  pipe?

5  A.  Another line phone.

6  Q.  Okay.  And then down at line 18 he says, when he refers to

7  the skinny MF-er, who was he talking about?  If you know.  Who

8  was he referring to?  Line 18 and 19.  Do you know when you

9  refer to the skinny MF-er, who he was referring to?

10  A.  Me.

11      MR. PHILLIPS:  We can continue.

12      (Audio recording was played.)

13  Q.  We're going to go back up to line six.  "You got to make

14  sure you write it -- make sure you put it like that, like I

15  never did nothing.  You know what I'm saying?  And that black

16  MF-er is a good person."  Who is the black MF-er?

17  A.  Him.

18  Q.  And you got to put it like it's Mr. Ballard saying like I

19  never did nothing.  What was he talking about?

20  A.  Like he never sold drugs.

21  Q.  Okay.  Now, but if you were to write something that he

22  never did nothing, would that be the truth?  If you wrote

23  that, would that be the truth?

24  A.  No.

25      (Audio recording was played.)

STEVEN MOSLEY – DIRECT EXAMINATION

1   Q.  We're on page four of the transcript.  He told you what to
2   say -- before you went inside there, he told you what to say,
3   didn't tell you nothing like that?  You said no.  What were
4   y'all talking about?
5   A.  The meeting with the agents.
6   Q.  Who was he asking whether they had told you what to say?
7   A.  Oh, my attorney.
8   Q.  Okay.  But he did not tell you what to say before that
9   meeting?
10  A.  No.
11      (Audio recording was played.)
12  Q.  He said that put -- him and you in another bracket.  What
13  was he talking about?
14  A.  The amount of cocaine.
15  Q.  Amount of cocaine that you told the agents?
16  A.  Yes.
17  Q.  And then you said, "What do I need to do?"  And he said,
18  "Get a clear piece of thing," and then he starts talking about
19  telling them from the start.  What was he telling you to do at
20  that point?
21  A.  Write a letter, tell them I was pressured.
22      MR. PHILLIPS:  Okay.  Let's continue, please.
23      (Audio recording was played.)
24  Q.  I'm backing up to page five of the transcript.  He tells
25  you to put it -- to put in the letter that you were under

STEVEN MOSLEY - DIRECT EXAMINATION

1   pressure and that's why you talked.  Is that right?

2   A.  Yes.

3   Q.  And at the end of the letter he tells you, "You did it

4   under pressure, that you didn't feel right lying about it, so

5   that's why you're writing this now."  He tells you what to

6   write in the letter, correct?

7   A.  Yes.

8   Q.  And he tells you it's going to go to my people.  Who was

9   it going to go to?

10  A.  His attorney.

11       MR. PHILLIPS:  Okay.  Let's continue.

12      (Audio recording was played.)

13  Q.  When he says keep, "Like you're still with the program,"

14  what was he talking about?

15  A.  Testifying.

16  Q.  And testifying, tell us, what was the program?  What was

17  y'all's plan?

18  A.  To blow the trial.

19       MR. PHILLIPS:  Okay.  Please continue.

20      (Audio recording was played.)

21  Q.  This is a female voice now?

22  A.  Yes.

23  Q.  Who is that?

24  A.  My wife.

25  Q.  That's your wife?

STEVEN MOSLEY - DIRECT EXAMINATION

1  A.  Yes.

2  Q.  So what happened at this point, you were on the phone with

3  Mr. Ballard --

4  A.  Yeah.

5  Q.  -- through Mr. Davis, and then she takes the phone from

6  you?

7  A.  Yes.

8  Q.  Okay.  So where were y'all when this call happened?

9  A.  On the front porch.

10  Q.  Was Mr. Davis present?

11  A.  Yes.

12  Q.  Okay.  So were you talking directly on Mr. Davis' phone?

13  A.  Yes.

14  Q.  This wasn't a three-way call?

15  A.  No.

16  Q.  Did you know -- don't tell us what he said, but did you

17  know why Mr. Davis was at your house?

18  A.  Yes, to pick up a letter.

19  Q.  And the letter that y'all been talking about on these

20  calls?

21  A.  Yes.

22  Q.  And had he ever been to your house before?

23  A.  No.

24  Q.  How did that make you feel to have Mr. Davis in your

25  house?

1    A.  Not too comfortable.

2    Q.  Why?

3    A.  Just made my wife feel uncomfortable.

4    Q.  So this is your wife talking with Mr. Ballard?

5        (Audio recording was played.)

6    Q.  Now, during this period when all this is happening in

7    January of 2014, was your wife aware of the FaceBook posts?

8    A.  Yes.

9    Q.  And she was aware that you were cooperating?

10   A.  Yes.

11   Q.  And had y'all expressed concerns to one another regarding

12   fear for your safety?

13   A.  Yes.

14   Q.  And that was because of what?

15   A.  The FaceBook.

16   Q.  That word of your cooperation was in broadcast?

17   A.  Yes.

18   Q.  And who were you afraid of?

19   A.  All just, you know, worried about the family's safety.

20   Q.  Were you afraid of Mr. Ballard?

21   A.  Well, I know he was locked up, but -- yes.

22   Q.  You were still afraid of him?

23   A.  Yeah, retaliation, yes.

24   Q.  And why were you afraid of him even though he was still

25   locked up?

STEVEN MOSLEY - DIRECT EXAMINATION

A.  I just didn't want anything to happen, you know, to my family.

Q.  And at the time of all these calls, you had already learned about what -- you said you found out the day after Mr. Brothers had been shot?

A.  Yes.

Q.  And that was before these calls?

A.  Yes.

Q.  Okay.  Now we're going to go to the final call.

THE COURT:  After putting me through what you put me through since 3:00 o'clock, I'll give you one moment.

MR. PHILLIPS:  Thank you, Judge.  My wiser counsel with me is on your side.  Well, let's go to Government's Exhibit 13.

THE COURT:  I see you didn't take that good advice.

MR. PHILLIPS:  No, Exhibit 13 is not a call.  And I may still -- I may still not take his good advice, Your Honor, but just give me one second.

BY MR. PHILLIPS:

Q.  Now, during this call Mr. Davis is in your house, right?

A.  Right.

Q.  And Mr. Ballard's telling you to write the letter.

A.  Right.

Q.  That phone call ended; was there another phone call?

A.  Yes.

STEVEN MOSLEY - DIRECT EXAMINATION

1   Q.  And during that phone call did Mr. Ballard tell you to

2   write the letter now and not wait?

3   A.  Yeah, he wanted it now, yes.

4   Q.  And did he tell you what to put in that letter?

5   A.  Yes.

6   Q.  And we'll show you Government's Exhibit 13.  Do you

7   recognize this?

8   A.  Yes.

9   Q.  Can you publish, or can you read this for the Court?  Dear

10  Martin?

11  A.  "Dear Martin, this is Chase.  Those people wanted me to

12  tell them things on you so I lied and made things up to help

13  myself under that pressure.  I never dealt no drugs, but they

14  think I did because of the situation afterwards.  I love you

15  and I'm here for you.

16  Q.  And then you signed it Chase Mosley?

17  A.  Yes.

18  Q.  Now, there's a notary down here, Janet Hurd, my commission

19  expires August 14.  Did you do this letter in front of a

20  notary?

21  A.  No.

22  Q.  Who was around you when you wrote this letter?

23  A.  No one.

24  Q.  And what did you do with the letter after you wrote it?

25  Did you write it the same day or night that you were making

STEVEN MOSLEY - DIRECT EXAMINATION

1  these calls on January 17?

2  A.  The next day.

3  Q.  You did that the next day?

4  A.  Yes, sir.

5  Q.  Why didn't you do it while you were on the phone or that

6  same day when y'all were on the phone when Mr. Ballard was

7  telling you to do it?

8  A.  Because my wife was there; I didn't want her to know.

9  Q.  Okay.  And so you wrote it the next day.  Then what did

10  you do with it once you wrote it?

11  A.  I gave it to Davis.

12  Q.  How did he get it from you?

13  A.  He came by and got it.

14  Q.  And when you gave it to him, is that the last time you saw

15  it till this trial came about?

16  A.  Yes.

17  Q.  And when you gave it to him there was no notary, no

18  signature from a notary?

19  A.  No.

20  Q.  Okay.  Now, why did you write this letter?

21  A.  Out of fear, safety for my family.

22  Q.  And in this letter you say you lied and made things up to

23  help yourself under that pressure.  Was that what you wrote in

24  the Exhibit 13?  Was that true?

25  A.  No.

STEVEN MOSLEY - DIRECT EXAMINATION

1  Q.  Was what you told the agents true?

2  A.  Yes.

3  Q.  And what you told the Court today true?

4  A.  Yes.

5  Q.  Regarding your dealings with Martin Ballard?

6  A.  Yes.

7       MR. PHILLIPS:  One moment, Your Honor.  I may be

8  done.  And just one last question.

9  Q.  So in the calls we already heard and the call that we are

10  not playing, you have heard all those, did Mr. Ballard tell

11  you repeatedly that you were under pressure?

12  A.  Yes.

13  Q.  He told you to put that in the letter?

14  A.  Yes.

15  Q.  Mr. Mosley, were you under pressure from the Government to

16  talk to them and tell them about your dealings with

17  Mr. Ballard?

18  A.  No.

19       MR. PHILLIPS:  No further questions, Your Honor.  And

20  I took his good advice.

21       THE COURT:  Thank you.  Are you going to spend much

22  time with this witness?

23       MR. THEOS:  Your Honor, I would imagine I'd spend

24  anywhere from 30 to 45 minutes with him.

25       THE COURT:  You'll have to do that another day.  We

STEVEN MOSLEY - DIRECT EXAMINATION

1  have to do that Friday.

2         MR. THEOS:  That's fine, Your Honor.  I understand.

3         THE COURT:  We talked the first part of the week

4  we're going to be here Tuesday, Wednesday, skip Thursday and

5  be here Friday.

6         MR. RICHARDSON:  Yes, Your Honor.

7         THE COURT:  Then Friday we'll decide what we're going

8  to do next week.  Because we all agreed we need to take at

9  least one day.

10         MR. RICHARDSON:  That's a bare minimum, Your Honor.

11         THE COURT:  I wouldn't be against a little longer,

12  but --

13         MR. RICHARDSON:  Your Honor, I think we're set up for

14  Friday and we've got witnesses for then and then we've got

15  witnesses set up for Monday.  We've got some witnesses flying

16  in from out of town to be here Monday.

17         THE COURT:  Well, that suits me.  I just said we

18  ought to decide before we leave Friday, what we're going to do

19  the following week.

20         MR. RICHARDSON:  I agree, I was just giving you a

21  heads up, I'm going to ask you to have court on Monday since

22  we have people flying in.

23         THE COURT:  You have people coming in, we'll have

24  court, that's no problem, it's just what day we all would

25  rather be off.

STEVEN MOSLEY – DIRECT EXAMINATION

1   MR. RICHARDSON:  Government defers to you, Your

2   Honor, whatever day you prefer, suits us.

3   THE COURT:  You might not find me up here one day.

4   MR. RICHARDSON:  The problem is then we're going to

5   be here a lot of weeks, Judge, so you understand the good with

6   the bad.

7   THE COURT:  All right.  We'll recess until

8   10:00 o'clock Friday morning.

9   MR. RICHARDSON:  Thank you, Your Honor.

10   THE COURT:  Then we'll do what we can Friday.  All

11   right.  I'll see you Friday.

12   MR. THEOS:  Judge, would you just give --

13   THE COURT:  I'll give him instructions.

14   I don't want you to discuss this case with anyone.  You're

15   going to get in some trouble with -- Did I sentence you?

16   A.  No.

17   THE COURT:  Wasn't me?

18   A.  No.

19   THE COURT:  But you're going to -- you would get in a

20   lot of trouble with the Court if you discussed this case with

21   anybody, your wife, your children, whoever it might be, until

22   this case is -- until it's over.  So don't you be going around

23   talking about it.  You understand that?

24   A.  Yes, sir.

25   THE COURT:  Okay.  You may be excused.  You're to be

STEVEN MOSLEY – DIRECT EXAMINATION

1    back Friday; you understand that?

2    A.  Yes, sir.

3           THE COURT:  Is that witness in custody?

4           MR. RICHARDSON:  No, sir.

5           THE COURT:  I didn't think so.  All right.  We'll be

6    in recess.

7

8        (Court adjourned at 4:50 p.m.)

REPORTER'S CERTIFICATION


          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

Reporter for the United States District Court for the District

of South Carolina, hereby certify that the foregoing is a true

and correct transcript of the stenographically recorded above

proceedings.




S/Debra L. Potocki
_____

Debra L. Potocki, RMR, RDR, CRR