1          IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF SOUTH CAROLINA
2                 CHARLESTON DIVISION

3
UNITED STATES OF AMERICA       :     VOLUME III
4                               :
        vs.                     :
5                               :
MARTIN LOUIS BALLARD           :     2:12 - CR - 232
6

7

8          Trial continues in the above-captioned matter on

9    Friday, May 8th, 2015, commencing at 10:08 a.m., before

10   the Hon. Sol Blatt, Jr., in the United States Courthouse,

11   Courtroom III, 81 Meeting St., Charleston, South Carolina,

12   29401.

13

14
APPEARANCES:
15
                    JULIUS N. RICHARDSON, ESQUIRE,
16                  PETER T. PHILLIPS, ESQUIRE, Office of the
                    U.S. Attorney, P.O. Box 978, Charleston, SC,
17                  appeared for the Government.

18                  JERRY N. THEOS, ESQUIRE and
                    PHILIP R. HAMMOND, ESQUIRE, P.O. Box 399,
19                  Charleston, SC, appeared for defendant.

20

21

22
            REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
23         Official Court Reporter for the U.S. District Court
                          P.O. Box 835
24                    Charleston, SC  29402
                         843/723-2208
25

1                        I N D E X

2

3     WITNESS:  CHASE MOSLEY (CONTINUED)

4     Cross-Examination by Mr. Theos......................... 357

5

      WITNESS:  IVORY BROTHERS
6
      Direct Examination by Mr. Richardson.................... 382
7     Cross-Examination by Mr. Theos......................... 422
      Redirect Examination by Mr. Richardson................. 447
8

9     WITNESS:  CHARLES YOUMANS

10    Direct Examination by Mr. Phillips..................... 457
      Cross-Examination by Mr. Theos........................ 462
11

12

13

14

15

16

17    EXHIBITS:                    Received in Evidence

18    Defendant's Exhibit 1              379

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. THEOS:

3    Q.  Mr. Mosley, you've never met me.

4    A.  No.

5    Q.  You've never spoken with anybody in my office before?

6    A.  No.

7    Q.  Now, you sold cocaine to an informant, correct?

8    A.  Yes.

9    Q.  And that's what led to your arrest related to this

10   indictment, correct?

11   A.  Yes.

12   Q.  And the source of that cocaine was Michael Williams, as

13   you previously said, correct?

14   A.  Yes.

15   Q.  It was not Martin Ballard, correct?

16   A.  Correct.

17   Q.  Michael Williams was the source of your cocaine, correct?

18   A.  At that time.

19   Q.  And as a result of that arrest, which was brought about

20   based upon that sale to the informant, you agreed to cooperate

21   with law enforcement, did you not?

22   A.  Correct.

23   Q.  All right.  You signed a proffer agreement, I believe it's

24   marked as 10 D, it was shown to you before, I can show it to

25   you again, if you want me to, if you don't recall, but you

1  signed a proffer agreement on December the 3rd of 2013,

2  correct?

3  A.  On when?

4  Q.  December the 3rd of 2013 you signed a proffer agreement,

5  correct?

6  A.  I don't think it was December the 3rd.

7         THE COURT:  Why don't you show it to him.

8         MR. THEOS:  I will.

9  Q.  I misspoke, December the 30th, 2013.  This is a copy of

10  that proffer agreement, is it not?

11  A.  Yes.

12  Q.  And if you just look at the last page and confirm that

13  that's your signature.

14  A.  Yes.

15  Q.  Okay.  So on December the 30th of 2013, you signed this

16  proffer agreement, correct?

17  A.  Yes.

18  Q.  And this has previously been marked as Government's

19  Exhibit 10 D, correct?  Is that correct?

20  A.  Yes.

21  Q.  Now, at that point in time you knew you were in trouble,

22  right?

23  A.  Correct.

24  Q.  You knew you needed to do whatever was necessary in order

25  to get out of that trouble, or minimize, minimize the damages

CHASE MOSLEY – CROSS-EXAMINATION

1    to you.

2    A.   Yes.   I knew if I was truthful that it would benefit me,

3    yes.

4    Q.   You knew you needed to cooperate and help yourself, right?

5    A.   Correct.

6    Q.   And you also needed and wanted to cooperate to help your

7    family that you've talked so much about, correct?

8    A.   Correct.

9    Q.   You didn't want them to be adversely affected by your drug

10   dealing, did you?

11   A.   No.

12   Q.   So as a result of that, your concerns regarding what you

13   had done and what you had been arrested for, you agreed to

14   talk with DEA, correct?

15   A.   Correct.

16   Q.   You agreed to tell them what they wanted to hear, did you

17   not?

18   A.   I agreed to tell them the truth.

19   Q.   Well, on January the 3rd of 2014, you had your proffer

20   interview, correct?

21   A.   Correct.

22   Q.   Your lawyer was present?

23   A.   Yes.

24   Q.   And DEA and the agents that were there made it clear to

25   you that they were investigating Martin Ballard, did they not?

1   A. Yes.

2   Q. And they made it clear to you that they wanted to hear

3   from you regarding Martin Ballard, correct?

4   A. Correct.

5   Q. And Martin Ballard was the focus of what they were seeking

6   from you, correct?

7   A. Yes.

8   Q. They didn't care about anybody else, they wanted

9   information from you related to Martin Ballard. Right?

10   A. Yes.

11        THE COURT: You asked him that four times.

12   BY MR. THEOS:

13   Q. In an effort to -- an ongoing effort to help yourself, you

14   told them what they wanted to hear, did you not?

15   A. I told them the truth.

16   Q. You told them things about Martin Ballard that really

17   weren't true, didn't you?

18   A. I told them that I did the --

19   Q. You told them things about Martin Ballard that you knew

20   you didn't have any evidence of and couldn't corroborate.

21   Correct?

22   A. As far as what?

23   Q. You didn't have any physical evidence, you didn't have any

24   documents, you didn't have any records of any sort to support

25   or corroborate what you were telling them with Martin Ballard,

CHASE MOSLEY - CROSS-EXAMINATION

1  did you?

2  A.  No, I just told them the truth.

3  Q.  In other words, you told them things about Martin that you

4  knew Martin couldn't disprove, because it's impossible to

5  prove a negative, right?  Yes or no.

6        THE COURT:  That's a pretty hard question.  You'll

7  have to explain to him what impossible to prove a negative

8  means.

9  Q.  Do you agree with me that it's not possible to prove a

10  negative?

11  A.  Break that out again?

12  Q.  All right.  If somebody claims that you did something two

13  years ago or three years ago, and they don't have any evidence

14  that you did it except their word, then is it possible for you

15  to disprove what they claim, other than just saying no, I

16  didn't do it?

17  A.  No.

18  Q.  So when I say it's impossible to prove a negative, that's

19  what I mean.  It was impossible for Martin to disprove what

20  you're saying, because there was no evidence to support what

21  you were saying, correct?

22  A.  Yes.

23  Q.  All right.  Now, you're a drug dealer, right?

24  A.  Yes.

25  Q.  And you've been a drug dealer since 2009, at least?

1  Right?

2  A.  Correct.

3  Q.  All right.  You never saw Martin Ballard buy any cocaine,

4  did you?

5  A.  No.

6  Q.  You never saw Martin Ballard have any dealings with Ivory

7  Brothers, did you?

8  A.  No.

9  Q.  You never saw Martin Ballard sell cocaine to anybody else,

10  did you?

11  A.  Not personally, no.

12  Q.  You never heard Martin Ballard have any dealings with

13  Ivory Brothers, never overheard him speaking with Ivory

14  Brothers about drugs, did you?

15  A.  I don't know Ivory Brothers like that, I don't know their

16  relationship.

17  Q.  You don't know Mr. Brothers?

18  A.  Not besides the case.

19  Q.  Other than seeing him at the various court hearings and

20  docket soundings we've had, you had never seen Mr. Brothers

21  before that?

22  A.  I don't know him, no, sir.

23  Q.  Now, you never -- you know who all is in the indictment?

24  Have you had a chance to look at it?

25  A.  Yes.

CHASE MOSLEY – CROSS-EXAMINATION

1   Q.  I'm going to show it to you and I'm going to ask you a

2   couple questions regarding that indictment.

3   A.  Okay.

4           MR. THEOS:  One second, Your Honor.

5       (Brief interruption in proceedings.)

6   Q.  I'm going to ask you a few questions about that

7   superseding indictment, which is the second indictment in the

8   case.

9   A.  Um-hum.

10  Q.  And it's my understanding that it is that indictment that

11  you've entered a guilty plea to?  Is that right?

12  A.  Say that again?

13  Q.  It's my understanding that it's that second indictment

14  that you have entered a guilty plea to.

15  A.  Yes.

16  Q.  Okay.  You already said you didn't know or have any

17  dealings with Ivory Brothers, correct?

18  A.  Correct.

19  Q.  And you also had no dealings with Cedrick Edwards,

20  correct?

21  A.  No, I don't know who that is.

22  Q.  You had no dealings with Jonathan Edwards, correct?

23  A.  No.

24  Q.  You had no dealings -- when I say dealings, I mean drug

25  dealings.

CHASE MOSLEY – CROSS-EXAMINATION

1    A.   Right.

2    Q.   You had no dealings with Joey Charles, correct?

3    A.   Correct.  No.

4    Q.   You had no dealings with Tiffany Elliott, correct?

5    A.   Right.

6    Q.   You had no dealings with Paul Braxton?

7    A.   No.

8    Q.   You had no dealings with Edward Bryant?

9    A.   No.

10   Q.   You had no dealings with Brian Davis?

11   A.   No.

12   Q.   You had no dealings with Rocky Creel?

13   A.   No.

14   Q.   You had no dealings with Elijah Deal?

15   A.   No.

16   Q.   You had no dealings with Gerwron Lingard, correct?

17   A.   No.

18   Q.   You had no dealings with Jerry Rivers?

19   A.   No.

20   Q.   No dealings with Charles Youmans?

21   A.   No.

22   Q.   No dealings with Norman Robinson?

23   A.   No.

24   Q.   No dealings with Yvette Renee Calvins?

25            THE COURT:  Excuse me.  You're answering yes to some

1    and no to some.

2    A.  Oh, no.

3    Q.  You had no dealings with Steven -- I'm sorry -- so just to

4    make sure the record is clear and we all understand, you had

5    no drug dealings with any of those individuals that I just

6    named out of the indictment, correct?

7    A.  Correct.  No, I haven't, no dealings with them.

8    Q.  No drug dealings?

9    A.  No.

10   Q.  Now, you testified, I believe you testified earlier that

11   you sold approximately an ounce of cocaine per week from July

12   of 2009 through March of 2012.

13   A.  Yes.

14   Q.  So if my math is correct, that adds up to just over

15   five kilos of cocaine that you sold during that time frame,

16   correct?

17   A.  Correct, I couldn't do the math, but --

18   Q.  If we assumed --

19   A.  Yeah.

20   Q.  -- that my math is correct?  It would amount to a little

21   over five kilos of cocaine during that time frame?

22   A.  I haven't done the math.

23   Q.  All right.  Now, because of the amount of drugs that you

24   sold during that time frame, you knew that your sentence, your

25   sentence would have been very very severe, you would have been

1   looking at a long prison sentence, correct?

2   A.  Correct.

3   Q.  And unless you cooperated and told the DEA agents what

4   they wanted to hear, you would be sentenced to a long prison

5   sentence, correct?

6   A.  Yes, I had to tell the truth.

7   Q.  Now, we heard what you testified to yesterday regarding

8   what you told DEA about Martin Ballard.  We heard that.  But

9   after you told the DEA that, at that debriefing that you had

10  with them, you began to have second thoughts about it, did you

11  not?

12  A.  No.

13  Q.  You felt badly about it, didn't you?

14  A.  No.

15  Q.  And isn't that the reason you went to the Charleston

16  County detention center on January the 8th of 2014, you went

17  there about 10:00 o'clock, 10:15 in the morning, didn't you?

18  A.  No.  On what day?

19  Q.  On January the 8th of 2014.

20  A.  No, that was before.

21  Q.  Didn't you go to the jail, to the Charleston County

22  detention center a few days after you met with DEA?

23  A.  What day is that on?

24  Q.  I'm sorry?

25  A.  What date?  A day?

CHASE MOSLEY – CROSS-EXAMINATION

1    Q.  Well, you signed your proffer agreement on 12:30, you were

2    interviewed on January the 3rd of 2014.  So within a few days

3    of January the 3rd of 2014, when you gave your interview and

4    gave information to DEA --

5              THE COURT:  Go ahead.

6    Q.  Within a few days of going to DEA and providing them your

7    statement and all of that information, you went to the

8    Charleston County detention center to meet with Martin, did

9    you not?

10   A.  Correct.

11   Q.  And the reason you went to meet with him is because you

12   wanted to tell him what you told DEA, correct?

13   A.  No.

14   Q.  And you wanted to apologize to him for screwing things up,

15   didn't you?

16   A.  No.

17   Q.  You told him that the reason you met with him was in order

18   to help yourself because of the trouble you were in, didn't

19   you?

20   A.  No.

21   Q.  You told him you needed to do that because you wanted to

22   not only help yourself but help your family, correct?

23   A.  No.

24   Q.  You told him that the things that you had told DEA were

25   not true, that you had to do it, didn't you?

CHASE MOSLEY - CROSS-EXAMINATION

1  A.  No.

2  Q.  And you told him that the reason you told them those

3  things is because DEA again wanted to hear those specific

4  things about Martin, correct?

5  A.  No.

6  Q.  Didn't you tell him you were sorry?

7  A.  No.  Not that day.

8  Q.  Didn't you tell him that you had screwed up?  You may have

9  used another term for screwed up, but didn't you tell him you

10  had screwed up?

11  A.  I told him that over the phone, I believe.

12  Q.  And that would have been after that meeting with him at

13  the jail?

14  A.  Yes.

15  Q.  When you told him that over the phone?

16  A.  Um-hum.

17  Q.  And you told him you were also, you were also going to

18  straighten things out and make things right, didn't you?

19  A.  Yes.

20  Q.  And you told him that because you had lied to DEA and told

21  them things about Martin that weren't true.  Isn't that so?

22  A.  No.  No.

23  Q.  Now, Martin did call you several times, and we heard all

24  those phone calls, right?

25  A.  Um-hum.

1   Q.  And he did it through someone else, because I guess he

2   couldn't call you directly?  I don't know that, but did he

3   ever call you directly?

4   A.  No.

5   Q.  So you spoke with Martin by way of a three-way phone call?

6   A.  Yes.

7   Q.  And when he called you -- and again, he called you several

8   times.  When he called you, he was calling you in order to

9   follow up with you to make sure that you did what you -- that

10  you were going to do what you say you were going to do,

11  correct?

12  A.  He followed up with me that that's what he wanted me to do

13  at the time.

14  Q.  Well, didn't you tell him you were going to do that?

15  A.  No, I did not want to.

16  Q.  I'm sorry?

17  A.  I say I did not want to.

18  Q.  But you told him you were going to.

19  A.  Yes, I was pressured, yes.

20  Q.  And you -- well, Martin was in a detention center, so

21  there was no physical pressure from Martin to do anything, was

22  there?

23  A.  No.

24  Q.  But you nonetheless told Martin and continued to tell him

25  that you were going to straighten things out and you were

1  going to go back to DEA, correct?

2  A.  Yes.  I did tell him that.

3  Q.  And the reason he called you so many times was in order to

4  find out if you were going to do what you claimed you were

5  going to do, make things right, straighten things out with

6  DEA.  Correct?

7  A.  That's what he wanted me to do.

8  Q.  And didn't he express that in those phone calls?  There

9  was a lot of profanity and a lot of other stuff that was

10  talked about, but the purpose of his calls, was it not, to

11  make sure that you were going to do what you promised him you

12  would do?

13  A.  He wanted me to tell them that I lied, yes.

14  Q.  Well, he was upset and he was mad with you, wasn't he?

15  A.  Yes.

16  Q.  And he was upset and he was mad because of what you told

17  DEA, correct?

18  A.  I told him the truth.

19  Q.  And he was upset and mad because you had told DEA things

20  that weren't true.

21  A.  No, what I told them was true.

22  Q.  Now, ultimately you did write a letter, did you not?

23  A.  Yes, I did.

24  Q.  And you've seen that letter, it's a handwritten letter.

25  A.  Yes, it is.

CHASE MOSLEY - CROSS-EXAMINATION

1  Q.  You wrote that letter on January 19th of 2014.

2  A.  I can't remember that exact date, but -- I'm looking --

3  that's the date it was notarized?  I don't know whoever did

4  that, so I can't tell you that.

5  Q.  So you wrote it on approximately that date, is that right?

6  A.  Before, I guess.

7  Q.  You would have had to have write it before, for it to be

8  witnessed afterwards, correct?

9  A.  Yes.

10 Q.  Now, the reason -- and you wrote that letter in January of

11 2014, which was about a year after your meeting with DEA, is

12 that right?

13 A.  No.  What did you say?

14 Q.  I'm sorry, it was a couple weeks after your meeting with

15 DEA.

16 A.  This letter?

17 Q.  Yeah.  If you met with DEA on January the 3rd of 2014, you

18 wrote this letter within a couple weeks.

19 A.  Correct.

20 Q.  All right.  Now, in that letter, can you just read it?

21 A.  This is changed.  "Those people wanted me to tell things

22 on you so I lied and made things up to help myself under that

23 pressure.  I never dealt no drugs but they think I did because

24 of the situation afterward."

25 Q.  Keep on.

1  A.  "I love you and I'm here for you."

2  Q.  Now, you wrote that letter on or about January the 19th,

3  in an effort to make things right, did you not?

4  A.  Yes, for the safety of my family.

5  Q.  And you wrote that letter because you felt bad and you

6  felt guilty about what you had told the DEA about Martin, did

7  you not?

8  A.  No, I didn't feel guilty.

9  Q.  Well, but you wanted to make things right so you wrote the

10 letter, correct?

11 A.  No, I wrote the letter for my family's safety.  That's why

12 I wrote letter.

13 Q.  Let's talk about your family's safety.  Nobody has

14 threatened your family in any way, have they?

15 A.  No, but --

16 Q.  And nobody has --

17      THE COURT:  Wait a minute.  But what?  You started --

18 Did you have more to say?

19 A.  No.

20      THE COURT:  All right.

21 BY MR. THEOS:

22 Q.  Nobody physically forced you to write that letter, did

23 they?

24 A.  No one physically wrote it, but someone was at the -- you

25 know, he had Anthony Davis at my house, so at that time I --

1   you know, I just felt uncomfortable about the whole situation.

2   Q.  Well, Anthony Davis had been to your house before, had he

3   not?

4   A.  Well, when that happened, that was when everything just --

5   you know, he was popping up here, he would call or whatever,

6   and then from there on.

7   Q.  But Anthony Davis -- and Martin Ballard, for that

8   matter -- had both been to your house many times before this,

9   correct?

10  A.  Ballard has been to my house, Davis hasn't.

11  Q.  Davis had never been to your house before?

12  A.  No.  Not that I can recall.

13  Q.  Nobody put a gun to your head to write this letter?

14  A.  No, nobody put a gun to my head.

15  Q.  Then that was in January of 2014.  Then about a year

16  later, about a year later you then began to have second

17  thoughts again, did you not?  About that letter?  And the

18  impact would it have on you and your family?

19  A.  No, I don't understand what you're saying.

20  Q.  Well, it wasn't until about a year later that you went to

21  the U.S. Attorney's office and/or to DEA and talked with them

22  about the letter that you had written a year before.

23  A.  No, this -- this was in the same year -- month afterwards.

24  Q.  Our records, our records that we've been provided show

25  that on February the 18th --

1    MR. PHILLIPS:  Your Honor, we object.  It's not about

2  those records.  He needs to --

3    MR. THEOS:  I'll rephrase the question.

4  Q.  On February the 18th of 2015, just couple months ago,

5  that's when you first went back, went to DEA and told them

6  that you had written this letter.  Taking back your statement,

7  correct?

8  A.  No.

9  Q.  What -- tell us when you went back to DEA and told them

10  about the letter.

11  A.  I told them that back in 2000 -- it was March -- March of

12  2014.  Last year.

13    MR. THEOS:  Your Honor, can you just bear with me for

14  a second, please?

15    THE COURT:  Yes, sir.

16    (Discussion held off the record.)

17  BY MR. THEOS:

18  Q.  In preparation for your testimony today, how many times

19  would you say you met with the U.S. Attorney or DEA agents?

20  A.  I guess about three, four.

21  Q.  And those would have been within the last couple of

22  months?

23  A.  Over the period -- well, over a year and a half or

24  whatever.

25  Q.  Now, you didn't go back to DEA and tell them about this

1  letter, did you?  They actually -- you received a phone

2  call -- and they questioned you about that letter, correct?

3  A.  No, I told them about the letter.  I met back with them

4  and I told them about the letter.  They didn't know nothing

5  about the letter.

6  Q.  So you told the DEA about Mr. Ballard, then you wrote a

7  letter stating that it wasn't true, and then -- and now you're

8  stating that the letter isn't true, and your first statement

9  was true.

10  A.  What I told them.

11  Q.  So now you changed your story three times about Martin

12  Ballard, correct?

13  A.  No, my story is still the same.  In the letter I lied in

14  the letter.  That was the only lie I told.

15  Q.  Well, you signed a plea agreement on January the 8th of

16  2014, correct?

17  A.  I believe somewhere around that date.

18  Q.  All right.  And you agreed to offer evidence, correct?

19  And testify?

20  A.  Correct.

21  Q.  You agreed to cooperate.

22  A.  Yes.

23  Q.  You agreed to provide substantial assistance to the

24  Government, correct?

25  A.  Yes.

1  Q.  You agreed, in other words, to everything you could to

2  help yourself, correct?

3  A.  Correct.

4  Q.  To help your family?

5  A.  Tell the truth, yes.

6  Q.  And to help in the prosecution of Martin Ballard, correct?

7  A.  Yes.

8  Q.  Now, you agreed to be truthful, did you not?

9  A.  Yes.

10  Q.  And you agreed within that plea agreement to take a

11  polygraph test if the Government required one, correct?

12  A.  Correct.

13  Q.  Government never asked you to take a polygraph test, did

14  they?

15  A.  No, they mentioned it, but I never took one, no.

16  Q.  So the Government never asked you to take a polygraph test

17  in order to try to determine when you were telling the truth

18  and when you were lying about Martin Ballard, since you had

19  written -- since you had told two different stories, correct?

20  A.  No.  I just told one story.  And I told them about the

21  letter.

22  Q.  Well, you pled guilty, right?

23  A.  You see it in front of you, right?

24  Q.  Excuse me?

25  A.  I say, you see it in front of you.  You looking at it,

1  right?  Yes.

2  Q.  I'm looking at my notes.

3  A.  Yes.

4  Q.  When did you plead guilty?

5          THE COURT:  Is the plea agreement in evidence?

6          MR. THEOS:  The plea agreement is in evidence.  The

7  plea agreement was entered into on January the 8th, 2014, but

8  I'm asking Mr. Mosley when he pled guilty.

9          THE COURT:  The plea agreement wasn't when he pled

10 guilty?

11         MR. THEOS:  I don't know, Judge.  Oftentimes plea

12 agreements are signed at one point and then the pleas are

13 entered into at another, so I'm asking Mr. Mosley.

14         THE COURT:  I don't know, did you sign more than one

15 plea agreement?

16 A.  No, I just signed one plea agreement.

17         THE COURT:  And in that plea agreement were you

18 questioned by the Court about your guilt or innocence?

19 A.  I can't remember at this time.  I don't understand what

20 you're asking me.

21         THE COURT:  Sir?

22 A.  I can't understand what you're asking me.

23         THE COURT:  I said when you signed the plea

24 agreement, did you then come to court and before the judge,

25 admit what you had done and answer questions about your guilt?

1   A.  I think after I signed the plea agreement.

2           THE COURT:  Yes.

3   A.  Yes.

4           THE COURT:  How long afterwards; do you recall?

5   A.  Before I came to court?

6           THE COURT:  Yes.

7   A.  I guess about a month?

8           THE COURT:  All right, sir.  Go ahead.

9           MR. THEOS:  Thank you, Judge.

10  BY MR. THEOS:

11  Q.  Did you plead guilty?

12  A.  Right.

13  Q.  And I assume you pled guilty before Judge Blatt?

14  A.  Yes.

15  Q.  You're awaiting sentencing, correct?

16  A.  Correct.

17  Q.  And your sentence depends on your continued cooperation,

18  correct?

19  A.  Yes.

20  Q.  And your sentence depends and hinges upon your testimony

21  against Martin Ballard, does it not?

22  A.  Yes.

23  Q.  Without your testimony against Martin Ballard, your

24  sentence would be much much higher, would it not?

25  A.  I assume so, yes.

1          MR. THEOS:  I don't have any other questions, Judge.

2          THE COURT:  All right, sir.

3          MR. PHILLIPS:  One moment, Your Honor.

4      (Discussion held off the record.)

5          MR. PHILLIPS:  No questions, Your Honor.

6          THE COURT:  Anything else?

7          MR. THEOS:  Nothing, Judge.

8          THE COURT:  All right.  Then you may be excused.

9  Thank you.

10         MR. RICHARDSON:  Your Honor, the Government calls

11 Ivory Brothers.

12         THE COURT:  All right, sir.

13         MR. THEOS:  Your Honor, while we have a very short

14 break, yesterday we talked about the introduction of Norman

15 Robinson's rap sheet, as you recall, his criminal record.  And

16 it's been marked as Defendant's Exhibit 1, and at this time

17 I'd move it into evidence, please.

18         MR. RICHARDSON:  Without objection.

19         THE COURT:  All right.

20     (Defendant's Exhibit 1 received.)

21         MR. RICHARDSON:  Your Honor, apparently he is still

22 en route.  For security reasons, they didn't have him sitting

23 right outside.  I believe he is en route, he should be here in

24 just a minute.

25         THE COURT:  All right, sir.

1          MR. RICHARDSON:  Your Honor, while we have a moment

2     of down time waiting on Mr. Brothers to get here, we do have a

3     number of stipulations that were entered into in this case,

4     and if it pleases the Court, we'd tell you just briefly --

5     we're not going to read them, but we'll tell you just briefly

6     what those are and ask the Court to admit those stipulations

7     at this time.

8          THE COURT:  All right.  They've been agreed upon by

9     both parties?

10          MR. RICHARDSON:  Your Honor, they have been agreed

11     upon by both parties.  They have been signed both by the

12     Government, by defense counsel, Mr. Theos, as well as we had

13     the defendant, Mr. Ballard, sign them as well.

14          THE COURT:  All right, sir.

15          MR. RICHARDSON:  Your Honor, those stipulations,

16     stipulation 1 A is a drug analysis and chain of custody

17     stipulation; 1 B is a stipulation to authenticity of the Title

18     III wiretaps that you've been hearing; 1 C is a stipulation

19     regarding gunshot residue and swabs, we'll hear more about

20     that either later this afternoon or Monday; 1 D is a

21     stipulation regarding ballistics on two firearms that were

22     used in the shooting of Mr. Brothers; 1 E is a stipulation

23     that the jail inmate call system and cellular telephones are

24     facilities of interstate commerce which is relevant to the

25     murder for hire counts in this case; 1 F regards the

1    admissibility of a number of financial institution records,

2    the bank records and the like, they're authentic; 1 G is the

3    similar authenticity with respect to telephone records for a

4    number of cellular telephones, that those records are

5    admissible, they've already been admitted; 1 H is the

6    authenticity of the jail calls, you've been hearing a number

7    of those played.

8         THE COURT:  Why don't you just give me the list and

9    let me take a look at it.

10        MR. RICHARDSON:  I can do that, Your Honor.  I'm

11   almost done, if you want --

12        THE COURT:  If you're almost done.

13        MR. RICHARDSON:  We're waiting on him anyway.  It's

14   on the witness and exhibit list what we provided to Your Honor

15   as Government's Exhibit 1.  And so the last two are the GPS

16   data as well as the fingerprint analysis, that's 1 J and 1 K.

17   And that's the extent of them, Your Honor.

18        THE COURT:  All right, sir.

19        MR. RICHARDSON:  So we'd move to admit those

20   stipulations at this time.

21        THE COURT:  Any objection?

22        MR. THEOS:  No, sir, we previously stipulated, Judge.

23        THE COURT:  Mr. Richardson, do you know what the

24   meanings of en route in this particular instance are?  Are

25   they in the building or is it Charleston County jail?

1        MR. RICHARDSON:  No, he's not in Charleston County

2   jail, Your Honor.  I think it's probably five minutes.  I'm

3   not certain exactly, we had asked him to be here at 10:30.

4   And he was with law enforcement this morning about 9:30.  And

5   so we're just in the process of getting him here.  I

6   believe -- I thought that might be him.  I think it ought to

7   be in just a few minutes.  He was less than a mile away.

8        THE COURT:  En route can be anyplace.

9        MR. RICHARDSON:  I understand.

10       THE COURT:  That's all right, if you think he's right

11  close by.

12       MR. RICHARDSON:  He is right close by, Your Honor, at

13  9:30 he was on Meeting Street awaiting arriving here, and he

14  was scheduled to be here at 10:30.  We missed that just a

15  little bit, but I think he ought to be here in just a minute.

16       THE COURT:  All right, sir.

17     (Brief interruption in proceedings.)

18       THE CLERK:  State your name for the record.

19  A.  Ivory Brothers.

20     IVORY BROTHERS, a witness called by the Government, first

21  having been duly sworn, testified as follows:

22                       DIRECT EXAMINATION

23  BY MR. RICHARDSON:

24  Q.  Morning, Mr. Brothers.

25  A.  How are you doing.

1   Q.  I'm good.  Tell me where you were born.

2   A.  Walterboro, South Carolina.

3   Q.  Did you graduate from high school there?

4   A.  No.

5   Q.  What did you do when you dropped out?

6   A.  Started working.

7   Q.  Who did you work with?

8   A.  Rogers and Sons Construction and different companies.

9   Q.  And I'm going to just sort of get into the meat of what

10  we're talking about.  We're not going to spend a lot of time

11  on your background.

12  A.  All right.

13  Q.  When were you arrested in this case?

14  A.  March 2012.

15  Q.  Prior to being arrested in March 2012, have you ever been

16  convicted of any felony offenses?

17  A.  No.

18  Q.  And when you were arrested in March of 2012, did you get

19  out on bond?

20  A.  Yes.

21  Q.  And since you've been out on bond, what type of work have

22  you done?

23  A.  Still doing construction.

24          THE COURT:  Doing what?  What kind of work have you

25  done?

1   A.  Construction.

2   Q.  I want to spend a little bit of time talking to you about

3   how you got into this drug business, and then talk to you a

4   little bit about your dealings with Mr. Ballard, all right?

5   A.  All right.

6   Q.  When did you first start selling drugs?

7   A.  About 2008.

8   Q.  And prior to selling drugs, did you use drugs?

9   A.  No.

10  Q.  Did you use marijuana?

11  A.  Yeah, I used marijuana.

12  Q.  Did you ever use cocaine?

13  A.  No.

14  Q.  Why did you not use cocaine?

15  A.  Because I know what it does to you.

16  Q.  What does it do to you?

17  A.  Mess your life up.

18  Q.  Okay.  Do you know the defendant, Martin Ballard?

19  A.  Yeah.

20  Q.  Have you ever been with Mr. Ballard when he used cocaine?

21  A.  No.

22  Q.  Have you ever hear him talk about using cocaine?

23  A.  No, I never heard him talk about it.

24  Q.  So backing up to sort of around the 2008 time frame, how

25  did you first start getting drugs to sell?  Where did you

1  start going?

2  A.  Started going to St. George, different areas.

3  Q.  Okay.  And after St. George, who were you getting from in

4  St. George?

5  A.  Just random guys, guys I worked with.

6  Q.  Construction guys?

7  A.  Yeah.

8  Q.  What kind of weights were you getting when you first start

9  buying drugs?

10  A.  A little $50.

11  Q.  What does a little $50 mean?

12  A.  Fifty-dollar slab.

13  Q.  How much is a $50 slab of crack?

14  A.  A gram, gram and a half.

15  Q.  About a gram of crack?

16  A.  Yeah.

17  Q.  And then what would you do with that gram of crack

18  cocaine?

19  A.  Cut it up and try to sell it, double up.

20  Q.  You'd break it into smaller pieces?

21  A.  Yeah.

22  Q.  And then you'd sell those smaller pieces to people that

23  were using them?

24  A.  Yeah.

25  Q.  Did there come a time when you started dealing in larger

1  weights of cocaine?

2  A.  Yeah, I did.

3  Q.  And approximately when was that?

4  A.  When my cousin moved on Burr Hill.

5  Q.  And when your cousin moved over to Burr Hill, who did you

6  get introduced to?

7  A.  Mr. Ballard.

8  Q.  And tell me about the first time that you had any drug

9  dealings with Mr. Ballard.

10  A.  Well, I went -- I was trying to spend like $200, and

11  everybody over there told me that he had it.  So --

12  Q.  You were trying to spend $200 to do what?

13  A.  Buy some crack.

14  Q.  And do you remember particularly anybody that told you to

15  go to Mr. Ballard?

16  A.  Yeah, Mickey Limehouse; he's deceased right now.

17  Q.  And how did you know Mr. Limehouse?

18  A.  I ain't know him, I just met him because my cousin stayed

19  over there.

20  Q.  Okay.  And tell me the first time you went over to get

21  $200 of crack cocaine from Mr. Ballard, where did you go?

22  A.  To his house on Burr Hill Road.

23  Q.  Okay.  And did you deal directly with Mr. Ballard that

24  first time?

25  A.  No, I went down there and somebody went in the house for

1    me.

2    Q.  Okay.  And after that first dealing -- And when was this,

3    what year was this approximately?

4    A.  I left almost end of 2008, close 2009.

5    Q.  And after, after that first deal, did you begin dealing

6    with Mr. Ballard directly?

7    A.  Yeah, eventually I did.

8    Q.  And how long did you -- that first time when you first

9    started dealing with him 2008, how long did you deal with

10   Mr. Ballard?

11   A.  All the way up sometime in like the middle part of 2009.

12   Q.  And what happened in the middle of 2009 that caused you to

13   stop dealing with Mr. Ballard?

14   A.  I was at a gas station in Cottageville, and some of his

15   family members is up there, and the police ran up on my car,

16   jumped up in my car and they went back and told him that it

17   must be -- I wasn't right.  Maybe I was police.

18   Q.  All right.  So in the summer of 2009, word got around you

19   were cooperating with law enforcement?

20   A.  Yeah.

21   Q.  And after that word got around, why did Mr. Ballard stop

22   dealing with you?

23   A.  I guess he didn't trust me.

24   Q.  Time went by, did you have a chance to reconnect your drug

25   dealing activity with Mr. Ballard?

1    A.  Yeah, the early part of 2010.

2    Q.  And tell me how that happened, how did you run across

3    Mr. Ballard in the early part of 2010?

4    A.  My home boy, Eric Martin, took me down there one day.

5    Q.  When you say your friend Eric Martin took you down, where

6    did he take you?

7    A.  To Summerville, to the Bi-Lo.

8    Q.  To the Bi-Lo there in Summerville?

9    A.  (Witness nodded affirmatively.)

10   Q.  That's sort of right at Burr Hill Road and Old Orangeburg

11   Road?

12   A.  No, Orangeburg Road and whatever road that is.

13   Q.  It's right off Old Orangeburg Road?

14   A.  Yeah.

15   Q.  And why did Mr. Martin take you down to that Bi-Lo?  What

16   were y'all going to do?

17   A.  Make a drug deal.

18   Q.  What were you going to buy?

19   A.  Ounce of cocaine.

20   Q.  And who was driving?

21   A.  I was.

22   Q.  What were you driving?

23   A.  A Brown Cadillac.

24   Q.  Is that a Cadillac you'd been driving for some time?

25   A.  Yeah, I got it in 2010.

1  Q.  Tell me about what happened in the Bi-Lo parking lot, who

2  did you see Mr. Martin meet?

3  A.  He met with my home boy, Eric.

4  Q.  Mr. Martin -- Eric Martin, who did he meet with?

5  A.  He meet with Martin Ballard.

6  Q.  Okay.  And what did y'all obtain that day from

7  Mr. Ballard?

8  A.  Ounce of cocaine.

9  Q.  All right.  When was the next time that you had drug

10  dealings with Mr. Ballard?

11  A.  Probably sometime that week we went down there again.

12  Q.  And where did you go that second time?

13  A.  Back to the Bi-Lo.

14  Q.  And who did you meet with?

15  A.  Martin Ballard.

16  Q.  And what were you going to buy?

17  A.  Cocaine.

18  Q.  During that meeting, that second dealing, what

19  conversation did you have with Mr. Ballard?

20  A.  Well, basically my friend Eric was trying to charge me

21  high price.  So I told him, like hey, he trying to get extra

22  money.  So that's when he was like you can come straight

23  through me.  And Eric gave me his phone number, he told Eric

24  to give me his phone number and I got the number.

25  Q.  When you say that Eric was trying to tax you, what do you

1   mean by that, what role would Eric play?

2   A.   He played middleman.

3   Q.   And what does the middleman do in a drug deal?  What does

4   he get out of the drug deal?

5   A.   He got to put a tax on the drugs, make money.

6   Q.   When you say put tax on it, what do you mean?

7   A.   If it's a thousand, he charge 1100, 1200, making money.

8   Q.   After he got Mr. Ballard's telephone number, how did you

9   start contacting him to engage in drug deals?

10  A.   I called him myself.

11  Q.   The number that Eric gave you, did that number stay

12  consistent?  Did Mr. Ballard use that number over a long

13  period of time?

14  A.   No, not really.

15  Q.   Okay.  How often did Mr. Ballard change the phone number

16  that he was using to engage in drug dealings with you?

17  A.   Probably every two weeks, I don't know, whatever.

18  Q.   And what was your understanding as to why Mr. Ballard was

19  changing his phone every two weeks?

20  A.   Got to stay ahead of law enforcement.

21  Q.   When you would get cocaine from -- Let me ask you this

22  first.  When you're buying drugs from Mr. Ballard, were you

23  buying powder cocaine or crack cocaine?

24  A.   Buying powder.

25  Q.   Powder cocaine?

1    A.  Yeah.

2    Q.  When you were buying powder cocaine from Mr. Ballard,

3    would you pay for it up front or would you receive it on

4    credit?

5    A.  I paid for some.

6    Q.  Okay.  You'd pay for some; how would you get the rest?

7    A.  He let me get it on credit.  I owed him.

8    Q.  Okay.  What's a common term that you use for getting drugs

9    on credit?

10   A.  Front.

11   Q.  And tell me just briefly how does fronting work in the

12   drug business?

13   A.  You buy an ounce, they give you an ounce, you buy

14   two ounces, give you an ounce, whatever he got to give you.

15   Q.  And then how would you compensate that person for the

16   drugs that they gave you?

17   A.  Pay him later when I sell, come re-up.

18   Q.  After you sold the drugs, you then used that money to pay

19   off that debt?

20   A.  Yeah.

21   Q.  We talked a minute ago about middlemen.  Did you engage in

22   any middleman work as part of your drug dealings with

23   Mr. Ballard?

24   A.  That was one of my jobs.

25   Q.  Okay.  And tell me what you would do as part of being a

1    middleman on drug deals between Mr. Ballard and others.

2    A.  I go around and make orders and whatever they want.

3    Q.  Okay.  Orders of what?

4    A.  Cocaine.

5    Q.  And then once you got those orders from customers for

6    cocaine, what would you do?

7    A.  Put my price on it.

8    Q.  You'd add your little surcharge?

9    A.  Yeah.

10   Q.  And then what would you do with the orders in order to get

11   cocaine?

12   A.  Repeat that.

13   Q.  Once you got an order or orders for cocaine, who would you

14   call to get the cocaine?

15   A.  Called Mr. Ballard.

16   Q.  And how often did you do that, where you would middleman

17   orders from other drug dealers?

18   A.  Every day.  Sometimes two, three times out of the week.

19   But I usually go about every day for myself.  But I middleman

20   two or three days out of the week.

21   Q.  When you're middlemanning, what kind of quantities of

22   cocaine were you middlemanning for your customers from

23   Mr. Ballard as your supplier?

24   A.  One to three ounces.

25   Q.  And when you're middlemanning on every ounce that you'd

1  middleman, how much tax or how much surcharge would you add?

2  What was your profit on those ounces of cocaine?

3  A.  200 at least, nothing less than 200.

4  Q.  Two hundred dollars an ounce?

5  A.  Yeah.

6       THE COURT:  What does an ounce sell for?

7  A.  Ounce go from anywhere from 1000 to $1200.

8       THE COURT:  Twenty-eight grams in an ounce, aren't

9  there?

10  A.  That's right.

11  BY MR. RICHARDSON:

12  Q.  When you're doing this, were there certain weeks that were

13  busier than others?

14  A.  Yeah, some weeks.  First of the month is the busiest week.

15  Q.  Why is the first of the month the busiest week?

16  A.  Everybody got checks.

17  Q.  What about you mentioned a second ago that you also got

18  cocaine for yourself to distribute, not just the middleman,

19  but for you to distribute.

20  A.  Yeah.

21  Q.  Tell me about what you were doing in that regard.

22  A.  Well, I get ounce or ounce and a half for myself.

23  Q.  And what would you do -- who were you getting it from?

24  A.  From Mr. Ballard.

25  Q.  And what would you do with that powder cocaine when you

1   got it from Mr. Ballard?

2   A.  Go home and cook it.

3   Q.  And how often were you getting cocaine for yourself to

4   redistribute from Mr. Ballard?

5   A.  Out of a week, probably -- just about every day I go.  If

6   everything looked good, I go every day.  But -- most of the

7   times every other day.

8   Q.  When you would cook the powder cocaine into crack cocaine,

9   what would you then do with the crack cocaine?

10  A.  Cut it up, sell it.

11  Q.  And in doing that, when you'd cut it up and sell it in

12  smaller pieces, how much money could you make on a single

13  ounce of cocaine?

14  A.  I could make -- I could make $1000, whatever I paid for

15  it.  If I paid 12, I'd make that back plus double, about 2400.

16  Q.  So you'd be able to double your money if you broke it down

17  and sold it as smaller pieces of crack?

18  A.  Yeah.

19  Q.  Tell me, I'm going to talk just briefly about cooking

20  cocaine into crack cocaine.  Did you engage in cooking powder

21  cocaine into crack cocaine?

22  A.  Yeah.

23  Q.  And tell me just very briefly, I don't want details, tell

24  me briefly, how do you cook powder cocaine into crack cocaine?

25  A.  Baking soda, water, Pyrex jar.  Put it in a microwave

1   three minutes, you got crack.

2   Q.  And what about the quality of powder cocaine affects that

3   cooking process?

4   A.  Well, you got to have a pure cocaine.

5   Q.  And if you got pure cocaine, what does it do?

6   A.  Doubled up.

7   Q.  You use the term double up; what's that mean?

8   A.  Fourteen grams go to 28, 28 is double.  The numbers

9   double.

10  Q.  The weight?

11  A.  The weight doubles.

12  Q.  The weight doubles.  So if you put in 14 grams of powder

13  cocaine, if it's high quality you can get 28 grams of crack

14  cocaine?

15  A.  Yeah.

16  Q.  And why does that help you as a drug dealer, when you're

17  able to double the weight from the powder to the crack.

18  A.  Because I was able to do two for one.

19  Q.  What does cocaine that's high quality, what does it look

20  like?

21  A.  Like a bag of diamonds.

22  Q.  Like a bag of diamonds?

23  A.  Yeah.

24  Q.  What's the term that you use for that shimmery look?

25  A.  Fish scale.

1   Q.  Fish scales?  So it looks like a fish with scales on it?

2   A.  Yeah.

3   Q.  What happens when you have cocaine that's of low quality

4   or is impure and you try to cook that into crack cocaine, what

5   happens then?

6   A.  Ain't going to cook right.  Ain't going to double.

7   Q.  What happens to cocaine to make it impure or lower

8   quality?

9   A.  Step on it, cut it up, all kind of stuff.

10  Q.  You used the term step on it and cut it up.  What do you

11  mean by that?

12  A.  Probably recompress it.  All different type of tricks.

13  Q.  So they're adding something to it and recompress it?

14  A.  Yeah.  Basically.

15  Q.  Why do they recompress it back into that brick shape?

16  A.  So they can double up too.

17  Q.  When you were obtaining cocaine from Mr. Ballard to

18  redistribute as crack cocaine, what kind of packaging was

19  Mr. Ballard providing that cocaine to you in?

20  A.  Sandwich bag.

21  Q.  And what would you then do with that sandwich bag?  Would

22  you distribute that crack cocaine in the same bag?

23  A.  No.

24  Q.  What would you do with the cocaine when you got it from

25  Mr. Ballard, how would you then distributing it to your

1  customers?

2  A.  I put it in different bags.

3  Q.  How long -- you began dealing with Mr. Ballard the second

4  time in -- when in 2010?

5  A.  If I had to say, probably March.

6  Q.  Around March time frame?

7  A.  Yeah.

8  Q.  And how long did this continue?  We've been talking about

9  where you're getting cocaine for yourself and as a middleman,

10  multiple times a week, how long did that continue?

11  A.  Up until January 2012.

12  Q.  And what happened in January of 2012 that caused you to

13  stop dealing with Mr. Ballard?

14  A.  I got approached by the feds.

15  Q.  I'm going to come back to that getting approached by the

16  feds in January.  But from that point in time, did you deal

17  with Mr. Ballard any more after being approached by the feds?

18  A.  No.

19  Q.  All right.  When you were getting cocaine from

20  Mr. Ballard, where were you going to get it?

21  A.  Ancrum Lane or up on The Hill.  At his uncle cousin house.

22  Q.  What kind of cars would you see Mr. Ballard driving?

23  A.  I seen him in a dually pickup, dually pickup truck.

24  Q.  Dually pickup; what color was it?

25  A.  White.

1  Q.  And what other kind of cars did you see Mr. Ballard have?

2  A.  Gray Mercedes.

3  Q.  All right.  In your dealings with your customers, I want

4  to talk just briefly about that, when you were dealing with

5  your customers, what would you tell them about who your source

6  of supply was?

7  A.  I wouldn't tell them.

8  Q.  Why wouldn't you tell your customers who you were getting

9  cocaine from?

10  A.  That's just a rule I always go by, anybody try to go back,

11  they might try to --

12  Q.  When you say might go try to holler at them, what do you

13  mean by that?

14  A.  They might go try to make a purchase or --

15  Q.  Cut you out?

16  A.  Yeah, they can't cut me out.

17  Q.  And why would it be bad if they cut you out?

18  A.  Because I can't middleman no more.

19  Q.  And if you're not middlemanning, you're not doing what?

20  A.  Ain't making no money.

21  Q.  What would happen, what was your understanding of what

22  would happen if one of your customers showed up to

23  Mr. Ballard's house?

24  A.  They weren't going to get nothing.

25  Q.  And why not?

1    A.  He don't know them.

2    Q.  And why wouldn't you or other drug dealers, why wouldn't

3    you deal with people that you didn't know?

4    A.  Could be the police.

5    Q.  Those people could be working for law enforcement?

6    A.  Could be.

7    Q.  When, if ever, did your house get broken into?

8    A.  Yeah.

9    Q.  When was that?

10   A.  Late part -- early part 2011.

11   Q.  Is that during the time that you were dealing with

12   Mr. Ballard?

13   A.  Yeah.

14   Q.  Did you have discussions with Mr. Ballard about somebody

15   breaking into your house?

16   A.  Yeah.

17   Q.  Tell me what you told him and what Mr. Ballard told you.

18   A.  I told him somebody broke in my house, kicked the door in

19   or whatever.  They took a few items.  And he said, you know

20   who did it?  I like, no.  So if you do, I mean, I know people.

21   Q.  What did you understand Mr. Ballard to be telling you when

22   he said, "If you find out who did it, I know people."?

23   A.  Yeah, he know somebody who can take care of who broke in

24   my house.

25   Q.  When you say take care of who broke in your home, what do

1  you mean?

2  A.  Do whatever they got to do to them.  I mean, that's the

3  only assumption I got.

4  Q.  All right.  I'm going to play just a handful of calls for

5  you.  Have you had a chance to listen to the wiretaps in your

6  case?

7  A.  Yeah, I listened to them.

8  Q.  And there are a lot of them, aren't there?

9  A.  A lot.

10  Q.  I'm not going to play all of them for you, I'm just going

11  to play a handful of them, all right?  We're going to start

12  with Government's Exhibit 8 A.

13        MR. RICHARDSON:  Your Honor, this is in your binder,

14  but it will also be on your screen.

15        THE COURT:  All right, sir.

16     (Audio recording was played.)

17  BY MR. RICHARDSON:

18  Q.  Mr. Brothers, do you recognize those voices?

19  A.  Yes.

20  Q.  Who is that?

21  A.  That's me and Martin Ballard.

22  Q.  Did you have a chance to go over and review these

23  transcripts with me previously?

24  A.  Yeah.

25  Q.  And these are accurate transcripts?

1   A.  Yeah.

2   Q.  When Mr. Brothers here -- excuse me -- when Mr. Ballard

3   says, "Where you at on deck, 35 or 32," what's he referring

4   to?

5   A.  Money.

6   Q.  And what's that money going to be used for?

7   A.  Buy some more cocaine.

8   Q.  When you responded, "200 short but, I got 33 on deck,"

9   what are you telling him?

10   A.  Two hundred dollars short, but I got the other 3300.

11   Q.  What would $3300 buy you in the drug business?

12   A.  Three ounces.

13   Q.  Three ounces of what?

14   A.  Cocaine.

15   Q.  Mr. Ballard then goes on and says, "I'll let you owe me

16   another dollar."  What's he referring to there?

17   A.  When I go down there, I'm going to owe him another

18   thousand for what I'm going to get.

19      (Audio recording was played.)

20   Q.  Mr. Brothers, when Mr. Ballard tells you here, "Them boys

21   talking real foul about TK," what's that referring to?

22   A.  This guy from over there, Hardeeville somewhere.

23   Q.  What was his name?

24   A.  Tony Kitt.

25   Q.  And what is Mr. Ballard suggesting about Tony Kitt here?

1   A.  He got locked up, so people say he was snitching.

2   Q.  As a result of this information, would you have any

3   dealings with Mr. Kitt?

4   A.  No.

5       (Audio recording was played.)

6   Q.  Mr. Brothers, when Mr. Ballard's telling you here,

7   "There's so much bread, so much bread down there to get,"

8   what's he referring to.

9   A.  There's money down there.

10  Q.  And how would you be getting that money?

11  A.  Selling coke.

12  Q.  The reference here at the end where Mr. Ballard says,

13  "He's talking about them boys 14s and 28s," what's that a

14  reference to?

15  A.  Cocaine doubling.

16  Q.  So that's -- 14 is what unit?  What unit of measure are we

17  talking about there?

18  A.  Half ounce.

19  Q.  A half ounce is how many grams?

20  A.  Fourteen.

21  Q.  Fourteen grams.  And then what's happening to it when it's

22  cooked into crack cocaine?

23  A.  Doubling up.

24  Q.  Turning it into 28 grams?

25  A.  Yeah.

1    (Audio recording was played.)

2    Q.   Right here at the end of that call, it pulled down, but

3    the end of that call where you said that, "You waiting on that

4    other two," what's that a reference to?

5    A.   Waiting on the other $200.

6    Q.   And what did you need another $200 for?

7    A.   So I can put with the 33 and make 35.

8    Q.   All right.  And what were you going to do with that money?

9    A.   Buy cocaine with it.

10    Q.   Who were you buying it from?

11    A.   Martin Ballard.

12         MR. RICHARDSON:  Can we go to Exhibit B, Miss Baker.

13    (Audio recording was played.)

14    Q.   Government Exhibit 8 B is a call from August the 4th of

15    2011.  Mr. Ballard asked at the beginning, "How that thing

16    work out for you, Old G?"  What's that a reference to?

17    A.   Telling him how the cocaine worked out when I cooked it.

18    Q.   And where had you gotten the cocaine that you're talking

19    about from?

20    A.   From Martin Ballard.

21    Q.   If you go on there in discussing it, Mr. Ballard asked,

22    "Everything's looking good coming back," what's he asking?

23    A.   How it's coming back when I cook it.

24    Q.   What did you tell him there, "I got seven out them,"

25    what's that a reference to?

1    A.   I got seven cookies, seven circles out of it.

2    Q.   And how much crack is a cookie?  How many grams is in a

3    cookie of crack?

4    A.   Twenty-four grams, 25, better.

5    Q.   When we talk about a cookie, why do we call crack cocaine

6    cookies; what's that a reference to?

7    A.   Because it just look like a big cookie.

8    Q.   And why is that?  Why does it come out round and looking

9    like a big cookie?

10   A.   Because when you put it in Pyrex to cook it, that's the

11   shape.

12   Q.   Okay.  It fills out the bottom of a Pyrex jar, right?

13   A.   Yeah.

14   Q.   So if you got seven cookies of crack cocaine, that's

15   almost seven ounces of crack cocaine there, that's what you're

16   referring to?

17   A.   Yeah.

18   Q.   And how much powder cocaine would you have had to get from

19   Mr. Ballard in order to make seven cookies of crack cocaine?

20   A.   Three and a half ounces.

21        (Audio recording was played.)

22   Q.   Here, Mr. Ballard asked you, "So he happy."  What's that a

23   reference to?

24   A.   The dude I got the cocaine for.

25   Q.   Do you remember who you got the cocaine for?

1    A.  I don't know.

2    Q.  And when Mr. Ballard says here, "Them boys call you

3    Gucci," what's that a reference to?

4    A.  Like a slang name like for cooking cocaine.

5    Q.  And where does it come from?

6    A.  Come from a rapper.

7    Q.  What's the rapper's name?

8    A.  Gucci Man.

9    Q.  What does he sing about?

10   A.  Cooking cocaine.

11          MR. RICHARDSON:  Miss Baker, if we can go to

12   Government's Exhibit 8 C.  This is also on August the 4th, a

13   little bit later, about 25 minutes later on August the 4th.

14       (Audio recording was played.)

15   Q.  When you're telling him here you did a little 21 of those

16   shakes, what's that mean?

17   A.  Twenty-one grams of coke.

18   Q.  What are shakes, when you're talking about cocaine, what's

19   the shakes refer to?

20   A.  Like loose, it ain't rocks, it just like dust.

21   Q.  What's left in the bottom of the bag?

22   A.  Yeah, like real shaky.

23   Q.  And you asked him to guess what it went to.  What are you

24   saying there?

25   A.  Wanted me to guess what it went to, like guess how far I

1    took it.

2    Q.   When you say how far you took it, what do you mean?

3    A.   When I was cooking it.  How much left over.

4    Q.   How much the weight increased?

5    A.   Yeah.

6    Q.   When you said you took 21, you talking it went to 47,

7    what's that mean?

8    A.   More than double.

9    Q.   So that's 21 grams of powder cocaine that you turned into

10   how many grams of crack cocaine?

11   A.   Forty-seven grams.

12        MR. RICHARDSON:  Mr. Baker, if we can skip over to 8

13   G.  This is a call from August the 10th of 2011.

14        (Audio recording was played.)

15        MR. RICHARDSON:  I apologize, Your Honor, this is

16   apparently 8 E.  This is on August 10th of 2011.

17        (Audio recording was played.)

18   BY MR. RICHARDSON:

19   Q.   This is August the 10th.  What are you referring to here,

20   Mr. Brothers?

21   A.   I was supposed to go down there that night, but my little

22   boy swallowed a quarter.

23   Q.   What do you mean your boy swallowed a quarter?

24   A.   My little boy swallowed a quarter.

25   Q.   Okay.  And when you say you were supposed to go down that

1    night, what were you going down to do?

2    A.  Going to get some cocaine.

3         MR. RICHARDSON:  Beg the Court's indulgence, Your

4    Honor.  This is one we were playing a minute ago, I apologize

5    for that.  This is 8 G, this is later on the day of August the

6    10th.

7         (Audio recording was played.)

8    Q.  Mr. Ballard here asked you, "You going to need two or

9    three of them," what are you referring to?

10   A.  Two or three ounces of cocaine.

11   Q.  When you tell him you probably need three, what's that a

12   reference to?

13   A.  Three ounces of cocaine.

14        MR. RICHARDSON:  We go to 8 H.  This is from August

15   the 11th, the next day.

16        (Audio recording was played.)

17   Q.  In this call, Mr. Brothers, when you asked Mr. Ballard,

18   "That thing last night, that was something different," what

19   are you telling him there?

20   A.  It's different cocaine from the last time.

21   Q.  And how did you know it was different cocaine than he had

22   previously been supplying you?

23   A.  It wasn't cooking right.

24   Q.  Then you reference here, "I don't know them 21s like 30, I

25   just did a 20 and it did the 32."  What is 20 in that

1  sentence?

2  A.  Twenty grams of coke went to 32.

3  Q.  Thirty-two grams of what?

4  A.  Crack.

5  Q.  So it wasn't quite doubling when you cooked it, is that --

6  A.  No, it wasn't doing nothing.

7  Q.  What was that telling you with respect to the quality of

8  that cocaine?

9  A.  That's a low grade.

10  Q.  Somebody had stepped on it?

11  A.  Either that, or it's just -- it ain't cooking product.

12      (Audio recording was played.)

13  Q.  Mr. Ballard there is saying, "I know I done like a 12 to

14  22."  What's Mr. Ballard talking about doing?

15  A.  Cooking crack.

16  Q.  And what is Mr. Ballard saying he cooked, how much weight

17  and what did it turn into?

18  A.  Twelve grams of cocaine went to 22 grams of crack.

19      (Audio recording was played.)

20  Q.  What did you understand Mr. Ballard to be saying, when he

21  said, "I did one last night but I didn't have any fresh

22  bake."?  What's bake?  What's he talking about?

23  A.  Baking soda.

24  Q.  What happens when you don't have fresh baking soda and

25  you're trying to make crack cocaine?

1   A.  Ain't going to cook right.

2   Q.  When Mr. Ballard says, "I did one," what did you

3   understand that to be a reference to?

4   A.  He must have did -- must have put something in the Pyrex.

5   I don't know what weight, but he put something in there.  And

6   it came back crumbly.

7   Q.  What happens when crack cocaine comes back crumbly instead

8   of hard?

9   A.  Baking soda ain't no good.

10      (Audio recording was played.)

11  Q.  Mr. Brothers, Mr. Ballard says here, "I just got to fly

12  that one there real quick."  What's he saying?

13  A.  Got to get it off.  Bad cocaine, got to get rid of it.

14  Q.  And when you want to get rid of bad cocaine, how is

15  Mr. Ballard going to make it fly?  How is he going to move

16  that bad cocaine?

17  A.  Drop the price.

18          MR. RICHARDSON:  I'm going to go to 8 I.

19          THE COURT:  How many of these conversations do you

20  intend to play?

21          MR. RICHARDSON:  About two more, Your Honor.

22          THE COURT:  Good.

23          MR. RICHARDSON:  In fact, Your Honor, I think we just

24  went to one more.

25  BY MR. RICHARDSON:

1   Q.  Mr. Brothers, you've had a chance to listen to a number of

2   these other calls during the course of your review of

3   discovery.

4   A.  Yeah.

5   Q.  There are quite a few more calls that are like those?

6   A.  Plenty of them.

7   Q.  All right.  I'm going to move on then from the calls and

8   talk to you just a minute about when you were approached by

9   law enforcement in January of 2012; tell me what happened.

10  A.  Well, I was leaving out my yard and the cops got behind

11  me.  And basically told me -- the federal agents was parked

12  around the side of the road.  And the county cops talking

13  about, yeah, some guys want to talk to you or whatever.  And I

14  went and talked to them.  And they gave me a letter.

15          MR. RICHARDSON:  Can you put 10 G up, Miss Baker.

16  Q.  Is this the target letter that they gave you?

17  A.  Yeah.

18  Q.  What did you understand this letter to be telling you?

19  A.  I mean, it's telling me that they know something about me,

20  but I really didn't understand what was going on.

21  Q.  Okay.  Did you talk to the federal law enforcement

22  officers that day when they gave you this letter?

23  A.  Yeah.

24  Q.  Okay.

25  A.  They told me I had like 30 days to come down there,

1    something like that.

2    Q.  They gave you 30 days to think about it?

3    A.  (Witness nodded affirmatively.)

4    Q.  After you got the letter that day, who did you go talk to

5    about being approached by federal law enforcement?

6    A.  Martin Ballard.

7    Q.  When you approached Mr. Ballard, what did you tell him

8    about what had happened to you?

9    A.  Tell him feds pulled me over, gave me this letter.

10   Q.  And what did Mr. Ballard tell you?

11   A.  Don't go talk to them.

12   Q.  And what did you understand him to be telling you to do?

13   A.  Don't go talk to them.

14   Q.  Okay.  After you got this letter from the federal law

15   enforcement, did you deal with Mr. Ballard ever again?

16   A.  That was it.

17   Q.  Who else had heard about the feds getting involved in your

18   case?

19   A.  My whole town heard about it.

20   Q.  How long did that take?

21   A.  Ten minutes.

22   Q.  That's what small towns are, right?

23   A.  Bad news get around quick.

24   Q.  What did you do the next week?  With respect to that

25   letter.

1   A.   Nothing.

2   Q.   When did you go talk to law enforcement?

3   A.   It was the last day I had, and I just went down there.

4   Q.   Where did you go to talk to them?

5   A.   The Bank of America building right there on -- right off

6   the interstate.

7   Q.   The DEA's office?

8   A.   Yeah.

9   Q.   And why, Mr. Brothers, why did you decide to cooperate

10  with law enforcement and sit down and talk to them?

11  A.   Well, I went down there to see what's going on, but when I

12  got on their side there and heard my voice, they got my phone

13  tapped, they got me.  So it's either cooperate or go to jail.

14  I mean --

15  Q.   Were you able to hear your voice?  They played some of

16  those wiretap calls for you, didn't they?

17  A.   Thousands.

18  Q.   Were you able to recognize your voice on those calls?

19  A.   The first one, I recognized my voice.

20  Q.   Were you able to recognize Mr. Ballard's voice on those

21  calls?

22  A.   Yeah.

23  Q.   Were you able to recognize what y'all were talking about?

24  A.   Yeah.

25  Q.   In the calls that you listened to then and today, what

1  kind of dealings did you have with Mr. Ballard on the phone?

2  A.  Straight cocaine deals.

3  Q.  Did at some point, Mr. Brothers, you learn that your

4  cooperation had been made known to the defense lawyers?

5  A.  Yeah.

6  Q.  And after that occurred, did you come to a bar meeting

7  here in this courthouse?

8  A.  Yeah.

9  Q.  And during that bar meeting, or around the time of that

10  bar meeting, did you have any interaction with Mr. Ballard?

11  A.  Yeah.  Once he found out that I was cooperating with them,

12  we was in the hallway, and he was like, you a snitch bitch,

13  you know, you sell your soul to them white folks.  I mean --

14  Q.  You sold out to those white folks, what did you understand

15  that to mean?

16  A.  Selling out to the police.

17  Q.  June -- I'm fast forwarding to June of 2013, and talk to

18  you particularly about June 6th.  But in June of 2013, where

19  were you living at the time?

20  A.  In an apartment in Walterboro.

21  Q.  And who were you living with?

22  A.  My girlfriend.

23  Q.  And did you have kids there with you, too?

24  A.  Yeah.

25  Q.  How many kids you got?

1    A.   Four.

2    Q.   What type of work were you doing?

3    A.   Construction.

4    Q.   In particular, I'm going to focus on June the 6th of 2013,

5    the day you got shot.

6    A.   Yeah.

7    Q.   What did you do that morning?

8    A.   Went to work.  Got off a little early.

9    Q.   Do you remember what you had for lunch that day?

10   A.   Red Lobster.

11   Q.   Whose house did you go to that afternoon?

12   A.   My cousin Tony house.

13   Q.   Do you know Tony's full name?

14   A.   Tony Bennett.

15   Q.   How long have you known Tony?

16   A.   About 15 years.

17   Q.   What kind of things do you and Tony do together; y'all

18   friends?

19   A.   Yeah.

20   Q.   What kind of things do you do together?

21   A.   Drink, that's it, hang out.

22   Q.   What else do you do?

23   A.   Smoke a little weed.

24   Q.   That point in time, before you got shot, you were smoking

25   weed a fair bit, weren't you?

1    A.  Yeah, before I got shot.

2         MR. RICHARDSON:  Can we put 30 D up, Miss Baker?

3    Q.  Do you recognize where this is, Mr. Brothers?

4    A.  Yeah.

5    Q.  Okay.  Down here on the -- this area where I just put the

6    arrow, what is that?

7    A.  Trailer where I got shot at.

8    Q.  That's Mr. Bennett's trailer?

9    A.  Yeah.

10   Q.  How long were you at Mr. Bennett's trailer before you

11   noticed something peculiar?

12   A.  I been there probably about 30, 40 minutes.

13   Q.  And what did you notice?

14   A.  Burgundy Lincoln rolled through the parking lot, through a

15   little dirt road.

16   Q.  Did you recognize that burgundy Lincoln?

17   A.  Oh, I knew the burgundy Lincoln.

18   Q.  Whose was it?

19   A.  Chucky Sanders.

20   Q.  Chucky Sanders?

21   A.  Yeah.

22   Q.  Did you recognize the driver of the burgundy Lincoln when

23   it was driving by that day?

24   A.  Yeah.

25   Q.  And who was the driver?

1    A.  Chucky Sanders.

2    Q.  Did you recognize the passenger of that vehicle?

3    A.  No, I didn't recognize him.

4    Q.  How did you know Mr. Sanders?  Chucky Sanders.

5    A.  He been around for a minute.  Like we go to the club, he'd

6    be out there.

7    Q.  Okay.  You see him in social settings?

8    A.  Yeah.

9    Q.  How did you recognize the burgundy Lincoln he was driving;

10   you seen it before?

11   A.  All the time.

12   Q.  How fast was Mr. Chucky Sanders driving when he went past

13   Mr. Bennett's house?

14   A.  He was going real slow.  Just kept looking back.

15   Q.  What happened next?

16   A.  I mean, about five minutes later, dude came from around

17   the back of the trailer.

18   Q.  Did you recognize that dude?

19   A.  No.

20   Q.  Was he the same guy that was in the passenger's seat

21   earlier?

22   A.  Yeah.

23   Q.  When you saw him coming around the trailer, what happened?

24   A.  He pulled out two pistols.

25   Q.  Did you notice anything about those two pistols?

1   A.  One was a revolver.

2   Q.  And what was the other one?

3   A.  Forty caliber.

4   Q.  What happened then?

5   A.  He let off shots, started shooting through the screen

6   door.  Then I got up.  I got up, I about to go open the door.

7   But he backed me up when he start shooting.

8   Q.  Did you feel yourself getting hit?

9   A.  Oh, yeah.

10  Q.  Where did you go then?

11  A.  Went to the back of the trailer.

12          MR. RICHARDSON:  Can we put up 31 A, Mr. Baker.

13  Q.  Do you recognize this?

14  A.  Yeah.

15  Q.  Whose house is this?

16  A.  My cousin Tony.

17          MR. RICHARDSON:  Go to 31 B.

18  Q.  This is another angle of that house?

19  A.  Yeah.

20  Q.  Whose vehicle is this on the right side of this picture?

21  A.  That's mine.

22  Q.  That's a -- what kind of vehicle was that?

23  A.  A Honda Accord.

24  Q.  Green one?

25  A.  Green.

1    MR. RICHARDSON:  Go to the next one, Miss Baker.

2  Q.  What is this?

3  A.  Where he shot through the window.

4  Q.  That's that glass door?

5  A.  Yeah.

6  Q.  Right there on the center of this picture here, you can

7  see a little red couch.  What is that?

8  A.  Where I was sitting at.

9    MR. RICHARDSON:  Go to the next one, Miss Baker.

10  Q.  Which of these couches were you sitting on when the

11  shooter showed up and started firing?

12  A.  On the short couch.

13  Q.  The one on the bottom of the screen?

14  A.  Yeah.

15    MR. RICHARDSON:  Can we go to the next one,

16  Miss Baker?

17  Q.  After the shots started firing, where did you go?

18  A.  Straight to the back.  In that little corner back there.

19  Q.  What was back there?

20  A.  We had a gun back there, too, my cousin had a shotgun, and

21  that was just the quickest way to go, quickest place to go.

22    MR. RICHARDSON:  Go to the next one, Miss Baker.

23  Q.  All right.  What room is this in that trailer?

24  A.  The room we was staying in.  My cousin room.

25  Q.  And the gun here that's got the number 13 right beside it,

1  what's that?

2  A.  Shotgun.

3  Q.  When you went back in this room, after you'd been shot,

4  tell me what happened.

5  A.  Well, I kept hearing the glass fall off the screen door.

6  Q.  And what did that make you think was happening?

7  A.  I don't know, I thought the dude about to come do a

8  finishing move.

9  Q.  Where did you get?

10  A.  I went in the bathroom.  Right there.

11        MR. RICHARDSON:  Turn to the next one, 31 G.

12  Q.  Is that where you were standing?

13  A.  Yeah, right there.

14  Q.  Did y'all call 911?

15  A.  Yeah, two times.

16        MR. RICHARDSON:  Miss Baker, could we put up

17  Government's Exhibit 34.  This is a 911 call you made.  See if

18  you recognize these voices.  Go ahead.

19     (Audio recording was played.)

20        MR. RICHARDSON:  Can you go to 31 H.

21  Q.  Was that your voice, Mr. Brothers?

22  A.  Yeah, that was me.

23  Q.  Do you recognize this picture, Mr. Brothers?

24  A.  Yeah, that's me.

25  Q.  Who's the guy on the ground there in the center?

1    A.   Me.

2    Q.   And who's the guy in the red shirt over here on the side?

3    A.   My cousin Tony.

4    Q.   That's Mr. Bennett?

5    A.   Yeah.

6    Q.   After this shooting, where did they take you?

7    A.   MUSC.

8    Q.   And do you have any bullets still remaining in you?

9    A.   Yes, sir, got one in my neck.

10   Q.   You got one that's still in your neck today?

11   A.   (Witness nodded affirmatively.)

12   Q.   They weren't able to take that one out?

13   A.   No, it's too close to my spine.

14   Q.   Did you have a bullet that was taken out of you?

15   A.   Yeah, I had surgery, took bullets out of my stomach.

16   Q.   Okay.  I'm not going to go through in detail, but fair to

17   say it took you a long time and hard road to recover?

18   A.   Yeah.

19   Q.   You were in the hospital for awhile?

20   A.   Yeah.

21   Q.   You weren't allowed to move around or wash yourself or do

22   any of those things for a long time, right?

23   A.   Couldn't do none of that.

24   Q.   After you got out of the hospital, law enforcement put you

25   up in a hotel, didn't they?

1    A.  Yeah.

2    Q.  And they paid for your food and those sorts of things

3    while you were trying to recover?

4    A.  Yeah.

5    Q.  Right?  And that happened for more than a month or so?

6    A.  Yeah.

7    Q.  And then at some juncture law enforcement helped you get

8    an apartment in another location -- we're not going to talk

9    about where -- but helped you get an apartment in another

10   location?

11   A.  Yeah.

12   Q.  And during the course of that, you received some money

13   from the Government?

14   A.  Yeah.

15   Q.  All right.  And in total, it was a little less than

16   $10,000; does that sound about right?

17   A.  About right.

18   Q.  Okay.  And that was for lodging and food and rent and all

19   those sorts of things?

20   A.  Yeah.

21          MR. RICHARDSON:  Mr. Brothers, we sure appreciate you

22   being here today.  If you'd just answer any questions that

23   Mr. Theos might have, I appreciate it.

24          THE COURT:  Let me ask you something.  How many times

25   were you shot?

IVORY BROTHERS - CROSS-EXAMINATION

1   A.  I got shot 11 times.

2           THE COURT:  What?

3   A.  Eleven.

4           THE COURT:  You got hit 11 times?

5   A.  Eleven times.

6           THE COURT:  All right, sir, go ahead.  We're going to

7   take a ten minute break.

8       (A recess was held at this time.)

9                       CROSS-EXAMINATION

10  BY MR. THEOS:

11  Q.  Mr. Brothers, we've never met.

12  A.  No.

13  Q.  Never seen each other before, have we?

14  A.  Nope.

15  Q.  We've never talked before about this case, have we?

16  A.  Never.

17  Q.  Now, I understood when you were asked by Mr. Richardson

18  whether you had any felony convictions, your response was no.

19  A.  No.

20  Q.  But you had been arrested several times for drugs, have

21  you not?

22  A.  No.  Marijuana.

23  Q.  Weren't you arrested and charged with trafficking cocaine

24  as well?

25  A.  No, I wasn't.

IVORY BROTHERS - CROSS-EXAMINATION

1  Q.  You were arrested in 2008 for trafficking cocaine, weren't

2  you?

3  A.  My charges was dropped.  The case was thrown out.

4  Q.  But you were arrested for it.

5  A.  I was arrested.

6  Q.  And then you were arrested and convicted of marijuana,

7  correct?

8  A.  Yeah, simple possession.

9  Q.  And when was that; do you remember the date of that

10  conviction?

11  A.  No, I don't remember.

12  Q.  When was the last time you were convicted of a crime?

13  A.  I don't remember.

14  Q.  Have you ever gone to prison for a crime?

15  A.  Never.

16  Q.  Ever served time in the County Detention Center for a

17  crime?

18  A.  No.

19  Q.  Now, in this particular case you were arrested on March --

20  in March of 2012, is that right?

21  A.  Yeah.

22  Q.  Now, when you were arrested, were you taken to a detention

23  center or a jail?

24  A.  Yeah, Al Cannon detention center in Charleston.

25  Q.  Okay.  And at that -- at that time did you -- were you

1  bonded out?

2  A.  Yeah.  I stayed in there about five days.

3  Q.  And that would have been after you were interviewed by law

4  enforcement, is that correct?

5  A.  Yeah.

6  Q.  The first time, as you said, you were interviewed by law

7  enforcement, was January the 26th of 2012?

8  A.  That's when I got pulled over and gave me a letter.

9  Q.  Okay.  And that target letter, that target letter that you

10  received, target letter was dated January the 11th, as was

11  previously indicated, is that correct, 2012?

12  A.  I think it was; I don't remember.

13  Q.  All right.  And you received that target letter in the

14  mail?  Or was it hand delivered to you?

15  A.  Hand delivered.

16  Q.  And it was hand delivered by law enforcement?

17  A.  Yeah.

18  Q.  And that's the same -- on that same day is when they told

19  you, you would have 30 days to speak with them?

20  A.  Yeah.

21  Q.  And did they tell you at that time that if you didn't

22  speak with them within 30 days, that they would come get you?

23  A.  Yeah.

24  Q.  All right.  Now, they told you also at that time, and it

25  was included in the target letter, that you were under

1  investigation for distribution and trafficking cocaine, did

2  they not?

3  A.  Yeah.

4  Q.  And they told you that that trafficking cocaine was a

5  federal -- was a violation of federal laws, didn't they?

6  A.  Yeah.

7  Q.  And as a result of receiving that target letter, you made

8  a decision to cooperate with them, correct?

9  A.  Yeah, I went down there.

10  Q.  Excuse me?

11  A.  When I went down there for the actual interview.

12  Q.  Right.

13  A.  That's when I made my decision.

14  Q.  And as you said before, you made a decision to cooperate

15  with the Government based upon all of the phone calls that you

16  heard yourself speaking on, as well as the other information

17  they provided, correct?

18  A.  Yeah.

19  Q.  And some of that other information they provided was that

20  they had conducted four undercover buys, using a confidential

21  informant, from you, correct?

22  A.  That's correct.

23  Q.  And they had audio and video recordings of those

24  transactions, right?

25  A.  I don't know about that.

1  Q.  They didn't tell you that at the time?

2  A.  No, they didn't tell me that.

3  Q.  But they told you they had undercover buys, correct?

4  A.  Yeah.

5  Q.  From you to somebody cooperating with law enforcement.

6  A.  Yeah.

7  Q.  So as you said before, you knew at that time that they had

8  you.

9  A.  I knew they had me.

10  Q.  And as a result of your understanding that they had you,

11  you decided to cooperate, did you not?

12  A.  Exactly.

13  Q.  And you decided that pretty darn quickly.

14  A.  Yeah.

15  Q.  You had a lawyer there with you though, didn't you?

16  A.  Not when I went down there.

17  Q.  Not at that time?

18  A.  No.

19  Q.  Now, you knew at that point that they were aware of the

20  fact that you were a drug dealer, correct?

21  A.  Oh, yeah.

22  Q.  And that that's how you made your living.

23  A.  Yeah.

24          THE COURT:  At that time he did what?

25          MR. THEOS:  That's how he made his living.

1   BY MR. THEOS:

2   Q.   You didn't file any tax returns, of course?

3   A.   No, I didn't.

4   Q.   You knew at that time, based upon what they had, meaning

5   the phone calls and the undercover buys, you were facing a

6   long and a stiff prison sentence, didn't you?

7   A.   Yeah, I did know that.

8   Q.   And you made a decision at that time that you were going

9   to do whatever was necessary in order to help yourself and try

10  to avoid not only a stiff prison sentence, but also avoid even

11  possibly being prosecuted, correct?

12  A.   Yeah.

13  Q.   So at that time you told them in that first interview you

14  told them about a number of people that you sold drugs to, did

15  you not?

16  A.   Yeah.

17  Q.   I'm sorry?

18  A.   Yeah, I did.

19  Q.   All right.  You told them about several people.  There

20  were -- and I won't go through all the names -- but as I count

21  them, you told them about seven different people that you were

22  selling drugs to and providing drugs for, correct?

23  A.   Yeah.

24  Q.   Now, at that time you told them in that first interview

25  that you first met and began dealing with Martin Ballard in

1  2008, is that correct?

2  A.  Yeah.

3  Q.  But you were interviewed a second time, were you not, and

4  the second interview took place on May the 15th of 2012,

5  right?  Do you remember that interview?

6  A.  May 15, 2012?

7  Q.  Yeah.  Do you remember a second interview even though you

8  may not remember the exact date?

9  A.  No, I don't remember a second interview.

10  Q.  You don't remember your lawyer being with you during a

11  second interview?

12  A.  In the courthouse.

13  Q.  I don't know where it was.

14  A.  No.  Huh-uh.  You say May what?

15  Q.  May -- May the 15th of 2012, didn't you meet with DEA at

16  their office here in Charleston?  With Mr. Haley?  And --

17  A.  Mr. Haley wasn't with me.

18  Q.  He was not with you?

19  A.  No.  I ain't met him until I got arrested in March.

20  Q.  I know, but your arrest was in March.

21  A.  Yes.

22  Q.  March of 2012?

23  A.  Yeah.

24  Q.  I'm asking you about May 2012, so two months later?

25  A.  He wasn't with me.

1    Q.  He was not?

2    A.  No.  Not in the interview.

3    Q.  You don't recall meeting with Agent Evans and Agent

4    Tanner?

5    A.  Yeah, the first interview I had, but not a second time, I

6    didn't.

7    Q.  Well, my -- and I may be wrong, but my understanding --

8           MR. RICHARDSON:  Objection, Your Honor, he can't ask

9    him about things that are not his.

10          MR. THEOS:  Excuse me?

11          MR. RICHARDSON:  You're going to ask him about a

12   report.

13          MR. THEOS:  No, I'm not.  Why don't you let me ask

14   the question before you object.

15          THE COURT:  You're asking him about a report that he

16   didn't see, he didn't prepare; I just don't know what you're

17   asking him.

18          MR. THEOS:  I'm not asking him about a report, I'm

19   asking him about interviews, Your Honor.

20          THE COURT:  Well, I mean, he's answered the question

21   about the interview, hasn't he?

22          MR. THEOS:  Well, I don't really understand his

23   answer, so I'd like a little leeway to clear it up, because

24   it's important.

25          THE COURT:  I'm going to see what you're going to use

1  to clear it up.

2  BY MR. THEOS:

3  Q.  You met with DEA on January the 26th, as you testified to

4  on direct testimony, correct?

5  A.  Yeah.

6  Q.  You didn't have a lawyer present at that time?

7  A.  No, I didn't.

8  Q.  And you met with Detective Tanner and Detective Evans?  Do

9  you recall them being there?

10  A.  Yeah.

11  Q.  Were also Investigator Chapman and Kinard there, of the

12  Walterboro police department?

13  A.  Yeah, they were there too.

14  Q.  Now, you then met a second time with just Agent Tanner and

15  Agent Evans, did you not?

16  A.  I don't recall that.

17  Q.  You don't recall an interview in May of 2012?

18  A.  (Witness shakes head negatively.)

19  Q.  You have to answer.

20  A.  No, I don't.

21  Q.  Do you not recall providing a statement to Agent Tanner

22  and Agent Evans, that you began your dealings with Martin

23  Ballard in 1998 and not 2008?

24  A.  No, I don't recall that.

25  Q.  You do not recall advising them, Agents Tanner and Evans,

IVORY BROTHERS - CROSS-EXAMINATION

1  with your lawyer, Mr. Haley, present, that you actually bought

2  drugs from Martin Ballard from 1998 through 2008?

3  A.  I don't remember that.  1998, I didn't know about him.  I

4  didn't know he exists.

5  Q.  So if you told the agents that you were buying drugs from

6  Martin Ballard from 199 --

7          THE COURT:  He said he didn't tell them, didn't he?

8  A.  They got it on paper that I told them that?

9  Q.  I'm sorry?

10  A.  You got it written down on paper that I told them that?

11  That -- I mean -- because I don't remember that.  Unless --

12  you know.

13  Q.  So my question is -- my question is, Mr. Brothers, and

14  Judge, is that if you told them, if you told them that, that

15  you purchased drugs beginning in 1998, over a ten-year period

16  through 2008, if you told them that, that wasn't true?

17  A.  No, that wasn't true.  And I didn't tell them that.  I

18  know when I started selling drugs, and it wasn't 1998.

19  Q.  Your testimony today is you just did not tell them that.

20  A.  I don't remember telling them that about 1998 --

21  Q.  Okay.

22  A.  -- to 2008.  So I basically selling drugs for ten years?

23  No.  That's not possible.

24  Q.  1998 you would have been 16 years old, right?

25  A.  Seventeen.

1    Q.  Seventeen?  Now, you told DEA agents that during most of

2    your -- during most of your transactions, whether you were

3    buying or selling drugs, that Brian Davis was with you,

4    correct?

5    A.  Yeah.

6    Q.  And Brian Davis is somebody else that's named in this

7    indictment, is he not?

8    A.  Yeah, that's right.

9    Q.  Brian Davis has been referred to as your protection, your

10   bodyguard.  You've heard that, correct?

11   A.  Yeah.

12   Q.  And was he, in fact, somebody that was with you on a

13   regular and daily basis to serve as your bodyguard?

14   A.  Yeah.

15   Q.  And the reason he was serving as your bodyguard is because

16   you were selling large quantities of cocaine, you had large

17   quantities of money on you at any one time and you felt that

18   you needed somebody there to sort of cover you and watch your

19   back, is that right?

20   A.  Not exactly that, you know, we just became friends, and it

21   led from one thing to another.  But I didn't need no

22   protection.  But he kind of like served as my right-hand man

23   that stay with me all the time.  But I didn't pretty much like

24   I need you to be my security, no.

25   Q.  Understanding you didn't feel like you needed it, he was

1   there for that purpose.

2   A.   Yeah, it might look like that way, but it wasn't that way.

3   Q.   All right.  And I assume since he was there with you as

4   your right-hand man on a daily basis, that he at all times had

5   a firearm of some sort, gun of some sort, correct?

6   A.   No, he didn't have a firearm.

7   Q.   Did you carry a gun?

8   A.   I had one.

9   Q.   And the reason you carried one is for -- is for the same

10  exact reasons, right?  Drugs, money?

11  A.   Yeah.

12  Q.   In other words, to help in furtherance of your drug

13  dealing, correct?

14  A.   Yeah.  My firearm was registered in my name.

15  Q.   Because you didn't have a felony conviction.

16  A.   No.

17  Q.   But there isn't any question you used it for purposes of

18  selling and trafficking drugs, right?

19  A.   I basically used it, yeah, for my protection.  My house,

20  anywhere I go.

21  Q.   Now, you knew when you were interviewed by DEA and SLED

22  and U.S. Attorney's office, you knew it wasn't going to be

23  enough to tell them who you were selling drugs to.  Correct?

24  A.   Repeat that question?

25  Q.   You knew it wasn't enough to tell them who you were

1  selling drugs to.  You knew that they wanted you to talk with

2  them about Martin Ballard, right?

3  A.  Yeah.

4  Q.  I mean, they made it clear to you that that's who they

5  wanted you to talk about, right?

6  A.  Yeah.

7  Q.  They made it clear to you that they believed Martin

8  Ballard was your source of cocaine, correct?

9  A.  Yeah, they knew.

10  Q.  And they made it clear to you that that's all they wanted

11  to hear from you, was about Martin Ballard, who they believed

12  was your source, right?

13  A.  They only want to hear about just other people, too.

14  Q.  You didn't tell them about any other source, did you?

15  A.  They know about plenty of people.  All the people that's

16  on my indictment.

17  Q.  Did you tell them about anybody else as being a source?

18  A.  No.

19  Q.  Well, you had other -- you had sources.

20  A.  Yeah, but they wasn't involved in it, they -- I mean what

21  I tell them about them for?

22  Q.  So you weren't completely truthful with DEA and the

23  Government when they asked you to make full disclosure.

24  A.  They heard all the phone calls that I had.  They heard me

25  making buys from other dealers.  They had explained about

1  Martin Ballard.  They didn't ask me about other people.

2  Q.  But they knew, they knew that you had other sources of

3  cocaine, right?

4  A.  Yeah, they knew that.

5  Q.  And as you said, they didn't ask about those because they

6  didn't care about any of those people.

7  A.  No, they didn't ask about them.

8  Q.  And you didn't offer to tell them who those sources were.

9  A.  No.

10  Q.  Why don't you tell us who those sources were now?

11  A.  I don't do that.  I can't tell them who the source is.  I

12  mean --

13  Q.  Well, I --

14  A.  What you want me to tell you?

15  Q.  I want you to tell Judge Blatt and the U.S. Attorney's

16  office right now who your other sources of drugs were.

17  A.  I don't know them by real names.

18  Q.  Give us their street names.

19  A.  I know them by Bubbah and Big T.  Baby Boy.  I don't know

20  their real names.

21  Q.  Can you describe any of these three people?

22  A.  Short, dark skinned.

23  Q.  Darker than me?

24  A.  Darker than me.

25  Q.  All three of them?

1    A.   Yeah.

2    Q.   All three are short and dark skinned?

3    A.   (Witness nodded affirmatively.)

4    Q.   Shorter than I am?

5    A.   Shorter than me.

6    Q.   How all are you?

7    A.   5'11".

8         THE COURT:  You just grew.

9    Q.   Any of them have facial hair?

10   A.   No.  Not as I remember.

11   Q.   When did you deal with these other sources, since you said

12   you started your drug dealing in 2008, when were they

13   providing you drugs?  2008 also?

14   A.   Some from 2008 on up.

15   Q.   On up till when?

16   A.   2012.  It was like emergency people I just go call,

17   nothing major.

18   Q.   So from 2008 until 2012, how many sources, other than what

19   you claim about Martin Ballard, how many other sources of

20   cocaine did you have?

21   A.   I just know three different people.

22   Q.   And give us those nicknames or those street names again.

23   A.   The street names what?

24   Q.   Give us the street names again.

25   A.   Big T.

1   Q.  And where is Big T, where does he work out of?

2   A.  He in Hampton.

3   Q.  Hampton, South Carolina?

4   A.  Um-hum.

5   Q.  Would you go to him in Hampton, South Carolina, or would

6   he come to you?

7   A.  I meet him.

8   Q.  Would you meet him somewhere in between, or would you --

9   A.  Yeah, somewhere in between.

10   Q.  Where would you normally meet him?

11   A.  Yemassee.

12   Q.  Where in Yemassee?

13   A.  On a road.

14   Q.  On a road?  Just on the side of the road?

15   A.  Yeah, on the road.

16   Q.  And how much -- You buy cocaine from him, right?

17   A.  No, I buy just regular rocks, crack.

18   Q.  And how much crack would you buy from him in any one time?

19   A.  Probably about $400, that's about it.

20   Q.  Probably about that?

21   A.  That's about it.

22   Q.  Okay.

23   A.  Something to get by with.

24   Q.  Yeah, and do you remember the date, the first time you met

25   and dealt with him?

1   A.  I ain't dealt with him too many times.

2   Q.  How many times did you deal with him?

3   A.  About three or four times.

4   Q.  What's the total amount of cocaine you bought from him?

5   A.  Crack?  You mean?  Crack.  I bought crack.

6   Q.  Crack.  Do you remember?

7   A.  About an ounce altogether.

8   Q.  Was Brian Davis with you when you bought drugs from Big T?

9   A.  Yeah, he was with me all the time.

10  Q.  Okay.  Now, how about the second person, who is that?

11  A.  Black.

12  Q.  I'm sorry?

13  A.  Black.

14  Q.  His nickname or street name was Black?

15  A.  Yeah.

16  Q.  Black also is short and dark skinned?

17  A.  (Witness nodded affirmatively.)

18  Q.  And where is Black from, where did he operate out of?

19  A.  Right out of Walterboro.

20          THE COURT:  Where?

21  A.  Walterboro.

22  Q.  But again, you didn't tell DEA or Walterboro police or the

23  U.S. Attorney's office about Big T or Black, did you?

24  A.  They the ones listening to my phone, why they didn't ask

25  me about it?

1  Q. You didn't offer to tell them though, did you?

2  A. No, I didn't.

3  Q. Where would you meet Black?

4  A. In Walterboro.

5  Q. But where in Walterboro?

6  A. Any place, gas station, Dollar Store, any place.

7  Q. How many times did you meet with Black and buy drugs from

8  him?

9  A. I only dealt with him a few times.

10  Q. Well, how many times roughly?

11  A. About 56 times.

12  Q. And would you buy crack or powder?

13  A. Crack.

14  Q. And what quantities?

15  A. Like quarters, seven grams.

16  Q. And then you'd sell that?  Then you'd sell those drugs?

17  A. Yeah.

18  Q. Is Big T in jail now or in prison now or is he still out

19  there?

20  A. No, he long gone.

21  Q. Where did he go?

22  A. I don't know, he disappeared.  When I got locked up,

23  everybody vanished.

24  Q. And how about Black, where is he?

25  A. Gone.

1   Q.  He's gone, too.  How about the third person?

2   A.  They gone, too.

3   Q.  Who was that?  What was that name?

4   A.  They Black -- they both named Black.

5   Q.  Oh, they go by Black I and Black II, or --

6   A.  No, he just happened to have the same Black.

7   Q.  And where did this second Black, where did he deal out of?

8   A.  He right in Green Corner.

9   Q.  In Green -- so that's between here and Walterboro, right?

10  A.  Yeah.

11  Q.  And where would you meet him?

12  A.  Right there in Green Corner.

13  Q.  At that gas station/grocery store?

14  A.  No, down on Turkey Hill, place called Turkey Hill.

15  Q.  And how many times did you meet with him?

16  A.  One or two times.  He ain't really didn't have it like

17  that, just --

18  Q.  Now, are you sure those are the only three people you

19  bought drugs from?

20  A.  Yeah.

21  Q.  Remember now, you're under oath.

22  A.  The only people -- three people I bought drugs from.

23  Q.  Just those three people?

24  A.  Yeah.

25  Q.  Now, again, you knew and they told you they only wanted to

1  hear about Martin Ballard, as you just said, correct?

2  A.  Um-hum.

3  Q.  So that's what you did.  You told them -- you told them

4  things about Martin Ballard that you knew, that you knew

5  weren't true.

6  A.  That I knew weren't true?

7  Q.  Yeah.

8  A.  What I told them?

9  Q.  Told them Martin Ballard was a source of drugs for you.

10  A.  So that wasn't true?

11  Q.  I'm --

12  A.  You heard us on the phone.

13  Q.  That's what I'm asking you.  You told them things that you

14  knew Martin Ballard could not -- could not -- the only thing

15  Martin Ballard could say is it ain't true, I didn't sell him

16  any drugs.  Right?

17  A.  Yeah, that's what he can say?

18  Q.  Well, do you have any documents, any records of any sort

19  about your supposed drug dealings with Martin Ballard?

20  A.  No, all I got is what y'all got, phone calls and all that.

21  Q.  Do you have any photographs of any drugs that you claim

22  you bought from Martin Ballard?

23  A.  No.

24  Q.  And so whatever drugs you claim you bought from Martin

25  Ballard since you said Brian Davis was with you on a daily

1    basis, Brian Davis would come in here and say, yeah, I was

2    there, I saw it, I observed these drug transactions.  Right?

3    A.  He probably would, but he wouldn't.  I don't know.  Ain't

4    no telling.

5    Q.  No telling what he'd say, is there?

6    A.  No telling.

7    Q.  Now, you believed and you still believe that in providing

8    all this information to the Government that you'd get a

9    substantial benefit from it, right?

10   A.  Yeah.

11   Q.  And, in fact, you already received a substantial benefit,

12   haven't you?

13   A.  What was that benefit?

14   Q.  Well, you're in the indictment that is on trial today, but

15   you're not on trial.  You're not being prosecuted.

16   A.  I'm about to get prosecuted.

17   Q.  I'm sorry?

18   A.  I'm getting prosecuted, too.

19   Q.  And when are you getting prosecuted?

20   A.  I guess when this trial is over.

21   Q.  You haven't signed a plea agreement of any sort?

22   A.  I don't know, you got to talk to my lawyer about that.

23   Q.  I'm asking you, have you signed a plea agreement?

24   A.  You got to talk to him about that.

25            MR. THEOS:  Judge, I'd ask you to instruct the

1    witness to answer my question.  He can answer whether or
2    not --
3            THE COURT:  Wait just a minute.  Are you asking him
4    whether he's pled guilty?
5            MR. THEOS:  No, sir, whether he has signed a plea
6    agreement, and if he has, we're certainly entitled to that
7    information.
8            THE COURT:  Well, I've got to go into an explanation,
9    if you're asking him if he's guilty of some crime, he needs to
10   be instructed -- he's got a lawyer.  Doesn't he have a lawyer?
11           MR. THEOS:  Bob Haley is his lawyer, and he's already
12   testified on direct and cross that he's a drug dealer and he
13   sold all these drugs.
14   A.  He's not present.  You have to ask him that information.
15   I don't know.  I'm just being truthful.  I don't know if I
16   signed a plea agreement or not.
17           THE COURT:  Did Mr. Haley know you were going to
18   testify?
19   A.  Yeah, he know, but he going to a convention today.
20           THE COURT:  That wasn't what I asked you.  Did he
21   know you were going to testify?
22   A.  Yeah, he knew.
23       (Brief interruption in proceedings.)
24           THE COURT:  Let me see the indictment in this case.
25       Well, he's a defendant in this case.

1    MR. THEOS:  Yes, sir.

2    THE COURT:  And he's already testified about all the

3  things that he did.  So if he should have received any kind of

4  warning, it's too late to do it now, unless I, as a -- unless

5  I decide not to consider it, but I think you can go ahead,

6  because I've already let it in.

7    MR. THEOS:  Yes, sir.

8  BY MR. THEOS:

9  Q.  Mr. Brothers?

10  A.  Yeah.

11  Q.  You don't know whether you signed a plea agreement or not?

12  A.  No.

13  Q.  That's the bottom line?

14  A.  I don't know.

15  Q.  And if you have, you don't remember?

16  A.  I don't remember signing it.

17  Q.  All right.  Now, you said you bought drugs from a number

18  of people between 2008 and 2012, but one of them you claim is

19  Martin Ballard, right?

20  A.  Yeah.

21  Q.  Now, can you give us any specific date or dates that you

22  bought drugs from Martin Ballard?

23  A.  I can't give no specific dates.

24  Q.  Can you give us specific times that you bought drugs from

25  Martin Ballard?

1   A.  During the day.

2   Q.  Not at night?

3   A.  Sometimes at night.

4   Q.  Sometimes at night, sometimes during the day, but that's

5   the best you can do from a time standpoint?

6   A.  I mean, all my calls had the times on it.  I don't know.

7   Q.  What about where you bought drugs from, can you tell us on

8   a specific date and time and location about a particular

9   purchase that you claim you made from Martin Ballard?  You

10  can't do that, can you?

11  A.  No, I can't.

12  Q.  So the bottom line is this.  You want Judge Blatt to

13  believe that you bought drugs from Martin Ballard, but you

14  can't give Judge Blatt any dates, times or locations regarding

15  any specific drug deal, right?

16  A.  Well, sir, I was selling drugs, right?  And I was buying

17  from him.  I wasn't just riding around with a notebook putting

18  down the times and the dates.  I don't remember that.  I don't

19  remember.  I mean, and if I tried to sit here and tell you a

20  date, that's a waste of time.

21  Q.  Because you can't do it.

22  A.  No, I can't.  I don't remember.

23  Q.  So again, I'm sorry, you don't want to do it, is that what

24  you said?

25  A.  I said I don't remember.  Let me pull this down a little

1    bit.  Can you hear me now?  I don't remember.

2    Q.  So again, the bottom line is you just expect Judge Blatt

3    to take the word of a drug dealer, an admitted drug dealer,

4    without any evidence to support it, without any drugs, without

5    any money, without any witnesses, without specific dates or

6    times, you just want Judge Blatt to believe what you have to

7    say?

8    A.  Yeah, I do.

9    Q.  And the reason you're saying all these things is so that

10   you can help yourself and get the best possible result, isn't

11   it?

12   A.  And another thing, because it's all right down on video,

13   you just heard it.

14   Q.  So you don't care whether the judge believes it or.

15   A.  No, you putting words in my mouth.  I didn't say I don't

16   care whether the judge believes it or not.

17   Q.  Well, so far you've -- again, you've benefited, you

18   received some money, you received some lodging from the

19   Government in exchange for your testimony, correct?

20   A.  Yeah, I did.

21   Q.  And you are hoping that you will either receive a very

22   light sentence whenever you are sentenced, if you're

23   prosecuted, or that you may not be prosecuted at all in

24   exchange for your testimony against Mr. Ballard, right?

25   A.  I don't know.

1   Q.  That's what you're hoping for, isn't it?

2   A.  Damn, I'm just hoping to get that all over with, that's

3   what I'm hoping for.

4   Q.  That's why you're here, isn't it?

5   A.  I'm here because I got to be here.

6   Q.  And you're here to help yourself.

7   A.  Exactly.  Ain't nobody else going to help me.

8   Q.  Right.

9           MR. THEOS:  Thank you, Judge.

10          THE COURT:  All right.

11                      REDIRECT EXAMINATION

12  BY MR. RICHARDSON:

13  Q.  Mr. Brothers, Mr. Theos asked you a couple questions about

14  the controlled buys that law enforcement did from you in

15  January and March and May of 2011.  You remember him asking

16  you about those?

17  A.  Yeah.

18  Q.  Okay.  And you've reviewed the -- you sold those drugs to

19  an informant, right?

20  A.  Yeah.

21  Q.  Who did you get that crack cocaine from?

22  A.  From Martin Ballard.

23  Q.  We talked a little bit about Mr. Brian Davis.

24  A.  Yeah.

25  Q.  You were around him a fair bit?

1  A.  Every day he was with me.

2  Q.  Did you take Mr. Davis with you every time you went to

3  meet with Mr. Ballard?

4  A.  Every time.

5  Q.  And during your dealings we listened to a phone call, for

6  example, earlier, where you talked about your boy swallowing a

7  quarter and going to MUSC; do you remember that call?

8  A.  Yeah.

9  Q.  And do you remember after you took him home from MUSC,

10  after you got him --

11          MR. THEOS:  Your Honor, I object.  This is beyond the

12  scope of redirect.

13          MR. RICHARDSON:  Your Honor, he asked the questions

14  about this.

15          THE COURT:  I'm pretty liberal about that.  Go ahead.

16  BY MR. RICHARDSON:

17  Q.  In those conversations, who was with you in the car when

18  you were talking with Mr. Ballard?

19  A.  Brian Davis.

20  Q.  Okay.  And where did y'all go that night?

21  A.  Martin Ballard.

22          MR. RICHARDSON:  Beg the Court's indulgence one

23  moment.  Nothing further, Your Honor.

24          THE COURT:  Anything else?

25          MR. THEOS:  One second, Your Honor.  No other

1    questions, Judge.

2         THE COURT:  All right, sir.  Everybody through with

3    this witness?

4         MR. RICHARDSON:  We are, Your Honor.

5         MR. THEOS:  Yes, sir.

6         THE COURT:  All right, sir, then you can be excused.

7       Now, I believe you mentioned when you came back to the

8    office you wanted -- since you have a few minutes, you wanted

9    to talk about the schedule for next week?

10        MR. RICHARDSON:  Yes, Your Honor.

11        THE COURT:  Well, we're going to -- we are somewhat

12   committed to taking a day off.

13        MR. RICHARDSON:  Yes, sir.

14        THE COURT:  And I suggest that -- I'm flexible now,

15   but I suggest we work Monday, Tuesday, Wednesday and Thursday

16   and take Friday off.

17        MR. RICHARDSON:  That suits us.

18        THE COURT:  Does that suit the Government?

19        MR. RICHARDSON:  It does, Your Honor.

20        THE COURT:  How about the defendant?

21        MR. THEOS:  That's fine, Judge.

22        THE COURT:  We'll do that next week.  That would be

23   Monday, Tuesday, Wednesday and Thursday we'll work, and we'll

24   take Friday off.

25      Anything else?  Now you've got two more witnesses?

1          MR. RICHARDSON:  Your Honor, as it turns out, we just

2     spoke with one of the witnesses who is a law enforcement

3     officer, and he will not be able to get here this afternoon.

4          THE COURT:  Is he here now?

5          MR. RICHARDSON:  He's not here now, Your Honor.  He

6     was coming and he -- he's based out of Colleton County, they

7     had something come up in Colleton County, and he wouldn't be

8     able to get here until after 4:00 o'clock, and I don't --

9          THE COURT:  Where is your other witness?

10          MR. RICHARDSON:  He will be here at 2:00 o'clock.

11     He's a short witness, but he will be here at 2:00 o'clock and

12     available, if you would like him to, but he's going to be

13     short.

14          THE COURT:  He can't get here right this minute?  Is

15     he close by?

16          MR. RICHARDSON:  He's not, Your Honor, he's up in

17     Summerville.  Walterboro, excuse me.

18          THE COURT:  Where is he?

19          MR. PHILLIPS:  He'd be coming from Walterboro, Your

20     Honor.  We anticipated going longer, so I told him to come at

21     2:00, so he probably -- he might have left by now, but he's

22     not here yet.  He was going to meet us at our office at 2:00,

23     so -- but he's a short witness, probably I would think 30, 45

24     minutes at the most, maybe even shorter.

25          THE COURT:  We'll just recess and come back at --

1    Will he be here by 2:30?

2            MR. PHILLIPS:  He was instructed to be at my office

3    at 2:00.

4            THE COURT:  Then we can come back at 2:30 and take

5    his testimony and recess.  That suit everybody?  Okay.  We'll

6    be in recess now till 2:30.  Thank you.

7        (A recess was held at this time.)

8            THE COURT:  All right, Mr. United States Attorney.

9            MR. RICHARDSON:  Thank you, Your Honor, the

10   Government calls Charles Youmans.

11           MR. PHILLIPS:  Government calls Charles Youmans to

12   the stand.

13           THE CLERK:  State your name for the record.

14   A.  Charles Youmans.

15       CHARLES YOUMANS, a witness called by the Government, first

16   having been duly sworn, testified as follows:

17                          DIRECT EXAMINATION

18   BY MR. PHILLIPS:

19   Q.  Mr. Youmans, again state your name.

20   A.  Charles Youmans.

21   Q.  And where were you born?

22   A.  In Walterboro County.

23   Q.  And how old are you?

24   A.  Thirty-five.

25   Q.  And have you lived most of your life in Walterboro?

1    A.  Yes, sir.

2    Q.  And where did you go through school?

3    A.  Walterboro and Ruffin.

4    Q.  And when did you -- did you finish school?  What is the

5    highest grade you completed?

6    A.  Eleventh.

7    Q.  Once you finished with school, what kind of work did you

8    get into?

9    A.  Landscaping.

10   Q.  And that's what -- that's still a legitimate employment

11   you've had out there?

12   A.  Yes, sir.

13   Q.  Okay.  Now, in addition to that legitimate employment,

14   you've been involved in selling drugs, haven't you?

15   A.  Yes, sir.

16   Q.  And regarding your criminal history, you've got possession

17   of marijuana in 2000, possession of cocaine 2002, and then in

18   another possession of marijuana conviction?

19   A.  Yes, sir.

20   Q.  Now, tell the Court -- Let me go back.  You also have one

21   other plea -- one other conviction in this case, correct?

22   A.  Yes, sir.

23   Q.  We'll come back to that, because I forgot that we didn't

24   have our assistants today.

25       Now, tell the Court how old you were and about when your

1    drug dealing started.

2    A.  When I was like 16 I had a problem with using cocaine.

3    Q.  So you started using cocaine and marijuana when you were

4    16?

5    A.  Yeah, and selling.

6    Q.  You were selling at the same time?

7    A.  Yes, sir.

8    Q.  How did you get introduced to all that?

9    A.  Through one of my home boys.

10   Q.  Okay.  Who was that?

11   A.  Nathaniel.

12   Q.  And where did you meet up with him?

13   A.  By the truck stop.

14   Q.  A truck stop in Walterboro?

15   A.  No, but you could say Walterboro address, Walterboro on

16   61.

17   Q.  And when did you -- and you have stopped selling drugs?

18   A.  Now I stopped.

19   Q.  Yeah.  So when did you stop selling drugs?

20   A.  I can't remember.

21   Q.  Did you stop when you got arrested in this case?

22   A.  Yes.

23   Q.  And so between -- you began in 2000 -- when you were 16

24   years old until you were arrested in this case, you had

25   various sources of supply for your cocaine?

CHARLES YOUMANS - DIRECT EXAMINATION

1   A.  Yes, sir.

2   Q.  And what were you selling?

3   A.  I was selling crack, crack cocaine and cocaine.

4   Q.  And when you started, was it small amounts?

5   A.  Yes, like one to two grams.

6   Q.  So you had various sources of supply.  Was one of the

7   sources of supply Ivory Brothers?

8   A.  Yes, sir.

9   Q.  Tell the Court briefly how you came about to meet

10  Mr. Brothers and how much you would buy from him and when that

11  began approximately.

12  A.  I can't remember when it began.  I met him through Beat

13  Down.

14  Q.  Beat Down?

15  A.  Yes.

16  Q.  Do you know his real name?

17  A.  No, I don't know his real name.

18  Q.  So you met -- were you buying from Beat Down?

19  A.  Yes, I was buying from him.

20  Q.  And then why did you switch to Mr. Brothers?

21  A.  His was cheaper than his.

22  Q.  And how much were you getting from Mr. Brothers during

23  this time?

24  A.  I was getting like about 3.5 to like seven grams estimate.

25  Q.  Of crack?

CHARLES YOUMANS - DIRECT EXAMINATION

1   A.   Yeah.

2   Q.   How often?

3   A.   I would say like one time a week sort of.

4   Q.   And were you selling all of that or were you using some

5   and selling some?

6   A.   Using.  Using some and selling some.

7   Q.   Now, before we go into the next round of questions, I'm

8   going to go ahead and deal with this issue.  This plea

9   agreement that's Government's Exhibit 10 L, do you recognize

10  this document?

11  A.   Yes, sir.

12  Q.   What is it?

13  A.   It's a plea agreement.

14  Q.   Whose plea agreement?

15  A.   Mine.

16  Q.   And I'm going to show you the second-to-last page.  Is

17  that your signature on that plea agreement?

18  A.   Yes, sir.

19  Q.   Okay.  And you pled guilty in this case, right?

20  A.   Yes, sir.

21  Q.   And what is your understanding of your agreement with the

22  Government, what have you agreed to do in this plea agreement?

23  A.   Nothing but tell the truth.

24  Q.   Okay.  And what do you hope the Government will do on your

25  behalf if you do that?

1    A.  Give me a lesser sentence or something.

2    Q.  And what happens if you don't tell the truth?

3    A.  Well, all goes down the drain.

4    Q.  You said it will all go down the drain?

5    A.  (Witness nodded affirmatively.)

6    Q.  Will you get more time or more charges?

7    A.  Yes, more time, more charges.

8    Q.  Getting back to your dealings, during this period that you

9    outlined, and I won't go into any more detail about that, but

10   when you were dealing with Mr. Brothers up until your

11   arrest -- When did you stop dealing with Mr. Brothers?

12   A.  I can't remember.

13   Q.  Was it around the time of his arrest?

14   A.  Yes.  No, when he got with y'all, I stopped dealing with

15   him.

16   Q.  You heard he went with y'all; what do you mean?

17   A.  Like -- like I heard when he got picked up or something

18   like that.

19   Q.  This was before everyone got arrested in this case?

20   A.  I can't remember all that.

21   Q.  Okay.  But you heard -- you heard or you believe that

22   Mr. Brothers was cooperating with the police?

23   A.  No, that -- I heard that.

24   Q.  Okay.  And that -- All right.  Now, during this period

25   that we're talking about when you were selling drugs, did you

1    ever have any dealings with Martin Ballard?  Drug dealings.

2    A.  No, sir.

3    Q.  Okay.  We'll come back to that.  Did you know Mr. Ballard?

4    A.  No, sir.

5    Q.  Had you ever come across him before y'all were

6    incarcerated?

7    A.  No, sir.

8    Q.  Now, during the time since you've been arrested in this

9    case -- I'm just going to touch on a couple things, then we'll

10   be almost done.  You were out on bond initially, right?

11   A.  What you say now?

12   Q.  You got out on bond in this case initially?

13   A.  Yes, sir.

14   Q.  Then but your bond got revoked?

15   A.  Yes, sir.

16   Q.  Why did it get revoked?

17   A.  My drug habits.

18   Q.  You were using drugs?

19   A.  Yes, sir.

20   Q.  You tested positive?

21   A.  Yes, sir.

22   Q.  Several times?

23   A.  Yes, sir.

24   Q.  And you didn't do what they asked as far as dealing with

25   your drug problem?

1   A.  Yes, sir.

2   Q.  And you were revoked.  And then you spent a period in

3   jail, and then you got another bond and are you -- did you

4   have a requirement of that bond, did you have to do anything

5   when you got out?  Are you in any particular drug program

6   right now?

7   A.  Yes, sir.

8   Q.  Tell the Court what that is.

9   A.  I have went through the some place in Summerville, and

10  then I had went to -- I got in a Bridge program.

11  Q.  You're in the Bridge program?

12  A.  Yes, sir.

13  Q.  Are you currently still in the Bridge program?

14  A.  Yes, sir.

15  Q.  All right.  Now, since your arrest in this case, have

16  you come across Mr. Ballard or have any discussions with

17  Mr. Ballard in this case?

18  A.  Since I had came home?

19  Q.  No, since -- from the time that you were arrested.

20  A.  I don't understand.

21  Q.  Did you have any conversations with him in the courthouse?

22  A.  Yes, sir.

23  Q.  Tell the Court about that.

24  A.  Oh, that's when I had -- I came in and he like --

25  Q.  Let's back up.  Why were you in court that day?

1    A.   We had a Bridge -- a meeting, bar or something like that?

2    Q.   And were all the other defendants present?

3    A.   Yes, sir.

4    Q.   And it was in this courtroom?

5    A.   Yes, sir.

6    Q.   Okay.  And tell us what happened.  Were you with

7    Mr. Ballard?

8    A.   I came in with him?

9    Q.   Back up.  Just tell us what happened.  Your interaction

10   with Mr. Ballard.

11   A.   I came in, we were sitting down, we was talking, BJ came

12   in, he like, that snitch motherfucker, know what I'm saying,

13   then they got little words --

14   Q.   Back up.  Who's BJ?

15   A.   Ivory Brothers.

16   Q.   And he came by and walked by you and Mr. Ballard.  Where

17   were y'all sitting?

18   A.   We was sitting right here in a lobby right there.  At the

19   front.  So we walked in the elevators.

20   Q.   And what did Mr. Ballard say about Mr. Brothers?

21   A.   That's a snitching motherfucker there.

22   Q.   And did he say that to -- Did Mr. Brothers hear that?

23   A.   I guess his home man heard it, and --

24            MR. THEOS:  Your Honor, I'm going to object to what

25   he overheard anybody other than Martin Ballard say or what he

1  claims he overheard.

2  BY MR. PHILLIPS:

3  Q.  Was there any reaction from Mr. Brothers or anyone else

4  when he stated that Mr. Brothers was a snitch?

5  A.  Yes, his mama had said something --

6           MR. THEOS:  Your Honor, I object.

7           THE COURT:  He can testify what Mr. Ballard said.

8           MR. THEOS:  Sure, he can, Your Honor, but he can't

9  testify to what somebody else said, which is what he's about

10  to testify to.

11          MR. PHILLIPS:  Your Honor, he said she said

12  something.  Just that she spoke is not hearsay.  He's not

13  going to tell us what she said.  I'm just asking if they -- if

14  they heard --

15          THE COURT:  I said all right.

16          MR. PHILLIPS:  Okay.  Yes, sir.  I apologize.

17  BY MR. PHILLIPS:

18  Q.  So don't tell us what anyone says, but did they react as

19  if they heard?

20  A.  Yes, sir.

21  Q.  Including Mr. Brothers?

22  A.  Yes, sir.

23  Q.  After that, did you talk with Mr. Ballard any more?

24  A.  Yes, he like you seen -- he asked me did I seen him

25  around, and --

1    Q.  See who around?

2    A.  Ivory Brothers.  And he asked me I seen him around, he

3    like I got some stacks on him.

4    Q.  He said, "I have some stacks on him."?

5    A.  Yes.

6    Q.  What does that mean?

7    A.  Like --

8          THE COURT:  Well, now, he can't testify to what --

9    Q.  What did you understand that to mean?  Have you ever heard

10   the term stacks?

11         THE COURT:  Wait a minute.  Wait a minute.  He can

12   testify to what Mr. Ballard said.  I don't know if he can

13   interpret it, unless you qualify him.

14         MR. PHILLIPS:  Yes, sir.  I'll try to lay a

15   foundation that he might have some knowledge as to what the

16   word "stacks" means.

17         THE COURT:  All right.

18         MR. PHILLIPS:  That's the importance of that.

19         THE COURT:  Is that what he said Mr. Ballard said?

20         MR. PHILLIPS:  Yes, he said he had stacks on his

21   head.

22         THE COURT:  Okay.

23   BY MR. PHILLIPS:

24    Q.  Now, in your years as a drug dealer, have you ever heard

25   the term stacks used in drug talk?

CHARLES YOUMANS - DIRECT EXAMINATION

1   A.  Yes, sir.

2   Q.  And in that drug talk, what was the word stacks used for?

3   A.  Like thousand dollars.  Like a thousand.

4   Q.  And have you ever heard about, in the years of being a

5   drug dealer, of stacks being put on someone's head?

6   A.  Yes, sir.

7   Q.  Okay.  And what did that mean, based on your experience as

8   a drug dealer, when someone puts stacks on someone's head?

9   A.  Like you ready to go and kill somebody.

10  Q.  Okay.  So there's a price on his head?

11  A.  Yes, sir.

12  Q.  Now, did y'all talk about anything else?  Did y'all talk

13  about maybe coming across each other when y'all were out?

14  A.  No, sir.

15  Q.  I have one more question.  Prior to this bar meeting, had

16  you learned that Mr. Brothers was cooperating, through meeting

17  with your attorney and other information out there?

18  A.  Yes, sir.

19          MR. PHILLIPS:  Okay.  Thank you.

20                    CROSS-EXAMINATION

21  BY MR. THEOS:

22  Q.  Mr. Youmans, you said you're 35 years old?

23  A.  Yes, sir.

24  Q.  And you said you've been dependent on and using drugs

25  since you were 16 years old?

1    A.  Yes, sir.

2    Q.  Nineteen years?  The last 19 years you've been on drugs,

3    right?

4    A.  I guess so.  I can't remember the years.  When I was like

5    16.

6    Q.  And the drugs that you've been on have been marijuana?

7    A.  Marijuana and cocaine.

8    Q.  Crack?

9    A.  Cocaine.

10   Q.  Powder cocaine?

11   A.  Yes, sir.

12   Q.  How do you take it?

13   A.  Sniff it, smoke it.

14   Q.  Do you shoot it up?

15   A.  No, I ain't shoot it up.

16   Q.  And how often would you say during that time frame, those

17   19 years, how often would you say you used drugs; on a daily

18   basis?

19   A.  No, not daily basis.  Like say like Friday, Saturdays,

20   weekends.

21   Q.  Safe to say you used it whenever you could get your hands

22   on it?

23   A.  No, not like that.

24   Q.  Well, you started selling drugs when you were how old?

25   A.  Sixteen.

CHARLES YOUMANS - CROSS-EXAMINATION

1    Q.  So you not only began using drugs at 16, you began selling
2    drugs at 16.
3    A.  Using and selling.
4    Q.  And when you were selling those drugs, you were using the
5    money that you made in order to support your habit of using?
6    A.  Yes, sir.
7    Q.  Now, you have several convictions for drugs, is that
8    right?
9    A.  Yes, sir.
10   Q.  And you also have a conviction for giving false
11   information to law enforcement, don't you?
12   A.  Yes, sir.
13   Q.  And that was just a couple years ago, that was in 2012,
14   wasn't it?
15   A.  I don't know what year it been, but I did that.
16   Q.  You don't remember what year you were arrested and
17   convicted of giving false information to law enforcement?
18   A.  No, but I did it though.  I don't know exactly what date
19   been.
20   Q.  Do you remember the years that you were convicted of
21   drugs?
22   A.  I don't remember all that.
23   Q.  Can you remember how many times you were convicted of
24   drugs?
25   A.  Say at least about five, five or six, seven.

CHARLES YOUMANS - CROSS-EXAMINATION

1    Q.  That was my count, too, but in listening to Mr. Phillips

2    question you, it sounded like you had only been convicted a

3    couple of times for drugs.  But the truth is, you've been

4    convicted several times for drugs, right?  So many you can't

5    even remember, right?

6    A.  No, I say -- about three or four.

7    Q.  And you've also been convicted of burglary?

8    A.  Burglary, no, sir.

9    Q.  What happened to the charge of burglary that you were

10   arrested on?

11   A.  Oh, me and my old lady had got into it, and she got

12   jealous and told the police that I hit her in the head with a

13   hammer, know what I'm saying, but when we went to court, they

14   throw it away, because you fighting with a hammer, why she

15   ain't go to the hospital?

16   Q.  So the burglary was when you broke back into the house and

17   she claims you attacked her?

18   A.  Yes.  I ain't broke in the house.

19   Q.  You were arrested for it, you just weren't convicted of

20   it?

21   A.  Yes, sir.

22   Q.  So were you convicted of the domestic violence charge?

23   A.  No, sir.  They throwed all that away.

24   Q.  They threw that out, too?  Now, you're indicted in the

25   superseding indictment in this case, right?

1    A.  What's that?

2    Q.  It was an original indictment in this case, then there was

3    a superseding indictment.  A second indictment.

4    A.  Yes, sir.

5    Q.  And you pled guilty under that second indictment, right?

6    A.  Yes.

7    Q.  You originally pled not guilty in March of 2012, right?

8    A.  No, I don't remember what date.

9    Q.  You don't remember that?  Do you remember being arraigned

10   on March the 21st of 2012?

11   A.  I don't remember the dates.

12   Q.  Do you remember how many times you went to court in 2012?

13   A.  No.

14   Q.  Do you remember why you went to court, what the Court

15   appearances were for in 2012?  You had a few of them for bar

16   meetings, roster soundings --

17   A.  Oh, yes.

18   Q.  -- arraignment.  Do you remember how many of those you

19   went to?

20   A.  I'd say at least about two or three.

21   Q.  And Martin Ballard would have been at all of those,

22   because he's a defendant in that, he was a defendant in that

23   same case, correct?

24   A.  Yes, sir.

25   Q.  You had never met Martin Ballard before, as he's

1    testified?

2    A.  No, I ain't never met him till I came here.

3    Q.  You hadn't had any drug dealings, as you were questioned

4    by Mr. Phillips, with Mr. Martin Ballard?

5    A.  No, sir.

6    Q.  You didn't know anything about Martin Ballard?

7    A.  No, sir.

8    Q.  Never seen him before?

9    A.  No, sir.

10   Q.  Never talked to him before?

11   A.  Since I been here.

12   Q.  You had never talked to him before.

13   A.  No, sir.

14   Q.  Now, you pled guilty, you pled guilty in this case to a

15   lesser included offense of count one; does that sound

16   familiar?

17   A.  Yes, sir.

18   Q.  You, as a result of your agreement to testify here today,

19   you were allowed to plead guilty to only one count, and that

20   was that lesser included offense, correct?

21   A.  What you say now?

22   Q.  In exchange for your testimony against Martin Ballard, you

23   were allowed to enter a guilty plea to one count of the

24   indictment.  Correct?

25   A.  I don't know.

CHARLES YOUMANS - CROSS-EXAMINATION

1   Q.  You don't know?

2   A.  (Witness shakes head negatively.)

3   Q.  Well, in between the date that you pled guilty -- and do

4   you remember the date you pled guilty?

5   A.  No, sir.

6   Q.  Do you remember the date you were arrested?

7   A.  No, sir.

8   Q.  Do you remember in between those two dates, do you

9   remember when you met with law enforcement about the case?

10  A.  No, sir.

11  Q.  Do you remember signing a proffer agreement?

12  A.  Yes, sir.

13  Q.  Okay.  You remember when that was?

14  A.  No, I don't know what date.

15  Q.  Do you remember anything about the proffer agreement?

16  A.  No, sir.

17  Q.  Do you at least remember in the proffer agreement as well

18  as the plea agreement that you signed, that you would -- you

19  were -- you would have to take a polygraph test, if the

20  Government requested it of you?  Do you remember that?

21  A.  Yes, sir.

22  Q.  And they haven't made that request, have they?

23  A.  I don't even know.

24  Q.  You don't know?

25  A.  No, sir.

1    Q.  If they have, you're not aware of it?

2    A.  No, sir.

3    Q.  But you haven't taken one?

4    A.  Sir?

5    Q.  You have not taken one?

6    A.  No, sir.

7    Q.  Is that right?  Now, does January the 20th of 2013 sound

8    like the date or close in time to date that you met with DEA

9    and Mr. Phillips to talk about this case?

10   A.  I can't remember that.

11   Q.  Well, let me put it this way.  Do you recall meeting with

12   Mr. Phillips and DEA about a year after your arrest?

13   A.  Yes, sir.

14   Q.  And you testified earlier that shortly after your arrest

15   you were in this courthouse and that Mr. -- you heard

16   Mr. Ballard say certain things, correct?

17   A.  Yes, sir.

18   Q.  So that would have taken place in March or the spring of

19   2012, right?  Shortly after your arrest.

20   A.  Yes, sir.

21   Q.  And then sometime in January, sometime about a year later

22   or so, is when you met with law enforcement and Mr. Phillips,

23   and that's when you told them what you claim you heard Martin

24   Ballard say, correct?

25   A.  Ain't no claim.

1  Q.  Well, that's the first time you told anybody what you

2  claim Mr. Ballard said.  Right?

3  A.  Sir?

4  Q.  You had not told anybody in about a year, a year from the

5  time you say you heard Mr. Ballard say those words, you didn't

6  tell anybody until you told Mr. Phillips about a year later,

7  correct?

8  A.  A year later?  You got me lost.

9  Q.  Now, when you met with law enforcement, you acknowledge

10  and agree it was about a year after your arrest, right?

11  A.  Yes, sir.

12  Q.  And at that time you told him how you became involved in

13  the drug business?

14  A.  Yes, sir.

15  Q.  Right?  You told him you started when you were 16 and you

16  were -- you were a user and a dealer, right?

17  A.  Yes, sir.

18  Q.  And you told him that one of your sources was a man named

19  Sutter?

20  A.  Yes.

21  Q.  Do you remember that?

22  A.  Yes, sir.

23  Q.  You told him that another source was somebody named Moore,

24  Clyde Moore?

25  A.  Yes, sir.

CHARLES YOUMANS - CROSS-EXAMINATION

1  Q.  Do you remember who else you told him were sources of

2  yours?

3  A.  Ryan Hull.

4  Q.  Anybody else?

5  A.  Bobo.

6  Q.  Somebody named Bobo?

7  A.  (Witness nodded affirmatively.)

8  Q.  Did you tell him who you were selling drugs to?

9  A.  No, sir.

10  Q.  Why didn't you tell him who you were selling drugs to?

11  A.  I was selling drugs to people who use it.

12  Q.  I'm sorry?

13  A.  I said I was selling drugs to people who were using.

14  Q.  Now, do you remember also at that meeting if that was the

15  first time you told law enforcement and Mr. Phillips that you

16  had heard Mr. Ballard say something in the courthouse?  Wasn't

17  that the first time --

18  A.  Yes, sir.

19  Q.  So a year passed before you decided to say anything about

20  what you claim you heard from Martin Ballard, correct?

21  A.  Yes, sir.

22  Q.  And the reason you brought it up a year later is because

23  at that point in time you were doing whatever you felt like

24  you needed to do to help yourself, right?

25  A.  No, sir, that's the only time I had to talk to him.

1  Q.  Well, you didn't come forward before that, right?

2  A.  No, sir.

3  Q.  And at that point in time you had made a decision that you

4  were going to plead guilty, correct?

5  A.  Yes, sir.

6  Q.  And in making that decision to plead guilty, you also

7  realized that in order to help yourself, you needed to provide

8  information that could help you from a sentencing standpoint,

9  right?

10  A.  Ain't no guarantee I'm going to get that.

11  Q.  Oh, I know, there are no guarantees in life and no

12  guarantees in this system.  But you made those statements and

13  you agreed to try to cooperate to help yourself regarding

14  sentencing, right?

15  A.  Yes, sir.

16  Q.  And, in fact, you have already received substantial

17  benefit from your claim that Martin Ballard said those things,

18  haven't you?

19  A.  I don't know.

20  Q.  Well, you entered a guilty plea to a lesser offense,

21  right?

22  A.  Yes, sir.

23  Q.  You violated your bond several times, you smoked marijuana

24  throughout the time you were out on bond, you came in late

25  several times, you didn't even show up at various times.  And

1    your bond was revoked as a result of that, right?

2    A.  Yes, sir.

3    Q.  But because of your cooperation and your testimony against

4    Martin Ballard, when you entered a guilty plea, admitting that

5    you were a drug user and a drug dealer and a drug supplier,

6    even though you admitted all those things, you were let out on

7    bond again, weren't you?

8    A.  Yes, sir.

9    Q.  And the reason you were let out on bond again is because

10   you were cooperating and you were providing information about

11   Martin Ballard.  Right?

12   A.  Yes, sir.

13   Q.  They wouldn't let you out otherwise.  You had violated

14   your bond, you'd have been in jail at least several months

15   away -- your bond was revoked and you'd have been in jail

16   several months before you pled guilty, right?

17   A.  Yes, sir.

18   Q.  Now, in fact, when you were out on bond, you not only

19   continued to use drugs but you continued to sell drugs, didn't

20   you?

21   A.  What you talking about?

22   Q.  Didn't you continue to get drugs, you continued to get

23   drugs from Mr. Brothers for some period of time, but then

24   ultimately you bought drugs from somebody else, didn't you?

25   Who else did you buy drugs from?

1  A.  Who you talking about?  Talking about the first time I got

2  out of jail?

3  Q.  After you got out on bond, you continued to sell drugs,

4  didn't you?

5  A.  You got me confused.

6  Q.  I'm sorry?  I have you confused?

7  A.  Yes, sir.

8  Q.  Well, didn't you, after Brothers got arrested and you said

9  you stopped buying drugs from him, didn't you start buying

10  drugs again from Bobo?

11  A.  Oh, I got you now.

12  Q.  Right?

13  A.  Yes.

14  Q.  And that was while you were out on bond, right?

15  A.  Not for the feds.

16  Q.  I'm sorry, what?

17  A.  No, I don't think I been --

18  Q.  So the truth is, you not only violated the terms of your

19  bond, but you also violated the terms of your proffer

20  agreement and your plea agreement with the Government, in

21  continuing to use drugs and sell drugs, right?

22  A.  Talking about when I had got out the first time?

23  Q.  Yes.

24  A.  When I got out of here I ain't went back to selling drugs.

25  Q.  So your testimony is you just used drugs?

1    A.  Yes.

2    Q.  So you know that's a violation --

3    A.  Got me messed up, man.

4    Q.  Well, it's tough to keep -- when you're not telling the

5    truth, it's tough to keep up with what the truth is and what

6    the lies are, right?

7    A.  I don't know what you talking about.

8    Q.  Well, do you --

9    A.  You got to break it down for me, man.

10   Q.  I've got to do what?

11   A.  Break it down.

12   Q.  Martin Ballard, you claim that Martin Ballard -- Martin

13   Ballard was someone you had never met before.

14   A.  Right.

15   Q.  And you were in a courtroom, as Mr. Phillips said, with a

16   number of people there.

17   A.  Yes, sir.

18   Q.  Right?  Yet miraculously you were the only person, you

19   were the only person that claims you heard Martin make those

20   statements.

21   A.  I was sitting right by him.

22   Q.  So you expect Judge Blatt to believe you, a drug dealer, a

23   drug user, somebody that's been on drugs throughout adulthood

24   and most of their teenage years, you expect Judge Blatt to

25   believe you, when you can't remember dates, times, important

1   dates and times related to this case, you expect Judge Blatt

2   to believe that in a crowded courtroom, you were the only

3   person that overheard Martin Ballard say things.

4   A.  I'm just speaking the truth.

5   Q.  And somebody that you had never known, decided to confide

6   in you and tell you things in the middle of a courthouse with

7   people all around.

8   A.  Yes, sir.

9   Q.  The truth of the matter is, since you pled guilty and

10   you're awaiting sentencing, what you're trying to do at this

11   point is help yourself related to that sentence and trying to

12   get the lightest sentence you can, isn't that right?

13   A.  Ain't nothing promised.

14   Q.  I understand, but as you testified when Mr. Phillips was

15   questioning you, your goal is to get the lightest sentence you

16   can, isn't it?

17   A.  Yes, sir.

18   Q.  And the reason you're here testifying against Martin

19   Ballard is to help yourself.  That's the bottom line, isn't

20   it?

21   A.  Yes, sir.

22           MR. THEOS:  No other questions, Judge.

23           THE COURT:  All right.

24           MR. PHILLIPS:  No questions, Your Honor.

25           THE COURT:  You may go down.

1        MR. PHILLIPS:  Your Honor, we have no further

2   witnesses for this afternoon.

3        THE COURT:  I thought we were waiting on somebody

4   from Walterboro.

5        MR. PHILLIPS:  That was the individual that was

6   coming from Walterboro.  The second witness was the law

7   enforcement that couldn't get here in time.  Sorry for

8   confusion, but we only have one for now.

9        THE COURT:  All right, sir.  Well, you're through for

10  today?

11       MR. PHILLIPS:  Yes, sir, we're done for today.

12       THE COURT:  Well, I look for everybody at

13  10:00 o'clock Monday.

14       MR. PHILLIPS:  Yes, sir.

15       THE COURT:  And we're going to work Monday, Tuesday,

16  Wednesday and Thursday.

17       MR. PHILLIPS:  Yes, sir.

18       THE COURT:  How many more witnesses do you have?

19  About.

20       MR. RICHARDSON:  Your Honor, I believe it's ten.

21  Could be 11.

22       THE COURT:  You think you'll finish, take all week to

23  do it?

24       MR. RICHARDSON:  I think we'll finish on Tuesday.  My

25  best guess is we'll probably finish up Tuesday afternoon, we

1   might run into Wednesday, but I think we're in pretty good

2   shape, we moved along. I know it doesn't always seem this

3   way, but we've moved along pretty quickly. I anticipate that

4   we would finish up either Tuesday afternoon or sometime on

5   Wednesday would be when we would finish up. That's obviously

6   subject to a lot of unknowns, depending on the testimony that

7   we have on Monday and Tuesday.

8           THE COURT: And how long is the -- Mr. Theos, do you

9   think it's going to take you?

10           MR. THEOS: Your Honor, I believe we've got, I think

11   the count was ten witnesses. So at this point we plan on

12   calling all of them. I think there will be two witnesses that

13   will be lengthy. Mr. Ballard will be quite lengthy. And our

14   financial expert will probably be somewhat lengthy. The

15   others I anticipate will be fairly short.

16           THE COURT: Well, looks like we'll go into week after

17   next then.

18           MR. THEOS: I would think probably just maybe Tuesday

19   at the latest. I'm guessing.

20           THE COURT: Of course, you don't know what he's got.

21   All right then, I don't know there's any use for us to stay

22   any longer on Friday afternoon.

23           MR. RICHARDSON: I don't think so, Your Honor.

24           THE COURT: So we'll be in recess.

25       (Court adjourned at 3:14 p.m.)

1                    REPORTER'S CERTIFICATION

2


3              I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4     Reporter for the United States District Court for the District

5     of South Carolina, hereby certify that the foregoing is a true

6     and correct transcript of the stenographically recorded above

7     proceedings.

8


9


10
      S/Debra L. Potocki
11    _____

12    Debra L. Potocki, RMR, RDR, CRR

13


14


15


16


17


18


19


20


21


22


23


24


25