IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

UNITED STATES OF AMERICA        :        VOLUME IV
                                :
        vs.                     :
                                :
MARTIN LOUIS BALLARD            :        2:12 – CR – 232

        Trial continues in the above-captioned matter on

Monday, May 11th, 2015, commencing at 10:18 a.m., before

the Hon. Sol Blatt, Jr., in the United States Courthouse,

Courtroom III, 81 Meeting St., Charleston, South Carolina,

29401.

APPEARANCES:

                JULIUS N. RICHARDSON, ESQUIRE,
                PETER T. PHILLIPS, ESQUIRE and
                SEAN KITTRELL, ESQUIRE, Office of the
                U.S. Attorney, P.O. Box 978, Charleston, SC,
                appeared for the Government.

                JERRY N. THEOS, ESQUIRE and
                PHILIP R. HAMMOND, ESQUIRE, P.O. Box 399,
                Charleston, SC, appeared for defendant.

            REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
            Official Court Reporter for the U.S. District Court
                        P.O. Box 835
                    Charleston, SC  29402
                        843/723-2208

I N D E X

WITNESS:  CLIFTON BROWN

Direct Examination by Mr. Kittrell........................ 485
Cross-Examination by Mr. Theos........................... 497

WITNESS:  JIMMIE HARRIS

Direct Examination by Mr. Richardson..................... 505

WITNESS:  JAMAL McELVEEN (CONTINUED)

Direct Examination by Mr. Phillips........................ 528
Cross-Examination by Mr. Theos........................... 534
Redirect Examination by Mr. Phillips..................... 555

WITNESS:  SHAWN BLOUNT

Direct Examination by Mr. Phillips........................ 559
Cross-Examination by Mr. Theos........................... 571

WITNESS:  GERNARDO CATO

Direct Examination by Mr. Phillips........................ 580
Cross-Examination by Mr. Theos........................... 596

WITNESS:  GARRICK SANDERS

Direct Examination by Mr. Richardson..................... 610
Cross-Examination by Mr. Theos........................... 619
Redirect Examination by Mr. Richardson.................. 622

WITNESS:  CHARLES SANDERS

Direct Examination by Mr. Phillips........................ 624
Cross-Examination by Mr. Theos........................... 650
Redirect Examination by Mr. Phillips..................... 650

WITNESS:  CEDRIC MYERS

Direct Examination by Mr. Kittrell........................ 652
Cross-Examination by Mr. Theos........................... 671

1          THE COURT:  All right, Mr. United States Attorney, I

2     can't tell exactly where we stand from all the information

3     I've gotten.

4          MR. RICHARDSON:  Your Honor, I believe Jerry is

5     walking in.  Before I start, maybe we'll wait --

6          THE COURT:  We better wait.

7        (Discussion held off the record.)

8          MR. RICHARDSON:  Your Honor, first thing the

9     Government is going to do is we're going to call Mr. Clifton

10    Brown.  He will testify, he's a relatively short witness.

11    He's a noncustody witness, flew in from Missouri last night.

12    The second witness will be Jimmie Harris.  And I had the

13    chance, and I believe Mr. Theos did as well, to speak with his

14    lawyer.  There's some uncertainty as to exactly what

15    Mr. Harris is going to do.  So we'll have to maybe play that a

16    little bit by ear.  I anticipate that he is not going to

17    invoke the Fifth Amendment, but is instead going to simply

18    refuse to answer the Government or the defense's questions.

19    That would subject him -- he's entitled to do that -- it

20    subjects him to potential civil or criminal contempt, but

21    that, you know, he's entitled to make that decision.

22         THE COURT:  Well, what would be the difference in him

23    refusing to take the stand on the grounds of, say the Fifth

24    Amendment, and getting up on the stand and refusing to answer

25    the question?

1          MR. RICHARDSON:  The only difference between the two,

2     Your Honor, is if he just simply refuses to answer the

3     question, then he's subject to contempt proceedings.

4          THE COURT:  I realize -- I mean on the ground that --

5     on the Fifth Amendment grounds.

6          MR. RICHARDSON:  And if he takes the Fifth Amendment,

7     he wouldn't be subject to contempt, that's just a valid

8     privilege that he could assert.  I don't anticipate he's going

9     to take the Fifth Amendment, I anticipate he's going to simply

10    refuse to comply with the Court's order that he answer the

11    questions that are propounded to him.

12         THE COURT:  Well, of course, Mr. Theos, you don't

13    know either?

14         MR. THEOS:  No, sir, I guess we'll just have to wait

15    and see, Judge.

16         THE COURT:  I mean before we get started I'd like --

17    I'm trying to -- of course I just found out about it myself.

18    If he gets up on the stand, if he's sworn and gets up on the

19    stand and takes the position it may tend to incriminate him,

20    and he refuses -- and is not going to testify about anything

21    about it, that's one way to approach it.  Now, if he gets up

22    on the stand and answers some general questions, and when he

23    gets into the part that you're talking about, he just refuses

24    to answer the question on the grounds it may tend to

25    incriminate him, what -- I'm not positive, but we just haven't

1  had a chance to look into it. But it seems that once -- I

2  believe there's some difference in taking the stand and

3  answering some questions, then stopping and refusing to --

4  refusing to -- he can't refuse to take the stand, but refusing

5  to answer anything.

6           MR. RICHARDSON: I think that's right, Your Honor.

7           THE COURT: I'm not sure of that, but I think there's

8  some difference.

9           MR. RICHARDSON: Obviously we don't know what he's

10 going to refuse. My belief is that he's going to refuse to

11 answer any questions. I don't know what he's going to do,

12 obviously, but I believe he's going to simply refuse to answer

13 questions relevant to this case.

14          THE COURT: Well, would the Government be in a

15 position to tell the Court what you think he knows about the

16 case or what you think he --

17          MR. RICHARDSON: Absolutely, Your Honor. What he

18 knows about the case, Mr. Harris is the shooter.

19          THE COURT: I know that.

20          MR. RICHARDSON: And so what he knows about the case,

21 in essence, in some reform, was that he was --

22          MR. THEOS: Your Honor, I object to what the

23 Government claims that Mr. Harris may or may not know. I

24 mean, that's the purpose of him testifying. And I don't think

25 it's appropriate at this time for the Government to proffer to

1    the Court what they think he knows.

2            THE COURT:  One thing I forgot about, I'm trying this

3    case as a jury, and that's another -- that's what you do

4    outside the presence of the jury, but we can't very well do it

5    outside the presence of the jury.

6            MR. RICHARDSON:  I don't think it matters.  I mean, I

7    think the Government can proffer to you what the evidence

8    would be and Your Honor can take that into appropriate

9    consideration as a legal issue.

10           THE COURT:  I can do that.

11           MR. RICHARDSON:  So I think we could do that.  I

12   don't think it's critically important in this case.  I think

13   Your Honor's familiar with the role that he played, based on

14   his guilty plea.  I think what I can say, without getting into

15   detail, is we think that he would provide testimony consistent

16   with someone who was involved in that manner.

17           THE COURT:  Well, you know, we can stay here all day

18   guessing, so I think the first witness, what is his --

19           MR. RICHARDSON:  He's really unrelated to this issue,

20   Your Honor.  He just flew in from Missouri last night, and so

21   we're going to have him testify first.

22           THE COURT:  All right, sir, then --

23           MR. RICHARDSON:  So he can then fly back to Missouri.

24           THE COURT:  Why don't we just take his testimony,

25   then we'll get into all this.

CLIFTON BROWN - DIRECT EXAMINATION

1      MR. RICHARDSON:  I think that would be fine, Your

2  Honor.

3      MR. KITTRELL:  This witness is Clifton Brown.  And he

4  should be right outside.

5      THE CLERK:  State your name for the record.

6  A.  Clifton Brown.

7      CLIFTON BROWN, a witness called by the Government, first

8  having been duly sworn, testified as follows:

9                    DIRECT EXAMINATION

10  BY MR. KITTRELL:

11  Q.  You're Mr. Clifton Brown?

12  A.  Yes, sir.

13  Q.  And where are you from?

14  A.  I'm from Chicago, Illinois.

15  Q.  How did you come to be in South Carolina?

16  A.  I was incarcerated in Greenville, Illinois, and actually

17  they had a little riot on the yard.

18  Q.  I'm sorry, what?

19  A.  They had a riot on the yard, and they scooped up a bunch

20  of people off the yard and they ended up sending me to South

21  Carolina Estill.

22  Q.  So you were a federal prisoner, a federal inmate as a

23  result of being convicted on federal charges?

24  A.  Yes, sir.

25  Q.  And ultimately you were housed at Estill?

1   A.  Yes, sir.

2   Q.  And when you were at Estill, you were serving a sentence

3   for what offense?

4   A.  For distributing crack cocaine, cocaine, marijuana, and

5   being caught with firearms.

6   Q.  And you do remember what statute that was you were

7   convicted of?

8   A.  I was convicted of a 924(c).

9   Q.  And what sentence did you receive?

10  A.  Hundred thirty months.

11  Q.  When did that sentence terminate?

12  A.  Actually they gave me a two-point reduction, and they took

13  ten months off, so I ended up serving 120 months, ended

14  April 9, 2015.

15  Q.  So you were on supervised release for that offense?

16  A.  Yes, sir.

17  Q.  And you also have another charge hanging over your head,

18  do you not?

19  A.  Yes, sir.

20  Q.  What is that?

21  A.  I was caught introductory of contraband, marijuana, I got

22  caught bringing eight ounces of marijuana into the Federal

23  Institution Estill, South Carolina.

24  Q.  So you were -- have you been convicted of that?

25  A.  No, sir, I wasn't convicted; I pled guilty to it though.

CLIFTON BROWN – DIRECT EXAMINATION

1    Q. And so you're awaiting sentence on that?

2    A. Yes, sir.

3    Q. And who is the judge that will sentence you?

4    A. Judge Blatt.

5    Q. Who is sitting next to you today?

6    A. Correct.

7    Q. All right.  In this case is there a plea agreement?

8    A. No, there's no plea agreement yet.

9    Q. Is there a proffer?

10   A. Yes, there's proffer.

11         THE COURT:  You're saying this case; are you talking

12   about the case he's just --

13         MR. KITTRELL:  Yes, sir, in his case there's no plea

14   agreement.  And all we have is a proffer letter, which is

15   Exhibit 10 H.

16         THE COURT:  That's the second case.

17         MR. KITTRELL:  I'm sorry, Your Honor, we have no plea

18   agreement between the Government and this defendant.  All that

19   we have is 10 H, which is a proffer letter.

20         THE COURT:  Yes, sir.  All right.

21         MR. KITTRELL:  May I approach?

22         THE COURT:  Yes, sir.

23   BY MR. KITTRELL:

24   Q. Show you 10 H.  Do you recognize this?

25   A. Yes, sir.

CLIFTON BROWN - DIRECT EXAMINATION

1    Q.  Look on the back page.

2    A.  Yes, sir.

3    Q.  Is that your signature?

4    A.  Yes, sir.

5    Q.  And what is this?

6    A.  That's a proffer agreement.

7    Q.  And that's with the Government?

8    A.  Yes, sir.

9    Q.  And what does that require you to do?

10   A.  Requires me to tell the truth, state nothing but the

11   truth.  And it also let me know that the Government didn't

12   make me any promise, et cetera.

13   Q.  Now, when you were brought back from Estill did you end up

14   at the detention center here in Charleston?

15   A.  Yes, sir.

16   Q.  Under what circumstances?

17   A.  I ended up at the detention center being held waiting to

18   go to court for the situation that happened as Estill, South

19   Carolina.

20   Q.  All right.  And that's the introduction of contraband, the

21   marijuana into Estill?

22   A.  Yes, sir.

23   Q.  And do you know Mr. Martin Ballard?

24   A.  Yes, sir.

25   Q.  How do you know him?

CLIFTON BROWN - DIRECT EXAMINATION

1    A.  We actually met leaving Charleston County detention

2    center.  We met inside of a little holding cell, we were on

3    our way actually to Georgetown County, they woke us up early

4    in the morning and told us that we were going to be

5    transferred, randomly picked.

6    Q.  Did you have a relationship/friendship with him?

7    A.  Actually right then and there we met and we, you know,

8    talked or whatever, showed me a couple of pictures of his

9    vehicles.  And prior to riding over to Georgetown we built a

10   relationship, you know.  And once we got in Georgetown we

11   started connecting and built a pretty tough relationship.

12   Q.  Did y'all become close?

13   A.  Yes, sir.

14   Q.  And what other things did you talk about?

15   A.  He would always talk about his case.  He would always, you

16   know --

17   Q.  I'm sorry, what?

18   A.  He would always talk about his case.  He would always, you

19   know, look into his paperwork and research his case and say,

20   you know, he was pretty sure that he could beat his case.

21   Q.  Why was that?

22   A.  Stuff like that.  Because he said he only had one witness

23   or whatever that, you know, was testifying against him or

24   whatever at the time.  And he was pretty sure that he could

25   beat his case.  He said he didn't get caught with anything but

1    a small bag of cocaine and, you know, a firearm that was

2    registered.  So he was pretty sure he could beat his case.

3    Q.  And what did he say about the witness?

4    A.  He said that the guy that was going to come and be a

5    witness on him or whatever, he said, you know, he was pretty

6    sure he could beat his case or whatever.  He said later on

7    stating down through it he said that he needed to put some

8    racks on him.

9    Q.  What does that mean?

10           THE COURT:  He needed to what?

11   A.  He needed to put some racks on him.

12   Q.  R-A-C-K-S?

13   A.  Yes, sir.

14   Q.  What is that?

15   A.  Racks is like, you know, money, cash money, thousand

16   dollar increments of money.

17   Q.  How do you know what that term means?

18   A.  I mean, I'm a street guy, I was a street guy myself, and

19   you know, they talk about it in rap songs and stuff, kind of

20   like a street term we use.

21   Q.  And what was he going to do with that?  With the racks.

22   A.  I guess, you know, he was going to pay somebody at the

23   time, you know, to have something done to the guy.

24   Q.  What specifically?

25   A.  Pay him cash, you know, to have him killed maybe, you

CLIFTON BROWN - DIRECT EXAMINATION

1    know?

2    Q.  And what else did he say?

3    A.  He stated that, you know, if he can get that done, then he

4    was pretty sure he could beat his case.

5    Q.  Did you talk anything else about his life or his

6    background?

7    A.  Yes, sir, he stated, you know, that he pretty much, you

8    know, ran Summerville, you know.  He had a trucking company,

9    he had, you know, a dually truck, he had a Benz, you know.

10   Had a Chevy convertible.

11   Q.  When you say Benz, what do you mean?

12   A.  Like a 500 Benz coup.  Nice car.

13   Q.  And you said that he said he ran Summerville; what does

14   that mean?

15   A.  You know, you pretty much labeled the man, you know, you

16   pretty much control the area.

17   Q.  Control the area in terms of what?

18   A.  And you know, whatever it is that you do, drugs or you

19   know what I'm saying?  Stuff like that.

20   Q.  Did he speak about the drug trade?

21   A.  Well, you know, he told me basically that, you know, he

22   was holding it down, down there, you know.  Whatever it is

23   that, you know, he wanted something, he can get it, you know

24   what I'm saying?

25   Q.  No, I don't know what you're saying.

CLIFTON BROWN - DIRECT EXAMINATION

1    A.  Whatever it is, like whenever he wanted something, then he

2    can get it, he'll go buy it.  He can go get whatever it is

3    that you want.

4    Q.  What are you speaking of?

5    A.  As far as drugs.

6    Q.  And talking about cocaine, marijuana?

7    A.  Yeah, cocaine.

8    Q.  Okay.  Now, you mentioned earlier about him saying he

9    wanted to put racks on Mr. -- on a witness' head, correct?

10   A.  Correct.

11   Q.  What else, if anything, did he say about what he was

12   trying to do or planning to do, if anything?

13   A.  Well, he said that he had a cousin that he was pretty sure

14   like, you know, could carry it through for him.

15   Q.  And did he give any other details about --

16            THE COURT:  He was pretty sure they could do what?

17   A.  He had a cousin that could carry it through for him.

18   Basically go ahead, go through with the situation for him.

19   Q.  Did there ever come a time that you talked more

20   specifically about what happened?

21   A.  Yeah, actually we was restricted to rec inside of

22   Georgetown, so we get two hours of rec in a day, two hours of

23   rec at night.  So we come out at nighttime or whatever and we

24   would run and talk on the phones.  At the point in time I was

25   talking on the phones, he actually was talking on the phone

1  one time and, you know, he called me over, asked me for a

2  piece of my honey bun.  And another time he was on --

3  another other time he was on a phone, he came actually he

4  called me over there and he was actually happy and excited

5  about the situation, you know.  I guess his people had finally

6  come through for him, and he said the guy was shot and in

7  critical condition in the ICU in the hospital or whatever, and

8  he hope he die.

9           MR. KITTRELL:  Let me go ahead, if I could, and bring

10  up Government Exhibit 22 Y1.

11       (Audio recording was played.)

12  Q.  That was a call that's dated June 5th, 2013, at 7:47 p.m.

13  Who is Shy Town?

14  A.  Shy Town is me.

15  Q.  And why is that?

16  A.  Because I'm from Chicago, Illinois, everybody call me Shy

17  Town.

18  Q.  Do they do that at the Charleston County detention center?

19  A.  Yes, sir, if I walk through there everybody going to call

20  me Shy Town.

21  Q.  And this specific portion of that call, is that what

22  you're talking about with regards to the honey bun?

23  A.  Yes, sir, I gave him a piece of a honey bun.

24  Q.  What exactly did Mr. Ballard do after that phone call or

25  when he was talking to you?

CLIFTON BROWN - DIRECT EXAMINATION

1   A.   After that phone call, that right there that he was

2   talking or whatever, you know, he said that he had finished

3   talking to his people or whatever.  And we went over, you

4   know, hang out or finish talking or whatever that it is we was

5   doing at the time inside of Georgetown County.  And the next

6   day or whatever, is when he came back, and he stated that, you

7   know, everything -- once we got on the phone at night when we

8   came out for rec, he was fist bumping, he was happy about the

9   situation.

10  Q.   And what situation is that?

11  A.   The murder situation, the guy being shot and in critical

12  condition.

13  Q.   And did he react differently later on?

14  A.   Yeah, later on he reacted different.  Like the next day he

15  was kind of sad, you know, he was like, you know, they ain't

16  get the job done, you know.

17  Q.   Who's they?

18  A.   I guess his people, who he had to go through with the

19  situation at the time.

20  Q.   And y'all are pretty close friends, right?

21  A.   Yes, sir.

22          MR. KITTRELL:  Can you play Government's Exhibit 22

23  Y2, and just listen to this as well.

24      (Audio recording was played.)

25  Q.   So did you ever give him advice and talk to him, you were

CLIFTON BROWN - DIRECT EXAMINATION

1  close enough to do that?

2  A.  Yes, sir.

3  Q.  And did you ever give him advice about his case or talk

4  about his case?

5  A.  Yes, sir, I gave him advice to his case several times.

6  Q.  Did you speak in terms of your involvement in the past in

7  federal cases?

8  A.  Yes, sir.

9  Q.  And tell me about phones, you said mostly that you used

10  the phones in the rec?  When you had rec hours?

11  A.  Yeah, we would use the phones during rec before we

12  actually -- we had got set up to get some phones, so at the

13  time, we didn't have no cell phones, so --

14  Q.  Are you allowed to have cell phones in the detention

15  center in Georgetown?

16  A.  No, you're not.

17  Q.  So you were arranging to get phones?

18  A.  Yes, sir, we were arranging to get phones.

19  Q.  Tell us about that.

20  A.  Well, actually we run into a guy named Stretch or

21  whatever, Antonio Smalls, and he was able to get phones

22  through a corrupted officer or whatever, and actually we

23  retrieved some phones through that way.

24  Q.  And did he talk about -- did Mr. Ballard get a phone?

25  A.  Yes, sir.

CLIFTON BROWN – DIRECT EXAMINATION

1    Q.  And why did he want a phone?

2    A.  He wanted a phone so he could talk more freely and, you

3    know, have more access and talk about having what he wanted to

4    have done.

5    Q.  What did he want to have done?

6    A.  Meaning the murder.

7    Q.  And you mentioned also at the beginning of the middle

8    portion of your testimony about his trucking business.  Did he

9    talk about his lifestyle, how much income that trucking

10   business generated, or what purpose the trucking business held

11   for him?

12   A.  No, he just stated that, you know, the trucking business,

13   it was used just like, you know, a cover-up to help him cover

14   up some of the money he was making, you know.

15   Q.  And did he talk about spending money?

16   A.  Well, you know, he always talked about he had Gucci

17   loafers and lived the elaborated life, nice cars and stuff, go

18   shopping when he want, things like that.

19            MR. KITTRELL:  Beg the Court's indulgence.

20   BY MR. KITTRELL:

21   Q.  When Mr. Ballard was talking about the witness, did he

22   talk about what information that witness had on Mr. Ballard?

23   A.  Yeah, he stated that the witness was going to testify that

24   he sold in between eight to 14 bricks.

25   Q.  What are bricks?

CLIFTON BROWN - DIRECT EXAMINATION

1    A.   Like kilos.

2    Q.   Kilos of what?

3    A.   Kilos of cocaine.

4    Q.   And was Mr. Ballard -- when y'all did make phone calls

5    from the jail, do y'all use a personal identification number?

6    A.   Yes.

7    Q.   And did he use his or others, as far as you know?  Or did

8    he use yours?

9    A.   I really don't know.  Sometimes he would use his, maybe

10   sometimes he would use others.  But I really don't know, you

11   know, all the time other people's that he was using, I don't

12   know that.

13   Q.   Would you hear him or were you close enough to him to

14   listen to conversations he had on the phone?

15   A.   Yeah, they all close with each other.

16            MR. KITTRELL:  Answer any questions Mr. Theos may

17   have.

18                       CROSS-EXAMINATION

19   BY MR. THEOS:

20   Q.   Mr. Brown, you said you were a street guy, right?

21   A.   Yes, sir, I was.

22   Q.   And you're a convicted felon, right?

23   A.   Yes, sir.

24   Q.   You're a drug dealer?

25   A.   I was, yes, sir.

CLIFTON BROWN - CROSS-EXAMINATION

1    Q.  Well, you recently were arrested and charged with and are
2    awaiting sentence for bringing drugs into the prison, federal
3    prison, right?
4    A.  Yes, sir, correct.
5    Q.  So you continued even after you went to prison, you
6    continued to sell drugs, right?
7    A.  Yes, sir.
8    Q.  You're awaiting sentencing by Judge Blatt, are you not?
9    A.  Correct.
10   Q.  You're hoping that your testimony here will help you in
11   getting either a lighter sentence and minimizing your time in
12   prison, or possibly even not going to prison, right?
13   A.  No, sir.
14   Q.  So you don't mined if Judge Blatt sentences you to prison?
15   A.  No, sir, whatever the judge do in this -- in my current
16   situation, I'm fully okay with that.
17   Q.  Now, you testified that once you got to Georgetown,
18   that's -- that's when you really developed a relationship with
19   Martin Ballard, right?
20   A.  On the way to Georgetown, we were talking all the way
21   over.  It's pretty quick when you're incarcerated to develop a
22   relationship with people, you know what I mean?  Because you
23   can pretty much judge the character of, you know, from dealing
24   with somebody from you past dealings in the street and stuff
25   like that, so you pretty much pick on your ability to discern

1   with people real quick.

2   Q.  You had never met Martin Ballard before being transported

3   with him to Georgetown, right?

4   A.  No, sir, I haven't.

5   Q.  And it was in the Georgetown County detention center that

6   you -- that the relationship really blossomed, so to speak,

7   right?

8   A.  Yes, sir.

9   Q.  That's when you got closer to him, right?

10  A.  Yes, sir.

11  Q.  And you got closer to him because y'all were cellmates,

12  right?

13  A.  No, we were never cellmates, sir.

14  Q.  Didn't you tell -- well, you were -- you offered your

15  proffer interview on January 31st, 2013, correct?

16  A.  Correct.

17  Q.  And didn't you tell the agents that you met with that you

18  were cellmates with Martin Ballard?

19  A.  We would sneak in the same cell and stay with each other

20  sometimes.  But actually as far as the officers putting us in

21  the cell together making us roommates, we were never roommates

22  on that behalf.

23  Q.  So do you deny telling the agents that you were cellmates?

24  A.  No, because we were, we were sneaking be cellmates, spend

25  the night with each other so we could talk on the phone, stuff

1  like that.

2  Q.  So you would sneak out of your cell while in the detention

3  center?

4  A.  Correct.

5  Q.  And spend the night with Martin?

6  A.  Correct, we would stay in the same cell like that.

7  Because you could jam the doors and you can go out of the cell

8  freely whenever you want, you can go in other people's rec and

9  everything.

10  Q.  You didn't tell the agents that, did you?  You told them

11  you were cellmates, correct?

12  A.  Correct.

13  Q.  And you weren't cellmates, right?

14  A.  Correct.  Not freely through the jail, no, correct.

15  Q.  Now, it was -- you told the agents, did you not, that you

16  saw a note that Martin wrote while y'all were cellmates?

17  A.  Yes, sir.

18  Q.  And that that note made some reference to shooting his

19  witness, right?

20  A.  Correct.

21  Q.  And that this was while y'all were cellmates, right?

22  A.  Correct.

23  Q.  And also when you were cellmates you saw Martin tear up

24  that note, correct?

25  A.  Correct.

CLIFTON BROWN - CROSS-EXAMINATION

1   Q.  And you saw Martin, while you were cellmates, flush that

2   down the toilet.

3   A.  That's correct.

4   Q.  Now, you also say that it was during that time that y'all

5   were cellmates that Martin told you all these things, correct?

6   A.  Correct.  We were on rec a lot of times, too, we would do

7   a lot of talking like when we get on rec -- we hung out.

8           THE COURT:  Back off from that mike.

9   A.  During rec him and I, we hung out all the time together.

10  Q.  But it was primarily during the time y'all were cellmates

11  that Martin confided in you and told you all this stuff,

12  right?

13  A.  No, most of the time during rec.

14  Q.  Well, the truth of the matter is that you and Martin

15  weren't cellmates until August the 17th of 2013, right?

16  That's when y'all became cellmates, right?

17  A.  See, Martin and I were never actually put together inside

18  of a cell in the jail.  Through the officers.

19  Q.  Weren't y'all in solitary confinement together?

20  A.  Yes, that was -- that's the hole, yes.

21  Q.  And so that's in the same cell, is it not?

22  A.  Yes.  Yes, sir.

23  Q.  So y'all were cellmates, correct?

24  A.  Correct.

25  Q.  And you were cellmates for the first time on August the

CLIFTON BROWN - CROSS-EXAMINATION

1    17th of 2013, right?

2    A.   Correct.

3    Q.   And that was after the phones were taken away from you.

4    A.   That's correct.

5    Q.   And, in fact, the reason you were put in solitary

6    confinement along with Martin Ballard is because of those

7    phones, correct?

8    A.   Correct.

9    Q.   Now, you realize, of course, that the shooting took place

10   on June the 6th.  And your testimony regarding everything

11   Martin -- you claim Martin told you, could not have taken

12   place until you were cellmates, which would have been almost

13   two months after the shooting.

14            THE COURT:  Wait a minute.  Don't answer that.  Yes,

15   sir?

16            MR. KITTRELL:  I object.  That's a

17   mischaracterization of the testimony given by this witness.

18   He's already stated that they --

19            THE COURT:  Are you objecting because the witness

20   didn't say that?

21            MR. KITTRELL:  Yes, sir, that is correct.

22            THE COURT:  Well, correct us and tell us what --

23            MR. KITTRELL:  The predicate to Mr. Theos' question

24   is that they were never cellmates until after August.  The

25   testimony actually was that they were cellmates, and that this

CLIFTON BROWN - CROSS-EXAMINATION

1    witness would share a cell with Mr. Ballard.  So --

2            THE COURT:  All right, you go into that, if you want

3    to.

4            MR. THEOS:  Yes, sir.

5    BY MR. THEOS:

6    Q.  You were cellmates with Mr. Ballard beginning on August

7    the 17th of 2013, and it actually continued until September

8    the 4th of 2013, correct?

9    A.  Correct.

10   Q.  Now, prior to that, you were not cellmates, correct?

11   A.  Correct.  We just sneak in the room and share with each

12   other.

13   Q.  So you would somehow break through the barriers in the

14   bars and share a cell with Martin Ballard?

15   A.  See, sir, I don't know if you're familiar with how jail is

16   or whatever, but they have doors.  And when you -- they let

17   the top floor out first, or the bottom floor out first.  After

18   that, you can -- they let the other people go back in and the

19   other people out.  Well, when they let the other people out,

20   once we go in, they don't pop the doors for the other people

21   until your doors are shut.  Well, in the jail you can jam your

22   door to where you can come back out on the next person's rec.

23   And we would do that a lot of times.

24   Q.  So your testimony is that Martin Ballard, who you had

25   never met before, would sneak into your cell so he could tell

1  you all about the crimes that you've testified about, so that

2  he could tell you about a shooting, he could tell you about

3  his drug business, he could tell you about all these things.

4  A.  Yes, sir, you'd be surprised how you mingle -- how fast

5  you mingle in jail.

6  Q.  Well, I am surprised.

7      You've not signed a plea agreement?

8  A.  No, sir.

9  Q.  But you've pled guilty?

10 A.  Yes, sir.

11 Q.  And again, the reason you are here testifying is to try to

12 help yourself in your case regarding your sentencing, isn't

13 it?

14 A.  No, sir, it's really not about the helping in the

15 situation.

16 Q.  And the reason you have offered this information -- the

17 reason you've offered this information is because you heard

18 about these things through rumors in the jail, correct?

19 A.  No, sir.

20 Q.  And you've heard about these things in order to try to

21 help yourself, related to your sentence, you've come here to

22 testify against a man who you knew very briefly.

23 A.  No, sir.

24          MR. THEOS:  No other questions, Judge.

25          THE COURT:  All right, sir.

JIMMIE HARRIS - DIRECT EXAMINATION

1      MR. KITTRELL:  Nothing more from the Government, Your

2   Honor, thank you.

3           THE COURT:  Anything else from anybody?

4           MR. THEOS:  Nothing of this witness.

5           THE COURT:  You may be excused.

6           MR. RICHARDSON:  Your Honor, the Government will call

7   Jimmie Harris.

8           THE COURT:  Well, we'll see what happens.

9           THE CLERK:  State your name for the record.

10  A.  Jimmie Harris, Junior.

11      JIMMIE HARRIS, a witness called by the Government, first

12  having been duly sworn, testified as follows:

13                      DIRECT EXAMINATION

14  BY MR. RICHARDSON:

15  Q.  Mr. Harris, we've never met before, have we?

16  A.  No.

17  Q.  My name's Jay Richardson, I'm with the U.S. Attorney's

18  office, all right?  Are you here because you want to cooperate

19  in this investigation?

20  A.  No.  I ain't trying to cooperate.

21  Q.  I'm sorry, you have to say that again.  I'm having a hard

22  time understanding you.

23  A.  I said no, sir, I ain't trying to cooperate.

24  Q.  Okay.  You have had a chance to speak with your counsel.

25  I don't want you to tell me what he told you.  You had a

1    chance to speak with your lawyer about being compelled to be

2    here today?

3    A.  Yes, sir.

4    Q.  And I just want to outline just briefly make sure you

5    understand what we're doing here.  I'm going to ask you some

6    questions.  You understand that?

7    A.  Yeah, I understand that.

8    Q.  Okay.  And then you have the choice to decide whether you

9    choose to answer that question or refuse to answer the

10   question.  Do you understand that?

11   A.  Yeah.

12   Q.  And if you refuse to answer the question, the Court can

13   order you to answer that question.  Do you understand that?

14   A.  Um-hum.  Yes, sir.

15   Q.  Thank you.  And if you refuse to answer the question after

16   the Court orders you to answer it, then you can be subject to

17   contempt proceedings.  You talk to your counsel about that?

18   A.  Yes, sir.

19   Q.  You can be subject to civil contempt or criminal contempt.

20   Do you understand that?

21   A.  Yes, sir.

22   Q.  And at that -- any time that you receive as a result of

23   that, can be in addition to any sentence you receive based on

24   your guilty plea in the case.  Do you understand that?

25   A.  Yes, sir.

1    Q.  You also understand that if you refuse to cooperate and

2    provide information freely and voluntarily and truthfully,

3    that you will not receive any benefit --

4              THE COURT:  Wait a minute.  Wait a minute.

5              MR. THEOS:  Your Honor, I object to the leading

6    nature of Mr. Richardson's questioning.  This is his witness.

7    He's attempting to cross-examine him.

8              MR. RICHARDSON:  Your Honor, I'm laying a background.

9    This is the preliminary proceedings of establishing that he

10   understands.

11             THE COURT:  Well, you don't know whether it's a

12   preliminary proceeding or what, you don't know what it's going

13   to be.  So I think you established that he talked to his

14   lawyer and he understands his situation.  He hasn't raised

15   anything yet.  If something happens, you might want to talk to

16   him, but I just want him just like he's your witness.

17   BY MR. RICHARDSON:

18   Q.  What were you doing, Mr. Harris, on June the 6th of 2013?

19   A.  I trying to -- I trying to plead.  I trying to plead the

20   Fifth (unintelligible).

21             THE COURT:  I didn't understand you.

22             MR. RICHARDSON:  He's trying to plead the Fifth to

23   all questions anyway, is what he said.

24        Would you like me to question him about the basis for

25   pleading the Fifth?

1    THE COURT:  Mr. Richardson asked you what you were

2  doing on June the --

3    MR. RICHARDSON:  6th.

4    THE COURT:  June the 6th of 2 --

5    MR. RICHARDSON:  2013.

6    THE COURT:  2013.  And your answer was that you

7  wanted to plead the Fifth Amendment to all questions.  Is that

8  your answer?

9  A.  Yes, sir.

10    THE COURT:  So your position is that you're not going

11  to answer any questions that anybody asks you?

12  A.  Your Honor, yes, sir.

13    THE COURT:  Well, you've taken the stand and sworn to

14  tell the truth.  The Court has the right to order you to

15  answer these questions.  The Court has the right to order you

16  to answer these questions.  On what ground do you take the

17  right that you have not to answer these questions?

18  A.  I mean, I ain't trying to -- I ain't trying to answer no

19  questions, period.

20    THE COURT:  Your answer is that you don't want to

21  answer any questions period.  That's your --

22  A.  Yes, sir.  Yes, sir.

23    THE COURT:  Is it because you feel that such an

24  answer might tend to incriminate you in any way?

25  A.  Yes, sir.

JIMMIE HARRIS – DIRECT EXAMINATION

1    THE COURT:  Well, you've taken the stand and sworn to

2    tell the truth.  If the Court orders you to answer the

3    questions --

4    A.  But this is what I saying.  I thought you had to come up

5    on this stand.  I never did this stand before in my life.  So

6    I thinking you got to come up on the stand, and once you get

7    on the stand and say you plead the Fifth.  See, I ain't never

8    been through this procedure before in my life.

9    THE COURT:  You're telling me that you thought that

10   you had to take the stand before you could exercise your

11   privilege not to testify?

12   A.  Yes, sir, that's what I telling you.

13   THE COURT:  And so you're telling me that the only

14   purpose for which you took the stand was so you could take the

15   position that you're taking, that you don't want to answer any

16   of these?

17   A.  Yes, sir, I thought you had to come up here and sit right

18   here and say you plead the Fifth.

19   THE COURT:  I see.  Well, suppose the Court orders

20   you -- suppose the Court orders you to answer these questions;

21   would you answer those questions if I ordered you to answer

22   them?

23   A.  No.  No, sir.

24   THE COURT:  So if I order you to answer the question

25   of where you were on June 6th, 2013, that's a question -- You

1  remember the question he asked?

2  A.  Yeah, I remember the question he asked me.

3       THE COURT:  If I ordered you to answer that question,

4  you're not going to answer it?

5  A.  No, sir.

6       THE COURT:  Well, it would be useless then for me to,

7  in view of what you said, to tell you to answer

8  Mr. Richardson's question, because you're telling me you're

9  not going to do it.  Is that correct?

10 A.  Yes, sir.

11      THE COURT:  And do you realize that if you do not

12 have the right to refuse to answer the question, that you

13 subject yourself to liability, criminal and civil contempt of

14 court, if you should not possess that right.  Do you realize

15 that?

16 A.  Yes, sir.

17      THE COURT:  You understand what I said?

18 A.  (Witness nodded affirmatively.)

19      THE COURT:  You understand what I just told you?

20 A.  Yes, sir.

21      THE COURT:  And you realize that that could happen to

22 you?

23 A.  Yes, sir.

24      THE COURT:  And again, the only reason that you took

25 the oath as a witness and took the stand, is because it was

1    your understanding that you have to take it from the stand,

2    witness stand, you couldn't just say I'm not going to take the

3    witness stand.

4    A.  Yes, sir.  I ain't never did this before.  That's why,

5    again, just what I telling you, I ain't never did this

6    procedures before.

7          THE COURT:  Well, the Court feels that you've

8    exercised your privilege appropriately.  What is going to

9    happen in the future insofar as you're concerned individually,

10   is another thing.  But insofar as this case is concerned, this

11   particular case, I think you've exercised your privilege

12   appropriately.

13      I want to hear from the lawyers.  So, Mr. Marshal, if

14   you'll just take him outside a minute.

15          MR. RICHARDSON:  Your Honor --

16          MR. THEOS:  I would like an opportunity to try to

17   question this --

18          THE COURT:  I'm going to bring him back.  Just wait a

19   minute, you'll see why I'm --

20      (Witness excused.)

21          THE COURT:  Now, Mr. United States Attorney, I'll be

22   glad to hear from you as to any further steps that you think

23   the Court should do in this instance.

24          MR. RICHARDSON:  Your Honor, I think you are the

25   appropriate person to question and determine whether he has

JIMMIE HARRIS - DIRECT EXAMINATION

1    appropriately exercised his Fifth Amendment rights; the

2    Government believes that he has in this circumstance.  And so

3    I don't believe he's subject to further questioning by me or

4    by Mr. Theos.  The one thing that I would add, Your Honor, for

5    Your Honor to consider questioning him on, is would he assert

6    the Fifth Amendment with respect to any and all other

7    questions related to Mr. Ballard.  And so what we've

8    established is that --

9           THE COURT:  I think he said he wasn't going to answer

10   any questions in this case.

11          MR. RICHARDSON:  I think that's right, Your Honor.  I

12   would just ask just out of an abundance of caution that you

13   inquire of him -- we focused on the June 6th, that date.  I

14   just ask that you --

15          THE COURT:  All right, all right.

16          MR. RICHARDSON:  Ask him, would he assert the same

17   privilege with respect to any and all questions related to

18   Mr. Ballard.

19          THE COURT:  All right, now, Mr. Theos, I'll be glad

20   to hear from you.

21          MR. THEOS:  Your Honor --

22          THE COURT:  Wait a minute.  You come up here.

23          MR. THEOS:  Your Honor, I understand your line of

24   questioning.  I understand Mr. Harris' responses.  But I don't

25   think that precludes me from asking him questions, whether he

1    chooses to assert his Fifth Amendment right or not, I guess we

2    would just have to wait and see. But I would like an

3    opportunity to ask him some questions and just to see what his

4    response is. I think I have that right. Mr. Richardson has

5    asked him about the date June the 6th, 2013, and he said he

6    would refuse to answer any questions.

7          THE COURT: He just said he wasn't going to answer

8    any questions about that date. I'm going to find out if he's

9    going -- I think he's right, I ought to ask him if he would

10    answer any questions about Mr. Ballard. Now, what you want to

11    do is go down a litany of questions and let him take the Fifth

12    on each individual question, I believe is what you're saying.

13          MR. THEOS: Essentially, Your Honor, I don't want to

14    belabor the Court in any way, but he's an important witness.

15    I mean, he's pled guilty to shooting Mr. Brothers, and his

16    testimony would be important. And I think that I have a duty

17    to ask him questions not only regarding the shooting, but

18    regarding any involvement Mr. Ballard may or may not have had

19    related to that shooting. If he asserts his Fifth Amendment

20    right not to answer any of those questions, so be it.

21          THE COURT: Well, what's your position is his general

22    statement he's not going to answer any questions about it,

23    that's what he said.

24          MR. THEOS: Yes, sir.

25          THE COURT: And but I'm going to -- he just refused

1  to answer one.  I'm going to ask him if he's going to answer

2  any questions about Mr. Ballard.  If he says he is not, I

3  don't understand your position that you should be, despite

4  that statement, be entitled to ask him 20 questions, let him

5  answer it.

6      MR. THEOS:  Well, Your Honor, I would not only ask

7  him questions related to Mr. Ballard.  I would ask him

8  questions related to other individuals as well.  And I think I

9  have a duty to Mr. Ballard, in order to be competent and to

10  provide effective assistance of counsel, to ask him those

11  questions.  To be denied that opportunity, without knowing

12  what his responses may or may not be, I think would be

13  prejudicial.

14      THE COURT:  I'm going to find out if he's going to

15  answer any questions about anything.  And if he says no, I'm

16  not going to answer any questions, I take advantage of my

17  Fifth Amendment rights, and I don't think it's necessarily

18  appropriate to ask him 100 questions to find out what he'll

19  answer and what he won't.  If he says he's not going to answer

20  any questions about Mr. Ballard or any questions that would in

21  any way affect -- involved in this case, then I don't think

22  that you should go on top of that.  I think he's got the right

23  to assert his Fifth Amendment rights.  And I don't know,

24  unless you've got some basis that he doesn't have the right to

25  assert his rights.  Now, whether he's subject to civil or

1    criminal contempt is a different matter.

2           MR. THEOS:  I certainly think he has a right to

3    assert his Fifth Amendment rights regarding answering

4    questions or refusing to answer questions.  For all I know, he

5    may simply be refusing to answer the Government's questions,

6    but he may be willing to answer my questions.

7           THE COURT:  I'm going to find that out.

8           MR. THEOS:  And again, Your Honor, I at least would

9    like -- certainly wouldn't ask a lengthy litany of questions,

10   but I'd like an opportunity to at least ask a few questions to

11   see if he is willing to answer my questions rather than the

12   Government's questions.  I've received mixed signals from his

13   lawyer regarding whether or not he would ask questions, just

14   as Mr. Richardson has.  And because of that, and because of

15   his inexperience as a witness, as he's just stated, I think

16   that there is a possibility that he might answer my questions,

17   even though he's refusing to answer the Government's.

18          THE COURT:  All right, sir.

19          MR. THEOS:  Thank you, Judge.

20          MR. RICHARDSON:  Your Honor, just in response to

21   that, I don't think he's entitled to do that.  He either

22   asserts the Fifth Amendment or not.  He can't just answer the

23   defense questions and not mine.

24          THE COURT:  That's right, he couldn't do that.  If

25   he answers your questions, he's got to answer them all.

1   MR. THEOS:  I understand, Your Honor.

2   MR. RICHARDSON:  So, Your Honor, we'd ask that you

3   question him with respect to the scope of his --

4   THE COURT:  I am.

5   MR. RICHARDSON:  Thank you, Your Honor.

6   THE COURT:  Bring the witness in.

7   (Witness present.)

8   THE COURT:  You told the Court that you were not

9   going to answer the question that was asked of you, and I want

10   to be sure.  Do you intend, or would you answer any questions,

11   any questions at all --

12   A.  No, sir.

13   THE COURT:  -- about Mr. Ballard or anybody else in

14   this case?

15   A.  No, sir.

16   THE COURT:  Now, that's questions by the Government.

17   Would you answer any questions posed to you by Mr. Ballard's

18   lawyer?

19   A.  No, sir.

20   THE COURT:  Then I take it that you don't intend to

21   answer any questions posed to you by any lawyer about anybody

22   in this case.  Is that correct?

23   A.  Nothing.

24   THE COURT:  Mr. Richardson, does that cover your --

25   MR. RICHARDSON:  It does, Your Honor.

JIMMIE HARRIS – DIRECT EXAMINATION

1     THE COURT:  Although I understand you feel a little

2  different, Mr. Theos, I feel that I -- once I've asked him

3  what I did, insofar as you're concerned, that covers it.

4     MR. THEOS:  I understand the Court's position, Your

5  Honor.  I would respectfully take exception to that and would

6  like to nonetheless question him, but I understand the Court's

7  position.

8     THE COURT:  Just to be sure now, you wouldn't answer

9  any questions, as I understand what you said, you're not going

10  to answer any questions asked of you by Mr. Ballard's lawyer

11  about this -- about anything about Mr. Ballard or anybody else

12  in this case.

13  A.  I ain't answering nothing.

14     THE COURT:  All right.  Then I think you properly

15  invoked your Fifth Amendment rights.  So I'm going to -- you

16  can take him away.

17     (Witness excused.)

18     THE COURT:  Let me ask you one other question, you

19  can answer it from right there.  Is your reason -- or what is

20  your reason for exercising these rights?  Is it because they

21  may tend to incriminate you in some way?

22  A.  Yes, sir.

23     THE COURT:  All right, sir.  You can go ahead.

24     (Inaudible.)

25     THE COURT:  Sir?

1    THE MARSHAL:  He asked if he's finished, Your Honor.

2    THE COURT:  Yeah.  You better keep him available.

3    MR. RICHARDSON:  We'll take care of that, Your Honor.

4    MR. THEOS:  Your Honor, I would like to bring up a

5    matter regarding Mr. Harris.  And I shared this information

6    with the U.S. Attorney's office.  We received information from

7    Mr. Harris' lawyer, Bill Runyon, that Mr. Harris, when he was

8    interviewed by federal probation, that Mr. -- for his pretrial

9    investigation report.

10    THE COURT:  Presentence.

11    MR. THEOS:  I'm sorry, presentence report.  That he

12    advised Probation that he did not commit the shooting that he

13    had pled guilty for, and was not guilty of the shooting.  We

14    also received from Mr. Runyon information that Mr. Harris

15    wrote Your Honor a letter seeking to withdraw his plea in the

16    case.  Again, I don't know whether that's true or not.

17    THE COURT:  I was trying to find out about the

18    letter.  Sometimes letters come that I may not see.  I don't

19    know anything -- let me find out if I've gotten any letter

20    from him.

21    MR. RICHARDSON:  We have nothing that corroborates

22    that having ever occurred.  I'm not saying it did or didn't,

23    I'm saying I have no reason to believe that is true.

24    MR. THEOS:  I understand the Government's position,

25    and I haven't seen either of those things, Judge.  I received

1    an e-mail from Mr. Runyon to that effect, so I certainly want

2    to find out if there's any truth to either one of those

3    things.

4           THE COURT:  Only thing I can tell you is whether I've

5    gotten a letter.  He told her that he sent me a letter, and

6    who else, what was his other?

7           MR. THEOS:  That apparently when he was interviewed

8    by Probation for his presentence report, that he advised

9    Probation that he did not, in fact, commit the shooting of

10   Mr. Brothers and that he was not guilty of that, although he

11   previously pled guilty.

12          THE COURT:  Well, I haven't gotten any letter.

13          MR. THEOS:  Yes, sir.

14          THE COURT:  Now, whether the rest of that's true or

15   not, of course, I don't know.  I said let me find out about

16   those two things.  Anything else that --

17          MR. THEOS:  No, sir, that's it.  Thank you, Judge.

18          THE COURT:  Well, is the Government ready to proceed?

19          MR. PHILLIPS:  Yes, sir.  Based on that, we would

20   like to recall Jamal McElveen, and he's ready.  And we would

21   submit to the Court that we've established that Mr. Harris is

22   unavailable, and continue our direct regarding statements made

23   by Mr. Harris.  He's unavailable.  On two grounds; that he

24   asserted the Fifth, but, Your Honor -- and the questions also

25   asked, if I ordered you to answer under penalty of contempt,

would you answer any questions, and he said he would not.  So

under Rule 804, he's unavailable as defined.  I'll give you

the exact subsections, Your Honor.  Under 804(a)(1) he's

exempted by your ruling that he's properly exercising his

privilege from testifying on the subject matter declarant's

statement, which circles around the shooting.  He's also

unavailable under subsection (a)(2), because he indicated

under oath that he would refuse to testify even if you had

ordered him to do so, privilege notwithstanding.  So we

believe the subject matter of what Mr. McElveen is going to

testify on direct, which is statements made against

Mr. Harris' penal interests, are now admissible under

Rule 804.

THE COURT:  Now, tell me the section -- I didn't have

804 before me.

MR. PHILLIPS:  I apologize, Your Honor.  It's

Rule 804(a), subsection (1) and (2) both cover him.  One

pertains to the privilege and (2) pertains to him refusing to

testify, even if ordered to do so.

THE COURT:  All right, sir, now, you propose to put

up a witness who's going to testify to what?

MR. PHILLIPS:  As you recall last week, Mr. McElveen,

we had gotten to a point in his direct he talked about his

past dealings with Mr. Ballard and he was about to talk about

conversations that he had with Mr. Harris in the jail related

1    to the shooting.  And Mr. McElveen is going to testify to the

2    details of those conversations which shed light on the

3    shooting, how it took place, Mr. Ballard's involvement.  And

4    we believe that those are all statements against Mr. Harris'

5    penal interests, because he implicated himself in the

6    shooting.  And as I just mentioned, he's unavailable, so under

7    804(d)(3), they should come in as statements against his

8    interests.

9         And then, Your Honor, the next two witnesses will testify

10   largely to the same sort of situation, they had conversations

11   with Mr. Harris wherein he admitted the shooting and provided

12   details regarding the shooting and Mr. Ballard's involvement

13   as well.

14        THE COURT:  Let me find out before he gets in here

15   and objects, let me find out the defendant's position.

16        MR. THEOS:  Yes, sir.  Your Honor, I understand the

17   Government's position.  But I don't think that any of these

18   witnesses should be allowed to testify as to what Mr. Harris

19   allegedly told them.  It is my understanding pursuant to 801

20   that in order -- Rule 801 -- that in order for a statement to

21   be admitted by an alleged co-conspirator, that that statement

22   must be in furtherance of the alleged conspiracy.  The

23   statement that I anticipate Mr. McElveen and/or Mr. Cato would

24   offer would be statements that were made subsequent to the

25   conspiracy, statements that were made after the conspiracy had

ended.  The object of the conspiracy was the shooting of
Mr. Brothers.  That object had been completed, had been
accomplished, the conspiracy had ended.  So any statement made
post-conspiracy would not be admissible.

Your Honor, and I refer you, it's an old case, but I
believe pronounced Krulewitch United States, I've got a copy
of the case here, as well as Grunewald versus the United
States, and a Fourth Circuit case as well, I believe it's
United States v. Kang, and I've got copies of those for you
and the Government.  But I don't believe that this witness,
any of these witnesses should be allowed to testify regarding
what Mr. Harris allegedly said, well after the conspiracy had
ended.

Secondly, Your Honor, although under 804 it is arguably a
statement against Mr. Harris' penal interests, and perhaps the
Court might rule in spite of what I just quoted regarding
Rule 801, that these witnesses should be allowed to testify
regarding what Mr. Harris told him related to his involvement,
that he certainly should not be -- these witnesses should
certainly not be allowed to testify as to what Mr. Harris
claims Mr. Ballard's involvement allegedly was.

That's not a statement against Mr. Harris' penal
interests, that's an implication against Mr. Ballard, which --
and we're denied an opportunity to cross-examine Mr. Harris
regarding those alleged statements.  So again, I think under

1 Rule 801, Mr. Harris and Mr. Harris' alleged statements to

2 Mr. McElveen and/or Mr. Cato should be excluded because the

3 conspiracy had ended.

4 And then secondly, Your Honor, although it may be

5 deemed -- his statements to these third persons may be deemed

6 as statements against his penal interests, and the Court might

7 allow those statements in, certainly the Court should not

8 allow any statements against Mr. Ballard's penal interest.

9 THE COURT: All right, sir.

10 MR. THEOS: I'll hand these cases up to Allison.

11 THE COURT: All right, do you want to reply to that,

12 Mr. United States Attorney?

13 MR. PHILLIPS: Your Honor, we are proceeding under a

14 theory that these are co-conspirator statements. That's one

15 avenue to try to get statements, out-of-the-court statements

16 in. That's not where -- that's not the avenue we're taking,

17 we're taking the statement against Mr. Harris' interests. And

18 I think that the -- first, our case cited in our brief on page

19 36 of our pretrial brief, U.S. versus Dargan, 738 F.3d 643,

20 2014 Fourth Circuit case.

21 THE COURT: What page is that?

22 MR. PHILLIPS: That's on page 36 of our brief. It's

23 in -- about midway down. My understanding is -- I mean, that

24 case involved a co-defendant's statement made out of court

25 against that co-defendant's penal interests. See, Mr. Theos

1    is sort of parsing it.  The hearsay rules, as Your Honor well

2    knows, are -- the exceptions are designed to try to find

3    situations where an out-of-court statement would be more

4    likely to be truthful, and let those in.  When you're saying

5    something against your own penal interests, as the declarant,

6    it's the declarant's penal interests that are important.  So

7    when Mr. Harris said against his interests, that's what makes

8    it fall within the exception, that's why that exception is

9    there, because it's more likely than not --

10             THE COURT:  I don't have a problem with Mr. Harris.

11             MR. PHILLIPS:  Yes, sir.  His statement regarding his

12   involvement in the plot, and as Mr. Ballard's direct -- hiring

13   him to do the plot, is against his interests.  And the fact

14   that it inculpates Mr. Ballard, we think under U.S. versus

15   Dargan, just in general terms, that's beside the point.

16   That's unfortunate for Mr. Ballard, but it doesn't make it

17   inadmissible.  What's important is does it fall within the

18   confines of the rule, which it does.  And then Your Honor, as

19   the trier of fact, can then determine whether he finds --

20   whether the statement was made, through these witnesses.

21   Whether they're being truthful or not, that's another issue.

22   But the fact that it inculpates Mr. Ballard does not take it

23   outside of the rule and make it an exception to the hearsay.

24   It's still admissible against Mr. Ballard, because he's

25   detailing his involvement and why he was in the plot, which

1    was at Mr. Ballard's request, and that he was going to be

2    paid.  And we submit the Dargan case is on point factually.

3         THE COURT:  I was looking at that.  Let's take about

4    a ten-minute break.  Let me think about it.

5         (A recess was held at this time.)

6         THE COURT:  Mr. United States Attorney, I think that

7    at this stage of the proceedings at least that the statement

8    that you've proposed to introduce, as I understand Harris made

9    to his cellmate?

10        MR. PHILLIPS:  Yes, sir.  Yes.

11        THE COURT:  And in addition, you have other witnesses

12   who are going to testify to basically the same thing.

13        MR. PHILLIPS:  Yes, sir, statements Mr. Harris made

14   to them while they were in the same unit on the jail.

15        THE COURT:  Well, I don't think there's any question,

16   Mr. Theos, that it's against Harris' penal interests.  And

17   I've looked at the question -- the other question that's

18   important is it's supported by a corroborating circumstance or

19   other evidence.  And I think at this time, the six items that

20   Dargan mentions is one, whether the declarant had, at the time

21   of making the statement, pled guilty or was still exposed to

22   prosecution.  Well, I don't know, I don't think he entered his

23   guilty plea at that time.

24        MR. PHILLIPS:  He had not, Your Honor, hadn't even

25   been indicted.

1          THE COURT:  The declarant's motive in making the

2     statement, and whether there was reason for the declarant to

3     lie.  I haven't had any evidence that would indicate that.

4     Whether the declarant repeated the statement and did so

5     consistently.  Well, I understand there's going to be evidence

6     that he did repeat it to others.  Whether the party or parties

7     to whom the statement was made, who they were, the

8     relationship of the declarant with the accused.  Well, I

9     haven't heard any -- that I can recall -- any testimony

10    particular about that.  And the nature and strength of the

11    independent evidence relevant to the conduct in question.  I

12    think under the circumstances, that at this stage the

13    Government has met those corroborating circumstances.  If

14    later on it turns out that there isn't anybody else to whom

15    they've made the statements, although they expect to have

16    others, or whether he repeated it turns out to be not correct,

17    then I can reconsider striking it.  But I think at this time

18    that they can proceed to introduce a witness to testify about

19    what Harris said.  Now, I know you object to it.

20         MR. THEOS:  I do, Your Honor, and if I could just

21    make clear for the record our position, and that is that even

22    if we assume that Mr. Harris' statement -- that Mr. Harris'

23    alleged statement to Mr. McElveen is admissible under Rule 804

24    as a statement against penal interests, that it should not be

25    with respect to any alleged statement that he may have made or

1    allegedly made regarding Martin Ballard.  Because, again, I

2    will not have an opportunity to cross-examine Mr. Harris

3    obviously.  And it was certainly not in furtherance of the

4    conspiracy.  And our position is in order for the statement --

5    the alleged statement by Mr. Harris to Mr. McElveen regarding

6    Mr. Ballard regarding Mr. Ballard and his alleged involvement,

7    that that must be in furtherance of the conspiracy.  And that

8    the prejudicial effect certainly of allowing this testimony

9    in, far outweighs any probative value.

10        THE COURT:  Well, it is damaging to the defendant,

11   but I don't think it outweighs the probative value of the

12   evidence.  And I don't think that there are two separate

13   rules, and I don't think that 804 requires compliance with a

14   conspiracy rule.  If -- that they would have to be members of

15   a conspiracy at the time the event occurred.  I think the two

16   separate rules, two separate ways to get in evidence.  I think

17   that, that they're proceeding under the penal interest rule,

18   fortunately trying it, as we all are, if they don't prove

19   everything they said they're going to prove, I can always

20   strike it.  And I have that opportunity.  I mean, with a jury,

21   it would be impossible to strike.  But I think that I want to

22   see that everybody gets a fair trial.  And if I'm convinced

23   later on that I let it in erroneously, and you've convinced me

24   of that, then I can strike it.

25        MR. THEOS:  Yes, sir, I understand your ruling, Your

1    Honor, and just would respectfully take exception to it.  And
2    also ask that the Court, in determining whether to accept and
3    take into consideration Mr. McElveen's testimony, or Mr. Cato,
4    who I understand may testify similarly, to take into account
5    the issue of credibility as well of those witnesses.
6            THE COURT:  All right, sir.  Let's go.
7            MR. PHILLIPS:  Yes, sir, we'd re-call Mr. McElveen,
8    Jamal McElveen.
9            THE COURT:  You've already been sworn in this case
10   and you're still under oath.  You understand that?
11   A.  Yes, sir.
12       JAMAR McELVEEN, having been previously sworn, testified
13   further as follows:
14                      DIRECT EXAMINATION
15   BY MR. PHILLIPS:
16   Q.  Good morning, Mr. McElveen.
17   A.  Good morning.
18   Q.  When we were here last you had talked about your time in
19   Charleston County jail.  And just to sort of get us to the
20   point we stopped, I believe you testified that for a short
21   time you got transferred from one unit to the same unit as
22   Mr. Ballard.
23   A.  Yes.
24   Q.  And how long were you with Mr. Ballard in that same unit?
25   A.  Maybe 12 hours.  Twenty-four hours.

1  Q.  And what happened?  Why weren't y'all in the same unit

2  after 12 hours?

3  A.  He was transferred.

4  Q.  Okay.  And I believe you stated that he made a comment

5  that he would have liked --

6      MR. THEOS:  I object to the leading nature of the

7  question.

8  BY MR. PHILLIPS:

9  Q.  Just to remind the Court, you made a comment about someone

10  you had just left from, right?

11      MR. THEOS:  Your Honor, again, I object.  He can ask

12  the witness --

13      MR. PHILLIPS:  I'll rephrase it.

14      THE COURT:  Wait a minute.  He's got to be able to

15  ask him if he made a comment about somebody.  You just can't

16  ask him if you made a comment, you've got to -- nobody would

17  be able to answer a question like that.  I think he's entitled

18  to ask him -- he made a comment about whoever he's talking

19  about.

20  BY MR. PHILLIPS:

21  Q.  So did he make a comment to you about someone from the

22  prior unit?

23  A.  Yes, sir.

24  Q.  And just tell the judge what that comment was.

25  A.  He just stated that he wished he knew that I was in that

1   particular unit, he would have liked for me to do something to

2   somebody.

3   Q.  And who did he want you to do something to?

4   A.  Someone named Slim.

5   Q.  Do you know Slim's real name?

6   A.  No.

7   Q.  Was Slim in your unit?

8   A.  Yes.

9   Q.  Do you know whether Slim was in the same case?

10  A.  Yes, he was a co-defendant of Mr. Ballard's.

11  Q.  And did Mr. Ballard tell you why he wanted you to do

12  something to him?

13  A.  He just said that he was cooperating with the Government

14  against him.

15  Q.  Okay.  Now, after Mr. Ballard was transferred and you

16  remained in Charleston County --

17  A.  Yes.

18  Q.  -- did you ever come across Mr. Harris after Mr. Ballard

19  had been transferred?

20  A.  Yes.

21  Q.  And that's Jimmie Harris?

22  A.  Yes, Jimmie Harris.

23  Q.  And what do you know Jimmie Harris as, what nickname?

24  A.  Jim Black.

25  Q.  Okay.  So after Mr. Ballard had left to go to -- was

1   transferred, you were in the same unit as Mr. Harris?  Later

2   on?

3   A.  Yes.

4   Q.  And did y'all have any conversations about Mr. Harris'

5   involvement in the shooting?

6           THE COURT:  Wait a minute now, what was your

7   question?

8   Q.  Did y'all have any conversations with Mr. Harris about his

9   involvement in the shooting?

10          THE COURT:  All right, sir, you object to that

11  question?

12          MR. THEOS:  Your Honor, I just want the record to

13  note my objection to this line of questioning.  I understand

14  your ruling, but I think I have to also note it at this point.

15          THE COURT:  All right, go ahead.

16  BY MR. PHILLIPS:

17  Q.  You can answer.

18  A.  Yes, we had a conversation.

19  Q.  And can you tell the Court the substance of that

20  conversation; what did Mr. Harris tell you?

21  A.  He just basically told me about a shooting that took place

22  in Colleton County, and that he was paid $10,000 to shoot a

23  witness.  In a case that involved Mr. Ballard.

24  Q.  And did he tell who you paid him, who he agreed to be paid

25  $10,000 to do that shooting?  Did he tell who you that was?

A.   He didn't tell me who specifically gave him the money, he

just said that Mr. Ballard said he would pay him $10,000 to

take care of a problem.

Q.   And what was the problem?

A.   The problem was a person named BJ testifying against him.

Q.   Did he tell you anything about how that payment was made

or was supposed to be made?

A.   Just 5000 up front, 5000 afterwards.

Q.   After the shooting?

A.   After the shooting, yes.

Q.   Did he tell you about any details regarding the shooting

itself?  Did he tell you how it happened?

A.   Yeah, he gave me a description of how everything played

out.

Q.   Can you tell the Court what he told you?  This is

Mr. Harris telling you about the shooting.

A.   Yes, he told me that he was put in contact with an

individual, they came and picked him up from the Dorchester

Road area, they drove him out to the Walterboro area after

they identified the person, they gave him a description of the

car and they told him where he would be and he -- they pretty

much directed him where the person would be, and he got out

the car and was given two weapons, and he shot.

Q.   So he told you he had two weapons.

A.   Yes, told me he had two weapons.

1  Q.  And that he was given those two weapons?

2  A.  Yes.

3  Q.  Did he tell you -- did he describe anything further about

4  the weapons?

5  A.  One of them was automatic, the other one wasn't.  That's

6  about it.

7  Q.  Okay.  Did he tell you about what kind of car the target

8  of the shooting drove?

9  A.  He told me it was a Honda.

10  Q.  And did he tell you where the shooting occurred or how it

11  actually occurred, other than the types of guns?

12  A.  He told me it was a trailer next to some type of a

13  construction building or construction site.

14  Q.  And did he tell you where he shot him from?  I mean

15  just -- mechanics of where he shot him?

16  A.  He said that he walked up to -- he walked up to pretty

17  much walkway to the house.  When he got to the door he seen

18  the individual, he shot through the door, and he said he never

19  opened the door or anything.  He just shot through the door.

20  But he saw that he hit the individual on the other side.

21  Q.  Now, regarding the information you just testified that the

22  things that Mr. Harris told you, when did you tell law

23  enforcement about this information?

24  A.  A few days after I heard it.

25  Q.  A few days after you heard it?

1    A.  Yeah.

2    Q.  Was that in 2013?

3    A.  Yes, 2013.

4    Q.  Do you know what month?

5    A.  Can't remember exactly what month, no.

6          MR. PHILLIPS:  Okay.  No further questions, Your

7    Honor.

8          THE COURT:  All right, sir.

9                     CROSS-EXAMINATION

10   BY MR. THEOS:

11   Q.  Mr. McElveen, you're a drug dealer, right?

12   A.  Have been.

13   Q.  For a long time, right?

14   A.  Not a very long time.

15   Q.  Well, you were convicted in 1992 of possessing crack,

16   being in possession of a stolen vehicle, failing to stop for a

17   blue light, right?

18   A.  Possessing drugs doesn't make me a drug dealer.

19   Q.  So you weren't selling drugs back then, you were just

20   using?

21   A.  No, I sold drugs back then.

22   Q.  So you were a drug dealer as far back as 1992, right?

23   A.  Yeah.

24   Q.  You also have convictions for gambling, right?

25   A.  Yes.

JAMAR McELVEEN – CROSS-EXAMINATION

1    Q.   Stealing a car?

2    A.   Yeah.

3    Q.   Right?  Carjacking?

4    A.   Yes.

5    Q.   And armed robbery.  So when you stole the car or committed

6    the carjacking, you were also armed with a sawed-off shotgun,

7    right?

8    A.   1996.

9    Q.   And that was a federal conviction, correct?

10   A.   Yes.

11   Q.   You were released in 2007 from prison for that?

12   A.   No.

13   Q.   When were you released?

14   A.   2005.

15   Q.   So you served about eight years on that charge?

16   A.   Nine years seven months.

17   Q.   Nine years seven months?  And then after that, you were

18   convicted of assault and battery with intent to kill?

19   A.   No.

20   Q.   Criminal domestic violence of a high and aggravated

21   nature?

22   A.   No.

23   Q.   Trafficking cocaine though?

24   A.   Yes.

25   Q.   And that 2011 trafficking cocaine, is that what you're

1  under sentence for now?

2  A.  Yes.

3  Q.  All right.  Then how, in 2013, were you arrested for

4  failing to stop for a blue light in 2013, if you were

5  sentenced in 2011?

6  A.  I wasn't sentenced in 2011, I was arrested with a kilo of

7  cocaine on I-26.

8  Q.  That's right.  So while you were out, while you were out

9  on bail, you failed to stop for a blue light and resisted

10  arrest, correct?

11  A.  I wasn't on bail no more.

12  Q.  You were off of bail at that time?

13  A.  Yes.

14  Q.  So were you also off of bail that time or on bail when you

15  gave false information to police officer?

16  A.  Off bail.

17  Q.  All right.  Do you recall when you gave false information

18  to a police officer?

19  A.  Yeah, in 2011.

20  Q.  Okay.  So you lied to the police?

21  A.  Yes.

22  Q.  All right.  Now, the arrest date that led to the

23  indictment that you received a sentence on, that you're

24  currently serving time on, that arrest date was when?

25  A.  2011.  I don't remember the exact date.

JAMAR McELVEEN - CROSS-EXAMINATION

1   Q.  Now, before that, before that date, before that date on

2   December the 3rd of 2010, you were actually stopped, and

3   several thousands of dollars, tens of thousands of dollars

4   were seized from you in Savannah, Georgia, correct?

5   A.  What date did you say?

6   Q.  In December of 2010.

7   A.  No.

8   Q.  What date was it?

9   A.  I mean December '10 I was stopped, but I was in Texas.

10  Q.  Okay.  And a large amount of cash was seized from you at

11  that time?

12  A.  They took some money, yes.

13  Q.  Can you remember how much it was?

14  A.  A little over a hundred thousand.

15  Q.  That's a good bit of money, isn't it?

16  A.  It is.

17  Q.  Not necessarily to a drug dealer though, right?

18  A.  It's a great amount of money to anybody.

19  Q.  And that money was taken from you?

20  A.  Yes.

21  Q.  And it was ultimately forfeited?

22  A.  I'm not sure as the result of the money.

23  Q.  You don't remember what happened to $100,000?

24  A.  Never had a disposition.

25  Q.  All right.  And it was after that, on July the 15th of

1  2011, that you were arrested, you were stopped by South

2  Carolina Highway Patrol and you were arrested for the charge

3  that you are currently serving time on?

4  A.  Yes.

5  Q.  And in the car with you was Cedric Myers?

6  A.  Yes.

7  Q.  And in the car with you is Dana Harris?

8  A.  Yes.

9  Q.  Right?  And you had a kilo of cocaine in an ice chest, is

10  that right?

11  A.  Yes.

12  Q.  And you ultimately pled guilty to one count, is that

13  right?

14  A.  Yes, I did.

15  Q.  And you received a sentence of five to 40 years, is that

16  right?

17  A.  No.  Sixty months.

18  Q.  Sixty months?

19  A.  Yes.

20  Q.  And the reason you received a 60-month sentence is because

21  you entered into a plea agreement with the Government?

22  A.  Exactly.

23  Q.  And that plea agreement that you entered with the

24  Government was based upon information that -- based upon

25  cooperation with the Government, was it not?

A.  Yes.

Q.  And that plea agreement required you to provide full and complete disclosure of everything you knew about the drug business, did it not?

A.  Yes.

Q.  And that plea agreement was signed on August the 19th of 2013, was it not?

A.  Yes.

Q.  Now, part of that plea agreement also stipulated that the Government had the right to require that you take a polygraph test, correct?

A.  Yes, it was.

Q.  And they haven't requested it or required it and you haven't taken one, is that right?

A.  Haven't taken one.

Q.  Okay.  They haven't requested it either, have they?

A.  I don't know what the Government requested.

Q.  Now, when you were pulled over by law enforcement on July the 15th, 2011, you admitted to the Highway Patrol at that time that you were a mule, right?

A.  Yes.

Q.  And explain to Judge Blatt what a mule is.  What you meant by that when you stated it to the Highway Patrol.

A.  A mule is someone who transports illegal anything for profit.

JAMAR McELVEEN – CROSS-EXAMINATION

1   Q.  So when you said to law enforcement, to the Highway

2   Patrol, that you were a mule, what you were telling them is

3   you made a living making runs from South Carolina to Texas to

4   buy drugs and bring them back to South Carolina, is that

5   right?

6   A.  Yes.

7   Q.  And that you were transporting these drugs on behalf of

8   others.

9   A.  Yes.

10  Q.  Right?  Now, at the time that you were stopped and you

11  spoke with law enforcement, you told them the truth, didn't

12  you?

13  A.  No.

14  Q.  So you lied to them?

15  A.  Yes.

16  Q.  When you talked with them, you told them that the kilo of

17  cocaine, that the money for the kilo of cocaine was for

18  somebody named Marion, somebody named Big Man, didn't you?

19  A.  Yes.

20  Q.  You also told them that -- you told them about a fellow

21  named Duce?

22  A.  Yes.

23  Q.  And that you were the middleman for Duce?

24  A.  Yeah.

25  Q.  You also told them about somebody named School?

1   A.  Yes.

2   Q.  You told them about -- you told them that your source of

3   supply in Texas was a man by the name of Chico?

4   A.  Yes.

5   Q.  An Hispanic man.  And that person, his name is Sandoval,

6   is that right?

7   A.  Yes.

8   Q.  And Sandoval was, in fact, your source in Texas, was he

9   not?

10  A.  Yes.

11  Q.  And that you had purchased two kilos before that trip from

12  Sandoval, or Chico, is that right?

13  A.  Yes.

14  Q.  At no time in any interview did you mention Martin

15  Ballard, did you?

16  A.  No, I had no reason to.

17  Q.  Exactly.  You then were interviewed again, another proffer

18  interview, and this time your lawyer was with you, Miss

19  Chiles, correct?

20  A.  Yes.

21  Q.  And that was on April 25th of 2013.

22  A.  Yes.

23  Q.  You met with a DEA agent, another detective by the name of

24  Upper or Euper, and Miss Chiles, is that right?

25  A.  That's what it says.

JAMAR McELVEEN - CROSS-EXAMINATION

1  Q.  You told them again about your source in Texas being

2  Alejandro Sandoval, Chico, right?

3  A.  Yes.

4  Q.  You told them about a trip that you took in late 2009 to

5  Texas to buy a kilo of cocaine from Chico?

6  A.  Okay.

7  Q.  Is that right?

8  A.  Yes.

9  Q.  Do you remember that?  You remember telling them that

10  you -- that the cocaine that you bought on that trip was body

11  wrapped to an Hispanic male to get it through a check point;

12  do you remember that?

13  A.  Yes.

14  Q.  And then you also told them about buying 30 pounds of

15  marijuana from Chico as well, in January of 2012?

16  A.  Yes.

17  Q.  Now, in neither of those two interviews did you mention

18  anything about Martin Ballard, did you?

19  A.  No, I didn't.

20  Q.  And at that time you were under a proffer to tell the

21  truth, correct?

22  A.  And I did.

23  Q.  And the truth was that you had had no dealings with Martin

24  Ballard, correct?

25  A.  The question wasn't about Martin Ballard, the questions

1  was about Alejandro Sandoval.

2  Q.  Well, you stated in your proffer agreement, did you not,

3  that you would provide information related to everything that

4  you knew about drug dealing, correct?

5  A.  The understanding that me and my lawyer spoke about with

6  my proffer agreement was that I be truthful in anything that I

7  say concerning my drug dealings.

8  Q.  And you were truthful in both of those interviews,

9  correct?

10  A.  Yes.

11  Q.  And you didn't say anything about Martin Ballard or having

12  any drugs dealing with Martin Ballard, correct?

13  A.  The questions were not about Martin Ballard.

14  Q.  Well, again, if you would answer my question.  When you

15  were interviewed on both of those occasions you did not

16  mention anything about Martin Ballard, did you?

17  A.  I wasn't asked anything about Martin Ballard.

18  Q.  So is the answer to my question yes or no?

19  A.  The answer is no.

20  Q.  Now, you were then interviewed on June the 19th of 2013.

21  Does that date sound --

22  A.  If that's the date on the paper, yeah.

23  Q.  Okay.  Now, that would have been a couple of weeks or so

24  after the shooting of the Government's witness?

25  A.  I wouldn't know.

1  Q.  You didn't know?

2  A.  No.

3  Q.  When you met with the Government at that time, Miss Chiles

4  was present again?

5  A.  Yes.

6  Q.  And you met with Agents Tanner and Simonetti; do you

7  recall their names?

8  A.  I don't recall their names.

9  Q.  When you met with DEA at that time, you -- they told you

10  that they were investigating Martin Ballard, correct?

11  A.  Yes.

12  Q.  They told you that they wanted you to provide help

13  regarding Martin Ballard in this shooting, did they not?

14  A.  No.

15  Q.  They told you that if you provided information regarding

16  Martin Ballard, that that would help you, didn't they?

17  A.  No, they didn't tell me anything.

18  Q.  In fact, you're hoping your testimony will help you

19  related to your sentence by perhaps getting it reduced, aren't

20  you?

21  A.  Sure.  Yes.

22  Q.  And even though you had never mentioned anything about

23  Mr. Ballard and drugs before, that you told them on that date

24  what they wanted to hear because you wanted to help yourself,

25  isn't that right?

1   A.  No, that's not correct.

2   Q.  Well, let's talk about what you told them on that day.

3   You told them that you made a trip for Martin, first trip for

4   Martin Ballard, you told them that you made that in the summer

5   of 2010.

6   A.  Correct.

7   Q.  You told them that you made a second trip for Martin

8   shortly thereafter, correct?

9   A.  Correct.

10   Q.  And then you told them that you made six more trips to

11   Texas for Martin for a total of 11 and a half kilos?

12   A.  Correct.

13   Q.  You told them about another trip in 2011 for Martin

14   claiming that you bought two kilos of cocaine for him.  Is

15   that right?

16   A.  No.

17   Q.  You don't recall saying that?

18   A.  No, I don't recall saying that.

19   Q.  You told them that you had made purchases for Martin

20   Ballard that totaled 13 and half kilos of cocaine?

21   A.  Sounds about right.

22   Q.  So the number of trips that you testified a couple of days

23   ago about and that you're testifying about today, would have

24   been somewhere in the neighborhood of nine or ten trips?  Is

25   that right?  For Martin Ballard?

1   A.  Can't remember the exact amount of trips.

2   Q.  Does that sound about right?  Nine or ten runs for Martin?

3   A.  I mean --

4        MR. PHILLIPS:  Your Honor, I would object.  I think

5   that mischaracterizes what he testified the other day, and

6   also to what --

7        THE COURT:  Well, I think he's asking, but -- I think

8   he's answered it.

9   BY MR. THEOS:

10  Q.  Martin Ballard wasn't the only person you were making runs

11  for, was he?

12  A.  No.

13  Q.  And how many other people would you say you were making

14  runs for?

15  A.  Myself, two other people.

16  Q.  And who were those people?

17  A.  Xavier and Demond McElveen.

18  Q.  I'm sorry, I didn't hear the second name.

19  A.  Demond McElveen.

20  Q.  Can you spell it?  Because I don't understand what you're

21  saying.

22        THE COURT:  McElveen.

23        MR. THEOS:  I understand the last name, Judge; the

24  first name.

25  A.  D-E-M-O-N-D.

JAMAR McELVEEN – CROSS-EXAMINATION

1   Q.  Xavier McElveen is now deceased, is that right?

2   A.  Yes.

3   Q.  He's a cousin?

4   A.  Yes.

5   Q.  And Demond McElveen, is he also a relative?

6   A.  Yes.

7   Q.  How many runs would you say you made for them?

8   A.  Can't remember.  Several.

9   Q.  Several?  And would several -- would you say is several

10  more than ten?

11  A.  For Demond, no.  For Xavier, we were partners.

12  Q.  So would you say the runs that you made for Xavier, would

13  they be more than ten?

14  A.  Possibly, yes.

15  Q.  And the runs you made for Demond would be something less

16  than ten?

17  A.  Yeah.

18  Q.  Now, do you recall testifying in Federal Court before

19  Judge Norton on September the 30th of 2013?

20  A.  Yes.

21  Q.  You recall you testified -- well, let me ask you this.

22  You were testifying in that case at the sentencing hearing of

23  Mr. Sandoval, correct?

24  A.  Correct.

25  Q.  At Chico's sentencing hearing, correct?

JAMAR McELVEEN - CROSS-EXAMINATION

A. Correct.

Q. And you offered testimony at that hearing not only to assist the Government, but to also get some assistance in your sentence, correct?

A. Correct.

Q. So you wanted to make sure that everything you said in that sentencing hearing was correct, did you not?

A. Yes.

Q. And you told the truth to Judge Norton, did you not?

A. Yes.

Q. You told him about your trips to Texas and you told him who you were buying drugs for and who you were buying drugs from, did you not?

A. Correct.

Q. Now, you told him that you made one trip to Texas, your first trip, in the fall of 2009 for one kilo, do you recall that?

A. Correct.

Q. You also told him that your second trip was in December of 2009, do you remember that?

A. Yes.

Q. You testified under oath that you -- to Judge Norton, you testified under oath that you only traveled to Texas five or six times. Do you remember that?

A. For Mr. Sandoval. I had numerous sources in Texas.

1  Q.  I'm going to show you the transcript, it's on page ten of

2  the transcript.  I'm sorry, it's on page 12 of the transcript.

3  Do you deny testifying that you sold Mr. -- that you traveled

4  to Texas five or six times only?

5  A.  I'm sorry?

6  Q.  Do you deny that you testified before Judge Norton that

7  you went to Texas five or six times only?

8  A.  No, I don't deny that.  The question was about how many

9  times I went to see Mr. Sandoval.

10 Q.  So your testimony here today is that you saw Mr. Sandoval

11 five or six times?

12 A.  Correct.

13 Q.  And that's it?

14 A.  Give or take, yeah.

15 Q.  Well, give or take how many?

16 A.  I mean, I didn't write it down in my Day Planner how many

17 times I went to see him.

18 Q.  You also testified, did you not, that although you didn't

19 recall the exact amount of cocaine that you purchased in

20 Texas, that during this time frame it was no more than

21 six kilos, is that right?

22 A.  It's possible.

23 Q.  All right.  And that's completely different than what you

24 testified here to today.

25          THE COURT:  You back away and your voice drops.

1   Q.  That is completely different and inconsistent with what

2   you testified to here today and a couple days ago, and what

3   you told law enforcement, because you told them you bought for

4   Martin Ballard 13 and a half kilos.

5   A.  What I told law enforcement was I had more than one

6   supplier in the State of Texas, and Chico was one of them.

7   Q.  You didn't bother to tell Judge Norton that you had

8   purchased any more than six kilos of cocaine while you were in

9   Texas, did you?

10  A.  The questions in front of Judge Norton weren't about how

11  many kilos of cocaine I purchased, it was how much I purchased

12  from Mr. Sandoval.

13  Q.  Well, you didn't say anything either to law enforcement on

14  those three occasions, you didn't mention anything to them

15  about Martin Ballard either, just as you didn't when you

16  testified before Judge Norton, did you?

17  A.  Martin Ballard wasn't the subject in front of Judge

18  Norton.

19  Q.  And when you spoke with the Government during your proffer

20  interviews, you didn't mention Mr. Ballard, and you were

21  required to tell them everything you knew about drug activity,

22  were you not?

23  A.  I answered the questions.  And the questions were about

24  Mr. Alejandro Sandoval.

25  Q.  So your testimony is that the reason you didn't offer any

1    information regarding Martin Ballard, in spite of your

2    agreement to provide all information, is because you just

3    weren't asked those questions.

4    A.   From the understanding of my lawyer, I honored my

5    agreement.  My lawyer was present at all of the meetings, and

6    she told me that I fully honored my agreement.

7    Q.   Now, while you were out on bond, you were on the run, were

8    you not?

9    A.   Yes.

10   Q.   You failed to show up to court when you were supposed to?

11   A.   Yes.

12   Q.   And you were actually on the run for a couple years,

13   weren't you?

14   A.   No.

15   Q.   How long?

16   A.   A year and a half.

17   Q.   Year and a half.  And during that time you were selling

18   drugs, right?

19   A.   Yes.

20   Q.   During that time you were using drugs, too?

21   A.   No.

22   Q.   You don't use drugs?

23   A.   No.

24   Q.   You just sell them?

25   A.   Just sell them.

JAMAR McELVEEN - CROSS-EXAMINATION

1  Q.  And while you were on the run, there was a warrant out for

2  your arrest, was there not?

3  A.  I believe there was.

4  Q.  And in addition to selling cocaine you were also selling

5  marijuana during that time frame?

6  A.  Yes.

7  Q.  Now, when you were before Judge Norton, you also testified

8  that the only trips, the only trips that you could

9  specifically remember were -- to Texas -- were the trips of

10  December 2009 and two trips in February of 2011.  Do you

11  recall that?

12  A.  Yes.

13  Q.  Those are the only three trips that you recall?

14  A.  Again, we were speaking of a specific person.

15  Q.  Well, your testimony is then today, that even though you

16  didn't -- at the time you testified before Judge Norton that

17  you could only remember three trips, specifically remember

18  three trips, your testimony today is you recall others.

19  A.  My testimony in front of Judge Norton was that I could

20  remember the three trips that involved myself and

21  Mr. Sandoval.

22  Q.  Well, in fact, you also told Judge Norton, when

23  questioned, that you just couldn't remember all the trips you

24  made to Texas, you couldn't remember dates, times, et cetera,

25  because there were too many of them, right?  And it was like

1  being stopped in -- for traffic stops, you just -- it was too

2  much for you to remember, right?

3  A.  No, it's not that I don't remember, I just don't remember

4  exact dates.

5  Q.  You don't deny admitting to Judge Norton that you couldn't

6  remember every cocaine purchase.

7  A.  Yes.

8  Q.  You deny that?

9  A.  No, I don't deny that.

10  Q.  And you don't deny that you told Judge Norton the only

11  three dates you could recall were December 2009 and

12  February 2011.  You don't deny that, do you?

13  A.  That's what it says.

14  Q.  But what you testified to a couple days ago was you

15  testified to here today, or entirely -- it's entirely

16  different.  You have now recalled, after the Government came

17  to see you to find out what information you could provide

18  about Martin Ballard, now you can recall a number of dealings

19  with Martin Ballard.  Your testimony today is different than

20  what you told law enforcement on at least two occasions, isn't

21  it?

22  A.  No.  It's not.  Because my testimony on those occasions

23  were about a specific person.  He asked me do I recall the

24  testimony -- the purchases that I had during those specific

25  times with Mr. Sandoval.  Those are the purchases that I

1    remembered.

2    Q.  And your testimony also today, wasn't just the other day,

3    but today, is that the reason you didn't tell law enforcement

4    previously during your two other proffer interviews about

5    Martin Ballard, is because you were never asked those

6    questions, right?

7    A.  Correct.  My understanding that my lawyer gave me was that

8    I be truthful in everything that I say, and that I answer all

9    the questions truthfully.  I did that.

10    Q.  All right.  Now, you're hoping, are you not, that with

11    your testimony here today you will get a reduction in your

12    current sentence, are you not?

13    A.  Sure.

14    Q.  And you'd say anything you could to try to help yourself

15    get a lesser sentence, wouldn't you?

16    A.  Actually, sir, my release date is still going to be this

17    year, no matter what.

18    Q.  When is your release date?

19    A.  It was 2018, now it's changed to 2017.  With some drug

20    classes and a halfway house, I should be home by November the

21    1st of this year.  So me lying won't help anything.

22    Q.  But if it's established that you are lying and you've

23    committed perjury either before Judge Norton or before Judge

24    Blatt, you'd be prosecuted for that, wouldn't you?

25    A.  It's a possibility.

1    Q.  Yeah.  And again, you acknowledge that what you've

2    testified here to today is completely different than what you

3    testified -- than what -- than the information you offered to

4    law enforcement and to Judge Norton, correct?

5    A.  No, I don't acknowledge that.

6    Q.  And that wouldn't be unusual for you, since you've also

7    previously been convicted of providing false information to

8    law enforcement, correct?

9    A.  No.  Never been convicted of providing false information

10   to law enforcement.

11   Q.  You testified earlier that you were.

12   A.  No.  You asked me did I lie on the side of the road; I

13   said yes, I did.  I was never charged for giving false

14   information.

15   Q.  So lying is not -- lying is something that you're

16   accustomed to then, isn't it?

17   A.  Sir, you're a lawyer, you lie too.

18   Q.  Well, we'll let the judge be the judge of who's lying and

19   who's telling the truth, Mr. --

20   A.  Him or God.

21          MR. THEOS:  No other questions, Judge.

22                      REDIRECT EXAMINATION

23   BY MR. PHILLIPS:

24   Q.  Just a few questions, Your Honor.  Mr. Theos spent a lot

25   of time talking about your testimony in front of Judge Norton,

1    and let's talk about what you actually said.  Do you recall

2    being asked by the assistant U.S. Attorney approximately how

3    many times between late 2009 and July of 2011 when you were

4    arrested did you go out to Texas and purchase cocaine from

5    Mr. Sandoval?  Do you recall that?

6    A.  Yes.

7    Q.  And your answer from him at that time about maybe five,

8    six times.

9    A.  I think that sounds about right, yes.

10   Q.  And then the question was then asked, "Do you recall

11   approximately how much cocaine did you purchase from

12   Mr. Sandoval at that time, over that time period?"  Do you

13   recall being asked that question?

14   A.  Yes.

15   Q.  And you answered, "I can honestly not remember the exact

16   amount, but just ballpark, no more than six keys."

17   A.  Yes.

18   Q.  Okay.  And do you recall being asked by the assistant U.S.

19   Attorney -- Let's see.  I want to make sure I'm on the

20   right -- a question now, "At that time were you still meeting

21   with your other source out in Texas?"

22   A.  Yes.

23   Q.  And your answer was, "When I initially met Mr. Sandoval,

24   because I wanted to have other options, and my primary source

25   became unavailable, then I started going through him."  Was

1  that your answer?

2  A.  Yes, it was.

3  Q.  And then you were asked, "When did he become unavailable?"

4  Who were you talking about?  Excuse me.  Did you get asked

5  that question, when did he become available?

6  A.  I'm sorry, I'm not --

7  Q.  That was my fault.  So you probably let -- that answer we

8  just talked about, "Do you recall being asked when he became

9  unavailable?"  Referring to the source.  The other source.

10  A.  Primary source?

11  Q.  Yes, sir.

12  A.  Like when as far as the time frame?

13  Q.  Do you recall being asked that question?

14  A.  Yes, I remember that question.

15  Q.  And your answer was, "He became unavailable for a short

16  time in 2010, and then permanently in 2011."

17  A.  Yes.

18  Q.  Now, you had testified previously about these multiple

19  sources in Texas.  And just so make sure we're clear, when you

20  were transporting cocaine for Mr. Ballard, which source were

21  you primarily getting from?

22  A.  Primarily from my original source.

23  Q.  Who was that?

24  A.  Never knew his last name.  His name was just Ocho.

25  Q.  Ocho.  So the cocaine that you were obtaining for

1  Mr. Ballard and transporting back to South Carolina was not

2  for Mr. Sandoval, who was the subject of that sentencing

3  hearing.

4  A.  No.

5  Q.  Now, one last question.  Mr. Theos asked you about that

6  2011 arrest, and he asked you whether you said anything about

7  Mr. Ballard when you were on the side of the road.

8  A.  The 2011 arrest.

9  Q.  Yes, 2011, he asked whether you said anything about

10  Mr. Ballard, and you said no, is that right?

11  A.  Yes.

12  Q.  And was Mr. Ballard involved in that deal --

13  A.  No.

14  Q.  -- in July 2011?

15  A.  No.

16  Q.  To refresh the Court's recollection, when was the last

17  time you dealt with Mr. Ballard?

18  A.  December of 2010.

19  Q.  And is that the seizure that Mr. Theos asked you about,

20  the seizure of the $100,000?

21  A.  Yes.

22  Q.  And whose money was in that seizure?

23  A.  It was a co-op money, mine, Mr. Ballard's, my cousin's.

24        MR. PHILLIPS:  No further questions.

25        MR. THEOS:  One second, Your Honor.  No other

SHAWN BLOUNT - DIRECT EXAMINATION

1    questions, Your Honor.

2           THE COURT:  You may go down.

3           MR. PHILLIPS:  Your Honor, the Government would next

4    call Mr. Shawn Blount, he's in custody and the marshals are

5    aware, they're bringing him.

6           THE CLERK:  State your name for the record.

7    A.  Shawn Blount.

8       SHAWN BLOUNT, a witness called by the Government, first

9    having been duly sworn, testified as follows:

10                      DIRECT EXAMINATION

11   BY MR. PHILLIPS:

12   Q.  Mr. Blount, can you state your name again for the Court?

13   A.  Shawn Blount.

14   Q.  And how old are you?

15   A.  Twenty-four.

16   Q.  Where were you born?

17   A.  Florida.

18   Q.  And where have you spent most of your life growing up?

19   A.  Charleston, South Carolina.

20   Q.  And what kind of education do you have?

21   A.  Tenth grade.

22   Q.  And what kind of work have you done, legitimate work,

23   since tenth grade?

24   A.  Dish washing.

25   Q.  At restaurants?

SHAWN BLOUNT - DIRECT EXAMINATION

1    A.  Yeah.

2    Q.  Okay.  Now, you've also been involved in some illegitimate

3    work, is that right?

4    A.  Yes, sir.

5    Q.  And you've got criminal convictions regarding that illegal

6    work?

7    A.  Yes, sir.

8    Q.  Specifically drug dealing?

9    A.  Drug dealing.

10   Q.  You have a 2008 conviction -- well, not regarding drug

11   dealing, but regarding possessing a pistol, unlawfully posing

12   a pistol?

13   A.  Yes, sir.

14   Q.  And you also have a conviction for cocaine, distribution

15   of cocaine?

16   A.  Yes, sir.

17   Q.  Any other convictions you -- other than those?  In State

18   Court?

19   A.  Yeah, that's the only one.

20   Q.  And you also have a conviction in Federal Court, is that

21   right?

22   A.  Um-hum.

23   Q.  And that was in a drug case?

24   A.  Yes.

25   Q.  I'm going to show you a document says Government

SHAWN BLOUNT - DIRECT EXAMINATION

1    Exhibit 10 I. Do you recognize this document?

2    A.  Yes, sir.

3    Q.  What is it?

4    A.  A plea agreement.

5    Q.  And that's -- you entered into that in December of 2012?

6    A.  Yes, sir.

7    Q.  And if we could go to the page 12 of that agreement, if

8    you could tell us if you see your signature?

9                THE COURT:  It's blinking on and off.

10               MR. PHILLIPS:  She's moving it to get to the page.

11   Q.  Do you see a signature on that document?

12   A.  Yes, sir.

13   Q.  And what is your understanding, what did you promise to do

14   in this plea agreement?

15   A.  Cooperate with the Government truthfully.

16   Q.  And what do you hope -- in making that agreement, what did

17   you hope to get in return for your truthful cooperation?

18   A.  I was hoping for the Government to file a motion.

19   Q.  And did they do that in your original case?

20   A.  Yes.

21   Q.  And you got a -- what was your sentence?

22   A.  Now?

23   Q.  The sentence you're currently serving.

24   A.  Ten years.

25   Q.  All right.  And that was down from what you would have

SHAWN BLOUNT - DIRECT EXAMINATION

1   expected, had you not cooperated?

2   A.  Yes.

3   Q.  And what happens if you don't tell the truth according to

4   that plea agreement?

5   A.  I get more time added to my sentence.

6   Q.  Now, we talked to -- you talked about your previous

7   convictions for drug dealing.  When did you start dealing

8   drugs?

9   A.  2008.

10  Q.  And what kind of drugs were you selling?

11  A.  Crack and coke.  And weed.

12  Q.  And how long did you sell those drugs?  Those types of

13  drugs.

14  A.  Up until I got arrested.

15  Q.  And did you sell any other kind of drugs during that time?

16  A.  Heroin.

17  Q.  Heroin?

18  A.  (Witness nodded affirmatively.)

19  Q.  Was that the subject of your federal conviction, heroin?

20  A.  Yes.

21  Q.  Now, just to be clear, did you ever have any dealings with

22  Martin Ballard?

23  A.  No.

24  Q.  No drug dealings?

25  A.  No drug dealings.

1  Q.  Have you ever met Martin Ballard?

2  A.  Yes, sir.

3  Q.  Where did you meet Mr. Ballard?

4  A.  In the county jail.

5  Q.  In the county jail when -- were you serving -- were you

6  arrested for your federal charges at that time?

7  A.  Yes, sir.

8  Q.  Okay.  And did you get to know Mr. Ballard during your

9  time in the county jail?

10  A.  Yes, sir.

11  Q.  Did you have any conversations about y'all's cases while

12  you were in the county jail?

13  A.  Yeah.

14  Q.  And he talked about his case?

15  A.  Yes, sir.

16  Q.  What did he tell you about his case?

17  A.  He told me that -- he took -- one day we been talking, and

18  he told me that he going to trial wherever, he asked me what I

19  think.  And I asked him if he got people telling, and he said

20  yeah, so I tell him threaten those people.  And he said doing

21  that BJ, he about to put ten grand on him --

22  Q.  You can continue.

23  A.  -- to get him killed.  And another dude named Slim, he get

24  him change his statement.  And he said -- and then a couple

25  weeks later, before -- when Jim Black from Cleveland --

SHAWN BLOUNT - DIRECT EXAMINATION

1  Q.  Let's stop there.  So he told you that -- you asked him if

2  someone was telling on him.

3  A.  Yeah.

4  Q.  And he said yes?

5  A.  (Witness nodded affirmatively.)

6  Q.  And he identified a guy named Slim?

7  A.  BJ and Slim.

8  Q.  Okay.  And do you know who Slim is?

9  A.  I don't know.

10  Q.  But he thought he could change his testimony?

11  A.  Right.

12  Q.  And what did he tell you about BJ?

13  A.  He said he put ten grand on him to get him killed.

14  Q.  Okay.  And, now, you mentioned Jim Black.  Who is Jim

15  Black?

16  A.  Jim Black is his co-defendant.

17  Q.  Do you know his full name?

18  A.  Jimmie Harris.

19  Q.  Were you also housed with Jimmie Harris?

20  A.  All us in the same unit.

21  Q.  "All us" being Ballard, Harris and you?

22  A.  Yes, sir.

23  Q.  All right.  And what happened -- you were about to start

24  talking about Mr. Ballard and Mr. Harris; what did you witness

25  between Mr. Ballard and Mr. Harris after the previous

1  conversation you just talked about?

2  A.  That they let Jim Black leave.

3  Q.  Where was he leaving?

4  A.  The county jail.  He was going home.

5  Q.  Okay.

6  A.  And he told Jim Black that he needed that BJ situation

7  handled.  Jim Black told him he got him.

8         MR. THEOS:  Your Honor, I'm just renewing my

9  objection, please, to this witness testifying as to what

10  Jimmie Harris allegedly -- he overheard Jamie Harris allegedly

11  say.

12         MR. PHILLIPS:  He's testifying what Mr. Ballard said,

13  currently.  I understand his objection, but right now he's

14  talking about what Mr. Ballard told Mr. Harris.

15         MR. THEOS:  Well, he did say that, and he was just

16  about to say what he claims Mr. Harris said, so I wanted my

17  objection noted for the record.

18         MR. PHILLIPS:  All right.

19         THE COURT:  All right, sir, has he testified -- he's

20  testifying, I thought, about Mr. Ballard.

21         MR. PHILLIPS:  He is, Your Honor.  Right.  He was

22  just testifying about an exchange between Mr. Ballard and

23  Mr. Harris that he overheard.  So we can have him -- I

24  certainly want Your Honor to --

25         THE COURT:  All right.

SHAWN BLOUNT - DIRECT EXAMINATION

1  BY MR. PHILLIPS:

2  Q.  So just so we're clear, tell us what Mr. Ballard -- you

3  said he, you were talking about Mr. Ballard.

4  A.  Yes, yes.

5  Q.  So Mr. Ballard told Mr. Harris what?

6  A.  That he needed that BJ situation handled.

7  Q.  And Mr. Harris responded to Mr. Ballard and said what?

8  A.  I gotcha.

9  Q.  Did you see any other interactions regarding them after

10  that?

11  A.  No.

12  Q.  Did you come across Mr. Ballard again during your

13  incarceration?

14  A.  When he had left and went to Georgetown.  And ever since

15  then I ain't seen him.

16  Q.  Okay.  Did you ever communicate with him after you went to

17  Georgetown?

18  A.  No.

19  Q.  Did he send you a letter?

20  A.  Yeah, he sent me a letter.  I had come back in the county,

21  he sent me a letter asking me how much time I get.

22  Q.  Mr. Ballard did?

23  A.  Yeah.

24  Q.  Did he -- he asked you how much time you got?

25  A.  Yeah.

SHAWN BLOUNT - DIRECT EXAMINATION

1   Q.  Did he ask you anything else in his letter?

2   A.  He asked me how much time I got, and he asked me if those

3   people asked him -- asked me about him.

4   Q.  Who are those people?

5   A.  The feds.  DEA agents.

6   Q.  Okay.  So he asked if the DEA was asking about him?

7   Mr. Ballard?

8   A.  Yeah.

9   Q.  And did he say anything else about that?

10  A.  He just said, "I knew you wouldn't do me like that."

11  Q.  Did you write him back?

12  A.  Yeah, I did write him back.

13  Q.  Did you tell him of anything in response to his question?

14  A.  I tell him no.

15  Q.  So you mentioned you were housed with Mr. Harris and

16  Mr. Ballard, and that was all prior to Mr. Ballard -- prior to

17  Mr. Harris' release.

18  A.  Right.

19  Q.  And prior to Mr. Ballard's Georgetown transfer, right?

20  A.  Right.

21  Q.  Now, did you ever come back in contact with Mr. Harris

22  after all that you just talked about?

23  A.  Yes.

24  Q.  Tell the Court about that.

25  A.  A couple weeks later Jim Black came back and --

SHAWN BLOUNT - DIRECT EXAMINATION

1  Q.  Let's stop.  Couple weeks from Mr. Ballard's transfer?

2  A.  From a couple weeks from Mr. Ballard transfer and him

3  leaving.

4  Q.  Okay.

5  A.  He came back to jail and we be in another unit together --

6         THE COURT:  Wait a minute.  Who is this came back?

7  A.  Mr. Jimmie Harris.

8         THE COURT:  I see.  All right.

9  A.  And then we were talking and he told me he been the one

10  handle that BJ situation --

11         MR. THEOS:  Your Honor, I want to note my objection

12  to this line of questioning.

13         THE COURT:  Any time that issue comes up, you're

14  welcome to have your objection in the record.

15         MR. THEOS:  Thank you, Judge.

16         THE COURT:  All right, sir.

17  BY MR. PHILLIPS:

18  Q.  You can continue.

19  A.  He told me that he been the one handle that BJ situation

20  for Ballard.

21  Q.  And "he" being Jim Harris?

22  A.  Yes, sir.

23  Q.  What else did he tell you about how he handled that

24  situation?

25  A.  He said the first time he went with one of Ballard

1    peoples, but the person who drive got scared so he tell him to

2    leave.

3    Q.  So Jimmie Harris was driven by one of Ballard's people?

4    A.  Right.

5    Q.  And then Jimmie told him to leave because he was acting

6    scared?

7    A.  Right.

8    Q.  Did he tell you anything he thought about doing at that

9    time?

10   A.  He tell me (unintelligible.)

11   Q.  What does that mean?

12   A.  Kill him.

13   Q.  Okay.

14   A.  Kill the driver for acting scared.

15   Q.  So Mr. Harris said that he thought about killing the

16   driver because he was acting scared?

17   A.  Yes, sir.

18   Q.  Did he tell why you?

19   A.  Because he just say he acting scared.  And he not want him

20   to tell on him.

21   Q.  So he thought he might be cooperating?

22   A.  Yeah.

23   Q.  Okay.  And then what did he tell you?  What happened next?

24   A.  And he said the second time another one of Ballard people

25   take him, and he said when he went up there, they been sitting

1  outside the house, he say get out of the car, walk up some

2  stairs, and he saw BJ, whoever BJ sitting on a chair through

3  the screen door and he just started shooting.

4  Q.  They say Mr. Harris walked up the steps and started

5  shooting through a screen door?

6  A.  Yeah.

7  Q.  And he told you another driver; did he tell you who

8  provided that driver, the second occasion?

9  A.  He said Ballard did it.

10 Q.  Okay.  And what else did he tell you?  Did he say where BJ

11 was sitting?

12 A.  He said he was sitting on a chair.

13 Q.  Okay.  Did he tell you anything about how he shot him?

14 What he used to shoot him?

15 A.  No, I just remember him saying he had two guns.

16 Q.  Did he demonstrate to you how he did it?

17 A.  No.  He ain't never did no demonstration.

18 Q.  Okay.  Now, did he tell you what happened to BJ?

19 A.  He tell me -- he tell me he shoot him, but he thought he

20 been dead, but somehow he found out that he lived.

21 Q.  And I think we've already covered this, but what nickname

22 did Mr. Harris use and what did you know him by?

23 A.  I knew him by Jim Black.

24      MR. PHILLIPS:  One moment, Your Honor.  No further

25 questions.

CROSS-EXAMINATION

BY MR. THEOS:

Q.  Mr. Blount, as you said, you're drug dealer, right?

A.  Yes, sir.

Q.  And you've been a drug dealer for years, is that right?

A.  Yes, sir.

Q.  Now, you pled guilty to a number of different things,

didn't you?

A.  Yes, sir.

Q.  Seven different counts, right?

A.  Yes, sir.

Q.  One of those counts was related to the murder of a

witness, right?

A.  Yes, sir.

Q.  And the person that died was Jamar Gathers, is that right?

A.  Yes, sir.

Q.  So you were involved in a drug conspiracy, and part of

that conspiracy involved a shooting of a Government witness?

Is that right?

A.  He --

        MR. PHILLIPS:  Objection, Your Honor.  Your Honor --

        MR. THEOS:  I have a right to cross-examine this

witness.

        MR. PHILLIPS:  But he's characterizing his

conviction.

SHAWN BLOUNT - CROSS-EXAMINATION

1    THE COURT:  I can't hear but one of you at a time.

2    MR. PHILLIPS:  Your Honor, one moment.

3    (Brief interruption in proceedings.)

4  BY MR. THEOS:

5  Q.  You pled guilty to being involved in a conspiracy, and

6  included in the conspiracy to traffic drugs, cocaine and

7  heroin, was the killing of a Government witness.  Is that

8  right?

9  A.  No, he was a part of my case.

10  Q.  I'm sorry?

11  A.  Mr. Gathers was a part of my case before he died.

12  Q.  So he was a co-defendant of yours?

13  A.  Right.

14  Q.  Okay.  And he -- and your testimony is he was killed, but

15  he wasn't cooperating with the Government?

16  A.  No.

17  Q.  Now, in that case -- you pled guilty to being involved in

18  his killing though, right?

19  A.  Right.

20  Q.  Okay.  And he was killed even though he wasn't a witness

21  cooperating with the Government?

22  A.  Right.

23  Q.  Just for the sake of killing him?  Right?

24  A.  Right.

25  Q.  Yeah.  And when you pled guilty you received a sentence of

1   98 years to life?

2   A.   Huh?

3   Q.   You received a lengthy sentence, didn't you?

4   A.   Yeah.

5   Q.   And your first sentence you were sentenced to 98 years to

6   life, is that right?

7   A.   No.

8   Q.   What were you sentenced to?

9   A.   My first sentence, I was sentenced to ten years.

10  Q.   Well, you testified earlier that that's what your sentence

11  was changed to after you began cooperating.  What was your

12  original sentence?

13  A.   For my PSR report?

14  Q.   Well, from what the Court sentenced you to.

15  A.   Ten years.

16  Q.   Well, then what was your sentence changed to?

17  A.   It was -- it was ten -- when I got sentenced, I got 120

18  months.

19  Q.   Well, you testified on -- when Mr. Phillips was asking you

20  questions, that you had a higher sentence first, and then

21  after you cooperated, your sentence was reduced.

22  A.   My PSR came back to a higher sentence.  And then when I

23  got sentenced, I got ten years.

24  Q.   So your testimony is you only received one sentence?

25  A.   Yes.

SHAWN BLOUNT - CROSS-EXAMINATION

1   Q.  And that sentence, even though it was a lot higher in your

2   presentence report, it was ultimately -- you were ultimately

3   sentenced to 120 months, based upon your cooperation?

4   A.  Yes.

5   Q.  Well, let's talk about that cooperation.  Now, you signed

6   a proffer agreement, right?

7   A.  Yes, sir.

8   Q.  And that was in December of 2012; do you remember that?

9   A.  Yes, sir.

10  Q.  And when were you sentenced?

11  A.  I think like November 2013.

12  Q.  Your plea agreement was December of 2012, is that right?

13  A.  Yes.

14  Q.  The plea agreement you just read from?

15  A.  (Witness nodded affirmatively.)

16  Q.  And on August the 22nd of 2013, you recall meeting with

17  Mr. Kittrell?  Mr. Kittrell is the first man sitting on the

18  second row; do you remember meeting with him?

19  A.  Yeah.

20  Q.  And at that time you also met with the DEA agent, a DEA

21  agent was present, correct?

22  A.  Yes.

23  Q.  And this was August of 2013.  August 22nd of 2013, right?

24  Does that date sound familiar?

25  A.  I really can't remember.

SHAWN BLOUNT - CROSS-EXAMINATION

1  Q.  All right.  Now, at that time when you met with Mr.

2  Kittrell and DEA, you told them about a few different people,

3  you told them about Jamar Gathers?

4  A.  Right.

5  Q.  Do you recall that?  You told them about Bernard Carl

6  Anthony Jordan?

7  A.  Right.

8  Q.  You told them about Shakenth Deboe?

9  A.  Right.

10  Q.  And you told them about Herbert Eric Richardson, right?

11  A.  Right, right.

12  Q.  You didn't mention anything about Mr. Ballard or what you

13  now claim you heard from Mr. Ballard or Mr. Harris, right?

14  You didn't say anything about either one of those two, did

15  you?

16  A.  No, I didn't.

17  Q.  And that was in August of 2013.

18          MR. PHILLIPS:  Your Honor, I have to object, and

19  the --

20          THE COURT:  What's your objection?

21          MR. PHILLIPS:  He's misreading the report, Your

22  Honor.  He's mischaracterizing.  It's 2012.

23          THE COURT:  Well, he asked him if he remembered.

24          MR. THEOS:  It's not 2012, Your Honor.

25          MR. PHILLIPS:  He's talking about a different report.

SHAWN BLOUNT - CROSS-EXAMINATION

1  My mistake.

2  BY MR. THEOS:

3  Q.  You don't deny that you met with law enforcement and Mr.

4  Kittrell in August the 22nd of 2013, do you?  If the report

5  says that, you wouldn't disagree with that, would you?

6  A.  Right.

7  Q.  All right.  And at that time you did not mention anything

8  about Martin Ballard or Jimmie Black, did you?

9  A.  No.

10  Q.  Okay.  And that would have been after the shooting.

11  Because the shooting took place on June the 6th of 2013.

12  A.  Right.

13  Q.  Right?  So two months later, after the shooting, when you

14  were with DEA, and Mr. Kittrell and you were working to try to

15  get your sentence reduced, isn't that the reason you were

16  meeting with them, to try to get a further -- to try to get a

17  reduction of your sentence?

18  A.  I met the Government to cooperate.

19  Q.  Right.  And the reason you met with them in August of 2013

20  was to try to give them information to help get a reduction in

21  your sentence, right?

22  A.  Right.

23  Q.  And when you met with them in August of 2013, you met with

24  them and provided all the information you had at that time in

25  order to try to help yourself, right?

1  A.  Right.

2  Q.  Okay.  And again, during that interview you didn't make

3  any mention of anything related to Martin Ballard or Jimmie

4  Harris, did you?

5  A.  No.

6  Q.  Even though you now claim all those conversations had

7  already taken place, right?

8  A.  Right.

9  Q.  If you really had that information at that time, you would

10  have given it to him, right?  Because otherwise, you would

11  have been lying to him, right?

12  A.  I thought they was lying.

13  Q.  So your testimony today is you thought they were lying,

14  not that you were lying?

15  A.  I thought they was lying about that at first.

16  Q.  Well, whether you thought they were lying or telling the

17  truth, you would have brought that to Mr. Kittrell's

18  attention, because it would have been something that you could

19  have benefited from, right?

20  A.  I didn't want to say nothing about it because I thought

21  they was lying.

22  Q.  You don't have anything to support what you're saying

23  today, do you?

24  A.  I just thought they was lying.

25  Q.  You don't have anything to support what you're saying

1  today, do you?

2  A.  How you mean?

3  Q.  You don't have any evidence, any evidence to give Judge

4  Blatt or present to the Court to support what you're

5  testifying to about Martin Ballard or Jimmie Harris, do you?

6  A.  I just saying what they told me.

7  Q.  Even though you didn't tell Mr. Kittrell or one of the

8  Government's lawyers, you didn't tell him two months after the

9  shooting, right?  And this letter you claim that you received

10  from Martin Ballard, you don't -- You got that with you?

11  A.  No, I don't got that.

12  Q.  The letter you claim you wrote him, you don't have that

13  either, do you?

14  A.  No.

15  Q.  Now, as part of your cooperation you know you're required

16  to take a polygraph test if the Government asks for one,

17  aren't you?

18  A.  Right.

19  Q.  They haven't asked for one and you haven't given one, have

20  you?

21  A.  No.

22  Q.  And the only reason you're here is to try to help yourself

23  in sentencing, isn't it?

24  A.  I made an agreement to cooperate with the Government when

25  I saw it in the paper, I wanted to help.

SHAWN BLOUNT - CROSS-EXAMINATION

1   Q.  That's exactly right.  You saw something in the paper and

2   you decided to use it to help yourself.  Right?

3   A.  Right.

4            MR. THEOS:  No other questions, Judge.

5            MR. PHILLIPS:  Nothing further, Your Honor.

6            THE COURT:  All right, sir, you may be excused.

7            MR. PHILLIPS:  We're going to call Gernardo Cato as

8   our next witness, Your Honor, but -- Your Honor, he's not

9   going to be a ten-minute witness.

10           THE COURT:  What did you say?

11           MR. PHILLIPS:  I don't think he'll be a ten-minute

12  witness.  He shouldn't be a whole lot longer, but I just

13  wanted to let you know.  I can certainly start, then we can go

14  till 1:00.

15           THE COURT:  Let's start.  How many more witnesses do

16  you think you have?

17           MR. PHILLIPS:  We have -- total?  Or today.  I'll do

18  a quick count.  I'm sure Mr. Richardson might know, but we've

19  got --

20           MR. RICHARDSON:  I believe it's about seven, maybe

21  eight, Your Honor.

22           THE COURT:  Okay.  How many more today?

23           MR. RICHARDSON:  Your Honor, we are hopeful that

24  we'll do Mr. Cato today, and then we hopefully will do

25  Mr. Cedric Myers, Mr. Charles Sanders and Mr. Garrick Sanders.

GERNARDO CATO - DIRECT EXAMINATION

1   That could be an aggressive schedule, but we certainly want to

2   try to push it, if we can.

3              THE COURT:  Okay.

4              THE CLERK:  State your name for the record.

5   A.  Gernardo Cato.

6       GERNARDO CATO, a witness called by the Government, first

7   having been duly sworn, testified as follows:

8                        DIRECT EXAMINATION

9   BY MR. PHILLIPS:

10  Q.  Mr. Cato, would you state your name for the Court?

11  A.  Gernardo Cato.

12  Q.  And how old are you?

13  A.  Thirty-six.

14  Q.  Where were you born?

15  A.  North Charleston, South Carolina.

16  Q.  Where have you spent most of your life living?

17  A.  With my grandmother.

18  Q.  Where, what city, what town?

19  A.  Right there in the Union Heights.

20  Q.  North Charleston?

21  A.  North Charleston.

22  Q.  And what kind of education do you have?

23  A.  I have a G.E.D.

24  Q.  Okay.  And what kind of work have you done, legitimate

25  work, since you got your G.E.D.?

1    A.   I did some network marketing for a company out of Florida

2    named Wayair.  I used to run an entertainment company, I used

3    to work at Pizza Hut, and I used to work at a warehouse.

4    Q.   And you've also been involved in illegal activities as

5    well?

6    A.   Yes, sir.

7    Q.   And you have a few convictions?

8    A.   Yes, sir.

9    Q.   You were convicted -- this goes a little back, but you

10   were convicted when you were 19 in '98 of distribution of

11   cocaine?

12   A.   Yes, sir.

13   Q.   And you also got a conviction for unlawful carrying of a

14   pistol?

15   A.   Yes, sir.

16   Q.   And then in 2001 you pled guilty to conspiracy to commit

17   bank fraud?

18   A.   Yes, sir.

19   Q.   Was that in Federal Court?

20   A.   That was in Federal Court.

21   Q.   And just briefly tell the Court what that involved.

22   A.   The bank fraud?

23   Q.   Yes.

24   A.   Yeah, we was using account numbers from insurance

25   companies, putting them on counterfeit checks, setting up

1  business accounts and depositing them.

2  Q.  Okay.  And you pled guilty to that?

3  A.  Yes, sir.

4  Q.  And then you also had, in 2001, a possession of a

5  controlled substance with intent to distribute in New Jersey?

6  A.  Yes, sir.

7  Q.  And then in 2010 you pled to a federal case, possession

8  with intent to distribute marijuana using the mail?

9  A.  Yes, sir.

10  Q.  And then false statement on a loan application?

11  A.  Yes, sir.

12  Q.  And then also a distribution or attempted distribution of

13  cocaine; all three of those were federal cases?

14  A.  Yes, sir.

15  Q.  And you were convicted of all three?

16  A.  Yes, sir.

17  Q.  Now, in those -- in the last three federal cases I

18  referred to, you entered into a plea agreement regarding each.

19  A.  Yes, sir.

20  Q.  Okay.  And did you agree to cooperate?

21  A.  Yes, sir.

22       THE COURT:  You say he entered into a plea agreement.

23  Are you talking about those cases?

24       MR. PHILLIPS:  Those three cases, yes, sir, that's

25  what he's --

GERNARDO CATO - DIRECT EXAMINATION

1    BY MR. PHILLIPS:

2    Q.  You entered into multiple plea agreements regarding the

3    last three charges I talked about, the last three federal

4    cases?

5    A.  Yeah, I pled guilty three times.

6    Q.  And I'm going to show you Government's Exhibit 10 J.  Do

7    you recognize that document?

8    A.  Yes, sir.

9    Q.  And what is that document?  Is that your plea agreement?

10   A.  Yeah, that's my plea agreement.

11   Q.  Does that appear to be the plea agreement from your

12   distribution of marijuana case?

13   A.  Yes, my distribution of marijuana.

14   Q.  And you agreed to cooperate in that plea agreement?

15   A.  Yes, sir.

16   Q.  Tell us your understanding of your agreement to cooperate.

17   A.  My understanding was to come clean about all my criminal

18   activities and other criminal activities I know or heard

19   about.

20   Q.  Okay.  And what was your understanding if you failed to do

21   so?

22   A.  That they can use everything that I say against me.

23   Q.  Okay.  And you could get more charges?

24   A.  Yes, I can.

25   Q.  Now, were your other plea agreements similar, had a

1    similar cooperation provision in them?

2    A.  Exactly.

3    Q.  Okay.  And they were all entered at different times after

4    this one?

5    A.  Yes, sir.

6    Q.  Now, you were sentenced on all three cases at the same

7    time?

8    A.  Yes, sir.

9    Q.  And what sentence did you receive?

10   A.  I received a 180 months.

11   Q.  And did you receive a motion from the Government for your

12   cooperation?  Did the Government make a motion on your behalf?

13   A.  Yes, they did.

14   Q.  All right.  And you received 180 months after that motion

15   the Government made to the judge?

16   A.  Right.

17   Q.  Okay.  Now, during your time from the time that you

18   started under federal indictment in these three cases, did you

19   abide by that agreement, did you tell the truth the entire

20   time of your cooperation?

21   A.  Well, one part of the story I told part of the truth, I

22   lied about not knowing a person.

23   Q.  Who was that?

24   A.  Eugene Carroll.

25   Q.  Okay.  You were confronted about that?

1   A.  I was.

2   Q.  And you told them you didn't know him?

3   A.  I told them I didn't know him.

4   Q.  And you just said you did know him?

5   A.  Right.

6   Q.  When you said it was part of the -- you lied about part of

7   it, explain that to the Court.

8   A.  Well, I lied about knowing him, but the truth was, the 300

9   some thousand dollars that he got caught with, and a half a

10  key that he got caught which didn't have anything to do with

11  that, that's why I said I didn't know him.

12  Q.  Okay.  But that wasn't true?

13  A.  It was true that I didn't -- that the 310,000 and the half

14  a key of coke wasn't mine.  The lie was when I first said that

15  I didn't know him.

16  Q.  Yes, sir.  Now, in your last federal indictment, your last

17  federal case which you pled guilty to, did that -- Let's back

18  up.  At any point did you fail to appear to a sentencing in

19  your federal cases?

20  A.  I did.

21  Q.  And what happened when that happened; tell the Court about

22  that briefly.

23  A.  I was supposed to come to sentencing September the 22nd.

24  Q.  So you were on bond?

25  A.  I was out on bond.

1    Q.  All right.  And did you show up to that sentencing?

2    A.  No, I didn't.

3    Q.  And did you do anything that gave rise to other criminal

4    charges instead of going to that sentencing?

5    A.  I did.

6    Q.  What did you do, briefly?

7    A.  Briefly, I tried to buy some cocaine from some guys from

8    the Caribbeans.

9    Q.  And that's the subject of your last federal conviction?

10   A.  Right.

11   Q.  Now, when did you start dealing drugs?

12   A.  Roughly around the ages of 14 or 16.

13   Q.  What kind of drugs did you start selling then?

14   A.  I started selling weed, then I graduated to coke and

15   crack.

16   Q.  And how long did you sell coke and crack?

17   A.  I sold coke and crack probably up until I was like 18.

18   After that I was strictly coke.

19   Q.  Okay.  And at the time of your arrest, let's just focus on

20   the last arrest and the last convictions, how much cocaine

21   were you typically dealing with?

22   A.  Talking about my last arrest?

23   Q.  Not specifically, but at the time that you were arrested

24   and it all ended, how much -- what weight were you selling?

25   A.  My orders would range anywhere between three and six keys

1    at a time.

2    Q.   And that's of cocaine?

3    A.   Right.

4    Q.   All right.  Now, just to be clear, did you ever have any

5    drug dealings with Martin Ballard?

6    A.   I never had no drug dealings with him.

7    Q.   Prior to your incarceration, did you know Mr. Ballard?

8    A.   Yes, I knowed him.

9    Q.   How did you know him?

10   A.   From seeing him around town, since back in the days at

11   Club Diplomat, Club Badabing.

12   Q.   But you never had any drug dealings with him?

13   A.   No.

14   Q.   Now, did you come across Mr. Ballard while you've been

15   incarcerated on your federal charges?

16   A.   I have.

17   Q.   Tell the Court about that.

18   A.   He just got back from -- he was out on bond.  He messed up

19   when he was on bond, and he was having another hearing for --

20   court hearing for him.

21   Q.   Okay.  And that's Mr. Ballard you're referring to?

22   A.   Right.

23   Q.   And where were you when you were around him?

24   A.   We was leaving from Charleston County jail and we came

25   here to this Federal Courthouse and went back to the

1  Charleston County jail.

2  Q.  So y'all were together being transported?

3  A.  Yes, sir.

4  Q.  Now, you had a hearing as well?

5  A.  I did.

6  Q.  And just to be clear, you aren't involved in Mr. Ballard's

7  case?

8  A.  No, I'm not.

9  Q.  Okay.  What happened while y'all were transported and

10  while you were around each other on that day?

11  A.  We was just pretty much speaking about females who we

12  knew, other guys who we know, we was comparing coke prices we

13  used to pay and what we used to charge for them.

14  Q.  So he told you what he used to pay for cocaine?

15  A.  He did.

16  Q.  Mr. Ballard?

17  A.  Right.

18  Q.  Do you recall what he said?  How much?

19  A.  If I'm not mistaken, he said the cheapest he was getting

20  them for was like 23, and they would range anywhere between 23

21  and 26,000.

22  Q.  Now, did you tell him how much you were getting it for?

23  A.  Yeah, I told him.

24  Q.  What did you tell him?

25  A.  My range was pretty much about the same, a little bit

1    more, anywhere ranging between 24 and 28,000 a key.

2    Q.  Now, did y'all talk about your pending cases at that time?

3    A.  Yes, we did.

4    Q.  What did he say about his case?

5    A.  He told me that his case started from after this guy named

6    BJ phone, and they had a recorded conversations with him

7    talking about some guy named Slim, and this other female me

8    and him both was dealing with named Vet.

9    Q.  Vet?  Who was that?

10   A.  Her real name was Yvette Thompson.

11   Q.  Now, what did he tell you about these witnesses, if

12   anything?

13   A.  At the time he was like they came at him with a plea deal

14   for ten years.  And he was thinking about taking it.  And then

15   again he was like he might go to trial.  And he was kind of

16   frustrated when he was talking about the BJ fellow, but he was

17   like he's not too concerned about the guy named Slim, he was

18   like he know he can get Slim to change his statements.  But he

19   was like, BJ, he want to take his ass out.  In his words.  And

20   he was like, you know anybody who can help me with that?  I

21   was like no.  And when he was saying that, he had a smile on

22   his face like he was playful about it.  But I just thought he

23   was just playing, his motions about the whole situation.

24   Q.  So Mr. Ballard asked -- he said he needed to take BJ's ass

25   out?

1   A.  Right.

2   Q.  And then -- I'm sorry.

3   A.  He was like he needed to get rid of him.

4   Q.  Um-hum, and he asked if you knew anyone that could do

5   that?

6   A.  Right.

7   Q.  How else did he talk about this BJ individual; did he talk

8   about anything else about him?

9   A.  He was like that's like the main person that can mess him

10  up.  He was like he was not concerned about Vet neither,

11  because he on a touch basis with her, and she said in her

12  statement -- he said that she said she told the people that

13  she never did no business with him.

14  Q.  And when regarding the people, who was he referring to?

15  A.  The feds.

16  Q.  All right.  Now, did you later find out about the

17  shooting -- don't tell us -- just answer that question.  Did

18  you ever hear about a shooting?

19  A.  Yes, I did.

20  Q.  And we'll just leave it at that.  Now, have you, during

21  your incarceration, have you been housed with Jimmie Harris?

22  A.  Yes, I have.

23  Q.  Tell the Court about that.  Do you know Jimmie Harris from

24  the streets?

25  A.  I don't know him at all.  I just met him in jail for the

GERNARDO CATO – DIRECT EXAMINATION

1    first time.

2    Q.   Do you know what his nickname is?

3    A.   Jim Black.

4    Q.   And when did you -- when were you confined with

5    Mr. Harris, when and where?

6    A.   Back in 2013 we was in Charleston County together.  2014

7    we was in Georgetown County detention center together.  And

8    2014 we was in Ocilla, Georgia together.

9    Q.   All right.  Now, did Mr. Harris ever make any statements

10   to you regarding his involvement in a shooting?

11   A.   Yes, he has.

12   Q.   And do you recall where you were housed when he made these

13   comments to you?

14   A.   He made -- he talked about it briefly when we was in

15   Charleston County.  But when we was in Georgetown and Georgia,

16   that's when he went full fledged with the story.  Given some

17   details rather.

18   Q.   Now tell us, tell us about what Mr. Harris told you

19   regarding the shooting.

20   A.   The shooting?

21   Q.   Yes, sir.

22   A.   The full story?

23   Q.   Yes, just tell the Court what Jimmie Harris told you about

24   the shooting.

25   A.   Yeah, he was like he was in the unit with my -- showing

1  them his paperwork, and showing how the different people were

2  telling on him with that.

3  Q.  When you said he was showing him his paperwork, what were

4  you referring to?

5  A.  I guess it was -- I would say his motion or what have you.

6  Q.  His discovery?

7  A.  Right.

8  Q.  Okay.

9  A.  And he was like --

10  Q.  And who is he?

11  A.  Jim Black.  Jimmie Harris.

12  Q.  Okay.

13  A.  And he was like, that's when they agreed to come up with

14  $10,000 for him to take care of BJ for him.

15  Q.  So who was going to pay, based on Mr. Harris' statement to

16  you, who was paying the $10,000?

17  A.  Martin.

18  Q.  And he was paying that to Mr. Harris?

19  A.  Right.

20  Q.  And what was the $10,000 for?

21  A.  To kill BJ.

22  Q.  Okay.  Did Mr. Harris tell you how much -- did he tell you

23  how that price was agreed upon?

24  A.  He didn't went into details about the price, he was just

25  like he was going to get paid five up front and five

1  afterwards.

2  Q.  Okay.  And then did he tell you anything about the

3  shooting itself?

4  A.  Yeah, he said he first went down there with some guy named

5  Butchie, Shrimp, those are two names he gave the fellow who he

6  first went down to Walterboro with.  And he said they ride

7  around for a little while, and they came to a house where they

8  believe BJ was staying at.  And he was like he told Butchie to

9  park.  And Butchie wasn't feeling the idea.  And he said

10  Butchie was acting kind of scared.  So he was like, man, drop

11  me off.

12     So when he dropped him off he say he got back in the car

13  and talked with Martin, and he was like what wrong with your

14  peoples, he been acting kind of scared, like I wanted to take

15  his ass out, too.  And he was like -- Martin was like, no, you

16  ain't got to do that.  I'm going to put you in the play with

17  my little cousin or what have you.

18  Q.  Okay.  This is all Mr. Harris telling you?

19  A.  Yeah, this is everything he told me.

20  Q.  Okay.

21  A.  And he was like Butchie had called some guy who was

22  supposed to be Martin little cousin for him on a three-way.

23  And he said they talked and he gave guy, the little cousin

24  fellow, directions to come pick him up in Charleston.  And he

25  said they went riding around Walterboro looking for BJ.  And

1  they say they went through a few spots or what have you, and

2  he was like, man, I don't know -- if he's not right here, I

3  don't know where he's at.  And he said just by luck they saw

4  BJ pull up in a Honda.  And he told the guy like --

5  Q.  Who's he told the guy?

6  A.  Jimmie.  Jimmie told the driver to go ahead and spin the

7  corner what not and let him out a few houses down.  And he

8  told him to park down the street and just be patient on it

9  when he get there.

10  So he say he got out the car, walk up to the house, walk

11  up the stairs.  And after he saw BJ sitting on the couch, he

12  said he pulled out two guns and started shooting.  He say he

13  couldn't see the bullets hitting him, as BJ sprang up off the

14  couch and run to the back of the house or what have you.

15  And he said he took his time going down the stairs walking

16  back to the car whatnot.  And he tell the driver to take his

17  time as he pull out.

18  So he say after they pull off, the driver phone start

19  going off.  He said the first call was from some guy who the

20  driver called Pa or Pops.  And they were saying on the phone

21  we heard BJ just got shot, and your car just leave from around

22  there.  And he was like, Pa, be easy, I'm going to call you

23  back.

24  Then he said the phone went off again.  It was, I guess,

25  the cousin girlfriend or whatnot.  And she was calling saying

1    the same thing as well.  And he was like, I'm going to call

2    you back.  Then he said the phone went off again, that one was

3    a guy giving them directions on where to go at and put the

4    guns.

5    Q.  And did he tell you anything about who took the guns from

6    them?

7    A.  He told me he didn't see that guy.  He just been like --

8    he saw -- he said the cousin got out the car with the guns and

9    put the guns inside another car.  That's what he told me.

10   Q.  Okay.  And did Mr. Harris tell you anything about the --

11   anything else about the shooting?

12   A.  That pretty much was it.

13   Q.  Okay.  Since that time when he told you about the

14   shooting, have you come across Mr. Harris and has he talked to

15   you about his case?

16   A.  He told me a lot about his case from the time he was in

17   Georgetown, and from the time we was in Ocilla, Georgia.

18   Q.  Okay.  Now, did you ever come across -- Well, let me back

19   up.  Let me back up here.

20              THE COURT:  Let's stop.

21              MR. PHILLIPS:  Yes, sir.

22              THE COURT:  We'll come back at quarter to 3:00.  It's

23   1:15.  We'll be in recess till then.

24      (A recess was held at this time.)

25              THE COURT:  All right, Mr. United States Attorney.

GERNARDO CATO - DIRECT EXAMINATION

1    BY MR. PHILLIPS:

2    Q.  Mr. Cato, before we left you were talking about statements

3    Mr. Harris made regarding his involvement in a shooting.  At

4    the time he was making those statements, did he ever tell you

5    what type of car, if any, he was driven in to the shooting?

6    A.  He said -- I can't remember whether he said the first guy

7    he went with Shrimp, but the second car was a Lincoln.

8    Q.  Okay.  And did he talk about the type of guns that he used

9    for the shooting?

10   A.  He said he had on all black, had on a black hat, black

11   shirt, black jacket, trench-like jacket.  Some black jeans,

12   some black tennis shoes.  He said he didn't have no gloves on.

13   And he said that the two guns he had was a .357 and a .40.

14   Q.  Did he demonstrate how he shot?

15   A.  Yeah, he said he held both arms out.

16   Q.  And did he tell you how many times he thought he had hit

17   the witness, Mr. Brothers?

18   A.  He never said.  He just said he saw the bullets hitting

19   him.

20          MR. PHILLIPS:  No further questions, Your Honor.

21                     CROSS-EXAMINATION

22   BY MR. THEOS:

23   Q.  Mr. Cato.

24   A.  Yes, sir.

25   Q.  You rode to court today with Jamal McElveen, is that

GERNARDO CATO - CROSS-EXAMINATION

1   right?

2   A.  Yes, I did.

3   Q.  In the same van or the same vehicle?

4   A.  Yes.

5   Q.  And he talked to you about his testimony, didn't he?

6   A.  No, he didn't.

7   Q.  He didn't say anything about his testimony?

8   A.  He didn't say anything.

9   Q.  You didn't ask him any questions about his testimony?

10  A.  None at all.

11  Q.  How many times would you say you spoke with Jamal McElveen

12  in the last six months?

13  A.  We was in Ocilla together from February to May.  So I

14  talked to him every day.

15  Q.  And when you say from February till May, what year are you

16  talking about?

17  A.  This year right here.

18  Q.  2015?

19  A.  Right.

20  Q.  And during that time y'all have been together, y'all spoke

21  about the case, didn't you?

22  A.  He just told me what he was back for, he didn't went into

23  no details.

24  Q.  But you knew that he was going to testify in the case,

25  right?

GERNARDO CATO - CROSS-EXAMINATION

1    A.  I would think so.

2    Q.  Well, I'm asking you if you knew that.  You knew that,

3    right?

4    A.  He just said he was back for his situation with Ballard;

5    he never said he was going to testify or anything.

6    Q.  Okay.  And you were back also for the same reason, to

7    testify against Martin Ballard, correct?

8    A.  Correct.

9    Q.  So y'all were both together for at least three months,

10   knowing full well that you were both coming here to testify

11   against Martin Ballard.

12   A.  Yes.

13   Q.  And y'all spoke about that testimony, didn't you?

14   A.  No.

15   Q.  Not at all?

16   A.  Not at all.

17   Q.  Well, you've got convictions for lying, right?

18   A.  I didn't get convicted for lying.

19   Q.  You've got convictions -- you've got a conviction for

20   stealing.

21   A.  Stealing?

22   Q.  Yeah, you took money from -- you benefited in taking money

23   from banks improperly by committing fraud, didn't you?

24   A.  No, I didn't benefit because I didn't receive -- depending

25   what case you're talking about, because on both cases I never

GERNARDO CATO - CROSS-EXAMINATION

1    received no money.

2    Q.  You committed fraud; you just didn't receive any money.

3    A.  Right.

4    Q.  You lied to the IRS in your tax returns, didn't you?

5    A.  No, I didn't lie to them.  I filed taxes on $30,000, and

6    they asked me why I didn't file taxes for the full $90,000.  I

7    couldn't file the taxes because the Government had took

8    $60,000 from me.

9    Q.  So the tax returns that you did file were inaccurate.

10   A.  No, it wasn't inaccurate, I filed what I had, which was

11   the $30,000.

12   Q.  You have convictions for cheating, cheating the bank, even

13   though you say you didn't get any money from them, right?

14   A.  I have convictions for fraud.

15   Q.  For fraud, right?  You also have convictions -- a

16   conviction for violence, correct?

17   A.  No.

18   Q.  Kidnapping in 2000 -- in the year 2000?

19   A.  I never kidnapped nobody.  And I didn't get convicted for

20   that.

21   Q.  You weren't convicted for that?

22   A.  No, I wasn't.

23   Q.  You were just arrested for it.

24   A.  (Witness nodded affirmatively.)

25   Q.  Arrested for kidnapping an adult.

GERNARDO CATO - CROSS-EXAMINATION

1   A.  Yeah, that's what I got arrested for.

2   Q.  Now, you've also been held in contempt of this court,

3   haven't you?

4   A.  Yeah, for not showing up for sentencing.

5   Q.  Well, it wasn't for just not showing up for sentencing, it

6   was also for trafficking cocaine, a kilo of cocaine while you

7   were out on the run.  After you failed to appear for court,

8   right?

9   A.  Yeah, that was the charge that I plead guilty to.

10  Q.  You violated your proffer agreement, right?

11  A.  What do you mean by violated?

12  Q.  Well, one of the terms of your proffer agreement was that

13  you would abide by all state and federal laws and that you

14  would not break the law, right?

15  A.  Correct.

16  Q.  You broke the law though, didn't you?

17  A.  I did.

18  Q.  You failed to show up for court as you were supposed to,

19  correct?

20  A.  I did.

21  Q.  And you trafficked cocaine, a kilo of cocaine while you

22  were out, correct?

23  A.  Yeah, I did purchase a key of cocaine.

24  Q.  And you lied to the Government about involvement of Mr. --

25  I believe his name is Mr. Taylor that you testified earlier

GERNARDO CATO - CROSS-EXAMINATION

1   about.

2   A.  Taylor?

3   Q.  I might be wrong about the name.  Mr. Carroll, I'm sorry.

4   A.  I denied knowing him.  That's what I did lie about.  But

5   the 300 and 10,000 that Mr. Carroll got caught with and the

6   half a key that he was involved in serving, I didn't have

7   anything to do about that.

8   Q.  So you lied to the Government about that, correct?

9   A.  I lied about knowing Mr. Carroll.

10  Q.  You lied, you provided false information to the

11  Government, didn't you?

12  A.  I lied about knowing Mr. Carroll.

13  Q.  So you provided false information to the Government,

14  didn't you?

15  A.  If that's what that's called.

16  Q.  You lied.

17  A.  I lied about knowing Mr. Carroll.

18  Q.  Now, when you were interviewed pursuant to your proffer

19  agreement, that was on March the 5th of 2013, was it not?

20  A.  I can't remember exactly.

21  Q.  Does that sound about right, March of 2013?

22  A.  I probably -- I remember having a proffer meeting around

23  that time frame.

24  Q.  All right.  And at this time you agreed to cooperate with

25  the Government, correct?

GERNARDO CATO - CROSS-EXAMINATION

1    A.  Yes, I did.

2    Q.  And in agreeing to cooperate with the Government, you

3    agreed to provide DEA and the Government with any and all

4    information you had pertaining to criminal activities, right?

5    A.  Correct.

6    Q.  And you did that in order to try to help yourself with

7    your sentence in order to reduce or receive a lesser sentence,

8    correct?

9    A.  Correct.

10   Q.  And those were related to the charges that you had pled

11   guilty to about six months or so -- six or seven months

12   earlier on September the 14th of 2012, right?

13   A.  That was for me -- me attempting to purchase.  I can't

14   remember the exact name of the charge, but my drug charge,

15   yes.

16   Q.  All right.  So -- but the bottom line is this.  You pled

17   guilty to an offense or offenses on September the 14th of

18   2012, and when you met with DEA on March the 5th of 2013, you

19   were doing that in order to hopefully ultimately receive a

20   lesser sentence.  Right?

21   A.  Correct.

22   Q.  And one of the reasons -- one of the major reasons that

23   you were concerned about your sentence and you wanted to help

24   yourself was because of the multiple violations that you had

25   while you were out on bond.  What we just talked about, the

1  lying, the drugs and the failure to appear for court, right?

2  A.  Correct.

3  Q.  And you wanted to make -- you knew you were going to be in

4  front of Judge Norton ultimately for sentencing, right?

5  A.  Yes.

6  Q.  So you wanted to tell the Government and DEA everything

7  you knew about drugs and any other unlawful activities to try

8  to help yourself with sentencing, right?

9  A.  Yes.

10  Q.  Now, you knew the only way that you could help yourself

11  was to make things right, so to speak, in light of your prior

12  lies and in light of your drug trafficking, correct?

13  A.  Repeat that again?

14  Q.  You knew that the only -- the only way that you could

15  really help yourself was to tell them everything you know and

16  to be truthful at that time, correct?

17  A.  Yeah, to come clean about everything.

18  Q.  Right.  Now, during that interview you didn't say anything

19  about Martin Ballard or anything about Jimmie Harris or

20  anything about this shooting, did you?

21  A.  Not in my first proffer meeting of 2013, no.

22  Q.  Now, that was in March of 2013, and you've just testified

23  you neglected to tell them anything about Martin Ballard or

24  Jimmie Harris, correct?

25  A.  Correct.

GERNARDO CATO - CROSS-EXAMINATION

1    Q.  And you previously said that you knew that you had to tell

2    them anything and everything that you were aware of regarding

3    criminal activity, correct?

4    A.  Correct.

5    Q.  Now, that was also after -- after you had this supposed

6    conversation on the way to the courthouse with Martin Ballard,

7    isn't it?

8    A.  That was afterwards.

9    Q.  Yeah.  Because --

10   A.  And --

11   Q.  -- your ride to the courthouse with Martin Ballard took

12   place on September the 12th of 2000 -- I believe it took place

13   on September the 12th of 2012?

14   A.  I can't remember.

15   Q.  I'm sorry, I was wrong about the date, it was September

16   the 14th of 2012 that you rode with Mr. Ballard to the

17   courthouse; at least that's what the Marshals Service records

18   reflect.

19   A.  Okay.

20   Q.  So that would have been several months -- that would have

21   been several months before March the 5th when you later gave

22   this statement, correct?

23   A.  Well, when you having those proffer meetings, sometimes an

24   hour, two or three, and there's certain details that you will

25   leave out.  And when you have other proffer meetings you can

GERNARDO CATO - CROSS-EXAMINATION

1    make up for it. So I can't sit here and say exactly if I

2    didn't mention anything about everything me and Martin said

3    back then, because it was so long, I'd have been locked up

4    almost four years now. But I did make mention of it in my

5    proffer meetings.

6    Q. Well --

7    A. I didn't -- if I didn't say anything exactly then, I know

8    I said it later.

9    Q. Well, there's no question about the fact that on February

10   the 6th of 2015 you told the Government about Martin Ballard.

11   That was your second proffer interview, wasn't it? February

12   the 6th of 2015?

13   A. That was my first with the DEA, if I'm not mistaken.

14   Q. Your first proffer interview took place on --

15   A. No, I'm talking about pertaining to the last charge I

16   plead guilty to.

17   Q. I understand, but your first proffer interview took place

18   on March the 15th of 2013, correct?

19   A. No, that wasn't my first.

20   Q. Well --

21   A. I talking about that's when I first saw the DEA, but I

22   done had prior meetings before then while I was out on bond.

23   Q. You didn't bother to tell the Government in that March the

24   15th, 2013 meeting, you didn't bother to tell them anything

25   about Martin Ballard and Jimmie Harris, correct?

GERNARDO CATO - CROSS-EXAMINATION

1    A.  I didn't know about Jimmie Harris until the end part of

2    2013.

3    Q.  You didn't tell him anything about Martin Ballard, even

4    though you've testified you knew about him as of September the

5    14th of 2012, right?

6    A.  When the prosecutor asked me the question about -- that's

7    the day we went to court, and that's when he told me what I

8    said he told me.

9    Q.  But you didn't tell the Government that in March of 2013,

10   did you?

11   A.  I can't remember exactly.

12   Q.  You also didn't bother to tell the Government about any of

13   this, anything you claim Mr. Ballard said or you claim

14   Mr. Harris said, you didn't bother to tell them anything about

15   that prior to your sentencing, and your sentencing was on

16   September the 12th of 2014, wasn't it?

17   A.  Yeah, I got sentenced 2012 to 2014.  That's when I got

18   sentenced.

19   Q.  And you were trying to do everything you could up until

20   that point in order to help yourself to get a lighter

21   sentence, weren't you?

22   A.  No, I wanted to make sure I didn't leave nothing from out

23   of my proffer that can come back and jeopardize everything

24   that I done told the Government.

25   Q.  Oh, so --

1   A.  And I didn't -- I didn't get the full story from Jimmie

2   Harris about the crime that he's involved in with Martin until

3   it had to have been like July or August of 2013.  So,

4   therefore, if I had a proffer meeting back in earlier March, I

5   didn't know -- I never seen Jimmie in March, I saw Jimmie

6   around the end part of 2013.

7   Q.  So what you're telling us and what you're telling Judge

8   Blatt is that you deliberately withheld that information until

9   February 2015?

10  A.  No, I didn't say I deliberately withheld information.

11  What I'm saying is I can't remember what all that I said.  In

12  March.

13  Q.  It's hard to keep track of things when you're not telling

14  the truth, isn't it?

15  A.  No, it's hard when you have other meetings speaking about

16  different issues.  Just like when I was explaining the story

17  with Jimmie was telling me what all take place, I left some

18  things out, but I just summed it all up.

19  Q.  Right.  But you don't deny the fact that it wasn't until

20  February the 6th of 2015 that you bothered to tell the

21  Government what you claimed Mr. Ballard said and what

22  Mr. Harris said.  That was the first time you told them,

23  wasn't it?

24  A.  No, that wasn't.

25  Q.  There is no record of you telling anything about this

GERNARDO CATO - CROSS-EXAMINATION

1    beforehand.

2    A.  I let them know -- I believe it was around September, the

3    same month I got sentenced, that I let them know everything

4    about what Jimmie told me.

5    Q.  So somehow, almost three years after you supposedly heard

6    Martin Ballard talk about this shooting, somehow you

7    miraculously remembered it.  Almost three years later?

8    A.  When you got Jimmie Harris in the holding cell in the unit

9    telling me everything, back in 2013.

10   Q.  Well, the real reason you didn't mention it, you didn't

11   mention it in 2013 when you spoke with the Government, when

12   you were trying desperately to help yourself, is because it

13   isn't true, isn't that right?

14   A.  No, that's not true.

15   Q.  And the real reason you --

16   A.  Repeat that again, you say the real reason what?

17   Q.  The real reason you didn't bother to tell anybody about

18   this when you met with the Government in 2013, March of 2013,

19   is because it wasn't true.

20   A.  What's not true?

21   Q.  What you've testified here to today.

22   A.  No, everything I said today here is true.  Like I said,

23   didn't get the full story from Jimmie until the end part of

24   2013.  The conversation me and Ballard had back in what, 2012,

25   I got the complete story from Jimmie back in 2013, which was

GERNARDO CATO - CROSS-EXAMINATION

1    past March.

2    Q.  And then what your claim is then is that you didn't bother

3    to tell the Government or Judge Norton or anyone, or DEA,

4    about what you claim Martin Ballard said in 2012 or what you

5    claim Jimmie Harris said in 2013, you didn't bother to tell

6    anyone until February the 6th of 2015, which is the only

7    report we've got.

8    A.  Well, I don't know why that's the only report you got, but

9    I've told everything pertaining to this matter around the end

10   part of 2013.  And I did make mention about Ballard earlier

11   proffer, I didn't have full details about this situation.  I

12   got the full details from Mr. Harris.

13   Q.  Well, the real reason you're here to testify is to try to

14   get your sentence reduced, isn't it?

15   A.  I never was promised a sentence reduction.

16   Q.  Well, that's why you're here though, isn't it?  That's why

17   you agreed to testify in order to hopefully get a sentence

18   reduction.

19   A.  I'm here because I proffered on it.  But nobody never told

20   me that I was going to get a sentence reduction.

21   Q.  No, but that's the reason you're here, you're hoping to

22   get one, aren't you?

23   A.  I would like to get one.

24   Q.  Just about anything to get a reduction from your 180-month

25   sentence, wouldn't you?

1    A.  Not anything.

2            MR. THEOS:  No other questions, Judge.

3            THE COURT:  All right, sir.

4            MR. PHILLIPS:  Nothing further, Your Honor.

5            THE COURT:  All right, sir, you may be excused.

6            MR. RICHARDSON:  Your Honor, the Government calls

7    Garrick Sanders.

8            THE CLERK:  State your name for the record.

9    A.  Garrick Sanders.

10       GARRICK SANDERS, a witness called by the Government, first

11   having been duly sworn, testified as follows:

12                          DIRECT EXAMINATION

13   BY MR. RICHARDSON:

14   Q.  State your name again for the record, Mr. Sanders.

15   A.  Garrick Sanders.

16   Q.  Given the fact that there are multiple Sanders here, I'm

17   going to refer to you by your first name; is that okay with

18   you?

19   A.  Yes, sir.

20   Q.  Tell us, Garrick, where you went to high school and what

21   kind of education you've got?

22   A.  Colleton County High School, I got a bachelor's in science

23   and an associate in science.

24   Q.  Where did you get your bachelor's in science from?

25   A.  South Carolina State.

GARRICK SANDERS - DIRECT EXAMINATION

1    Q.   When did you graduate?

2    A.   2012.

3    Q.   After you graduated, did you move back to --

4    A.   I went back to Walterboro, Roundo, South Carolina.

5    Q.   Roundo is sort of like a suburb of Walterboro?

6    A.   Little country area.

7    Q.   Little country town.  I'm not going to belabor a lot of

8    things, I just want to hit a few things, I want to focus on

9    June the 6th, all right?  But before June the 6th of 2013, you

10   were involved in the drug business in any way?

11   A.   Yeah, I used to sell a little marijuana.

12   Q.   When did you start selling marijuana and how long did you

13   deal?

14   A.   Probably from 2009 to -- I'm not sure, 2012.

15   Q.   Okay.  And did you use marijuana as well?

16   A.   Yes, sir.

17   Q.   When did you stop using marijuana?

18   A.   2012, after I graduated.

19   Q.   Did you ever use cocaine?

20   A.   No.

21   Q.   Why not?

22   A.   I just never used it.

23   Q.   In this case --

24        MR. RICHARDSON:  Put Exhibit 10 B up, Miss Baker.

25   Q.   When were you arrested in connection with this case?

1   A.  March 2000 -- I want to say '14.

2   Q.  Prior to your arrest in March of 2014, have you ever been

3   convicted of a felony offense?

4   A.  No, sir.

5   Q.  All right.  After you were arrested in March 2014, do you

6   see Government Exhibit 10 B in front of you there?  B as in

7   boy.  P as in Paul.  Excuse me, 10 P.

8   A.  Okay.

9   Q.  Do you see that in front of you?

10  A.  Yeah.

11  Q.  Do you recognize that?

12  A.  Yes, sir.

13          MR. RICHARDSON:  We go to page ten of that,

14  Miss Baker.

15  Q.  Is that your signature at the top of that page?

16  A.  Yes, sir.

17  Q.  And what is this plea agreement?  Is this your plea

18  agreement?

19  A.  Yes, sir.

20  Q.  Tell me what you understand this plea agreement to do.

21  A.  I would have time served for my charges and probation for

22  six years.

23  Q.  And as part of that plea agreement, what are you required

24  to do?

25  A.  Tell what I did.

GARRICK SANDERS - DIRECT EXAMINATION

1    Q.  And part of telling what you did, what are you required as

2    part of that telling to do?

3    A.  Tell the truth.

4    Q.  All right.  I'm going to talk to you primarily about the

5    events of June the 6th, 2013.  Before we do that, what is your

6    relationship with the Charles Sanders who is also part of your

7    case?

8    A.  My first cousin.

9    Q.  So prior to June the 6th of 2013, what did you know about

10   BJ Brothers?

11   A.  That I guess that he was an informant, or what, the

12   police, whatever.

13   Q.  He was working with law enforcement?

14   A.  Yeah.

15   Q.  And who was he providing information on?

16   A.  I guess everybody.

17   Q.  On the morning of June the 6th of 2013, tell me just

18   briefly sort of how that morning started out, who did you see

19   first thing?

20   A.  I believe -- I want to say it was -- it was Charles and my

21   uncle.

22   Q.  Okay.  And who were you living with at the time?

23   A.  My Uncle Montey.

24   Q.  And how long after you woke up did you see Charles?

25   A.  I -- it woke me up.

GARRICK SANDERS - DIRECT EXAMINATION

1    Q.  After Charles left that morning, where did you go?

2    A.  After Charles left -- I want to say I went to the -- the

3    lawnmower shop, to check on one of my dirt bikes.

4    Q.  When you say lawnmower shop, tell me generally where that

5    is.

6    A.  On 15, right by Mighty Cougar Drive.

7    Q.  Is that pretty close to Oswald Court where Tony Bennett

8    lived?

9    A.  Yes, sir.

10   Q.  And the lawnmower shop you went to, tell me why you went

11   there, how frequently you went there, what you went and had

12   happening at that lawnmower shop.

13   A.  Okay.  I had a dirt bike, a couple of lawnmower tools

14   there that I received, and me and Ricky were pretty good

15   friends, I used to stop by and see him a lot.  And this week

16   here in particular I had my dirt bike getting my carburetor

17   cleaned out.

18   Q.  Ricky ran that lawnmower shop?

19   A.  Yes, sir.

20   Q.  All right.  After you left Ricky's lawnmower shop, where

21   did you go then?

22   A.  I went to Tony's.

23   Q.  And tell us who is Tony Bennett and how you know him.

24   A.  Just a fellow I knew from the country, from the country

25   area for a while.  And me and him always used to -- I used to

1    always go by his house and whatnot.

2    Q.  And how frequently would you go by his house?

3    A.  A couple times a week, man, you know, I stopped by when I

4    have nothing to do.

5    Q.  What kind of business dealings did you and Mr. Bennett

6    have?

7    A.  He used to call for marijuana, I used to sell him

8    marijuana.

9    Q.  Did you sell him anything other than marijuana?

10   A.  No.

11   Q.  What did you do at Mr. Bennett's house that day?

12   A.  Nothing, I just stopped by and talked to him for a little

13   bit and then I left.

14   Q.  Where did you go after you left Mr. Bennett's house?  What

15   time was that?  What time were you at Mr. Bennett's house

16   roughly?

17   A.  Had to be earlier that morning, around 10:00, 11:00, I

18   believe.

19   Q.  And where did you go then?

20   A.  After that I went to Cliff's Hot Dog Stand.

21   Q.  Who did you go to see at Cliff's Hot Dog Stand?

22   A.  Tina Caster.

23   Q.  And who is that?

24   A.  My girlfriend.

25   Q.  Y'all still together?

GARRICK SANDERS - DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  All right.  After you left -- How long did you stay at

3    Cliff's?

4    A.  Long enough to talk to her and I think eat some ice cream.

5    Q.  Then where did you go after that?

6    A.  I went to a girl name Sieta house.

7    Q.  And who is she, how do you know her?

8    A.  She was just another girlfriend.

9    Q.  While you were there, who did you get a call from?

10   A.  Charles.

11   Q.  And in general, what was the discussion about with

12   Mr. Sanders?

13   A.  He was asking me, he was asking me to go like go see -- go

14   over to Tony's house and what was going on over there.  And I

15   was like no.  I said no, I ain't doing that.  Asked him if he

16   had called my cousin Cash that get this -- the money for a

17   motorcycle.

18   Q.  Okay.  When you left, what time do you think you left

19   Sieta's house?

20   A.  I really don't know the time.  It was in the afternoon

21   though.

22   Q.  A little later in the afternoon?

23   A.  Yes, sir.

24   Q.  All right.  After you left Sieta's house did your cousin

25   Charles call you again?

1  A.  Yes, sir.

2  Q.  And tell me what you talked about in that conversation.

3  A.  He asked -- he was asking me why I wasn't -- was I home.

4  I like no, I ain't home, I'm on 95.  And he was like oh, oh,

5  oh, I thought you was at the house.  He said I got something I

6  need you to get.  And --

7          THE COURT:  He said he had somebody what?

8  A.  He had something he wanted me to get.

9  Q.  And what did y'all talk about then?

10  A.  Nothing.  I told him no, I ain't -- I ain't -- can't get

11  nothing, I'm on 95.  I was lying.

12  Q.  Did he tell you what he wanted you to come get?

13  A.  No, he said some -- he said it's some things he need me to

14  come get.

15  Q.  Okay.  And based on that conversation with him, where did

16  you go?

17  A.  After that I left Sieta's house and I went to my

18  grandfather's house, and I got them out of the car.

19  Q.  And where does your grandfather live?

20  A.  In Roundo.

21  Q.  You said you got them out the car.  Tell me where you went

22  and what you did.

23  A.  I went to my grandfather's house and I got the bag of guns

24  out of my -- out of a truck, a pickup truck.

25  Q.  All right.  And after you got the guns out of the back of

1  the truck -- Who had told you the guns were in the back of the

2  truck?

3  A.  That's where he told me he need me to get them things.

4  Charles.

5  Q.  Thank you.  And after you retrieved those guns, did you

6  recognize them?

7  A.  Yeah, I know the guns.

8  Q.  And how did you recognize them?

9  A.  Because I've shot them before.

10  Q.  What kind of guns were they?

11  A.  .357, and I think a .40 cal.

12  Q.  Once you picked up the guns, Garrick, where did you take

13  them?

14  A.  I took them to my brother's house and stashed them in the

15  garage.

16  Q.  And where is your brother's house, where does he live?

17  A.  Mt. Pleasant area.

18  Q.  Later that evening did you get another call from Charles

19  Sanders?

20  A.  Yeah, asking me to come get him.

21  Q.  Yes, sir.

22  A.  Um-hum.

23  Q.  And tell me what happened, when he called and asked you to

24  come pick him up, what did you go do?

25  A.  I went and picked him up.  I had to go pick up my -- pick

1    up my son also.

2    Q.  And when you went to pick up Mr. Charles Sanders, where

3    did you pick him up from?

4    A.  I can't recall, somewhere in Walterboro.  I don't

5    remember.

6    Q.  And after you picked Charles up, that evening, what did

7    Charles ask you about what you had done with the guns?

8    A.  He asked me what I did with them and I was like don't

9    worry about it, they gone.

10   Q.  Okay.  And what other conversations did you have with

11   Mr. Charles Sanders about those guns that evening?

12   A.  Not much.  None.

13   Q.  And who else was with you, you and Charles Sanders and who

14   else was in the car?

15   A.  I went and picked up my son.

16          MR. RICHARDSON:  Beg the Court's indulgence.

17   Garrick, if you answer any questions Mr. Theos might have, I

18   appreciate it.

19   A.  All right.

20                       CROSS-EXAMINATION

21   BY MR. THEOS:

22   Q.  Mr. Sanders, on March the 16th, 2015, you testified that

23   you entered into a plea agreement with the Government, is that

24   right?

25   A.  Yes, sir.

GARRICK SANDERS - CROSS-EXAMINATION

1   Q. On that same day, you were interviewed by the Government,

2   correct?

3   A. Yes, sir.

4   Q. And present at that interview was your lawyer, Mr. Lofton,

5   Lionel Lofton, right?

6   A. Yes, sir.

7   Q. And all three of these prosecutors, Mr. Kittrell, Mr.

8   Richardson and Mr. Phillips, correct?

9   A. Yes, sir.

10  Q. And at that time you understood that they wanted whatever

11  information you had regarding the shooting of Ivory Brothers,

12  correct?

13  A. Right.

14  Q. And you told them that you would provide whatever you knew

15  about the shooting, correct?

16  A. Correct.

17  Q. And you were truthful with them at the time, were you not?

18  A. Correct.

19  Q. At that time you told them that you first learned of the

20  plan to kill Mr. Brothers from your cousin, Charles Sanders,

21  correct?

22  A. Repeat that question.

23  Q. At that time when you met with them you told them that you

24  first learned about a plan to kill Ivory Brothers, you first

25  learned about it on either the evening of June the 5th, the

1  night before the shooting, or the morning of June the 6th, the
2  day of the shooting, correct?
3  A.  Correct.
4  Q.  And you heard about that plan from your cousin Charles
5  Sanders, correct?
6  A.  Correct.
7  Q.  You never spoke with Martin Ballard.
8  A.  I don't know Martin Ballard.
9  Q.  You don't know Martin Ballard?
10  A.  (Witness shakes head negatively.)
11  Q.  You never spoke with Martin Ballard on the phone?
12  A.  No.
13  Q.  And when Charles Sanders, your cousin, told you about this
14  plan, he didn't say it was Martin Ballard's plan, he just told
15  you about a plan, correct?
16  A.  He said his cousin.
17  Q.  Now, Charles, your understanding is that Charles drove
18  Jimmie Harris?  Were you aware of the fact that he drove
19  Jimmie Harris to the -- Mr. Bennett's for the shooting?
20  A.  Yeah, I don't know Jimmie Harris either.
21  Q.  But Charles told you, did he not, that he drove Jimmie
22  Harris to the shooting to shoot Mr. --
23  A.  He never said he drove Jimmie Harris.
24  Q.  After the shooting though, Charles asked you to help them
25  get rid of the guns that were used in the shooting, correct?

GARRICK SANDERS - CROSS-EXAMINATION

1    A.  He didn't say them, he said get rid of -- he asked me to

2    get rid of the guns.

3    Q.  So he didn't tell you about Mr. Harris either?

4    A.  I don't -- he didn't say -- he never told me Jimmie

5    Harris.  I don't know Jimmie Harris.

6    Q.  But he told you there was another person he drove to the

7    shooting and that had actually committed the shooting, did he

8    not?

9    A.  I told him I didn't want to know too much about the

10   shooting.  I didn't want to know too much.

11   Q.  But you knew that he wasn't the one who committed the

12   shooting.

13   A.  I could pretty much say that, yeah.

14   Q.  Now, you've pled guilty to -- you've pled guilty regarding

15   your involvement in this plan, this Charles Sanders plan to

16   kill Mr. Brothers, correct?

17   A.  I pled guilty to my part, yes, sir.

18          MR. THEOS:  No other questions, Judge.

19          MR. RICHARDSON:  Just briefly, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. RICHARDSON:

22   Q.  Garrick, when Mr. Theos was asking you questions, he said

23   that -- he asked you whose plan Charles Sanders told you it

24   was to kill BJ.

25   A.  Correct.

GARRICK SANDERS - REDIRECT EXAMINATION

1   Q.  Whose plan did Charles Sanders tell you it was?

2   A.  I can't say we had a conversation where he said it's his

3   plan or whose plan.  It was like a general understanding of

4   what was going on.

5   Q.  And whose plan did you understand it to be?

6           MR. THEOS:  I'm going to object to his understanding.

7           THE COURT:  I sustain that objection.  You have to

8   ask him that question another way.

9   BY MR. RICHARDSON:

10  Q.  Let me ask you a different question then.

11  A.  All right.

12  Q.  Garrick, what is the relationship between Charles Sanders

13  and Martin Ballard?

14  A.  I guess cousins.

15          MR. RICHARDSON:  Nothing further, Your Honor.

16          THE COURT:  All right, sir.  Anything further from

17  the defendant?

18          MR. THEOS:  Nothing, Judge.

19          THE COURT:  All right, you may be excused.

20          MR. PHILLIPS:  Your Honor, the Government would call

21  Charles Sanders as its next witness.

22          THE CLERK:  State your name for the record.

23  A.  Charles Sanders.

24      CHARLES SANDERS, a witness called by the Government, first

25  having been duly sworn, testified as follows:

1                    DIRECT EXAMINATION

2    BY MR. PHILLIPS:

3    Q.  Mr. Sanders, can you state your full name for the Court?

4    A.  Charles Sanders.

5    Q.  And I'm following my colleague's lead, because we have

6    other Sanders, I'm going to call you Charles; is that okay?

7    A.  Yes.

8    Q.  Okay.  How old are you?

9    A.  Twenty-five.

10   Q.  And where were you born?

11   A.  Walterboro.

12   Q.  Is that where you spent most of your life?

13   A.  Yes.

14   Q.  What kind of work have you done?

15   A.  Construction.

16   Q.  Is that the jobs you've held pretty much as long as you've

17   held a job?

18   A.  Yes.

19   Q.  And where did you finish in school?

20   A.  I never finished school.

21   Q.  Okay.  And you have your G.E.D.?

22   A.  Yes.

23   Q.  And you said you worked construction.  Have you ever been

24   involved in using or selling drugs?

25   A.  No.

1   Q.  Now, do you know Martin Ballard?

2   A.  Yes.

3   Q.  How do you know Martin Ballard?

4   A.  He's my cousin.

5   Q.  He's your cousin?  When did you first meet him?

6   A.  When I was about 16, 17, something like that.

7   Q.  Where did you meet him?

8   A.  Burr Hill.

9   Q.  Say that again?

10  A.  A road called Burr Hill.

11  Q.  Bird Hill?

12  A.  Burr.

13  Q.  Is it Bird or Burr?

14  A.  Burr.

15  Q.  B-U-R-R?

16  A.  Yes.

17  Q.  Burr Hill Road?

18  A.  Yes.

19  Q.  What connection do you have with Burr Hill Road?

20  A.  My family, my mom's there.

21  Q.  And what connection does Mr. Ballard have with Burr Hill

22  Road?

23  A.  His family.

24  Q.  Okay.  Have you ever -- during the time that you knew

25  Mr. Ballard from 16 on, did you know whether he sold drugs or

1   not?

2   A.  No.

3   Q.  You never seen him sell drugs?

4   A.  No.

5   Q.  All right.  What kind of cars did he drive during the time

6   you've known him?

7   A.  A Denali.

8   Q.  Any other cars?

9   A.  And a Benz.

10  Q.  Okay.  Have you ever been out to where Mr. -- Well, where

11  would you usually see Mr. Ballard?

12  A.  Burr Hill.

13  Q.  Burr Hill?  Did you ever see him anywhere else?

14  A.  Might have been to Summerville once or twice.

15  Q.  And where in Summerville?

16  A.  I don't know the name of the road, but I think it's Ancrum

17  Lane or something.

18  Q.  Okay.  And when you went out to -- what did you do when

19  you went to see him in Summerville on Ancrum Lane?

20  A.  Just see him.

21  Q.  Just hung out with each other?

22  A.  Not like hanging out, but just go over there because I was

23  in Summerville.

24  Q.  I gotcha.  Now, where did y'all hang out?

25  A.  On the road.

CHARLES SANDERS - DIRECT EXAMINATION

1  Q.  On the road?

2  A.  Yeah.

3  Q.  Where did y'all sit?

4  A.  Just like a little spot, we be under the tree.

5  Q.  Now, you also know Ivory Brothers, or BJ?

6  A.  Yes.

7  Q.  And how do you know BJ?  How -- Well, what do you call

8  him?

9  A.  His name BJ.

10  Q.  Okay.  And how do you know him?

11  A.  From Roundo, Walterboro, Burr Hill.

12  Q.  So same road?  Does everyone really hang out on Burr Hill

13  Road?

14  A.  Yes.

15  Q.  Okay.  And do you know BJ to sell drugs?

16  A.  I've seen him before.  I don't know -- I've never seen him

17  do it, but I've seen him underneath the tree.

18  Q.  Okay.  Now, at some point did you become aware of several

19  arrests that were happening in Walterboro related to drug

20  charges and --

21  A.  Yeah.

22  Q.  What did you learn about BJ's possible involvement in

23  those arrests?

24  A.  Twelve people got arrested, and they say he was the reason

25  for it.

CHARLES SANDERS - DIRECT EXAMINATION

1  Q.  And during that time did you run into Mr. Ballard?

2  A.  No, he got arrested.

3  Q.  Okay.  Did you see him after he got arrested when he was

4  out on bond?

5  A.  I believe so.

6  Q.  Tell the Court about that.  Where were y'all?

7  A.  I think we was at Leon's, I think.

8  Q.  What's Leon's?

9  A.  A club.

10  Q.  And what did he tell you about his arrest at Leon's?

11  A.  He just said he might have to go up the road for a little

12  while.

13  Q.  Okay.  And what did you understand that to mean, going up

14  the road a little while?

15  A.  He got -- he got in trouble with the law and he had to go

16  up the road for a little while.

17  Q.  Now, one moment please.  All right.  Do you know Anthony

18  Davis?

19  A.  I seen him before.

20  Q.  Okay.  And do you know him by a nickname?

21  A.  Yeah, they call him Boogaloo.

22  Q.  Okay.  And how do you know Anthony Davis or Boogaloo?

23  A.  He come on Burr Hill.

24  Q.  Have you ever seen Boogaloo with Mr. Ballard?

25  A.  Yeah.

CHARLES SANDERS - DIRECT EXAMINATION

1  Q.  Now, in 2013, were you contacted by Mr. Ballard or

2  Boogaloo or anybody regarding assisting them with anything in

3  2013?

4  A.  Yes.

5  Q.  Can you tell the Court about that, what was that contact

6  about?

7  A.  It was told give a guy a lift, give a guy a lift.

8  Q.  Okay.  Do you remember who contacted you first?

9  A.  It -- I can't even remember.

10  Q.  Okay.  But did you have discussions with Mr. Davis and

11  Mr. Ballard about doing that, giving someone a lift?

12  A.  Yes.

13       MR. THEOS:  Your Honor, I object.  He just testified

14  he couldn't remember who he spoke with, and now

15  Mr. Phillips --

16       MR. PHILLIPS:  I asked who he spoke to first.

17       MR. THEOS:  -- is giving him the answer he wants.

18       THE COURT:  Wait a minute now.

19       MR. PHILLIPS:  I asked who he spoke to first, who

20  first talked to him about it, and he said he couldn't

21  remember.  I said, did you have discussions about giving a

22  lift with Mr. Davis or Mr. Ballard.  That wasn't -- so that's

23  not the same question.

24       THE COURT:  I don't think it's the same question

25  either.

1    MR. PHILLIPS:  Yes.

2  BY MR. PHILLIPS:

3  Q.  Now, were there any discussions regarding why you were

4  giving him a lift?  This guy a lift?

5  A.  No, he just wanted me to show were somebody be at in

6  Walterboro.

7  Q.  Who was that somebody?

8  A.  BJ.

9  Q.  And at that time you knew that BJ was cooperating in this

10  federal case?

11    THE COURT:  You're trying to testify now.  You're

12  testifying.  Be better if you asked him the question.

13    MR. PHILLIPS:  Yes, sir.

14  BY MR. PHILLIPS:

15  Q.  Were you aware of BJ's cooperation at the time that you --

16  they asked you to take this lift?

17  A.  I didn't know everything, details in the case, I didn't

18  know if it was federal case, I didn't know nothing.

19    MR. PHILLIPS:  All right.  Let's go to the call.

20    Your Honor, we have two phone calls, the first one is a

21  little bit longer, but the second one a little shorter, but I

22  just want to let you know.

23  BY MR. PHILLIPS:

24  Q.  So this is a call from May 28th, 2013 at 21:38, 9:38 p.m.

25  If you listen to this call, I'm going to stop it, but if you

CHARLES SANDERS - DIRECT EXAMINATION

1   listen to it, I'm going to ask you some questions.

2          MR. PHILLIPS:  Your Honor, this is Exhibit 22 Z.

3      (Audio recording was played.)

4   BY MR. PHILLIPS:

5   Q.  Do you recognize the voices on that call?

6   A.  Yes.

7   Q.  Tell the Court who is on that call.

8   A.  That's me.  Ballard.

9      (Audio recording was played.)

10  Q.  When in that call Mr. Ballard states, "I got my little

11  people down my end though, but he probably going to need a

12  little lift down that side."  And you also talk about the

13  thing you holler to each other about.  What were you y'all

14  talking about?

15  A.  Giving the fellow a lift.

16  Q.  For what purpose?

17  A.  Ain't never told me.

18  Q.  Well, give him a lift to where?

19  A.  To show him where -- around where BJ be at.

20  Q.  Okay.  And when Mr. Ballard asked you, you don't have a

21  cell phone, and you said yeah, I got a cell phone, do you know

22  what phone was called?  How they reached you on this call?

23  A.  My grandfather's house.

24  Q.  So the land line?

25  A.  Yeah.

CHARLES SANDERS - DIRECT EXAMINATION

1  Q.  Okay.

2      (Audio recording was played.)

3  Q.  Now, when Mr. Ballard asked you where he was going to tell

4  you where the car was at, what did you -- was he talking about

5  a car?

6  A.  No.

7  Q.  What was he talking about?

8  A.  Wherever BJ be at.

9  Q.  And he talks about where Dawn used to live, and you

10  respond you knew where that was.  Where did Dawn used to live?

11  A.  Somewhere by the DMV.

12  Q.  Was it in a house, a trailer, apartment?

13  A.  Apartment.

14  Q.  Okay.

15      (Audio recording was played.)

16  Q.  When you said it was hard to see it, that was you that

17  said that?

18  A.  Yes.

19  Q.  Why was it hard to -- you said, "I'm straight to do," what

20  were you straight to do?

21  A.  Give the boy a lift.

22  Q.  And you said it's hard to see it.  Why was it hard to see

23  it?

24  A.  Because I been working.

25          MR. PHILLIPS:  Continue.

CHARLES SANDERS - DIRECT EXAMINATION

1    (Audio recording was played.)

2    Q.  And that's you that stated that you never talked to the

3    other fellow.  Is that right?

4    A.  Yes.

5    Q.  Who were you referring to?

6    A.  Boogaloo.

7    Q.  Okay.  And when you said no -- "ain't nobody never called

8    me.  Your cousin tell me he's supposed to call, but nobody

9    never called," you were talking about Boogaloo?

10   A.  Yeah.

11   Q.  And who is Boogaloo?

12   A.  Anthony Davis.

13        THE COURT:  Who did you say?  Boogaloo?

14   A.  Yes.

15   BY MR. PHILLIPS:

16   Q.  He's asking who was Boogaloo, he didn't hear your answer.

17   A.  Anthony Davis.

18        THE COURT:  All right.

19   (Audio recording was played.)

20   Q.  Is that you giving your phone number?

21   A.  Yes.

22   Q.  And that was the number you had at the time?

23   A.  Yes.

24   (Audio recording was played.)

25   Q.  When you said, "I can take off work if I know it's going

1    to happen," what were you talking about?

2    A.  If they need me to give the boy a lift.

3    Q.  And give the boy a lift to do what?

4    A.  To see where -- show him around the Walterboro.  Show him

5    around Walterboro.

6        (Audio recording was played.)

7    Q.  All right.  Now, after that phone call at your

8    grandfather's house, did you talk to Boogaloo or Anthony

9    Davis?

10   A.  I can't remember all the phone contact.

11       MR. PHILLIPS:  Let's go to another phone call on

12   June 5th, 2013, call 1915.  This is Exhibit 22 Q.

13       (Audio recording was played.)

14   Q.  What voices did you hear on the beginning of that?

15   A.  Me and Ballard.

16   Q.  Did you hear -- did you get -- catch enough of the third

17   voice?

18   A.  Huh-uh.

19   Q.  Okay.  That's fine.

20       MR. PHILLIPS:  Please continue.

21       (Audio recording was played.)

22   Q.  And that's Mr. Ballard that's saying that his people would

23   come down there -- down there that side and checked everything

24   out.  Did you know who he was talking about?

25   A.  No.

1    MR. PHILLIPS:  Okay.  You can continue.

2    (Audio recording was played.)

3  Q.  Now, Mr. Ballard references another -- his other little

4  partner coming down to chill and work with you and work on

5  that car for me.  Were you picking up anyone to go work on a

6  car?

7  A.  No.

8  Q.  Why was Mr. Ballard talking about working on a car?

9  A.  He was talking giving the fellow a lift to show him

10 Walterboro.

11 Q.  To just show him Walterboro, or were you looking for

12 someone?

13 A.  I wasn't looking for someone, just show him where somebody

14 might be.

15 Q.  Who was that somebody?

16 A.  BJ.

17 Q.  BJ?

18 A.  Yeah.

19    (Audio recording was played.)

20 Q.  Mr. Ballard references a race.  Were you going to be

21 involved with any race?

22 A.  No.

23    MR. PHILLIPS:  Okay.  Continue.

24 Q.  And again, were you going to work on any car with anybody?

25 A.  No.

CHARLES SANDERS - DIRECT EXAMINATION

1    (Audio recording was played.)

2    Q.  Is that Mr. Ballard says, "When everything's said and

3    done, you know what I'm saying," and then he goes on to say,

4    "You ain't got to worry about nothing ever, you see what I'm

5    saying, you dig where I'm coming from, right," what did you

6    understand him to mean?

7    A.  Just how he talk.

8    Q.  And what do you mean how he talked?

9    A.  That just how he talked, just was two people talking.

10   Q.  If you gave this ride -- if you did what you said you were

11   going to do, did you expect any help from Mr. Ballard?

12   A.  No, it was just like, you know, you do something for

13   somebody, that's just appreciation, I guess.

14   Q.  Okay.

15   (Audio recording was played.)

16   Q.  Again he talks about getting a car up and running.  You

17   weren't -- were you going to do anything regarding a car?

18   A.  No.

19   (Audio recording was played.)

20   Q.  So that call was on June the 5th.  What happened the next

21   day on June the 6th, 2013?

22   A.  That was the day of the shooting.  The day -- the --

23   that's the day of the shooting.

24   Q.  Well, tell us about the day of the shooting.

25   A.  I woke up, and I went to Charleston --

CHARLES SANDERS - DIRECT EXAMINATION

1    Q.  Let's slow down.  That's my fault.  Were you contacted by

2    anyone that morning or earlier that day?

3    A.  Yes.

4    Q.  Who contacted you?

5    A.  Boogaloo.

6    Q.  Boogaloo contacted you.  And what did Mr. Boogaloo tell

7    you?

8    A.  He just -- I think he was giving me a number or something.

9    Q.  So he gave you a number?

10   A.  Yes.

11   Q.  Did he give you any other directions?

12   A.  He told me where -- where to go find the boy, pick the

13   fellow up.

14   Q.  Where was that?

15   A.  By Gerald's.

16   Q.  In what city?

17   A.  Charleston.

18   Q.  Okay.  And what did you do next?

19   A.  I went to Gerald's.

20   Q.  Okay.  Did you find the person you were supposed to pick

21   up immediately?

22   A.  Yes.  Well, I passed the road, and then I called the

23   number and he said turn by Gerald's.

24   Q.  So you had to get some directions once you were out there?

25   A.  Yes.

1  Q.  And you picked somebody up?

2  A.  Yes.

3  Q.  Who did you pick up?

4  A.  Jimmie Harris.

5  Q.  All right.  And had you ever met him before?

6  A.  No.

7  Q.  And how did he introduce himself?

8  A.  Black, I think.

9  Q.  He called himself Black?

10  A.  I think.

11  Q.  Okay.  And when he got in the car, what did he tell you?

12  A.  When he got out the car?

13  Q.  When he got in the car.  I apologize.

14  A.  He just asked me, he said, "You strapped, right?"  And I

15  was like, "Yeah."

16  Q.  He asked if you were strapped?

17  A.  Yes.

18  Q.  What does that mean?

19  A.  Do I have a gun.

20  Q.  And did you have a gun?

21  A.  Yes.

22  Q.  What kind of gun did you have in the car?

23  A.  Smith and Wesson and a .357.

24  Q.  The Smith and Wesson, what caliber is that?

25  A.  Forty cal.

1    Q.  Semiautomatic?

2    A.  Yes.

3    Q.  And those are your guns?

4    A.  Yes.

5    Q.  And did he tell you why he wanted -- he asked you why you

6    had -- whether you had guns?

7    A.  He said because he can't go nowhere without a gun because

8    he got beef in the streets somewhere.

9    Q.  And then where did y'all go after you picked him up?

10   A.  Walterboro.

11   Q.  Did y'all talk on the way?

12   A.  No, he just like listened to the radio.

13   Q.  Where did you go in Walterboro?

14   A.  We went riding around first, then we went --

15   Q.  Well, let me back up.  Did you go to the apartments that

16   we talked about earlier?

17   A.  No.

18   Q.  Where did you go?

19   A.  Went riding around Walterboro, ended up Oswald Court.

20   Q.  And who lived there?

21   A.  Bennett.

22   Q.  And who is Mr. Bennett?

23   A.  Antonio Bennett.

24   Q.  And why did you end up at Oswald Court, why did you go

25   there?

CHARLES SANDERS - DIRECT EXAMINATION

1   A.  We were just riding around, that's a place that fellow be

2   at.

3   Q.  And who's the fellow?

4   A.  BJ.

5   Q.  BJ?  Okay.  And do you know how Mr. Bennett and BJ know

6   one another?

7   A.  They friends, I guess.

8   Q.  Okay.  Now, when you got to 98 Oswald Court, what

9   happened?

10  A.  We was pulling up, riding by, and BJ was on the step, and

11  guy asked me if that's the dude there.  And I say yeah.

12  Q.  Okay.  And do you recall what kind of car BJ was driving?

13  A.  He wasn't driving the car.

14  Q.  Okay.  Was there a car out front?

15  A.  Yes.

16  Q.  Do you recall anything about that car?

17  A.  Yes, a green car.

18  Q.  Okay.  So you saw Mr. -- you saw BJ on the steps?

19  A.  Yes.

20  Q.  All right.  And what happened after Mr. Harris asked if

21  you if that was the dude, what happened next?

22  A.  He told me to ride around.

23  Q.  Just to ride around, or --

24  A.  Yeah, to ride around, and then once we went around, he got

25  out, he asked where the guns was at, I told him, he took both

CHARLES SANDERS - DIRECT EXAMINATION

1   of the guns and he ran off.

2   Q.  And he walked off?  And when you said ride around, did you

3   leave Oswald Court and go somewhere else and --

4   A.  Well, it's all the same area, I don't know the roads.

5   Q.  That's fine.  So you stopped, he took the guns and he

6   left?

7   A.  Yeah.

8   Q.  And what happened, what happened next?

9   A.  Heard the gunshots.

10  Q.  All right.  And then what happened after you heard

11  gunshots?

12  A.  He came back, got back in the car.

13  Q.  Did he say anything?

14  A.  He said ride off.

15  Q.  All right.  Did he tell you how to drive off?

16  A.  No.  He just said ride out.

17  Q.  Okay.  What did he do with the guns?

18  A.  He sat on the floor.

19  Q.  Now, where did you go when you drove off?

20  A.  Went -- I was riding, and he called my cousin Rick, or he

21  called me, and he told me --

22  Q.  So you talked to your cousin Rick?

23  A.  Yeah.

24  Q.  What's his full name?

25  A.  Garrick Sanders.

CHARLES SANDERS – DIRECT EXAMINATION

1  Q.  Talked to him on the phone?

2  A.  Yeah.

3  Q.  And what did y'all talk about?

4  A.  He told me to take the guns to his -- to my aunt house.

5  Q.  Where is your aunt's house?

6  A.  Roundo.

7  Q.  Okay.  Did you take the guns to his aunt's house?

8  A.  I went there, but they was in the yard, so I went back and

9  I took them to my grandad house.

10  Q.  And what did you do with the guns at your granddaddy's

11  house?

12  A.  Put them in my truck.

13  Q.  And did you tell Rick, or Garrick, where the guns were?

14  A.  Yeah, I told him they was in the truck.

15  Q.  Okay.  Now, then where did you go after you dropped the

16  guns off?

17  A.  Took the guy back to Gerald's -- back to Dorchester Road.

18  Q.  And that's Jim Black -- excuse me -- Jimmie Harris?

19  A.  Yes.

20  Q.  Now, on the way back to North Charleston at Gerald's, did

21  you get any phone calls regarding the shooting?

22  A.  Yes.

23  Q.  Tell the Court about that.

24  A.  It was a bunch of different people calling.

25  Q.  Okay.  Did your father call you?

CHARLES SANDERS - DIRECT EXAMINATION

1    A.   Yes.

2    Q.   Did your girlfriend call you?

3    A.   Yes.

4    Q.   And from these calls did you -- did you get any

5    information about the shooting or --

6    A.   Said it was a shooting, my name came up.

7    Q.   Okay.  Now, what car were you driving that day?

8    A.   My Lincoln.

9    Q.   And what color is it?

10   A.   Burgundy.

11   Q.   And when you took Mr. Harris back to Gerald's, what

12   happened?

13   A.   He got up.

14   Q.   And then what did you do?

15   A.   Went back.

16   Q.   Went back to Walterboro?

17   A.   It was on my way back to Cottageville, and the police, I

18   talked to the police, police called on phone, and they told me

19   to meet him at Walterboro, and they stopped me in

20   Cottageville.

21   Q.   And what happened when they stopped you?

22   A.   They put me in the police car and they took my car.

23   Q.   And then did you meet with them at the police station?

24   A.   Yes.

25   Q.   When you met with the police at the police station, did

1    you tell them about the shooting?

2    A.  No.

3    Q.  Did you tell them that you were involved in the shooting?

4    A.  No.

5    Q.  Did you mention that you had driven Mr. Harris?

6    A.  No.

7    Q.  Okay.  What happened after they talked to you?  The

8    police.

9    A.  They let me go.

10         MR. PHILLIPS:  One moment, Your Honor, please.

11   Q.  You said the police took your car.  Did they take anything

12   else from you when they stopped you or when you met with them

13   at the police station?

14   A.  My cell phone.

15   Q.  Your cell phone?  And did that include the number that you

16   had given Mr. Ballard on that previous call?

17   A.  Yes.

18         MR. PHILLIPS:  Okay.  Please answer any questions

19   they might have of you.  Thank you.

20                      CROSS-EXAMINATION

21   BY MR. THEOS:

22   Q.  Mr. Sanders, you met with the Government on March the 19th

23   and the 23rd, is that right?

24   A.  I don't know the dates exactly, but I know I met with

25   them.

1    Q.  Twice?

2    A.  I can't remember how many times I done met with them.

3    When I was locked up once, twice, yeah, twice when I was

4    locked up.

5    Q.  And when was the last time you met with anybody, either

6    any of the agents, law enforcement or the lawyers for the

7    Government?

8    A.  Friday, I believe.

9    Q.  Just this past Friday?

10   A.  Yeah.

11   Q.  And what was the purpose of your meeting this past Friday?

12   A.  They said they wanted me to make sure I come and tell the

13   truth.

14   Q.  Did y'all go over your testimony?

15   A.  They just asked me some questions, and they told me

16   answer the questions truthfully.

17   Q.  Did they give you any information about what any other

18   witnesses had testified to?

19   A.  How you mean information?

20   Q.  Did they tell you what some of the other witnesses had

21   testified to during the trial up to that day?

22   A.  No.

23   Q.  You sure?

24   A.  You say they asked me something about the -- another

25   witness?

1  Q.  I'm asking you whether they told you anything about what

2  other witnesses may have testified to during the trial up to

3  that point.

4  A.  No.

5  Q.  Now, my understanding is that your grandmother and Martin

6  Ballard's grandmother, that they're sisters, is that correct?

7  A.  That's what I was told.

8  Q.  Okay.  You know that?  I mean, that's how you're related,

9  isn't it?

10  A.  Yeah, that's what I was told.  I don't know exactly, but

11  that's what I was told.

12  Q.  And that's what you believe.  That's what you believe the

13  relationship is?

14  A.  Yes.

15  Q.  Now, you spoke with Anthony Davis several times about the

16  plan to kill Ivory Brothers, did you not?

17  A.  We never talked about killing nobody.  Nobody never told

18  me to kill nobody.

19  Q.  When you met with the Government and DEA on the 19th and

20  the 23rd, did you not tell them that you spoke with Mr. Davis

21  several times about the shooting?

22  A.  We talk about giving somebody a lift, I didn't know it was

23  going to be a shooting.  Like I told the Government, I was

24  never told to kill nobody, and I was never told take nobody to

25  kill nobody.

CHARLES SANDERS - CROSS-EXAMINATION

1   Q.  All right.  But the only person that you had spoken with

2   up to that point in time was Anthony Davis, is that right?

3   A.  I talked to -- the phone conversation on the jail phone.

4   Q.  You never spoke with Martin Ballard about a plan to kill

5   Ivory Brothers, did you?

6   A.  I never spoke to nobody about a plan to kill Ivory

7   Brothers.

8   Q.  Now, on June the 6th you received a phone call from

9   Anthony Davis, is that right?  The day of the shooting.  That

10  morning, didn't you receive a phone call from --

11  A.  Yeah, he probably called me.

12  Q.  And the reason he called is because he wanted -- he wanted

13  to know where Brothers could be found, correct?

14  A.  The reason he called for me to give the lift, the lift to

15  the other fellow.

16  Q.  So the reason Anthony Davis called you was so that you

17  would give a ride and drive the other person, who ended up

18  being Jimmie Harris, so that you could give him a ride to

19  where Ivory Brothers was, correct?

20  A.  Not where he was, show him around, show him where Ivory

21  Brothers be.  We wasn't looking for him.  I was never told to

22  find Ivory Brothers, I was just supposed to show the boy

23  where -- what places he be at.

24  Q.  And that's what -- that was the purpose of Anthony Davis'

25  call to you, correct?

CHARLES SANDERS - CROSS-EXAMINATION

1    A.  Yes.

2    Q.  And you did pick up Jimmie Harris, right?

3    A.  Yes.

4    Q.  You didn't know Jimmie Harris before that?

5    A.  Huh-uh.

6    Q.  Never seen him before?

7    A.  Huh-uh.

8    Q.  Didn't talk with him about what -- about what the reason

9    was for you giving him a ride?

10   A.  Huh-uh.

11   Q.  Only thing you knew was that you were going to give him a

12   ride and show him around Walterboro.

13   A.  Yes.

14   Q.  Did he talk with you about the fact that he was looking

15   for Ivory Brothers?

16   A.  No.  Well, he -- we wasn't looking for nobody.  All I was

17   told to do was to show them around where Ivory Brothers be at.

18   That's all I was told to do.

19   Q.  So you knew he was looking for Ivory Brothers then,

20   because -- he told you he wanted to go to where Ivory Brothers

21   was.  Right?

22   A.  See where he be at.

23   Q.  Right.  And you knew at that point in time that he was at

24   Antonio Bennett's trailer, right?

25   A.  No.

CHARLES SANDERS - CROSS-EXAMINATION

1  Q.  At some point when you had an -- when you had Jimmie

2  Harris in the car, you found out that Brothers was at

3  Bennett's trailer though?

4  A.  No.

5  Q.  You just happened to drive up to Bennett's trailer and

6  Brothers happened to be there?

7  A.  Yes.

8  Q.  At that point though you realized that Harris was going to

9  shoot, or at least try to shoot Ivory Brothers.

10 A.  Not until he took the guns and started shooting.

11 Q.  Well, certainly after he got the guns from you and left

12 the car, you knew he was going to try to kill Ivory Brothers,

13 correct?

14 A.  Yes.

15 Q.  And the reason he was going to do that is because Ivory

16 Brothers, as you testified to earlier, Ivory Brothers was a

17 snitch, right?

18 A.  I never said a snitch.

19 Q.  Well, he was working for the Government as an informant or

20 something, correct?

21 A.  I know he had a couple people he told on, yes, but I never

22 said snitch.

23 Q.  And as you said in your earlier testimony, your

24 understanding at the time was that he had told on at least 12

25 people, and the 12 people had been arrested as a result of his

1   cooperation with law enforcement, correct?

2   A.  Yes.

3   Q.  So there were a lot of people that were upset with him?

4   A.  Yes.

5   Q.  A lot of people that were mad at him?

6   A.  Yes.

7   Q.  A lot of people that had reason to want to do harm to him,

8   right?

9   A.  Yes.

10  Q.  And Anthony Davis and Jimmie Harris were two of those

11  people, weren't they?

12  A.  I don't know.  At the time I didn't know, because I was

13  never told to hurt nobody, I never told to kill nobody, I was

14  only told to show the person around Walterboro.

15  Q.  I understand you didn't know before, but certainly after

16  the shooting you realized that Jimmie Harris, Jimmie Harris

17  was upset with Ivory Brothers and wanted him dead.  Right?

18  A.  Yeah, he took that on his own self to do that.

19  Q.  And you knew that Anthony Davis is the one that set it up

20  for you to give Jimmie Harris a ride to shoot Ivory Brothers,

21  right?

22  A.  Yes.

23          MR. THEOS:  No other questions, Judge.

24                      REDIRECT EXAMINATION

25  BY MR. PHILLIPS:

CHARLES SANDERS - REDIRECT EXAMINATION

1  Q.  So you talked to Mr. Davis about giving the ride to

2  Mr. Harris, right?

3  A.  Yes.

4  Q.  But you also talked to Mr. Ballard about picking up his

5  people and giving them a ride to Walterboro to show where BJ

6  would be at, right?

7  A.  Yes.

8  Q.  And that's what we -- these two calls were listened to

9  this afternoon, that's what you were speaking to Mr. Ballard

10  directly about.

11  A.  Yes.

12         MR. PHILLIPS:  Thank you.  No further questions.

13         THE COURT:  Any other questions?

14         MR. THEOS:  No, sir.

15         THE COURT:  You may be excused.

16         MR. THEOS:  Judge --

17         THE COURT:  Ten minutes.  How many more witnesses

18  have you got today?

19         MR. RICHARDSON:  One, Your Honor, Cedric Myers.

20         THE COURT:  And then how many will that leave you

21  tomorrow?

22         MR. RICHARDSON:  That will leave, I believe three,

23  Your Honor.  We would anticipate and we would wrap up before

24  lunch.  That's obviously dependent upon cross-examination, but

25  we would --

CEDRIC MYERS - DIRECT EXAMINATION

1    THE COURT:  I understand that.  Y'all go ahead.  How

2   many witnesses -- you told me ten or 12, didn't you?

3    MR. THEOS:  Judge, I have to look.  We've got ten or

4   12, I can't tell you at this point what order they'll be and

5   which -- there may be some or there may be a couple we may not

6   call.  We'll just have to talk about it.

7    THE COURT:  How long tomorrow -- if they finish by

8   lunch, what's your best estimate?  Now, you can't tell me, I

9   understand, what's your best estimate of the -- how long it

10  will take you?

11   MR. THEOS:  Judge, that depends on how many witnesses

12  we call.  But tomorrow is Tuesday, I don't know, anywhere from

13  two to four days, but maybe two.  It also may be four.

14   THE COURT:  Okay.  Thank you.

15   (A recess was held at this time.)

16   MR. KITTRELL:  Your Honor, we have Cedric Myers, but

17  we need to wait for Mr. Theos and Mr. Hammond.

18   THE CLERK:  State your name for the record.

19  A.  Cedric Myers.

20   CEDRIC MYERS, a witness called by the Government, first

21  having been duly sworn, testified as follows:

22              DIRECT EXAMINATION

23  BY MR. KITTRELL:

24  Q.  Good afternoon.

25  A.  How are you doing?

CEDRIC MYERS - DIRECT EXAMINATION

1    Q.  You're Cedric Myers?

2    A.  Yes, sir.

3    Q.  And you are a federal prisoner?

4    A.  Yes, sir.

5    Q.  What are you a federal prisoner for?

6    A.  For drug conspiracy.

7    Q.  For what?

8    A.  Drug conspiracy.

9    Q.  Now, we met a little while ago, you speak very fast, so if

10   you could slow things down, make sure you speak loudly.

11   A.  Yes, sir.

12   Q.  Where are you currently living?

13   A.  Mt. Pleasant, South Carolina.

14   Q.  And what are you doing there?

15   A.  I was living there -- I was going to sell drugs.

16   Q.  Okay.  You're going to -- you're going to have to speak

17   slowly and clearly between words, if you would.

18          THE COURT:  What are you doing in Mt. Pleasant?

19   A.  Sir?

20          THE COURT:  Where did you say you were living?

21   A.  Mt. Pleasant.

22   BY MR. KITTRELL:

23   Q.  Aren't you in a federal prison?

24   A.  Yeah, I'm a federal prisoner right now, yes, sir.

25   Q.  Where is that?

CEDRIC MYERS - DIRECT EXAMINATION

1   A.  Coleman.  Coleman, Florida.

2   Q.  And where are you from?

3   A.  Mt. Pleasant, South Carolina.

4   Q.  Where did you grow up?

5   A.  Mt. Pleasant.

6   Q.  And did you ever get in trouble with the law?

7   A.  Yes, sir.

8   Q.  Tell us when that first started.

9   A.  Happened in 1994.  I was arrested for misprision of a

10  felony, like accessory before and after the fact.  Accessory.

11  Q.  Accessory after the fact?

12  A.  Yes, sir.

13  Q.  And accessory after the fact of a murder?

14  A.  Yes, sir.

15  Q.  What did that case involve?

16  A.  A drug transaction that went bad.

17  Q.  And where was that?

18  A.  Happened on Charleston Heights.

19  Q.  In North Charleston, South Carolina?

20  A.  Yes, sir, North Charleston.

21  Q.  How old were you then?

22  A.  Seventeen.

23  Q.  Were you an active participant in the murder?

24  A.  No, sir.

25  Q.  What were you?

CEDRIC MYERS - DIRECT EXAMINATION

1    A.  Sitting in the car.

2    Q.  And did you go to prison for that?

3    A.  Yes, sir.

4    Q.  State prison?

5    A.  Yes, sir.

6    Q.  And after that did you get convicted of anything?

7    A.  Yes, sir.

8    Q.  What was that?

9    A.  I got sentenced to eight years in state prison.

10   Q.  And what was that for?

11   A.  Misprision of a felony.

12   Q.  Did you get in trouble with the law after that?

13   A.  Yes, sir.

14   Q.  And when?

15   A.  I came home December 1999, and I got in trouble in 2001.

16   Q.  For what?

17   A.  For drug charge and gun charge.

18   Q.  And where was that?

19   A.  North Charleston.

20   Q.  And who were the prosecutors for that?

21   A.  It was state charges at first.

22   Q.  And was it ultimately adopted federally?

23   A.  Yes, sir.

24   Q.  And you ended up signing a plea agreement back in 2002,

25   correct?

CEDRIC MYERS - DIRECT EXAMINATION

1    A.  Yes, sir.

2    Q.  And you went to prison for that?

3    A.  Yes, sir.

4    Q.  How much time did you serve?

5    A.  I served, all together, six years and ten months.

6    Q.  And you ultimately got out?

7    A.  Yes, sir.

8    Q.  Were you placed on supervised release?

9    A.  Yes, sir.

10   Q.  What happened then?

11   A.  After I got on supervised release, I came home, I got -- I

12   violated supervised release.

13   Q.  You did what?

14   A.  I violate my supervised release.

15        MR. THEOS:  Mr. Kittrell, could you ask him to speak

16   a little more slowly?  Because I'm catching about every other

17   sentence.

18   A.  Okay.

19   BY MR. KITTRELL:

20   Q.  Do me a favor, if you can just slow down, I know you speak

21   even faster than I do, but if you slow it down between words.

22   A.  Okay.

23   Q.  Just --

24   A.  Yes, sir.

25   Q.  Because it's very hard to hear.

CEDRIC MYERS - DIRECT EXAMINATION

1   A.   Okay.

2   Q.   So you violated supervised release.

3   A.   Yes, sir.

4   Q.   What did you do to violate supervised release?

5   A.   I was serving -- went to Mt. Pleasant to meet someone.

6   Q.   You were in Mt. Pleasant to meet someone?

7   A.   Yes, sir.

8   Q.   And what happened?

9   A.   I was there serving some cocaine, just at the time the

10  cops was watching the area where I met him at.  And they saw

11  me up in my car, and they pulled us over.

12  Q.   They pulled you over?

13  A.   Pulled me over, um-hum.

14  Q.   And then after that did you have a court proceeding where

15  your supervised release was revoked?

16  A.   Yes, sir.

17  Q.   Did you go back to federal prison?

18  A.   Yes, sir.

19  Q.   How long did that last?

20  A.   I went back for 11 months.

21  Q.   And after that?  Did you get out?

22  A.   Yes, sir.

23  Q.   Where did you go when you got out?

24  A.   I went back to -- well, Huger at the time, I was in Huger.

25  Q.   In South Carolina?

CEDRIC MYERS - DIRECT EXAMINATION

1   A.  Yes, sir, South Carolina.

2   Q.  Did you get back in the drug business?

3   A.  Sure did.

4   Q.  Tell us about that.

5   A.  You know, I came home, I can't find a job or anything, I

6   start back selling drugs.

7   Q.  Where were you selling drugs?

8   A.  From Mt. Pleasant to North Charleston, all over.

9   Q.  And did you have different sources for those drugs?

10  A.  Yes, sir.

11  Q.  What drugs were you selling?

12  A.  Mostly crack and cocaine.

13  Q.  And do you know Mr. Ballard, Mr. Martin Ballard?

14  A.  Yes, sir.

15  Q.  How do you know him?

16  A.  I met through my ex-girlfriend.

17  Q.  Who was your ex-girlfriend?

18  A.  Dana.

19  Q.  How did y'all meet?  Not you and Dana, but you and

20  Mr. Ballard.

21  A.  She knew the type of life I was --

22  Q.  I'm sorry, what?

23  A.  She knew what I was doing as far as selling drugs, and she

24  said she had a friend, you know, that she could introduce me

25  to.

1   Q.  Do you remember when this was?

2   A.  It was like around about April 2011.

3   Q.  Okay.  And so did you ultimately meet Mr. Ballard?

4   A.  Yes, sir.

5   Q.  Tell us the circumstances of that meeting.

6   A.  She called him over to her house.

7   Q.  She called you over to --

8   A.  No, called Martin.

9   Q.  You're pointing to Mr. Ballard.

10  A.  Yes, sir, to her house.

11  Q.  And what happened?

12  A.  It was just about meeting and greet conversation, just

13  talk.

14  Q.  What is a meet and greet?

15  A.  Just get introduced.

16  Q.  Why were y'all talking like that?  Did you have a drug

17  deal then?

18  A.  No, sir, just conversation.

19  Q.  Just conversation.  Why didn't you have a drug deal then?

20  A.  Because we just wanted to get to know each other.

21  Q.  And did y'all get to know each other?

22  A.  Yeah, we talked for about -- for a little while.

23  Q.  Did y'all communicate after that?

24  A.  Yes, sir.

25  Q.  When was that?

1    A.  I might have called him probably about -- probably about

2    three weeks to a month later.

3    Q.  What did you do?

4    A.  I purchased --

5           MR. THEOS:  I'm sorry, I didn't hear what he said in

6    response to that question.

7    Q.  I asked you if you had communicated with Mr. Ballard after

8    that; did you?

9    A.  Yes, sir.

10   Q.  And tell us the circumstances of that communication.

11   A.  I called him back to the house.

12   Q.  Just like one word at a time.

13   A.  I called him back to the house.

14   Q.  You called his house?

15   A.  No, I called him, Martin, back to the house in

16   Summerville.

17   Q.  And what did y'all do?

18   A.  I told him I wanted to purchase.

19   Q.  All right.

20   A.  And he said okay.  Later on that day he called me with

21   directions on how to get to where he was at.

22   Q.  And he gave you directions to where he was at?

23   A.  Yes, sir.

24   Q.  Do you remember those directions?

25   A.  Yes, sir.

CEDRIC MYERS - DIRECT EXAMINATION

1   Q.  Where are they?  Where was he?

2   A.  I remember he was telling me to take like Bacons Bridge

3   Road.

4   Q.  You said Bacons Bridge Road?

5   A.  Yeah, Bacons Bridge Road to the corner of Dorchester Road.

6   Q.  Corner of Dorchester?

7   A.  Yes.

8   Q.  This is in North Charleston or Summerville?

9   A.  This is like Summerville, yeah.  And there's a stoplight,

10  a gas station on my right-hand side.

11  Q.  Wait.  A gas station --

12  A.  On the right-hand side.  Yeah, once I got a gas station

13  light to make a right turn, I made a right, and I was on

14  Dorchester Road.

15  Q.  You're on Dorchester?

16  A.  Yes, sir.  Travel until I see a Y in the road.

17  Q.  A Y?

18  A.  Yeah.

19  Q.  A split in the road?

20  A.  Split in the road, yes, sir.  And he told me take -- make

21  a right on the Y, and I be on Old Orangeburg Road.

22  Q.  And did he tell you where to go off of Old Orangeburg

23  Road?

24  A.  Yes, sir.

25  Q.  Where?

1  A.  I took Orangeburg -- name of the road is something crum, I

2  can't --

3  Q.  Something crum?

4  A.  Yeah.

5  Q.  How do you spell that?

6  A.  C-R-U-M, I want to say.

7  Q.  Something crum, but you don't remember the full name.

8  A.  Can't remember the full name, um-hum.

9  Q.  Then where on that road?

10 A.  I remember making a right turn down a dirt road.  And I

11 went to the -- once I make a right on the dirt road, I want to

12 believe it's the fourth -- fourth or fifth house on my

13 right-hand side.  I'm sorry, on my left-hand side.

14 Q.  And what did you see and what did you do?

15 A.  When I pulled up to the house, he was sitting in a white

16 truck.

17 Q.  Who is he?

18 A.  Martin.

19 Q.  And what was he doing?

20 A.  He was just sitting inside a white truck waiting for me

21 to --

22 Q.  He was sitting on a white truck?

23 A.  Sitting in a white truck.

24 Q.  And what type of truck was it?

25 A.  It's a white dually.

1   Q.  White dually?

2   A.  Yes, sir.

3   Q.  Did y'all have a conversation or do anything?

4   A.  I got in the truck with him, and we talked probably like

5   good five, ten minutes.  And I gave him $32,000 cash for a key

6   of cocaine.

7   Q.  When you say a key of cocaine, what exactly did you buy

8   from him?

9   A.  Eighteen ounces of crack, 18 ounces of coke.

10  Q.  So --

11  A.  Half.

12  Q.  Half a kilo of crack, 18 ounces?

13  A.  Yes, sir.

14  Q.  Half a kilo of powder?

15  A.  Yes, sir.

16  Q.  And had you arranged for that amount or that weight

17  earlier or prior to that meeting?

18  A.  Yes, sir, earlier that day.

19  Q.  And you paid $32,000 for it?

20  A.  Yes, sir.

21  Q.  And what did you do after that?

22  A.  I left there, went home, and, you know, went to sell it.

23  Q.  Okay.  Is that a high price or a low price?

24  A.  It was a pretty fair price, because at that time there a

25  key was going for like 34,000, so it was pretty fair price.

1  Q.  So why are you buying a half key of powder and half a key

2  of crack cocaine?

3  A.  Because half my clientele want crack --

4  Q.  Because what?

5  A.  Half my clientele want crack and half my clientele want

6  cocaine.

7  Q.  So why didn't you cook it yourself?

8  A.  Because I didn't want to cook.

9  Q.  Did you have any other meetings or transactions with

10  Mr. Ballard?

11  A.  Yes, sir.

12  Q.  Go ahead.

13  A.  We had two more transactions.  I called him on --

14  Q.  You called -- Slow down again, I'm sorry.

15  A.  I called him for the second time, and I met him at the CVS

16  pharmacy.

17  Q.  CVS pharmacy?

18  A.  Yes, sir.

19  Q.  Where was that?

20  A.  That's right there on Bacons Bridge and Dorchester on the

21  corner.

22  Q.  Close to where you had gone earlier?

23  A.  Yes, sir.

24  Q.  And so you met him there.

25  A.  Yes, sir.

CEDRIC MYERS - DIRECT EXAMINATION

1  Q.  And what did y'all do?

2  A.  I told him I want the same thing, and I asked him did he

3  know anyone that want --

4  Q.  What?

5  A.  Asked him -- I told him I wanted to buy the same thing I

6  bought the first time, and I asked him did he know anyone that

7  wanted to sell a pistol, a gun.

8  Q.  So you wanted to buy a gun from him?

9  A.  Yes, asked him did he know anyone, and he said he'd get

10  one for me.

11  Q.  And what happened?

12  A.  Called me back later on.

13  Q.  Is that that same day?

14  A.  Yeah, same day.  And I met him at the same house on the

15  same dirt road.  But that time he didn't have the gun at the

16  time, I just bought another key from him.

17  Q.  You bought what?

18  A.  I bought another kilo from him.

19  Q.  When you say the same thing, 18 ounces of crack --

20  A.  Yes.

21  Q.  -- 18 ounces powder?

22  A.  Yes, sir.

23  Q.  And you said you met at the CVS; was he in a particular

24  vehicle?

25  A.  Same white truck.

1  Q. The dually?

2  A. Um-hum.

3  Q. So you had the actual transaction for the 18 powder 18

4  crack, and the price was this time?

5  A. Same price, 32 and change.

6  Q. And then what did you do?

7  A. After I met him at his mom house --

8  Q. You said his mama's house?

9  A. Yeah, down the dirt road.

10  Q. Yeah.

11  A. I gave him same $32,000 cash, and he went his way, I went

12  my way.

13  Q. He went --

14  A. He went his way, I went my way.

15  Q. And you went your way. And you sold all of that?

16  A. Yes, sir.

17  Q. Did you have another transaction with him?

18  A. Yes, sir.

19  Q. Tell us about that.

20  A. On the third transaction he called me, told me that he had

21  a gun, what I asked for, he had what I asked for.

22  Q. Which was what?

23  A. The gun.

24  Q. And were y'all talking about drugs as well?

25  A. Yes, sir.

CEDRIC MYERS - DIRECT EXAMINATION

1  Q.  Did you call him or did he call you?

2  A.  He called me.

3  Q.  And did you talk about drugs?

4  A.  Not on the phone.  Once I got where we were going --

5  Q.  I'm sorry, repeat that again.

6  A.  Yes, sir.

7  Q.  Say that again; I couldn't understand you.

8  A.  Yeah, once we got through the next part, yeah.

9  Q.  Tell us what happened this third time.

10  A.  Okay.  He called me, told me that he had what I wanted.  I

11  told him I wanted the same thing, the same -- what I purchased

12  before, 18 ounces of crack, 18 ounces of cocaine.

13  Q.  Okay.

14  A.  And he gave me the same direction how to get to --

15  Q.  Gave you what?

16  A.  Directions.

17  Q.  Okay.

18  A.  Yes, sir.  How to get to the house that he was at.

19  Q.  And where was that?  Was that a different location?

20  A.  Yeah, different location.  It's right -- it was on the

21  same road, Old Orangeburg Road, but it was a house on a hill.

22  Like I said, this is my first time to the house.

23  Q.  First what?

24  A.  My first time ever to the house.

25  Q.  Okay.

1    A.  Yeah.

2    Q.  And what happened?

3    A.  I got there, he was sitting on the porch.  There's a

4    screen porch, like at the -- 18 ounces of crack, 18 ounces of

5    cocaine.

6    Q.  And what was the price this time?

7    A.  Same price.

8    Q.  Thirty-two?

9    A.  Yeah.

10   Q.  And what did you do?

11   A.  He had gun for me, too.  I gave him the money, I gave him

12   $200 for the gun.

13   Q.  So 32,000 and $200 for --

14   A.  The gun.

15   Q.  -- crack, powder and the gun?

16   A.  Yes, sir.

17   Q.  And then what happened?

18   A.  Went in the backyard to show that it worked.

19   Q.  Show how what worked?

20   A.  The gun.

21   Q.  What type gun was it?

22   A.  It was a .380.

23   Q.  Do you remember the manufacturer who made the gun?

24   A.  No, sir, I don't remember that.

25   Q.  Did you ever deal with him again?

1   A.  No, sir.

2   Q.  Why not?

3   A.  I got arrested.

4   Q.  What were you arrested for?

5   A.  For conspiracy I'm on now.

6   Q.  For conspiracy and what?

7   A.  For conspiracy now, for the drug charge I'm on now.

8   Q.  What you're in federal prison for now?

9   A.  Yes, sir.

10  Q.  And that is -- I'm sorry -- Do you recognize this?

11  A.  Yes, sir.

12  Q.  And that's your plea agreement from the 14th of May, 2012.

13  Correct?

14  A.  Yes, sir.  Um-hum.

15  Q.  And in that plea agreement it has you pleading to

16  possession of attempting to distribute 500 grams or more of

17  cocaine.

18  A.  Yes, sir.

19  Q.  With whom were you arrested?

20  A.  This is me, Dana Harris and Jamal McElveen.

21  Q.  Okay.  And this plea agreement has a cooperation

22  provision?  If we could maybe flip --

23      MR. KITTRELL:  I'm sorry, Your Honor, may I approach

24  the witness?

25  Q.  I'll give you a paper copy of it, might be easier to deal

CEDRIC MYERS - DIRECT EXAMINATION

1   with.

2   A.   Okay.

3   Q.   Do you recognize that?

4   A.   Yes, sir.

5   Q.   Is that your signature on the last page?

6   A.   Yes, sir.

7   Q.   And again, that's what you're serving federal time for,

8   why you're in Coleman right now?

9   A.   Yes, sir.

10  Q.   And that plea agreement requires you to cooperate,

11  requires you to be honest in your cooperation with the

12  Government?

13  A.   Yes, sir.

14  Q.   What happens if you're not honest in your cooperation?

15  A.   It's not valid.  I mean --

16  Q.   And then if you are cooperative, the Government can make a

17  motion for downward departure, or in your case, a reduction of

18  sentence?

19  A.   Yes, sir.

20  Q.   What's that based on?

21  A.   Excuse me?

22  Q.   What is that based on, if the Government is to make a

23  motion for you to reduce your sentence.

24  A.   If I cooperate.

25  Q.   And if you're honest?

CEDRIC MYERS - CROSS-EXAMINATION

1    A.  Yes, sir.

2    Q.  Truthful?

3    A.  Yes, sir.

4    Q.  And your assistance is substantial, correct?

5    A.  Yes, sir, um-hum.

6           MR. KITTRELL:  Can we have the Court's indulgence for

7    a second?

8           THE COURT:  All right.

9        (Discussion held off the record.)

10                      CROSS-EXAMINATION

11   BY MR. THEOS:

12   Q.  Mr. Myers.

13   A.  Yes, sir.

14   Q.  The first time you spoke with the Government about this

15   case was about a week and a half, two weeks ago?

16   A.  Yes, sir.

17   Q.  Since that time, how many people have you spoken with

18   about this case?  How many people from the Government's

19   office, from the -- or from DEA?

20   A.  None.

21   Q.  You haven't spoken with anybody since April the 24th?

22   A.  No, sir.

23   Q.  Now, you're a convicted drug dealer?

24   A.  Yes, sir.

25   Q.  You also were convicted, as you said, of being involved in

1    a murder, correct?

2    A.  Yes, sir.

3    Q.  And you also have convictions for drugs and possessing

4    guns, right?

5    A.  Yes, sir.

6    Q.  You violated your supervised release by selling drugs?

7    A.  Yes, sir.

8    Q.  And then after you were released from prison, you started

9    selling drugs again?

10   A.  Yes, sir.

11   Q.  So that's how you make a living, selling drugs, when

12   you're not in prison?

13   A.  Yes, sir.

14   Q.  And you're in prison right now?

15   A.  Yes, sir.

16   Q.  And you're here today to testify against Martin Ballard,

17   because you're trying to get your sentence of 120 months

18   reduced, right?

19   A.  Yes, sir.

20   Q.  You pled guilty in 2012 to the drug trafficking, right?

21   A.  Yes, sir.

22   Q.  You got a 120-month sentence.

23   A.  Yes, sir.

24   Q.  And you'll have to serve that entire ten years, possibly,

25   or 85 percent of that ten years, unless you testify here

1  today, right?

2  A.  No, sir.

3  Q.  Well, the reason you're testifying here today and the

4  reason you came forward two weeks ago or so, is to try to get

5  your sentence of 120 months reduced, right?

6  A.  No, sir.

7  Q.  Excuse me?

8  A.  No, sir.

9  Q.  You're just here as a good citizen?

10  A.  Yes, sir, trying to do the right thing.

11  Q.  All right.  You've got a history of doing the wrong

12  things.

13  A.  Yeah.

14  Q.  Right?

15  A.  Yes, sir.

16  Q.  So it's unlikely that at this point in your life you would

17  start to do the right thing, isn't it?

18  A.  It's time to change.  I could change anything.

19  Q.  I'm sorry?

20  A.  It's time to change.

21  Q.  And this is that time?

22  A.  Yes, sir.

23  Q.  You didn't think it was that time to change when you were

24  interviewed on July the 15th of 2011 by law enforcement on the

25  side of the road?  Wasn't a time to change then, was it?

CEDRIC MYERS - CROSS-EXAMINATION

1    A.  Yes, I mean, it was time to change then, too, but, you
2    know.
3    Q.  Well, since you said it was time to change, then it would
4    have been important to tell law enforcement, when you were
5    pulled over with Jamal McElveen, it would have been important
6    to tell them at that time about all of your involvement with
7    drugs, because that's what they were investigating, correct?
8    A.  Well, at that time when I got pulled over, they didn't
9    really question me about nothing about -- about no prior drug
10   activity.
11   Q.  You were arrested for drug trafficking on that day,
12   correct?
13   A.  Yes, sir.
14   Q.  And you agreed to cooperate on that day, correct?
15   A.  Not that day, no, sir, it wasn't that day, huh-uh.
16   Q.  I'm sorry?
17   A.  Not that day.
18   Q.  You didn't speak with law enforcement that day?
19   A.  Yeah, they spoke to me that day, but it wasn't about me
20   cooperating, yes, they just asked questions about where we was
21   coming from.
22   Q.  And you told them you were getting your drugs and y'all
23   were making a run from Texas, right?
24   A.  Yes, sir, we came from Texas, yeah.
25   Q.  I'm sorry?

CEDRIC MYERS - CROSS-EXAMINATION

1   A.   Yes, um-hum.

2   Q.   What did you say after that, I just didn't --

3   A.   I said yes, sir.

4   Q.   You and Jamal McElveen were making a run to Texas to buy

5   cocaine.

6   A.   Yes.

7   Q.   And you and Jamal McElveen had made several runs to Texas

8   to buy cocaine.

9   A.   That was my first run right there.

10  Q.   Didn't you make another run before that, that you said you

11  didn't actually get any drugs?

12  A.   Yes, yes, sir, we didn't get anything, that's right.

13  Q.   So it was your second run to Texas, but it was the first

14  run you claim that you actually got the drugs?

15  A.   Yes, sir.

16  Q.   Is that right?

17  A.   Um-hum.

18  Q.   Now, that was on July the 15th of 2011.

19  A.   Yes, sir.

20  Q.   On August the 30th of 2011, you and Mr. Bybee, your

21  lawyer -- Mr. Bybee is here in the courtroom, isn't he?

22  A.   Yes, sir, he is.

23  Q.   You and Mr. Bybee met at the DEA office with DEA agents,

24  did you not?

25  A.   Yes, sir, we did.

1  Q.  And that was pursuant to your proffer agreement, wasn't

2  it?

3  A.  Yes, sir.

4  Q.  And pursuant to that proffer agreement, as Mr. Kittrell

5  pointed out, you agreed to be truthful regarding your

6  knowledge of drug activity, correct?

7  A.  Yes, sir.

8  Q.  And you told them everything you knew about drug activity,

9  didn't you?

10  A.  Yes, sir.

11  Q.  And you told them about a number of people that you were

12  involved in the drug business; in fact, you told them that you

13  were getting your drugs from Antonio in 2011, right?

14  A.  Yes, sir.

15  Q.  You told them that you were getting your drugs from

16  somebody by the name of Sylvester Doctor, who is also known as

17  Baby?

18  A.  Yes, sir.

19  Q.  You told them about -- and you told them that you were

20  getting drugs from a person by the nickname of Drice?

21  (phonetic)

22  A.  Yes.

23  Q.  And that Drice got his drugs from Jamar Rucker?

24  A.  Yes.

25  Q.  And Jamar Rucker is Hootie, Hootie and the Blowfish?

1  That's his brother?

2  A.  Jamar Ruckus?

3  Q.  Jamar Rucker, you told them that it was Hootie's brother.

4  A.  Yes, sir, yeah.

5  Q.  And you told them you were getting drugs from him, too,

6  right?

7  A.  Yes.

8  Q.  You also told him that you told the DEA and the Government

9  that you were getting drugs from somebody named Mike Clark

10  down in Florida.

11  A.  Yes.

12  Q.  You also told him you were getting drugs from a fellow by

13  the name of Damien Nelson, who was also known as Diamond?

14  A.  Yes, sir.

15  Q.  Is that right?

16  A.  Yes.

17  Q.  You gave them all this information because you agreed to

18  cooperate?

19  A.  Yes, sir.

20  Q.  You gave them all this information because you wanted to

21  help yourself, correct?

22  A.  Um-hum.

23  Q.  At no time whatsoever did you mention Martin Ballard's

24  name, did you?

25  A.  No, sir.

CEDRIC MYERS - CROSS-EXAMINATION

1  Q.  And the reason you didn't mention Martin Ballard's name is

2  because you hadn't gotten any drugs from Martin Ballard,

3  correct?

4  A.  No, sir, the reason why I didn't mention his name is

5  because I was trying to protect my ex-girlfriend.

6  Q.  Oh, I see, you decided to give them names of six other

7  people you got drugs from, just not Martin Ballard.

8  A.  Yes, sir.

9  Q.  Now, you said that -- Let's see, you got out of prison in

10  2009?

11  A.  Yes, sir.

12  Q.  August of 2009?

13  A.  Yes, August, um-hum.

14  Q.  You went back to prison in December of 2009?

15  A.  Yes, sir.

16  Q.  You didn't stay out very long though, because you were

17  released about a year later, on November the 1st of 2010?

18  A.  Yes, sir.

19  Q.  And then three months later --

20  A.  Three months?

21  Q.  Approximately three months later you started selling drugs

22  again?

23  A.  Well, (unintelligible.)

24  Q.  I'm sorry?

25  A.  It was a little before then.

CEDRIC MYERS - CROSS-EXAMINATION

1    Q.  A little before March of 2011?

2    A.  Yes, sir.  When I came home.

3    Q.  So you were released on November the 1st of 2010.

4    A.  Yes.

5    Q.  And you told the agents and the Government that you began

6    selling again in March or April of 2011, but your testimony

7    today is that it was actually a little sooner than that?

8    A.  Probably a little sooner.

9    Q.  When would you say it was?

10   A.  Like November, came out November 2 -- it was probably like

11   after New Year's sometime.

12   Q.  I'm sorry?

13   A.  Like probably after New Year's.

14   Q.  So within 30 to 45 days you were selling drugs again?

15   A.  Yes, sir, um-hum.

16   Q.  After you were released from prison?

17   A.  Yes, sir.

18   Q.  Now, you were, as we talked about earlier, you were

19   arrested on the roadside on July the 15th of 2011.

20   A.  Yes, sir.

21   Q.  You also testified earlier that you were introduced by

22   Dana Harris?

23   A.  Yes, sir, um-hum.

24   Q.  She's the same woman that was in the car with y'all on

25   July the 15th?

CEDRIC MYERS - CROSS-EXAMINATION

1    A.  Yes, sir.

2    Q.  You testified that Dana Harris introduced you to Martin

3    Ballard in March or April of 2011?

4    A.  Probably April, yes, sir.

5    Q.  Okay.  And you testified that you had three drug dealings

6    with Martin --

7    A.  Yes, sir.

8    Q.  -- shortly after you met him.

9    A.  Yes, sir.

10   Q.  And those drug dealings then would have been in April or

11   May?

12   A.  Yes, sir.

13   Q.  Is that right?

14   A.  Yes, sir.

15   Q.  And you're certain about those dates?  I mean obviously it

16   wasn't after you got arrested, but they would have been in

17   April or May, shortly after you claim Dana introduced him to

18   you, right?

19   A.  Yes, sir.

20   Q.  And one of the things that you said you remembered was

21   that Martin was driving in a white dually truck, is that

22   right?

23   A.  Yes, sir.

24   Q.  And you remember that specifically?

25   A.  Yes, sir.

CEDRIC MYERS - CROSS-EXAMINATION

1    Q.  So if I told you that Martin didn't have a white dually

2    truck, Martin didn't own a white dually truck and Martin

3    didn't drive a white dually truck until after June, after June

4    the 16th of 2011, that would mean you're lying about him

5    driving a white dually truck --

6    A.  Well --

7    Q.  -- wouldn't it?

8    A.  I know what I saw him driving, so you know, yes, sir.

9    Q.  So if you're lying about Martin being in a white dually

10   truck, because he couldn't have driven it before July the

11   16th, because it was not owned by him or his mother before

12   that day, so if you're lying about that, you're lying about

13   the drugs that you claim you bought from Martin Ballard,

14   aren't you?

15   A.  I'm not lying, but I know what he was driving.  So --

16   Q.  So your testimony under oath is that Martin Ballard was

17   driving a white dually truck in April or May of 2011?

18   A.  Yes, sir.

19   Q.  And your testimony is that Dana Harris is the person that

20   introduced you?

21   A.  Yes, sir.

22   Q.  You're going to stick with that testimony?

23   A.  Yes, sir.

24   Q.  That's not true though, is it?

25   A.  It's true.

CEDRIC MYERS - CROSS-EXAMINATION

1    Q.  So if Dana Harris were to walk into this courtroom and

2    testify that that was not, in fact, the case, your testimony

3    would be that she was lying and not you?

4    A.  Yes, sir.

5    Q.  But you are the liar, you are the convicted drug addict,

6    you are the drug dealer, and you are the person that has the

7    only incentive to come in here and lie about this, aren't you?

8    A.  I mean, I'm a convicted drug dealer.

9    Q.  The only reason you're here is to try to get a lesser

10   sentence, isn't it?

11   A.  No, sir.

12   Q.  The only reason you're here is to try to help yourself,

13   isn't it?

14   A.  No, sir.

15          MR. THEOS:  I don't have any other questions, Judge.

16          MR. KITTRELL:  Nothing further, Your Honor.

17          THE COURT:  Is that your last witness?

18          MR. PHILLIPS:  Yes, sir.

19          THE COURT:  For today.

20          MR. PHILLIPS:  Yes, sir.

21          THE COURT:  We'll see you at 10:00 o'clock in the

22   morning.

23

24          (Court adjourned at 5:00 o'clock p.m.)

25

REPORTER'S CERTIFICATION

        I, Debra L. Potocki, RMR, RDR, CRR, Official Court
Reporter for the United States District Court for the District
of South Carolina, hereby certify that the foregoing is a true
and correct transcript of the stenographically recorded above
proceedings.




S/Debra L. Potocki
_____

Debra L. Potocki, RMR, RDR, CRR